| | |
|---|---|
| Ori Katz (CA. Bar No. 209561)<br>J. Barrett Marum (CA Bar No. 228628)<br>Matt Klinger (CA Bar No. 307362)<br>SHEPPARD, MULLIN, RICHTER &<br>HAMPTON LLP<br>Four Embarcadero Center, 17th Floor<br>San Francisco, CA 94111-4019<br>Telephone:   (415) 434.9100<br>Facsimile:   (415) 434.3947<br>Email:   okatz@sheppardmullin.com<br>        bmarum@sheppardmullin.com<br>        mklinger@sheppardmullin.com<br><br>*Counsel to Debtors and Debtors in Possession* | Debra I. Grassgreen (CA Bar No. 169978)<br>John D. Fiero (CA Bar No. 136557)<br>Cia H. Mackle (admitted *pro hac vice*)<br>PACHULSKI STANG ZIEHL & JONES LLP<br>150 California Street, 15th Floor<br>San Francisco, CA  94111<br>Telephone:   (415) 263-7000<br>Facsimile:   (415) 263-7010<br>E-mail:   dgrassgreen@pszjlaw.com<br>        jfiero@pszjlaw.com<br>        cmackle@pszjlaw.com<br><br>*Counsel to the Official Committee of Unsecured Creditors* |

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>PROFESSIONAL FINANCIAL INVESTORS, INC., *et al.*,<br><br>Debtors. | Case No. 20-30604<br><br>(Jointly Administered)<br><br>Chapter 11<br><br>**PLAN SUMMARY FOR INVESTORS** |

Attached as <u>Exhibit A</u> is a summary of the *Joint Chapter 11 Plan of Professional Financial Investors, Inc. and Its Affiliated Debtors Proposed by the Debtors and Official Committee of Unsecured Creditors and Supported By the Ad Hoc LLC Members Committee and the Ad Hoc DOT Noteholders Committee* filed concurrently herewith, which summary is intended for investors in Professional Financial Investors, Inc. and its affiliated debtors and debtors in possession.

**EXHIBIT A**

# PFI PLAN SUMMARY FOR INVESTORS

Professional Financial Investors, Inc. ("PFI") and its affiliates (the "Debtors") and the Official Committee of Unsecured Creditors appointed in the PFI bankruptcy case (the "UCC") have proposed a chapter 11 plan (the "Plan")[2] that is supported by the Ad Hoc LLC Members Committee and the Ad Hoc Committee of Deed of Trust Holders (together, the "Ad Hoc Committees" and, together with the UCC, the "Committees").

Even before the commencement of the Debtors' chapter 11 cases, the investor body organized itself to ensure that investors' interests are well-represented, and, through both the appointment of the UCC and the formation of the Ad Hoc Committees, investors of all types are ensured an active and representative role in the bankruptcy process. To this end, the Debtors and the Committees, through months of open cooperation, information gathering and negotiation for the benefit of all investors, have reached a global resolution aimed at: (i) mitigating the damage inflicted by the Debtors' Ponzi scheme; and (ii) developing a level playing field that treats all aggrieved investors fairly. This global resolution is embodied in the proposed Plan.

The key terms of the Plan are summarized below. Among other things, these terms will govern: (1) how claims against the Debtors are divided into classes in order of priority under the Bankruptcy Code; (2) how claims in each class will be treated; and (3) what becomes of the Debtors' assets and how they will generate cash for the benefit of investors and other creditors.

This summary is provided as an overview, and is not meant to provide all of the information investors should rely on when considering whether to vote to accept or reject the Plan. That information can be found in the "Disclosure Statement" available at www.donlinrecano.com/pfi.

## I. WHAT DOES THE PLAN PROPOSE?

The Plan generally provides for all of the Debtors' assets, including the Debtors' real properties and litigation claims against third parties, to be owned and governed by a single trust (the "PFI Trust"). The properties will be placed, either directly or indirectly, in an operating company called "OpCo" (short for Operating Company) which will, in turn, be owned by the PFI Trust, and managed by experts retained by the trustee of the PFI Trust (the "PFI Trustee"). Michael Goldberg will serve as the PFI Trustee. Additionally, a "Board of Volunteers" (composed of investors selected jointly by the three Committees) will have certain duties and rights as the PFI Trustee attempts to best monetize the PFI Trust's assets and pursues third party litigation claims.

Investors and other unsecured creditors of the Debtors will, in exchange for their allowed claims against any of the Debtors, become beneficiaries of the PFI Trust and will be entitled to distributions on their allowed claims (proportionally based on the total aggregate claims amount divided by the aggregate amount of cash available for distribution) from cash generated by the PFI Trust either directly or indirectly from (1) operation of the properties, (2) real estate sales, and (3) litigation recoveries.

---

[2] Capitalized terms not otherwise defined herein are used as those terms are defined in the Plan.

*Is this a "single pot" plan?* Yes. The Plan consolidates all of the Debtors' assets into the PFI Trust on the effective date of the Plan. Litigation claims will go directly into the PFI Trust. Real Properties and certain related assets will go into the OpCo, which will be 100% owned by the PFI Trust. After the Plan becomes effective, Creditors of any Debtor entity will treated as if they have a claim against the entire PFI enterprise. This is referred to in the Plan as "substantive consolidation."

*Is there a "premium" or other benefit provided to certain types of investors based on the type of investment they held?* No. Each investor's claim will be calculated in the same manner, without regard to the type of investment held, and each investor will receive a proportional recovery from the PFI Trust based on such investor's allowed claim amount (after netting and any clawbacks are taken into account).

*What Investors Can Expect:*

Some PFI investors invested in straight notes (the "Straight Noteholder Investors"). Others invested in deeds of trust ("DOT") on PFI property (the "DOT Noteholders"), and still others bought equity interests in PFI-managed LLCs or LPs (the "LLC/LP Investors"), or tenant-in-common interests.[3] Under the Plan, each investment, regardless of its form, will ultimately give rise to an "Investor Claim" which will be exchanged under the Plan for a beneficial interest in the PFI Trust. Because this was a Ponzi scheme, Investor Claims will be divided into (i) an "Investor Restitution Claim," and (ii) an "Investor Subordinated Claim," each of which will be calculated without regard to the type of investment held. *Section III, below, discusses the differences between these claims, provides additional information regarding how they will be calculated, and explains the Plan process for fixing such claims.*

*When will I need to file a proof of claim?* Instead of filing a traditional proof of claim, you will need to submit an "Investor Proof of Claim Form" **at the same time that you vote on the Plan** to formally declare that you are a creditor based on your status as an investor. The Investor Proof of Claim Form does **not** require you to fill in any claim amount. After FTI completes its reconciliation of the Debtors' books and records and bank accounts to determine accurate "netted" Investor Claims for each investor, there will be a process by which claim amounts are fixed.

*How do I vote on the Plan?* Your ballot, included with all of the Plan solicitation materials, lists a "gross" amount for your investments (the "Plan Voting Amount") based on the Debtors' records as of the beginning of the bankruptcy case. The Plan Voting Amount is not the "netted" Investor Claim on which your distributions will be based. Its purpose is solely to help calculate the votes for and against the Plan. The ballot explains how you can object to your proposed Plan Voting Amount if you disagree with the amount and seek a different amount solely for purposes of Plan voting.

---

[3] Generally, holders of tenant-in-common interests in real property owned by the Debtors are co-owners and not creditors.

***What is the "Contributing Claimants Enhancement Multiplier"?*** Investors have the option on their ballot to "contribute" lawsuits held in their personal name to the PFI Trust in exchange for an increase of each of their Investor Restitution Claims and Investor Subordinated Claims by 5%.

*Classification of Claims Under the Plan:*

The Bankruptcy Code requires all plans to: "classify" claims in different "classes" based on whether the claims have substantially similar legal rights. Under the Plan, Investor Claims are deemed "impaired" (*i.e.*, entitled to vote) and are classified in one of the following two classes:

| Class 4 | DOT Noteholder Claims[4] | Impaired |
|---|---|---|
| Class 5 | Non-DOT Investor Claims (*i.e.,* Claims of Straight Noteholder Investors and LLC/LP Investors) | Impaired |

As set forth above, the separate classification of the DOT Noteholder Claims is a legal requirement of the Bankruptcy Code but it does not mean DOT Noteholders will be treated differently. To the contrary, both DOT Noteholder Claims and Non-DOT Investor Claims will be provided with the exact same treatment under the Plan.

Holders of Investor Claims in Classes 4 and 5 will become beneficiaries of the PFI Trust and receive one "Class A PFI Trust Interest" for each dollar of their Investor Restitution Claim and one "Class B PFI Trust Interest" for each dollar of the Investor Subordinated Claim.[5]

*Beneficiaries of the PFI Trust Interests:*

The PFI Trust, through OpCo and any subsidiaries, will own all of the Debtors' assets and will operate, sell or otherwise dispose of those assets to generate cash, and will distribute that cash to "PFI Trust Beneficiaries" (*i.e.*, PFI investors along with non-investor creditors holding claims in Classes 4, 5 and 6). The PFI Trust also will own litigation claims against third parties and may generate cash through prosecution or settlement of those claims.

As the holders of Class A and Class B PFI Trust Interests, investors will be entitled to distributions from the PFI Trusts' assets as they are turned into cash either from property management operations, sales of property, or successful litigation outcomes.

---

[4] For Plan voting purposes, DOT Noteholder Claims are deemed to be in their own subclass on a property by property basis.

[5] There are other unsecured creditors of the Debtors that are not investors, such as vendors and others who have claims against one or more of the Debtors based on transactions other than investments in one of the PFI investment vehicles. These general unsecured creditors will also become beneficiaries of the PFI Trust, and are classified in a separate impaired class, Class 6, which will share equally, on a proportional basis, with the investors in Classes 4 and 5. Holders of Class 6 claims, however, will not be entitled to any Class B PFI Trust Interests.

Holders of Class A PFI Trust Interests must receive a 100% recovery before Class B PFI Trust Interests, representing the Investor Subordinated Claims, are entitled to any distributions.

***How much am I projected to receive on account of my Investor Restitution Claim/Class A PFI Trust Interests under the Plan?*** The Debtors are projecting that Investors will receive between **35%** and **50%** on account of their Investor Restitution Claims. THE PROJECTED RECOVERY IS AN ESTIMATE ONLY AND ACTUAL RECOVERIES MAY DIFFER.

***How much am I projected to receive on account of my Investor Subordinated Claim/Class B PFI Trust Interests?*** Investor Subordinated Claims can only be paid after Investor Restitution Claims are paid in full. As the Debtors do not estimate that Investor Restitution Claims will be paid in full, they are projecting that there will be no distribution on account of Investor Subordinated Claims.

## II. HOW DOES THE PLAN GET CONFIRMED?

The Plan has been proposed by the Debtors and the UCC, and is supported by both of the Ad Hoc Committees. However, it is ultimately the votes of investors and other creditors and the Bankruptcy Court that will decide whether the Plan is "confirmed."

### *Voting – Acceptance & Rejection of Plan:*

Impaired investor and creditor classes will be given the chance to vote to "accept" or "reject" the Plan. In order for an investor's vote to be counted, that investor must return a ballot by the deadline established by the Bankruptcy Court. A class of claims accepts the Plan if (i) more than one-half in the number of creditors within a class who vote on the Plan vote to accept the Plan **and** (ii) at least two-thirds in amount of aggregate claims in the class who vote on the Plan vote to accept the Plan.

Even if a class votes to "reject" the Plan, it can still be confirmed if additional requirements under the Bankruptcy Code, known as "cram down," are met. To "cram down" the Plan on rejecting classes of claims, there must be at least one class of claims that is impaired that votes to accept the Plan. The Debtors must also show that the classification scheme under the Plan does not "unfairly discriminate" and that the Plan is "fair and equitable." Here, all concerned have worked very hard to make sure these tests are met. Finally, the Plan must respect bankruptcy priority rules such that no junior claims or interests may receive a distribution until the non-accepting senior class is paid in full. This Plan complies with this rule.

***What am I voting on when I vote to accept or reject the Plan?*** Your vote relates to whether you approve of the overall compromise of a one pot plan in which investors are all treated equally regardless of the form of their investments, and the creation of the trust as the structure to hold and monetize the assets and make distributions to creditors. The projected recoveries are merely estimates of potential recoveries and could be lower or higher in actuality, so those should not be the focus of how to vote on the Plan. The alternative to the Plan as proposed is a chapter 7 liquidation. The Debtors and the

Committees believe that the recoveries in a chapter 7 liquidation will be less than the recoveries under the Plan. Accordingly, the Debtors and Committees believe the Plan is in the best interests of the investors and creditors.

*Confirmation by the Court:*

If the Court approves the Plan, the Plan will be deemed "confirmed." In order for the Plan to be confirmed, the Court must find that the Plan complies with the requirements of the Bankruptcy Code. The Court will also consider any objections to the Plan.

### III. HOW ARE INVESTOR CLAIMS BEING CALCULATED FOR DISTRIBUTION PURPOSES?

FTI is performing a reconciliation to determine the correct amounts for each investor claim, taking into account bankruptcy law that requires claims to be "netted" in a Ponzi situation. FTI will create a detailed reconciliation for each investor, which will be sent to each investor upon completion. As discussed above, Investor Claims will not be calculated as part of the process for voting on the Plan. This work will be completed later.

*What is a "Restitution Claim"?* At its most basic, the Investor Restitution Claim is the investor's netted claim -- the amount of cash an investor put into any PFI related investment at any time minus any cash pulled out from such investments or otherwise paid to that investor since January 1, 2007 (whether it was designated as interest, principal or other designation).[6] Some investors will have a netted Investor Restitution Claim of $0 if they took out more from PFI than they put in. No investor will have a negative netted claim.

*What is a "Subordinated Claim"?* An Investor Subordinated Claim is a claim for interest not included in the Investor Restitution Claim, calculated based on 7% interest, compounded annually, on the investor's principal investments from January 1, 2007 until July 26, 2020.[7]

*How do I know what my claim amounts are? Who is calculating these claims and when will they be calculated?* FTI is in the process of reconciling the Debtors' books and records with bank records to determine with precision each investor's transaction history, including: (a) the investor's "starting balance" at January 1, 2007 (the amount invested plus any accrued interest – assuming an investor's involvement went back this far); (b) the cash invested by such investor since January 1, 2007; (c) the cash received by that investor since January 1, 2007 (whether as a return of principal, an interest payment or other designation); and (d) accrued interest not received by the investor. These amounts will be used to calculate each investor's "Restitution Claim" and

---

[6] There are some nuances to the netting calculation if your investment predates January 1, 2007, and your netted Investor Restitution Claim may also include accrued interest *if it accrued before January 1, 2007*.

[7] In addition, the Investor Subordinated Claim will include amounts for clawbacks/avoidance actions that are recovered by the PFI Trustee from that investor, if any.

Case: 20-30604   Doc# 488   Filed: 03/21/21   Entered: 03/21/21 20:06:39   Page 7 of 10

"Subordinated Claim." If you disagree with FTI's reconciliation, you will have the right to seek a different claim amount and explain where the FTI reconciliation is in error. In almost all instances, you will not need a lawyer to engage in this initial dialogue about the calculation of your Investor Claim. FTI will likely not be finished calculating the Investor Claims prior to the Plan's voting deadline, but again, such netted claims are not necessary for voting on the Plan.

***What if I do not agree with FTI's calculation of my netted Investor Claim?*** If you do not agree with FTI's calculations, you will have an opportunity to state your disagreement. Thereafter, the PFI Trustee and his professionals will work with you to determine the correct amount in accordance with the procedures approved by the Bankruptcy Court. If the parties cannot agree, the Bankruptcy Court will make the final determination as to the amount of your claim.

***Shouldn't I know my claim amount before I vote on the Plan?*** There is no need to have your netted Investor Claim (which will be used for distribution purposes only) determined when you vote on the Plan. This is because Plan Voting will be done using the Debtors' records of your gross investment.

The Plan provides for the treatment of claims, notwithstanding their amount. The actual netted Investor Claim amounts will determine the proportional share an investor will receive as distributions under the Plan in relation to the claim amounts of other investors and creditors.

***What is a "Collateral Source Recovery"?*** The Plan provides that if you recover funds from other sources (outside the bankruptcy process) on account of losses represented by your Investor Claim, including proceeds of insurance, litigation, or settlements, that amount will be reduced, dollar-for-dollar, first from your Investor Subordinated Claim and if your Investor Subordinated Claim has been satisfied in full, then from your Investor Restitution Claim.

## IV. SPECIFIC INFORMATION FOR DOT NOTEHOLDERS

The Ad Hoc DOT Noteholders Committee conducted an investigation of DOT Noteholders' Deeds of Trust, including examining the public real property records and documentation obtained from numerous DOT Noteholders. The investigation revealed that PFI engaged in improprieties with respect to the DOT investments. The result of these improprieties is that the PFI Trustee may be able to have the DOT liens removed from title if it brought a lawsuit to do so (the type of lawsuit he would bring is called an "avoidance action").

***How could my liens be invalid or challenged in a legal action?*** Substantially all of the DOTS were either not continuously perfected (i.e., over time, the Debtors caused liens to be removed from title and then added back onto title) or suffer from other defects. The lack of continuous perfection makes the DOT liens subject to an avoidance action.

*What happens to my DOT under the Plan?* The Plan proposes a compromise of claims held by DOT Noteholders as follows:

> (1) DOT Noteholders will be treated as general unsecured creditors for purposes of distribution, the same as all other investors; and

> (2) the order confirming the Plan shall include provisions removing the liens of the DOT Noteholders from the record of the real properties effective thirty (30) days after entry of the confirmation order approving the Plan.

Any DOT Noteholder that wishes to challenge the removal of its lien shall file an objection with the Bankruptcy Court within twenty (20) days of the Plan's confirmation. Then, the Debtors or the PFI Trustee, as applicable, will file an avoidance action seeking to have the lien removed. While the avoidance action lawsuit is pending, the claim of the objecting DOT Noteholder shall be deemed to be a disputed claim. A disputed claim is not eligible for distributions under the Plan until the avoidance action is resolved.

*Is the Plan a good resolution for the DOT Noteholders?* Without the Plan compromise, the Debtors would be required to spend hundreds of thousands of dollars prosecuting avoidance actions against approximately 100 DOT Noteholders based on thousands of transfers involving thirty (30) properties. The avoidance actions would be necessary to clear title to the properties to facilitate sales of, or to refinance, the properties under the Plan. The compromise is in the best interests of all creditors, including DOT Noteholders, by saving the expense to the estates (and to the DOT Noteholders who would be the subject of litigation) of the litigation and avoiding the delay in distributions to investors and creditors such litigation would cause. In addition DOT Noteholders will recover from the single pot, which includes equity in properties not previously encumbered by their DOT.

## V. SPECIFIC INFORMATION FOR LLC/LP INVESTORS

*I am an LLC/LP Investor. What happens to my membership interests in the applicable LLC/LP Debtor?* Your interest in the applicable LLC or LP will be recharacterized as a Non-DOT Investor Claim, meaning it will be treated as if it always were debt owed rather than an equity interest. Under the Plan, all investors, including LLC/LP Investors, are treated equally as holding unsecured claims. Each investor's claim (including claims of LLC/LP Investors): (i) will be calculated in the same manner, without regard to the type of investment held; and (ii) will receive a proportional recovery from the PFI Trust based on the allowed netted Investor Claim amount. All LLC/LP Investors are classified in Class 5 under the Plan, are entitled to vote on the Plan, and will receive the same distributions as other investors as described in further detail above.

## VI. CONCLUSION

Case: 20-30604   Doc# 488   Filed: 03/21/21   Entered: 03/21/21 20:06:39   Page 9 of 10

The Committees, representing all investors, have worked tirelessly to ensure that the Plan being proposed to you meets their goals, from the outset of these cases, of treating investors equally and fairly. The Committees urge you to vote to accept the Plan.

SUBMITTED BY:

Dated: March 21, 2021

SHEPPARD MULLIN RICHTER & HAMPTON LLP

By  */s/ Ori Katz*
ORI KATZ
J. BARRETT MARUM
MATT KLINGER

Counsel for Debtors

Dated: March 21, 2021

PACHULSKI STANG ZIEHL & JONES LLP

By  */s/ Debra Grassgreen*
DEBRA GRASSGREEN
JOHN D. FIERO
CIA H. MACKLE

Counsel for the Official Committee of Unsecured Creditors