**THIS DOCUMENT IS NOT A SOLICITATION OF VOTES ON THE PLAN. VOTES MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. ALL OF THE INFORMATION IN THIS PROPOSED DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

Ori Katz (CA Bar No. 209561)
J. Barrett Marum (CA Bar No. 228628)
Matt Klinger (CA Bar No. 307362)
Gianna Segretti (CA Bar No. 323645)
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
(A Limited Partnership Including Professional
Corporations)
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4019
Telephone:     (415) 434-9100
Facsimile:      (415) 434-3947
Email:    okatz@sheppardmullin.com
          bmarum@sheppardmullin.com
          mklinger@sheppardmullin.com
          gsegretti@sheppardmullin.com

*Counsel to Debtors and Debtors in Possession*

Debra I. Grassgreen (CA Bar No. 169978)
John D. Fiero (CA Bar No. 136557)
Cia H. Mackle (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, CA  94111
Telephone:     (415) 263-7000
Facsimile:      (415) 263-7010
E-mail:         dgrassgreen@pszjlaw.com
               jfiero@pszjlaw.com
               cmackle@pszjlaw.com

*Counsel to the Official Committee of Unsecured Creditors*

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PROFESSIONAL FINANCIAL INVESTORS, INC., *et al.*,[1]<br><br><div align="right">Debtors.</div> | Chapter 11<br><br>Case No. 20-30604<br><br>(Jointly Administered)<br><br>**AMENDED DISCLOSURE STATEMENT FOR THE AMENDED JOINT CHAPTER 11 PLAN OF PROFESSIONAL FINANCIAL INVESTORS, INC. AND ITS AFFILIATED DEBTORS PROPOSED BY THE DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND SUPPORTED BY THE AD HOC LLC MEMBERS COMMITTEE AND THE AD HOC DOT NOTEHOLDERS COMMITTEE** |

---

[1] A complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses is attached as Exhibit 1 to the Plan (as defined herein).

**DISCLAIMER**

**THIS DISCLOSURE STATEMENT PROVIDES INFORMATION REGARDING *THE AMENDED JOINT CHAPTER 11 PLAN OF PROFESSIONAL FINANCIAL INVESTORS, INC. AND ITS AFFILIATED DEBTORS PROPOSED BY THE DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND SUPPORTED BY THE AD HOC LLC MEMBERS COMMITTEE AND THE AD HOC DOT NOTEHOLDERS COMMITTEE*, WHICH BANKRUPTCY PLAN THE PLAN PROPONENTS ARE SEEKING TO HAVE CONFIRMED BY THE BANKRUPTCY COURT. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES TO, AND CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR THE MERITS OF THE PLAN.**

**THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN DOCUMENTS RELATING TO THE PLAN. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN FOR ALL PURPOSES. ALL HOLDERS OF CLAIMS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.**

**THE STATEMENTS CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN. ALTHOUGH THE DEBTORS HAVE MADE AN EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE RECOVERIES UNDER THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT CERTAIN EVENTS DO OR DO NOT OCCUR.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR ANY OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER SUCH AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ALL PERSONS OR ENTITIES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE SPECIFIC PURPOSE FOR WHICH THE DOCUMENTS WERE PREPARED.**

**THE PLAN PROPONENTS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT MAY BE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER THE FEDERAL SECURITIES LAWS. STATEMENTS CONCERNING THESE AND OTHER**

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 2 of 158

MATTERS ARE NOT GUARANTEES AND REPRESENT THE DEBTORS' ESTIMATES AND ASSUMPTIONS ONLY AS OF THE DATE SUCH STATEMENTS WERE MADE AND INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES, AND OTHER UNKNOWN FACTORS THAT COULD IMPACT THE PLAN PROPONENTS' PLAN OR DISTRIBUTIONS THEREUNDER. IN ADDITION TO STATEMENTS THAT EXPLICITLY DESCRIBE SUCH RISKS AND UNCERTAINTIES, READERS ARE URGED TO CONSIDER STATEMENTS LABELED WITH THE TERMS "BELIEVES," "BELIEF," "EXPECTS," "INTENDS," "ANTICIPATES," "PLANS," OR SIMILAR TERMS TO BE UNCERTAIN AND FORWARD-LOOKING. CREDITORS AND OTHER INTERESTED PARTIES SHOULD ALSO REVIEW THE SECTION OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS THAT MAY AFFECT THE PLAN AND DISTRIBUTIONS THEREUNDER.

SMRH:4845-5321-0342.1
04J623

-iii-

732ZL-319169

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 3 of
158

# **TABLE OF CONTENTS**

**Page**

GENERAL OVERVIEW AND SUMMARY ................................................................ 1

I.     INTRODUCTION ............................................................................. 5

    A.    Overview of the Plan ..................................................................... 5

        1.    General Structure of the Plan ................................................ 5

        2.    Summary of Treatment of Claims and Equity Interests Under the Plan .... 6

    B.    Plan Voting Instructions and Procedures ......................................... 7

        1.    Voting Rights ....................................................................... 7

        2.    Solicitation Materials ........................................................... 9

        3.    Election on Investor Ballots to Contribute Certain Claims ...................... 11

        4.    Confirmation Hearing and Deadline for Objections to Confirmation ....... 12

II.    BACKGROUND ......................................................................... 12

    A.    Debtors' Organizational Structure and Real Property Assets ............... 12

    B.    Debtors' Ponzi Scheme ............................................................... 14

        1.    Initial Discovery of the Ponzi Scheme .................................. 14

        2.    Indictment of Louis Wallach and His Admissions of Guilt .................... 15

        3.    Further Confirmation of Debtors' Fraudulent Business Operations from FTI and Anticipated Litigation By the Unsecured Creditors' Committee ..................................................................... 16

    C.    Commencement of the Chapter 11 Cases .......................................... 17

III.   THE CHAPTER 11 CASES .......................................................... 19

    A.    First Day and Other Routine Orders and Employment Applications .................. 19

    B.    Use of Cash Collateral ................................................................. 20

    C.    Appointment of the Unsecured Creditors' Committee .......................... 21

    D.    Schedules and Statements of Financial Affairs ................................. 21

    E.    Claims Bar Dates ...................................................................... 21

    F.    Post-Petition Operations ............................................................. 22

    G.    Wallach Related Agreements ........................................................ 22

    H.    Denial of the U.S. Trustee's Motion to Appoint a Trustee or Examiner ............. 23

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 4 of 158

| | I. | Motion for Authorization to File Involuntary Bankruptcy Petitions Against Related Entities ........................................................................................... | 24 |
| | J. | Extension of Exclusivity Periods ......................................................................... | 25 |
| | K. | Motion for Approval of the Committee Agreement with the Ad Hoc Committees ......................................................................................................... | 25 |
| | L. | Pending Investigations/Proceedings..................................................................... | 26 |
| | M. | Plan Negotiations and the Settlement Under the Plan........................................... | 26 |
| IV. | | OVERVIEW OF PROVISIONS RELATING TO THE GLOBAL COMPROMISE AND SETTLEMENT SUPPORTING THE PLAN STRUCTURE................................ | 26 |
| | A. | Comprehensive Compromise and Settlement Under the Plan.............................. | 27 |
| | | 1. Substantive Consolidation Issues ............................................................ | 27 |
| | | 2. Ponzi Scheme Issues................................................................................ | 28 |
| | | 3. Proposed Settlement Relating to DOT Noteholder Claims ..................... | 30 |
| | | 4. Proposed Settlement Relating to PFI LLC Members .............................. | 32 |
| | | 5. Proposed Settlement Relating to TIC Interests ....................................... | 33 |
| | | 6. Provisions Relating to Avoidance Actions and Other Causes of Actions ...................................................................................................... | 33 |
| | B. | The Settlement Provisions in the Plan are Fair and Reasonable and in the Best Interest of All Creditors.................................................................................. | 34 |
| V. | | RISK FACTORS ...................................................................................................... | 35 |
| | A. | Parties May Object to the Plan's Classification of Claims and Equity Interests... | 35 |
| | B. | The Plan Proponents May Not Be Able to Obtain Confirmation of the Plan........ | 35 |
| | C. | The Conditions Precedent to the Effective Date of the Plan May Not Occur ....... | 35 |
| | D. | Claims Estimation and Allowance of Claims ....................................................... | 36 |
| | E. | Potential Pursuit of PFI Trust Actions Against Creditors and Others ................. | 36 |
| | F. | Risks Regarding Real Estate ................................................................................ | 37 |
| | G. | Securities Law Considerations.............................................................................. | 38 |
| VI. | | CONFIRMATION OF the PLAN ............................................................................. | 39 |
| | A. | The Confirmation Hearing..................................................................................... | 39 |
| | B. | Requirements for Confirmation of the Plan........................................................... | 40 |
| | C. | Best Interests of Creditors .................................................................................... | 41 |
| | D. | Feasibility .............................................................................................................. | 42 |
| | E. | Acceptance by Impaired Classes........................................................................... | 42 |

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 5 of 158

F.    Confirmation Without Acceptance by All Impaired Classes .............................43

    1.    No Unfair Discrimination .........................................................43

    2.    Fair and Equitable Test ...........................................................44

G.    Alternatives to Confirmation and Consummation of the Plan............................44

VII.    CERTAIN SECURITIES LAW CONSEQUENCES OF THE PLAN ............................44

    A.    General ........................................................................................................45

        1.    Status as Securities ..................................................................45

    B.    Exemption From Offer and Sale of Securities Act and Blue Sky Laws ..............45

        1.    Issuance of PFI Trust Interests under Plan...............................45

        2.    Securities Issued in Reliance of Section 4(a)(2) of the Securities Act, Regulation D and/or Regulation S ...........................................47

        3.    Resale of PFI Trust Interests After Plan Effective Date ..........................48

VIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN..................................................................................................................49

    A.    Certain U.S. Federal Income Tax Consequences of the PFI Trust ......................53

    B.    Consequences to Holders of Claims Generally ...................................................55

    C.    Consequences to PFI Trust Beneficiaries............................................................57

    D.    Withholding on Distributions, and Information Reporting ..................................60

IX.    RECOMMENDATION ........................................................................................62

## EXHIBITS & SCHEDULES

EXHIBIT A    Joint Chapter 11 Plan

EXHIBIT B    Corporate Organizational Chart

EXHIBIT C    Liquidation Analysis / Plan Recovery Analysis

EXHIBIT D    Non-Exclusive Description of Preserved PFI Trust Actions

SCHEDULE 1    Schedule of the Real Properties

SCHEDULE 2    Schedule of Excluded Parties

SCHEDULE 3    Schedule of Non-Investor First-Priority Lender Claims

SCHEDULE 4    Schedule of Properties Subject to DOT Noteholders' Deeds of Trust

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**THE EXHIBITS AND SCHEDULES ATTACHED TO THIS DISCLOSURE STATEMENT ARE INCORPORATED BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN**

# GENERAL OVERVIEW AND SUMMARY

This disclosure statement (the "Disclosure Statement") describes in detail the historical background that led to the bankruptcy cases of Professional Financial Investors, Inc. ("PFI") and its affiliated debtors and debtors in possession (collectively with PFI, the "Debtors"), explains what has happened in the months since the commencement of the Chapter 11 Cases, and sets forth the treatment of creditors in the *Amended Joint Chapter 11 Plan of Professional Financial Investors, Inc. and its Affiliated Debtors Proposed by the Debtors and Official Committee of Unsecured Creditors and Supported By the Ad Hoc LLC Members Committee and the Ad Hoc DOT Noteholders Committee* (as may be amended, the "Plan").[2]  This overview and summary highlights the main points discussed in the Disclosure Statement, and should be read in conjunction with the remainder of the Disclosure Statement and the Plan.  This general overview and summary is qualified by the express terms of the Plan.

**Further, provided herewith as a separate document is a brief summary of the Plan, together with statements of the Ad Hoc Committees in support of the Plan, which should be reviewed by all Investors and other parties in interest.**

Originally founded by Ken Casey ("Casey"), the Debtors comprise a group of related entities that directly or indirectly own, manage and/or otherwise control various real properties in California, including Marin and Sonoma Counties in Northern California.[3]  Although touted and marketed to Investors as a premier real estate investment and management firm, in fact, the business was nothing more than a "Ponzi scheme."  After the death of Casey in May 2020, new management was installed, and the Debtors' prior fraudulent scheme was uncovered.[4]

---

[2] A copy of the Plan is attached hereto as **Exhibit A**.  All capitalized terms used but not defined herein shall have the meanings provided to such terms in the Plan.

[3] Overall, the Debtors own either direct or indirect interests in approximately seventy (70) real property locations (collectively, the "Real Properties"), primarily consisting of apartment buildings and office parks.  A Schedule of the Real Properties is attached hereto as Schedule 1.

[4] The Debtors' history, prepetition operations, and circumstances leading to the Debtors' Chapter 11 Cases, including further facts relating to the Ponzi scheme perpetrated by Casey and his cohorts, are discussed further below in Section II.

Following the revelation of the massive Ponzi scheme and the resulting bankruptcy filings, the Plan Proponents, together with the Ad Hoc Committees, have worked diligently to maximize recoveries for the Debtors' Investors and other creditors. Since even before the commencement of the Chapter 11 Cases, the investor body has played a critical role by organizing themselves to ensure that Investors' interests are well-represented, and, through both the appointment of the Unsecured Creditors' Committee and the formation of the Ad Hoc Committees, Investors of all types are ensured an active and representative role in the bankruptcy process. To this end, the Debtors and the Committees, through months of open cooperation, information gathering and negotiation for the benefit of all Investors, reached a global resolution, embodied in the proposed Plan, aimed at: (i) mitigating the damage inflicted by Casey's (and others') having operated the Debtors as a Ponzi scheme; and (ii) developing a level playing field that attempts to treat all aggrieved Investors equally and fairly.

Significantly, the proposed Plan is a "single pot" plan, meaning that under the Plan, generally, all of the assets and liabilities of all Debtors and non-debtor affiliates will be pooled and consolidated for distribution purposes. This is legally referred to under the Plan as "substantive consolidation.[5] As a result of such substantive consolidation, among other things:

- Creditors of any Debtor entity are treated as if they have a claim against the entire PFI enterprise, rather than a particular Debtor.
- Any and all purported equity interests of an Investor in any Debtor shall be automatically cancelled and extinguished as of the Effective Date, and deemed and treated as Investor Claims of the Investor pursuant to the Plan, regardless of the pre-petition designations used by the Debtors and/or Investors.
- No certain type of Investors will receive a "premium" or other benefit based on the type of investment they held. Rather, each Investor's Claim will be calculated in the same manner, and each Investor will receive a proportional recovery from the PFI Trust based

---

[5] By way of example, if Entity A holds $100 of assets and owes $0 of liabilities, and Entity B holds $0 of assets and owes $100 of liabilities, and if those two entities are substantively consolidated, the resulting entity will hold $100 of assets and owe $100 of liabilities.

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 9 of 158

on such Investor's allowed claim amount, after netting and any clawbacks are taken into account as described in the Plan.

To effectuate distributions to Investors and other creditors, the Plan provides for the creation of the PFI Trust, which will own the Estates' assets (including indirectly owning the Debtors' Real Properties through an operating company, referred to as the "OpCo") and will sell or otherwise dispose of those assets to generate cash, and will distribute that (and other) cash to creditors (including to Investors). The PFI Trust also will own litigation claims against third parties and may generate cash through prosecution or settlement of those claims. Cash will be distributed by the PFI Trust to Investors and other creditors over time (as the PFI Trust collects on the PFI Trust Assets and the OpCo upstreams operating profits from and/or sale proceeds from the disposition of the Real Properties).

Critically, the Plan Proponents have ensured that creditors continue to have an advisory role in connection with certain key decisions that will be made by the PFI Trust by creating a board of volunteers ("BOV") to serve in connection with the PFI Trust. The proposed PFI Trustee (Michael Goldberg) has been jointly selected by the Unsecured Creditors' Committee and the two Ad Hoc Committees, and the three Committees are in the process of jointly selecting the members to serve on the BOV.

As further explained in the Plan Recovery Analysis included as part of **Exhibit C** attached hereto, the Debtors estimate the following recoveries for Investors and other general unsecured creditors under the Plan on account of such parties' Class A PFI Trust Interests: [6]

| Class 4 | DOT Noteholder Claims | 35%-50% of "netted" Claims |
|---------|----------------------|----------------------------|
| Class 5 | Non-DOT Investor Claims | 35%-50% of "netted" Claims |
| Class 6 | TIC Claims | 35%-50% of Allowed Claims |
| Class 7 | Other Unsecured Claims | 35%-50% of Allowed Claims |

---

[6] These estimated recoveries do not take into account potential proceeds of the PFI Trust Actions because such litigation recoveries are unpredictable and highly contingent. Among other things, although the Debtors believe that strong litigation claims may exist, the ability to collect any judgment on those claims remains unknown at this time. As such, the estimated recoveries set forth in this chart assumes recovery only on account of Class A PFI Trust Interests, and that the Class B PFI Trust Interests that comprise part of the Investor Claims will not receive any recovery.

SMRH:4845-5321-0342.1
04162l
732L-319169

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 10 of 158

*        *        *

        Investors will also receive additional consideration as set forth in further detail below and in the Investor Claims Special Provisions in Section 2.11.2 of the Plan.

        The Debtors understand the precarious financial position that many Investors are in as a result of the Ponzi scheme. The Plan Proponents, together with the Ad Hoc Committees, believe that the settlement reflected in the Plan, which is the result of extensive negotiations with significant Investor input, represents the best outcome of these unfortunate circumstances, and importantly, provides the best prospect for Investors and other creditors to receive distributions as soon as reasonably possible.

# I.

# INTRODUCTION

The Debtors in the above-captioned Chapter 11 Cases and the Unsecured Creditors' Committee hereby submit this Disclosure Statement pursuant to sections 1125 and 1126(b) of the Bankruptcy Code, in connection with the solicitation of votes on the *Joint Chapter 11 Plan of Professional Financial Investors, Inc. and Its Affiliated Debtors Proposed by the Debtors and Official Committee of Unsecured Creditors and Supported By the Ad Hoc LLC Members Committee and the Ad Hoc DOT Noteholders Committee* (as amended, modified, or supplemented from time to time pursuant to its terms, the "Plan"). A copy of the Plan is attached hereto as **Exhibit A**.[7] **Both the Ad Hoc DOT Noteholders Committee and the Ad Hoc LLC Members Committee support the Confirmation of the Plan.**

The purpose of this Disclosure Statement is to enable creditors (including Investors) whose Claims are Impaired under the Plan and who are entitled to vote on the Plan to make an informed decision when exercising their right to accept or reject the Plan. This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, their reasons for seeking protection under chapter 11 of the Bankruptcy Code, the course of these Chapter 11 Cases, and the anticipated disposition of the Estate Assets. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of Confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the Confirmation process and the voting and election procedures that creditors entitled to vote under the Plan must follow for their votes to be counted.

## A.     Overview of the Plan

### 1.     General Structure of the Plan

A bankruptcy plan is a vehicle for satisfying the rights of holders of claims against and equity interests in a debtor. Consummation of a plan is the overriding purpose of a chapter 11 case. Upon

---

[7] The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between the summary herein and the Plan, the Plan shall govern.

Case: 20-30604     Doc# 572     Filed: 04/16/21     Entered: 04/16/21 18:37:04     Page 12 of 158

confirmation and effectiveness, a plan becomes binding on the debtor and all of its creditors and equity interest holders.

In these Chapter 11 Cases, the Plan contemplates a restructuring of the Debtors and the Estate Assets into the PFI Trust and the OpCo operating company structure, and the orderly monetization and other disposition of Estate Assets through such structure. The Debtors' assets largely consist of direct or indirect interests in the Real Properties, Cash, and the PFI Trust Actions under the Plan. The PFI Trust Actions include, but are not limited to, Causes of Action, Avoidance Actions, Claims, remedies, or rights that may be brought by or on behalf of the Debtors or the Estates under chapter 5 of the Bankruptcy Code and related statutes or common law, as well as any other Claims, rights, or Causes of Action held by the Debtors' Estates, including, without limitation, Contributed Claims transferred and assigned to the Debtors and the PFI Trust as part of the Plan.

2.      **Summary of Treatment of Claims and Equity Interests Under the Plan**

The table below summarizes the classification and treatment of Claims and Equity Interests under the Plan.

THE PROJECTED RECOVERIES FOR CLAIMS IN CLASSES 4, 5, 6, AND 7 SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ACTUAL RECOVERIES MAY DIFFER.[8] FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE PLAN.

---

[8] *See* Plan Recovery Analysis included as part of **Exhibit C** attached hereto.

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 13 of 158

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | ENTITLED TO VOTE? | PROJECTED RECOVERY |
|---|---|---|---|---|
| None | Administrative Claims | Unimpaired | No | 100% |
| None | Professional Fee Claims | Unimpaired | No | 100% |
| None | Involuntary Gap Claims | Unimpaired | No | 100% |
| None | Priority Tax Claims | Unimpaired | No | 100% |
| Class 1 | Non-Investor First-Priority Lender Claims[9] | Impaired | Yes | 100% |
| Class 2 | Non-Investor Other Secured Claims[10] | Unimpaired | No | 100% |
| Class 3 | Priority Claims | Unimpaired | No | 100% |
| Class 4 | DOT Noteholder Claims[11] | Impaired | Yes | 35%-50% |
| Class 5 | Non-DOT Investor Claims | Impaired | Yes | 35%-50% |
| Class 6 | TIC Claims | Impaired | Yes | 35%-50% |
| Class 7 | Other Unsecured Claims | Impaired | Yes | 35%-50% |
| Class 8 | Subordinated Claims | Impaired | No (deemed to reject) | 0% |
| Class 9 | Equity Interests | Impaired | No (deemed to reject) | 0% |

**THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE RECOVERIES TO CREDITORS, AND IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR STAKEHOLDERS. THE PLAN ALSO IS THE PRODUCT OF THE PLAN PROPONENTS' EXTENSIVE NEGOTIATION WITH, AND IS SUPPORTED BY, BOTH THE AD HOC LLC MEMBERS COMMITTEE AND THE AD HOC DOT NOTEHOLDERS COMMITTEE. FOR THESE REASONS, THE PLAN PROPONENTS, TOGETHER WITH THE AD HOC LLC MEMBERS COMMITTEE AND THE AD HOC DOT NOTEHOLDERS COMMITTEE, URGE HOLDERS OF CLAIMS AND INTERESTS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN.**

### B. Plan Voting Instructions and Procedures

#### 1. Voting Rights

Under the Bankruptcy Code, only classes of claims or interests that are "impaired" and that are not deemed as a matter of law to have rejected a plan under Bankruptcy Code section 1126 are

---

[9] For voting purposes and to comply with Bankruptcy Code section 1122(a), each Allowed Non-Investor First-Priority Lender Claim shall be deemed to be in its own subclass. A listing of Non-Investor First-Priority Lender Claims is attached hereto as **Schedule 3**.

[10] For voting purposes and to comply with Bankruptcy Code section 1122(a), each Allowed Other Secured Claim shall be deemed to be in its own subclass.

[11] For voting purposes and to comply with Bankruptcy Code section 1122(a), Allowed DOT Noteholder Claims shall be deemed to be in their own subclass on a property by property basis. *See* Schedule 4 attached hereto.

SMRH:4845-5321-0342.1
04162

entitled to vote to accept or reject such plan. Any class that is "unimpaired" is not entitled to vote to accept or reject a plan and is conclusively presumed to have accepted such plan. As set forth in Bankruptcy Code section 1124, a class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified or altered by the proposed plan. Holders of claims or interests within an impaired class are entitled to vote to accept or reject a plan if such claims or interests are "allowed" under Bankruptcy Code section 502.

Under the Bankruptcy Code, acceptance of a plan by a class of claims is determined by calculating the number and the amount of allowed claims voting to accept such plan. Acceptance by a class of claims requires more than one-half of the number of total allowed claims voting in the class to vote in favor of the plan and at least two-thirds in dollar amount of the total allowed claims voting in the class to vote in favor of the plan; only those non-insider holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number that actually vote cast their Ballots in favor of acceptance.

Pursuant to the Plan, Claims in Class 1, Class 4, Class 5, Class 6, and Class 7 are Impaired by, and entitled to receive a Distribution under, the Plan, and only the Holders of Claims in those Classes that are Allowed Claims or have been deemed allowed for voting purposes are entitled to vote to accept or reject the Plan. Only Holders of Claims in the aforementioned Classes as of the dates specific in the Solicitation Procedures Order (the "Voting Record Date") may vote to accept or reject the Plan.

Pursuant to the Plan, Claims in Class 2 and Class 3 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

The Plan Proponents have determined not to solicit the votes of Holders of any Other Subordinated Claims in Class 8, and such Holders shall be deemed to have rejected the Plan and, therefore, such Holders are not entitled to vote on the Plan. Pursuant to the Plan, Equity Interests in Class 9 will not receive or retain any property under the Plan on account of such Equity Interests, and are therefore deemed to reject the Plan and are not entitled to vote on the Plan.

SMRH:4845-5321-0342.1
04162

732L-319169

### 2. Solicitation Materials

The Debtors, with the approval of the Bankruptcy Court, have engaged Donlin, Recano & Co., Inc. (the "Voting Agent") to serve as the voting agent to process and tabulate Ballots and to generally oversee the voting process. The following materials constitute the solicitation package (the "Solicitation Package"):

- This Disclosure Statement, including the Plan and all other Exhibits and Schedules thereto;

- The Bankruptcy Court order provisionally approving this Disclosure Statement (the "Solicitation Procedures Order") (excluding exhibits);

- The notice of, among other things, (i) the date, time, and place of the hearing to consider Confirmation of the Plan and related matters and (ii) the deadline for filing objections to Confirmation of the Plan (the "Confirmation Hearing Notice");

- One or more Ballots, to be used in voting to accept or to reject the Plan and, in the case of Investors the applicable instructions to vote and instructions for the following additional Ballot elections (the "Voting Instructions"): (i) to elect to contribute their Contributing Claims to the PFI Trust; and (ii) to either agree with the proposed amount of the Investor Claim FOR VOTING PURPOSES ONLY by taking no action with respect to the proposed Investor Claim amount listed on the Ballot, OR object to such proposed Investor Claim FOR VOTING PURPOSES ONLY pursuant to the Voting Instructions;[12]

- A pre-addressed, postage pre-paid return envelope; and

- Such other materials as the Bankruptcy Court may direct or approve.

The Debtors, through the Voting Agent, will distribute the Solicitation Package in accordance with the Solicitation Procedures Order. The Solicitation Package, exclusive of Ballots for Investors, is also available without charge at the Debtors' restructuring website at https://www.donlinrecano.com/Clients/pfi/Index.

On or before the date that is seven (7) days prior to the Voting Deadline (defined below), the Plan Proponents will File a Plan Supplement, which will contain additional information relating to the Plan and its implementation that you are encouraged to read, including, without limitation, the PFI Trust Agreement and a document further discussing certain tax implications of the Plan. As the

---

[12] The amount of the Investor Claim on the Ballot is for voting purposes only. Allowed Investor Claims for distribution purposes shall be established separately in accordance with the process and procedures described in the Plan, the Schedule of Allowed Netted Claims, and further order of the Bankruptcy Court.

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 16 of 158

Plan Supplement is updated or otherwise modified, it will be made available without charge at the Debtors' restructuring website at https://www.donlinrecano.com/Clients/pfi/Index.

If you are the Holder of a Claim and believe that you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent by writing to:

> Professional Financial Investors, Inc., *et al.*
> c/o Donlin, Recano & Co., Inc.
> P.O. Box 199043
> Blythebourne Station
> Brooklyn, NY 11219
> Toll Free: 1-877-283-0316
> Email: pfiinfo@donlinrecano.com

Copies of the Plan, Disclosure Statement, and other documents Filed in these Chapter 11 Cases (other than Ballots for Investors) also may be obtained free of charge at the Debtors' restructuring website at https://www.donlinrecano.com/Clients/pfi/Index.

You are encouraged to read all of the materials in the Solicitation Package in their entirety, including, without limitation, the Solicitation Procedures Order and the Voting Instructions for important information about how and when to cast your vote and special procedures for estimating the amount of your claim FOR VOTING PURPOSES ONLY, among other things.

**The deadline to vote on the Plan is [•], 2021 at 4:00 p.m. (prevailing Pacific Time) (the "Voting Deadline")**. In order for your vote to be counted, your Ballot must be properly completed in accordance with the Voting Instructions on the Ballot, and actually received no later than the Voting Deadline.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS. IT IS IMPORTANT THAT THE HOLDER OF A CLAIM ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

The Voting Agent will process and tabulate Ballots for the Classes entitled to vote to accept or reject the Plan and will File a voting report (the "**Voting Report**"). The Voting Report will, among other things, describe every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late, illegible (in

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 17 of 158

whole or in material part), unidentifiable, lacking signatures, lacking necessary information, or damaged.

**THE PLAN PROPONENTS, TOGETHER WITH THE AD HOC LLC MEMBERS COMMITTEE AND THE AD HOC DOT NOTEHOLDERS COMMITTEE, URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN BY THE VOTING DEADLINE.**

3.      **Election on Investor Ballots to Contribute Certain Claims**

The Ballots also permit each Investor - Holder of a Class 4 Claim or a Class 5 Claim, or Class 6 Claim if the Holder thereof makes the TIC Investor Treatment Election, to elect to assign its Contributed Claims to the PFI Trust. By electing such option on its Ballot, the applicable Investor agrees that, subject to the occurrence of the Effective Date and the formation of the PFI Trust, it will be deemed to have, among other things, assigned its Contributed Claims to the PFI Trust. Pursuant to the Plan, "Contributed Claims" are  all Causes of Action (1) that are legally assignable (including Causes of Action that are legally assignable solely because of the preemptive effect of the Plan) that an Investor has against any Person that is not a Released Party and that are related in any way to the Debtors, their predecessors, their respective affiliates, or any Excluded Parties;[13] and (2) for which a Contributing Claimant elects to contribute such Causes of Action on its Ballot. For the avoidance of doubt, the following are not Contributed Claims: (i) Causes of Action based upon loss of liens or lien priority, and (ii) Causes of Action by Investors against their own professionals, investment advisers, or investment managers related to their decision to invest in PFI, PISF or any of the LLC/LP Debtors or the handling of such investments; provided, however, that any recoveries on such Causes of Action shall be Collateral Source Recoveries, as provided and further described in the Plan.

---

[13] Such Causes of Action include those based on, arising out of, or related to: (a) the marketing, sale, and issuance of any investments related to the Debtors; (b) unlawful dividend, fraudulent conveyance, fraudulent transfer, voidable transaction, or other avoidance claims under state or federal law; (c) the misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; (d) any failure to disclose, or actual or attempted cover up or obfuscation of, any of the wrongful conduct described in the Disclosure Statement, including in respect of any alleged fraud related thereto; and (e) aiding or abetting, entering into a conspiracy with, or otherwise supporting torts committed by the Debtors or their agents,

SMRH:4845-5321-0342.1
04162
73ZL-319169

The Allowed Investor Claim for any such electing Investor will be enhanced by the Contributing Claimants Enhancement Multiplier (*i.e.*, the applicable Investor's Allowed Claim amount will be increased by 5%). Investors may also choose to make such election because aggregating all Contributed Claims and similar PFI Trust Actions may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner.

In the event a Holder intends to apply certain IRS safe harbor procedures relating to the deduction of losses realized by investors in certain fraudulent investment schemes (discussed more fully below in Section VIII(C)), the transfer by such Holder of a claim against a third party to the liquidating trust may affect the manner in which such safe harbor procedures can be applied. Accordingly, Holders are urged to consult with their own tax advisors regarding the potential tax consequences to them of transferring third party claims to the liquidating trust, including the effect of such transfer on the manner in which the IRS safe harbor procedures relating to the deduction of losses realized by investors in certain fraudulent investment schemes may be applied.

### 4. Confirmation Hearing and Deadline for Objections to Confirmation

Objections to Confirmation of the Plan must be Filed and served on the Plan Proponents and certain other entities, all in accordance with the Confirmation Hearing Notice, so that such objections are actually received by no later than **[•], 2021 at 4:00 p.m.** (prevailing Pacific Time). Unless objections to Confirmation of the Plan are timely served and Filed in compliance with the Solicitation Procedures Order, they may not be considered by the Bankruptcy Court. For further information, refer to Section VI of this Disclosure Statement, "Confirmation of the Plan."

## II.

## BACKGROUND

### A. Debtors' Organizational Structure and Real Property Assets

A corporate organizational chart showing the Debtors' organizational structure is attached hereto as **Exhibit B**.

The Debtor PFI is a privately held California corporation founded by Casey in August 1990. Casey served as its sole officer, director and shareholder until 1998, when he relinquished his corporate positions and placed his shares of PFI in an irrevocable trust (for which his ex-wife,

SMRH:4845-5321-0342.1
04162]
73ZL-319169

Charlene Albanese ("Albanese"), is the current trustee and lifetime income beneficiary).[14]  Despite these actions, the Debtors believe that Casey maintained complete *de facto* control over PFI until his death on May 6, 2020.  Casey founded PISF on or about November 1, 1983 and served as its sole shareholder, officer, and director from that date until his death.  The remaining Debtors were created at various times as special purpose entities to hold the Real Properties purchased by PFI and/or PSIF.

The Debtors own either direct or indirect interests in approximately 70 Real Properties, primarily consisting of apartment buildings and office parks.  A schedule of the Real Properties is attached hereto as **Schedule 1**.  With respect to PFI's and PISF's interests in the Real Properties: (i) PFI holds fee title to approximately 28 Real Properties, (ii) PFI purports to hold an equity interest that typically ranges from 30% to 40% (with certain limited exceptions) in approximately 30 California limited liability companies (collectively, the "LLCs") that themselves hold either fee title or an interest as a tenant-in-common in various Real Properties, (iii) PFI has a general partner interest in approximately 10 California limited partnerships (collectively, the "LPs") that themselves hold fee title to various Real Properties, (iv) PFI holds an interest as a tenant-in-common in approximately 2 Real Properties, and (v) PISF has a significant limited partner interest in the LPs.  PFI also serves as the property manager for all of the Real Properties, as well as the operational arm that manages and accounts for the Debtors' activities.

The Debtors believe that most of the Real Properties are subject to a first lien deed of trust in favor of a traditional third party bank lender.  In addition, many of the Real Properties were purported to be encumbered by a second lien deed of trust in favor of investors in one of the other Debtors (these purported second lien deeds of trust are fractionalized deeds of trust). In some instances, the Investors may assert that they have a first lien deed of trust.  As of July 2020, the aggregate outstanding debt secured by these first and second lien deeds of trust totaled more than $400 million.  In addition, the Debtors believe that PISF owes more than $275 million of principal

---

[14] He did so after pleading guilty in federal court to one count of conspiracy to defraud the federal government, five counts of tax evasion, 41 counts of bank fraud and five counts of filing false income tax returns.  Casey was, at that time, sentenced to 18 months in prison and three years of probation.  As a result of such prior fraud, Casey lost his standing as a Certified Public Accountant.

SMRH:4845-5321-0342.1
04162021
-13-
732L-319169

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 20 of 158

and estimated accrued and unpaid interest to Investors whose investments were purportedly secured by PISF's interest in the LPs.

## B. Debtors' Ponzi Scheme

### 1. Initial Discovery of the Ponzi Scheme

The Debtors believe that the initial discovery of financial irregularities after Casey's death related to the loans made by the PISF Straight Noteholders, which appear to have a current total outstanding principal balance of approximately $237 million. However, additional review has made it clear that virtually every other PFI-related investment vehicle was also impacted. One element of the fraudulent scheme involved having PISF Straight Noteholders loan money to PISF based upon assurances that their loaned funds would be used to make improvements to properties owned by PISF, pay off existing investors in PISF, purchase new real properties to be held by PISF, and to fund a reserve to cover PISF's debt service on investors' loans. While the loans made by PISF Straight Noteholders are ostensibly secured by PISF's interests in the LPs, the investigation into the Debtors' finances indicates this collateral is mostly exhausted and likely has been for some years. It is also unclear if any of these security interests were ever perfected. The properties owned by the LPs are subject to mortgages and junior deeds of trust that, based on current estimated values for those Real Properties, leave little or no equity in the individual LPs.

Further, the Debtors believe that a substantial amount of the funds invested by the PISF Straight Noteholders appear to have been used to (i) make interest payments to pre-existing PISF Straight Noteholders, (ii) make interest payments to the DOT Noteholders, (iii) convert PISF Straight Noteholders' principal and accrued interest into membership interests in PFI-managed LLCs, (iv) fund intra-company transactions with PFI that were effectively booked as payables and receivables, (v) make intra-company loans to LLCs for improvements and interest payments to PFI LLC Members, and (vi) enrich Casey and potentially others.

The Debtors' finances are such that, without accepting new investment or monies from PISF Straight Noteholders, neither PISF nor PFI had sufficient cash flow to meet their monthly interest obligations to the existing PISF Straight Noteholders or the DOT Noteholders, or pay promised quarterly returns to certain PFI LLC Members.

SMRH:4845-5321-0342.1
041623
73ZL-319169

### 2. Indictment of Louis Wallach and His Admissions of Guilt

Lewis Wallach ("Wallach") is the former CEO of PFI. On September 29, 2020, Wallach was indicted in a criminal investigation in connection with the Debtors' activities, and that indictment included one count of wire fraud, in violation of 18 U.S.C. § 1343, and one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. On December 16, 2020, Wallach presented a plea agreement to the Honorable Maxine M. Chesney, U.S. District Judge, in which he pleaded guilty on both counts.

According to his plea agreement, Wallach admitted that he was hired by Casey and that he was later named president and CEO of PFI. Wallach admitted that PFI and PISF Investors were told that the Investors' regular interest and distribution payments would be paid from income on the residential and commercial properties owned and managed by PFI. In fact, as Wallach admitted, he knew that PFI was not profitable and that income from the Real Properties was not sufficient to pay both interest and distributions. In fact, both Wallach and Casey knew that PFI and PISF had to raise new investments to pay existing Investors.

Wallach admitted that he lied to Investors, including falsely telling Investors that PFI had significant reserves to allow it to survive and expand during the economic downturn caused by the COVID-19 pandemic. He admitted that he conspired with Casey to mislead Investors and solicit Investor funds using false statements.

Wallach also admitted that he engaged in a years-long scheme to embezzle funds from PFI and PISF in which he took more than $26 million from 2015 until June 2020, including money he used for large investments, the purchase of real estate, and payment of personal expenses.

Under the plea agreement entered by Wallach and the United States Attorney's Office, Wallach agreed to the entry of an order by the court requiring him to pay restitution of no less than $26.7 million. Pursuant to the agreement, Wallach also agreed to continue to cooperate in the criminal investigation and to assist prosecutors with identifying, securing, and transferring any assets derived from or related to the charged offense.

### 3. Further Confirmation of Debtors' Fraudulent Business Operations from FTI and Anticipated Litigation By the Unsecured Creditors' Committee

The Debtors believe that, since at least January 1, 2007, Casey and Wallach operated a fraudulent scheme in which investors believed they were loaning funds to or investing in equity of the Debtors. However, in fact, a significant portion of those funds were used to service the debt owed to existing investors and to personally enrich Casey and Wallach. The fraudulent scheme only came to light upon Casey's death. Several months later, the vast majority of the Debtors entered bankruptcy.

On September 3, 2020, the Debtors then in bankruptcy retained FTI as their financial advisor. Since that time, an FTI forensics team has worked day and night to gather data, organize it, analyze it, and present its findings to the Debtors, the Unsecured Creditors' Committee, and others. Based on communications with FTI, the Debtors believe that FTI would offer the following expert opinions at any trial in this matter, among others:

- No later than January 1, 2007, the Debtors' business records and other available evidence presents attributes commonly seen in Ponzi schemes, and such attributes continued through Casey's death.
- Many Debtors had either negative equity or a disabling lack of liquidity that demanded the use of cash belonging to other related entities.
- The "debt service" and investment returns paid to investors could never have been paid without the use of new capital from new investors because the Real Properties were not sufficiently profitable to have done so.
- The Debtors' cash flows were commingled, and this commingling was a prevalent feature of the Debtors' operations.
- Casey and Wallach removed millions of dollars from the Debtors.

The Plan Proponents believe that a formal judicial Ponzi finding from this Bankruptcy Court will benefit the Debtors because it will be integral to future "netting" and claims allowance in the Chapter 11 Cases. It will also be one of the cornerstones of future clawback actions against persons who got more out of the Ponzi scheme than they put in. Similarly, a formal judicial Ponzi scheme

SMRH:4845-5321-0342.1
04162)

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 23 of 158

732L-319169

finding will benefit all Investors, as the finding will assist Investors with their U.S. federal income tax filings.

**C.  Commencement of the Chapter 11 Cases**

After Casey's death, the Debtors engaged new counsel, Ragghianti Freitas LLP ("Ragghianti Freitas"), to help transition the business.  Ragghianti Freitas learned troubling facts regarding PFI's financial condition, and Albanese directed them to conduct an investigation into the Debtors' finances and operations.  Upon learning of possible criminal behavior, Albanese directed the Debtors to inform certain government authorities, including the SEC, and to cease accepting any additional loans.  The SEC initiated its investigation on May 28, 2020.  Further, Ragghianti Freitas informed many of the Debtors' investors of the SEC's review via a communication sent to investors on June 4, 2020 (the "June 4 Communication").

In light of the malfeasance uncovered, in June 2020, Michael Hogan, a Managing Director with Armanino LLP ("Armanino"), was appointed as the Chief Restructuring Officer of PFI and PISF.  Shortly thereafter, PFI asked for and received the resignations of all of PFI's and PISF's officers, so that PFI and PISF could work unimpeded on a game plan for restructuring their finances and operations.

Shortly after receiving the June 4 Communication, various Investors ("investor group(s)") began coordinating their efforts and organizing and holding regular meetings (which consistently included hundreds of Investor participants).  Various Investors created a Joinit website and a Facebook page, in an effort to track down Investors.  Two *ad hoc* committees of investor groups were formed: The Ad Hoc LLC Members Committee and the Ad Hoc DOT Noteholders Committee.  By early July 2020, the investor groups grew to a few hundred Investor participants.  The investor groups were also integral in the process of interviewing and selecting Michael Goldberg, an experienced Ponzi scheme bankruptcy professional, to oversee the Debtors for the benefit of the Investors and other stakeholders.

On July 16, 2020, Jacque Achsen, Samuel Goldberger, Elizabeth Goldblatt, Arthur Indenbaum, Andrew Michaels, Mary Michaels, and Joel Rubenzahl, each of whom assert they are creditors of PISF, commenced an involuntary chapter 11 bankruptcy action against PISF, Case No. 20-30579 (the "PISF Case").  On July 26, 2020, PISF filed a consent to the entry of an order for

-17-

SMRH:4845-5321-0342.1
04162

73ZL-319169

relief in the PISF Case, entered by the Bankruptcy Court on July 27, 2020.

On July 26, 2020, PFI (together with PISF, the "Original Debtors") commenced its bankruptcy case, by filing a voluntary chapter 11 petition. On November 20, 2020, under authority granted by the Bankruptcy Court, PFI commenced involuntary petitions and consented to orders for relief against twenty-nine (29) LLC/LP Debtors (the "November 2020 Debtors"). On December 11, 2020, the Bankruptcy Court entered orders for relief against the November 2020 Debtors. Between February 3-4, 2021, PFI filed involuntary chapter 11 petitions against ten (10) additional LLC Debtors (the "February 2021 Debtors"), and the Bankruptcy Court subsequently entered orders for relief against these additional Debtors on February 18, 2021. All of the Debtors' Chapter 11 Cases are jointly administered under Case No. 20-30604.[15]

PFI was unable to commence before the filing of the Plan involuntary petitions against two other affiliates involved in the Ponzi scheme: Professional Investors 28, LLC and PFI Glenwood LLC. Through the Plan, the Plan Proponents seek to have these two affiliates substantively consolidated with the other Debtors, as discussed further herein and in the Plan.

Since the commencement of the Chapter 11 Cases, the Debtors have focused their attention on, among other things, (i) maintaining normal operations at their respective real property locations, (ii) responding to creditor inquiries about the Chapter 11 Cases, (iii) developing strategies to maintain the Debtors' operations in bankruptcy and preserve their assets, and (iv) conferring with key creditor constituencies regarding potential paths for resolving claims against PFI, PISF, and their affiliated entities.

During the pendency of the Chapter 11 Cases, the Debtors, the Unsecured Creditors' Committee, and the Ad Hoc Committees each strived to achieve a global settlement for the benefit of the Estates and all stakeholders. After extensive discussions and negotiations undertaken in good faith and at arms' length, the Debtors, the Unsecured Creditors' Committee, and the Ad Hoc

---

[15] An immediate effect of commencement of the Chapter 11 Cases was the imposition of the automatic stay under Bankruptcy Code section 362(a), which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by Creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors during the pendency of the Chapter 11 Cases. The automatic stay will remain in effect, unless modified by the Bankruptcy Court, until the Effective Date.

SMRH:4845-5321-0342.1
04162
732L-319169

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 25 of 158

Committees reached a settlement, the terms of which are incorporated into the Plan, as discussed more fully herein.

## III.

## THE CHAPTER 11 CASES

### A. First Day and Other Routine Orders and Employment Applications

The Debtors, as applicable, have filed motions and obtained approval for:

(i)     joint administration of the cases [Docket Nos. 12, 302 and 412];[16]

(ii)     payment to employees for prepetition obligations [Docket No. 186];

(iii)     maintenance of existing insurance policies and, in the LLC/LP Debtors' cases, approval of postpetition financing of certain insurance premiums [Original Debtors - Docket Nos. 48 and 187; LLC/LP Debtors - Docket Nos. 309, 353, 385, 455];

(iv)     determining adequate assurance of payment for utility services [Docket Nos. 189, 352 and 454]; and

(v)     authorizing maintenance of existing bank accounts and continuity of cash management system, and authorizing certain intercompany transactions/transfers [Docket Nos. 232, 354 and 453].

The Debtors have obtained approval from the Bankruptcy Court to employ:

(i)     Sheppard, Mullin, Richter & Hampton LLP as bankruptcy counsel [Docket Nos. 180 and 345];

(ii)     Michael Hogan as Chief Restructuring Officer (until January 15, 2021) [Docket No. 202];

(iii)     Andrew Hinkelman as Chief Restructuring Officer, effective as of January 4, 2021 [Docket No. 442];

(iv)     Ragghianti Freitas LLP as special counsel [Docket No. 184];

(v)     Nardell Chitsaz & Associates as special real estate counsel [Docket Nos. 182 and 348];

---

[16] Unless otherwise stated, the docket numbers provided above are with respect to the Original Debtors if only one item is listed and, if two or more items are listed, with respect to the Original Debtors, the November 2020 Debtors, and the February 2021 Debtors, as applicable.

SMRH:4845-5321-0342.1
04162l
732L-319169

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 26 of 158

(vi)     Weinstein & Numbers LLP as special insurance coverage counsel [Docket No. 194];

(vii)    Trodella & Lapping LLP as conflicts counsel [Docket Nos. 181 and 346];

(viii)   Wilson, Elser, Moskowitz, Edelman & Dicker LLP as special litigation counsel [Docket No. 183];

(ix)     Michael Goldberg as the Debtors' independent director [Docket No. 203];

(x)      FTI Consulting, Inc. as financial advisors [Docket No. 211];

(xi)     Silicon Valley Disposition, Inc. as auctioneer [Docket No. 231];

(xii)    Kimball, Tirey & St. John, LLP as special real estate counsel [Docket Nos. 285 and 347];

(xiii)   Steven Kesten as special counsel for routine employment law matters [Docket No. 351]; and

(xiv)    Armanino LLP, to provide transition services and tax advisory and accounting services, effective as of January 16, 2021 [Docket No. 436].

**B.      Use of Cash Collateral**

Upon a motion filed on July 30, 2020 [Docket No. 24], the Original Debtors requested and obtained permission to use cash collateral on an interim basis pursuant to order entered on August 7, 2020 [Docket No. 47] and then on a final basis pursuant to an order entered on October 6, 2020 [Docket No.178] (the "October 2020 Order"), to administer their Chapter 11 Cases and operate their businesses, including to pay taxes, maintain insurance, and pay other expenses in relation to the Real Properties and other Estate Assets.  The October 2020 Order continues to have effect, except to the extent inconsistent with or modified by the January 2021 Order (as defined below).

The November 2020 Debtors filed an emergency motion for use of cash collateral on December 16, 2020 [Docket No. 296], which was approved on an interim basis pursuant to an order entered on December 24, 2020 [Docket No. 311], and on a final basis pursuant to an order entered on January 19, 2021 [Docket No. 350] ("January 2021 Order").

On February 22, 2021, subsequent to the filing of the Chapter 11 Cases of the February 2021 Debtors, all of the Debtors filed a motion [Docket No. 414] for interim and final orders authorizing the February 2021 Debtors to use cash collateral and for the other existing Debtors to continue to use cash collateral for payment of costs and expenses in the ordinary course of each Debtor's business

maintaining its real property assets. An interim order on this motion was entered on March 5, 2021 [Docket No. 452].

### C.  Appointment of the Unsecured Creditors' Committee

On August 19, 2020, the U.S. Trustee appointed the Unsecured Creditors' Committee in the Chapter 11 Cases of the Original Debtors [Docket No. 59]. The members of the Unsecured Creditors' Committee are Peter and Anne Bagatelos Revocable Trust, Lisa de Mondesir, Elizabeth Goldblatt, Paul S. Greidanus, William Howard Levine, Keith Merron, and Pardi Revocable Trust.

The Unsecured Creditors' Committee filed an application to employ Pachulski Stang Ziehl & Jones LLP as its bankruptcy counsel, which application was approved by an order entered on October 6, 2020 [Docket No. 185].

### D.  Schedules and Statements of Financial Affairs

While the Debtors and their advisors have made their best effort to prepare the Schedules and Statements as accurately as possible, the Debtors stress that, in light of PFI's prior mismanagement, the Schedules and Statements are incomplete and will likely contain information that will require revisions. Certain of the information contained in the Schedules and Statements are derived from historical information maintained by former management, and substantial and material amounts of the information was generated as part of an ongoing forensic reconstruction of the Debtors' books and records, which is not yet complete.

On August 18, 2020, PFI filed its Schedules and Statement of Financial Affairs [Docket Nos. 57 and 58]. On August 19, 2020, PISF filed its Schedules and Statement of Financial Affairs [Docket Nos. 35 and 36]. Certain LLC/LP Debtors filed their respective Schedules and Statement of Financial Affairs in January 2021. The Schedules and Statements of Financial Affairs of the LLC Debtors' whose Chapter 11 Cases were commenced in early February 2021 are anticipated to be filed in March 2021. *See* https://www.donlinrecano.com/Clients/pfi/Static/soals (access to Filed Schedules and Statements of Financial Affairs).

### E.  Claims Bar Dates

The initial deadline for non-governmental creditors to file proofs of claim against the Original Debtors was November 23, 2020. Upon the Original Debtors' motion filed on August 13, 2020 [Docket No. 55], on August 14, 2020, the Bankruptcy Court entered an order temporarily

SMRH:4845-5321-0342.1
04162

732L-319169

suspending the claims bar date in order to give creditors reasonable time to file proofs of claim after review of the Debtors' Schedules, pending further Bankruptcy Court order or notice [Docket No. 56]. Although no deadline(s) have yet been set for the filing of proofs of claim, contemporaneously with the filing of the Plan and this Disclosure Statement, the Debtors are filing a motion with the Bankruptcy Court to establish a deadline for filing proofs of claim for all creditors, other than Investors.

As of February 15, 2021, approximately 178 proofs of claim have been filed. The Debtors have not completed claim reconciliation work and do not anticipate doing so before the Effective Date of the Plan, including claim reconciliations necessary to prepare the Schedule of Allowed Netted Claims to determine each of the "netted" Investor Claim amounts. As set forth in the Plan, the Debtors or the PFI Trust, as applicable, will seek Bankruptcy Court approval to establish a bar date for Investors and special procedures for the allowance of Investor Claims for distribution purposes, including approval of the Schedule of Allowed Netted Claims, which will be filed as a separate motion at a later date.

F.     **Post-Petition Operations**

Following the filing of their respective Chapter 11 Case, the Debtors continued to operate their business and manage the Real Properties. However, the Debtors have ceased making distributions to Investors or making new investments. The Debtors' revenue and financial results are set forth in their monthly operating reports filed on September 21, 2020 [Docket No. 147], October 21, 2020 [Docket No. 216], November 23, 2020 [Docket No. 268], December 21, 2020 [Docket No. 304], January 26, 2021 [Docket No. 375], and February 26, 2021 [Docket No. 433].

G.     **Wallach Related Agreements**

On November 19, 2020, the Debtors filed a Motion for an Order Authorizing the Debtors to (I) Assume Partial Restitution Agreements, (II) Enter Into Side Letters Regarding Partial Restitution Agreements, and (III) Perform Obligations Thereunder (the "Restitution Motion") [Docket No. 261], which was approved by an order entered on December 4, 2020 [Docket No. 281]. Pursuant to the order, the Bankruptcy Court approved (1) partial restitution agreements entered into on July 25, 2020 between the Debtors and Wallach regarding real properties located at (a) 3830 Hayvenhurst Drive, Encino, California 91436 (the "Encino Property") and (b) 19236 Pacific Coast Highway, Malibu,

California 90265 (the "Malibu Property"), under which Wallach agreed to convey the Encino Property and the Malibu Property to PISF, to be credited towards any restitution judgment obtained in any future criminal or civil proceedings against Wallach arising from his conduct as an employee of PFI; and (2) a separate side letter agreement entered into on November 16, 2020 between the Debtors and Wallach, clarifying the Debtors' and Wallach's shared understanding that the value credited toward any applicable restitution Wallach is determined to owe is based on the net amount PISF receives from the sale of each of the Encino Property and Malibu Property, and not on the gross sales price of each such property.

Upon their motion [Docket No. 389], the Debtors also sought approval of a separate Partial Restitution Agreement with Wallach, pursuant to which PFI and PISF would recover $645,500 in funds Wallach had disbursed from his 401(k) plan (then in Wallach's counsel's trust account) and any proceeds otherwise due to Wallach upon release of the $500,000 appearance bond posted in connection with federal criminal proceedings against Wallach. The parties' agreement allows Wallach's counsel to retain $75,000, only to be used to Wallach's legal fees incurred in connection with his cooperation with the Debtors and their advisors to identify assets belonging to the Debtors or in which the Debtors may have an economic interest, to assist the Debtors and their attorneys in recovering assets for the Estates' benefit, and to assist in the Debtors' ongoing forensic investigation. The Bankruptcy Court entered an order on February 11, 2021 approving the Debtors' motion [Docket No. 402].

## H.  Denial of the U.S. Trustee's Motion to Appoint a Trustee or Examiner

On August 24, 2020, the U.S. Trustee filed a motion [Docket No. 71] for the appointment of a chapter 11 trustee for the Original Debtors, or alternatively, an examiner, so that a neutral person could investigate the fraudulent and other improper mismanagement of the Debtors' affairs as discussed herein. The Original Debtors and the Unsecured Creditors' Committee each argued that a trustee or examiner was not needed or appropriate, given, among other things, the Debtors are being operated with new independent and disinterested management, including Michael Hogan, the Debtors' Chief Restructuring Officer, who was installed in June 2020 following the resignations of the Debtors' then-officers upon discovery of the Debtors' fraudulent actions, and Michael Goldberg, who was chosen by a group of hundreds of the Debtors' Investors after a lengthy creditor vetting

SMRH:4845-5321-0342.1
04162)

73ZL-319169

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 30 of 158

process, as the Debtors' independent director in early August 2020. Further, the Debtors, with replacement management, will have the forensic assistance of FTI, which had a similar role in the SIPA and chapter 11 cases, respectively, of *Madoff* and *Woodbridge* involving prepetition Ponzi schemes. After a hearing on the motion on October 1, 2020, the Bankruptcy Court entered an order denying the U.S. Trustee's motion [Docket No. 171].

I.      **Motion for Authorization to File Involuntary Bankruptcy Petitions Against Related Entities**

On October 29, 2020, the Original Debtors filed a motion (the "<u>Related Entities Motion</u>") for authorization for PFI to file involuntary bankruptcy petitions against limited partnerships and limited liability companies in which PFI has an ownership interest and to consent to entry of orders for relief against such related entities. As explained in the Related Entities Motion, unless the related entities – the LLC/LP Debtors – become chapter 11 debtors, the Original Debtors would be severely hampered in their efforts to fully resolve their creditors' claims and reorganize their affairs in a manner that would provide the framework for a global resolution for the benefit of the victims in these cases. As described herein, the fraud committed by the Debtors' prior management pervaded both the Debtors and the related entities – which fraud has given rise to a thicket of claims against and among the Debtors and has likely rendered each related entities' principal asset, a specific piece of real property, unmarketable under the existing circumstances. To successfully resolve their bankruptcy cases, the claims against and among the Debtors must be dealt with, various pre-petition transfers must be addressed, and all of this, if it is to result in an equitable and value maximizing outcome for creditors, must be done in an organized and comprehensive manner. Such comprehensive relief can be achieved before the Bankruptcy Court once jurisdiction over all of the necessary entities is obtained. However, absent the relief requested in the motion, the Original Debtors do not believe they would have the corporate authority to unilaterally commence voluntary bankruptcy filings for all of the related entities. Accordingly, the Original Debtors filed the motion, and it was granted pursuant to an order entered on November 19, 2020 (the "<u>Affiliate Filing Order</u>") [Docket No. 260]. Pursuant to this order, the Original Debtors proceeded to commence the bankruptcy cases of certain LLC/LP Debtors, by filing involuntary petitions against the LLC/LP Debtors on November 20, 2020, February 3, 2021 and February 4, 2021, as applicable. As

-24-

authorized under the Affiliate Filing Order, PFI consented to the entry of the orders for relief against the LLC/LP Debtors.

## J. Extension of Exclusivity Periods

On November 23, 2020, the Original Debtors filed the *Debtors' Motion for Extension of Exclusive Periods to File a Plan and Solicit Acceptances Thereto* [Docket No. 266] (the "Exclusivity Motion"). In light of the complexity of these cases, the effort to unravel years' worth of fraud by prior management that affected over 1,000 creditors, rendered approximately 70 Real Properties owned directly or indirectly by the Debtors unmarketable, and encompassed dozens of entities related to the Debtors, the Original Debtors requested 90-day extensions of the Debtors' exclusive periods to (i) file a proposed chapter 11 plan (the "Plan Period"), and (ii) solicit acceptances of the plan without competing plan filings (the "Solicitation Period"). On December 11, 2020, the Bankruptcy Court entered an order granting the Exclusivity Motion and extending (i) the Plan Period for each Original Debtor to February 26, 2021, and (ii) the Solicitation Period for each Original Debtor to April 30, 2021 [Docket No. 287].

## K. Motion for Approval of the Committee Agreement with the Ad Hoc Committees

The Original Debtors filed a motion [Docket No. 112] for approval of an agreement (as updated and modified, in the form attached to a September 17, 2020 notice [Docket No. 126], the "Committee Agreement") by and among the Debtors (with the authorization of Debtors' independent director, Michael Goldberg), the Unsecured Creditors' Committee, the Ad Hoc LLC Members Committee, and the Ad Hoc DOT Noteholders Committee, pursuant to which the Debtors agreed to pay, up to the amount of the agreed budgets or such other amounts as ordered by the Bankruptcy Court, subject to Bankruptcy Court approval and to the terms of the Committee Agreement, the reasonable and documented fees and expenses of the members of the two Ad Hoc Committees, any consultants they engage and their respective counsel (Sklar Kirsh, LLP, retained by the Ad Hoc LLC Members Committee, and Baker & Hostetler LLP, retained by the Ad Hoc DOT Noteholders Committee).

The Debtors recognized that it would be nearly impossible and prohibitively expensive for the Debtors to engage in negotiations with the full body of Investors. The formation of the Ad Hoc Committees, in conjunction with the Unsecured Creditors' Committee, provides the Debtors with a

cost-effective opportunity to engage in meaningful and productive negotiations with much more manageably sized groups that advocate for the differing constituents that comprise nearly the whole investor group. The Bankruptcy Court approved the Committee Agreement pursuant to an amended order entered on October 9, 2020 [Docket No. 204].

### L. Pending Investigations/Proceedings

The Debtors continue to cooperate with the SEC; as noted, the SEC commenced in or about May 2020 an investigation into the structure and investment history of the Debtors. The Debtors anticipate, if necessary, cooperating with other government entities in their investigations of the Debtors in relation to the purportedly fraudulent scheme operated by Casey and others.

### M. Plan Negotiations and the Settlement Under the Plan

With the installation of new management, the preferred path of the Debtors and their professionals was to build consensus with the Unsecured Creditors' Committee and other key constituencies, including those represented by the two Ad Hoc Committees, and reach an agreement that would provide for a prompt and orderly path out of bankruptcy for the Debtors and would conserve the Estates' resources for the benefit of all Investors and other creditors.

The negotiations were ultimately fruitful, as they resulted in the Debtors, the Unsecured Creditors' Committee, and the Ad Hoc Committees reaching an agreement in principle regarding the fundamental terms of a chapter 11 plan. After many weeks of further discussion and negotiations with the Ad Hoc Committees, the Debtors and the Unsecured Creditors' Committee finalized and filed the Plan, which incorporates the parties' settlement.

### IV.

### OVERVIEW OF PROVISIONS RELATING TO THE GLOBAL COMPROMISE AND SETTLEMENT SUPPORTING THE PLAN STRUCTURE

This section provides a brief summary of certain special provisions and elements of the Plan, and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein). The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions.

### A. Comprehensive Compromise and Settlement Under the Plan

Pursuant to Bankruptcy Code sections 1123(a)(5), 1123(b)(3), and 1123(b)(6), as well as Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims and controversies relating to the rights that a Holder of a Claim or an Equity Interest may have against any Debtor with respect to any Claim, Equity Interest, or any Distribution on account thereof, as well as all potential Intercompany Claims, Liens, and Causes of Action against any Debtor. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are (i) in the best interest of the Debtors, the Estates, and their respective property and stakeholders; and (ii) fair, equitable, and reasonable.

The Plan Proponents believe that the comprehensive compromises and settlements to be effected by the Plan are appropriate for several reasons and intend to request that the Bankruptcy Court approve the compromises and settlements contemporaneously with the Confirmation Hearing. In particular, the compromises and settlements are a critical component of the Plan and are designed to provide a resolution of myriad disputed intercompany and intercreditor Claims, Liens, and Causes of Action that otherwise could take years of protracted litigation to resolve, which would delay and reduce the Distributions that ultimately would be available for all Creditors.

Among those many disputed matters that will be resolved through the Plan are the following complex matters, any one of which could be the subject of years of expensive, complicated, and uncertain litigation:

### 1. Substantive Consolidation Issues

Substantive consolidation is a construct of federal common law, emanating from equity, which treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities, save for inter-entity liabilities, which are erased. In these Chapter 11 Cases, a compelling argument could be made for complete substantive consolidation of all the Debtors and two non-debtor affiliates (the Plan-Consolidated Debtors). Although creditors generally may not have treated all of the Debtors and their non-debtor affiliates as one legal entity, there is

very substantial scrambling and commingling of assets and liabilities among the Debtors and the two non-debtor affiliates. *See, e.g.*, *In re Bonham*, 229 F.3d 750, 764-65 (9th Cir. 2000) (consolidating debtor and non-debtor entities in Ponzi scheme case).

The Plan here provides for substantive consolidation of the Debtors' and their non-debtor affiliates' assets and liabilities for the purposes of distributions under the Plan. The Plan Proponents and the PFI Trustee, at their election and after considering various tax implications, may elect to vest the OpCo Assets (which includes all of the Real Properties) so that the OpCo holds them either directly or indirectly through one or more of the remaining Debtors, as to be set forth, if applicable, in the Alternative Restructuring Transactions Memorandum to be Filed with the Bankruptcy Court prior to the Confirmation Hearing.

Consistent with the substantive consolidation contemplated by the Plan and in order to reduce administrative costs, subject to any Alternative Restructuring Transactions, on the Effective Date, PFI and PISF, and at the election of the Plan Proponents and the PFI Trustee, some or all of the other Debtors will be dissolved automatically without the need for any corporate action or approval, without the need for any corporate filings, and without the need for any other or further actions to be taken on behalf of such dissolving Debtor or any other Person or any payments to be made in connection therewith. The Debtors' Real Properties and other OpCo Assets will be vested in a new entity, the OpCo or its wholly owned remaining Debtor subsidiaries, as applicable.

The substantive consolidation effected pursuant to the Plan shall not affect, without limitation, (i) the defenses of the Debtors, the OpCo, any remaining Debtors as of the Effective Date (if applicable), or the PFI Trust to any Claim, Cause of Action or Avoidance Action, including the ability to assert any counterclaim; (ii) the setoff or recoupment rights of the Debtors, the OpCo, any remaining Debtors, or the PFI Trust; (iii) requirements for any third party to establish mutuality prior to substantive consolidation in order to assert a right of setoff against the Debtors, the OpCo, any remaining Debtors, or the PFI Trust; or (iv) distributions to the Debtors, the OpCo, any remaining Debtors, the Estates or the PFI Trust out of any insurance policies or proceeds of such policies.

### 2. Ponzi Scheme Issues

Additional disputes and possible litigation could arise regarding whether the Debtors were operating a Ponzi scheme, when that scheme began, and the implications of such conduct.

As discussed above, the Debtors' advisors have preliminarily found that (i) no later than January 1, 2007, the Debtors' business records and other available evidence presents attributes commonly seen in Ponzi schemes, and such attributes continued through Casey's death; (ii) many Debtors had either negative equity or a disabling lack of liquidity that demanded the use of cash belonging to other related entities; (iii) the "debt service" and investment returns paid to Investors could never have been paid without the use of new capital from new Investors because the Real Properties were not sufficiently profitable to have done so; (iv) the Debtors' cash flows were commingled, and this commingling was a prevalent feature of the Debtors' operations; and (v) Casey and Wallach removed millions of dollars from the Debtors.

On April 13, 2021 the Official Committee of Unsecured Creditors filed a complaint for declaratory relief against the Debtors and Plan-Consolidated Debtors seeking a declaration that the Debtors and Plan-Consolidated Debtors were operated as a Ponzi scheme beginning at least as of January 1, 2007. The Debtors and Plan-Consolidated Debtors have reviewed that complaint and intend to file an answer admitting the vast majority of its allegations before the deadline to file the Plan Supplement. In addition, the Debtors also plan to file a detailed declaration from their financial advisor that contains testimony regarding the conclusions the financial advisor has reached based on its investigation to date prior to the deadline to file the Plan Supplement.

Following a judicial determination that the Debtors were operating a Ponzi scheme, any payments of "interest" or other consideration that was transferred from any Person to an Investor during the period before the Petition Date, but typically *excluding* payments representing the return of or repayment of principal owed on the applicable investment, could potentially be avoided and recovered as an "actual" fraudulent transfer. *See, e.g.*, *Donell v. Kowell*, 533 F.3d 762, 770-72 (9th Cir. 2008); *AFI Holding, Inc. v. Mackenzie*, 525 F.3d 700, 708-09 (9th Cir. 2008); *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011); *Geltzer v. Barish (In re Geltzer)*, 502 B.R. 760, 770 (Bankr. S.D.N.Y. 2013); *Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 871-72 (Bankr. N.D. Ill. 2000). Because avoidance litigation would be a further hardship on the victims of the Debtors' fraudulent scheme, and to eliminate the significant litigation expense and inefficiency associated with seeking recovery from Investors of prepetition distributions on account of interest or the like (that would ultimately only reduce the aggregate amount available for distribution on

732L-319169

account of allowable claims), the Plan incorporates a netting mechanism that will account for any Prepetition Distribution received by an Investor when calculating the net claim amounts that will in turn drive the specific Distributions that such Investor will receive under the Plan.

Specifically, the Plan incorporates a "netting" mechanism where distributions of PFI Trust Interests will be made based on the applicable Investor's net claim – roughly, the total principal invested less all payments received from the Debtors since January 1, 2007, whether denominated as interest, principal, return of capital, referral fees or otherwise. The net claim also will be reduced to the extent an Investor recovers from a third party, such as insurance or litigation against an investment adviser.

The PFI Trust will be responsible for creating, based on the Debtors' books and records, a Schedule of Allowed Netted Claims, and will cause such Schedule of Allowed Netted Claims, or any applicable portion thereof, to be served on Investors that indicates both the Outstanding Principal Amount and the Prepetition Distributions for each Investor that is not an Excluded Party.

If an Investor disputes the amount of his, her or its Outstanding Principal Amount and the Prepetition Distributions set forth in the Schedule of Allowed Netted Claims by following the applicable objection procedures and deadlines, such Investor shall be deemed a Disputing Claimant with a Disputed Claim, and shall be subject to the procedures, deadlines and treatment for Disputed Claims. The PFI Trust and the PFI Trustee reserve all rights to object to the validity, amount or any other aspect of a Claim held by a Disputing Claimant. In addition, the Debtors and the PFI Trust reserve any and all Causes of Action and Avoidance Actions that may exist regarding a Disputing Claimant, all of which the PFI Trust may pursue on or after the Effective Date in accordance with the Plan.

### 3. Proposed Settlement Relating to DOT Noteholder Claims

Prior to the filing of the Chapter 11 Cases, the Debtors extensively commingled cash generated from rents from the Real Properties, and used the cash wherever PFI decided cash was needed (*see* Article II.B.3, above). PFI also took cash-out refinancings of several properties that were encumbered by DOT Noteholders' Deeds of Trust and used some loan proceeds to pay expenses on properties owned by LLCs and LPs that were not encumbered by DOT Noteholders' Deeds of Trust. The net result of PFI's activities is that several million dollars of value in the

properties securing the DOT Noteholders' Deeds of Trust was diverted from the properties before bankruptcy leaving less equity value to satisfy DOT Noteholders' claims on a property-by-property basis. In addition, the Ad Hoc DOT Noteholders Committee conducted an investigation of DOT Noteholders' Deeds of Trust, including examining the public real property records and documentation obtained from numerous DOT Noteholders. The investigation disclosed that PFI engaged in improprieties with respect to the DOT Noteholders' Deeds of Trust that may cause substantially all of the liens securing the DOT Noteholder Claims to be subject to avoidance pursuant to claims brought by the Debtors or PFI Trustee under 11 U.S.C. §§ 544 and 548. In particular, the Debtors appointed affiliates to serve as the trustee under the DOT Noteholders' Deeds of Trust for the purpose of enabling the Debtors to periodically remove the liens of the DOT Noteholders from the record of title without the knowledge or informed consent of the DOT Noteholders. Based on the foregoing, the Ad Hoc DOT Noteholders Committee concluded that DOT Noteholders collectively will receive a better recovery under a one-pot plan in which the proceeds of sales of all Real Properties and litigation recoveries are pooled together and all Investors receive equal distributions on account of their Allowed Claims.

As set forth more fully in the Plan, to the extent (a) the Real Properties securing the liens of DOT Noteholders have not been sold prior to the Effective Date, or (b) the liens of DOT Noteholders have attached to the proceeds of the sale of any Real Properties and have not been otherwise removed and expunged pursuant to an order of the Bankruptcy Court, the Plan proposes a compromise of DOT Noteholder Claims as follows: (1) DOT Noteholders will be treated as general unsecured creditors for purposes of distribution; and (2) the Confirmation Order shall include provisions expunging the liens of the DOT Noteholders from the records of the Real Properties, or the proceeds of sales thereof, unless such expungement is challenged.

Any DOT Noteholder that wishes to challenge the expungement of its lien shall file an objection with the Bankruptcy Court no later than twenty (20) days after entry of the Confirmation Order. The PFI Trustee shall file its Avoidance Action in response to such an objection no later than thirty (30) days after service of the objection.

Expungement of the liens of the DOT Noteholders shall become effective with respect to each DOT Noteholder and Real Property, or sale proceeds thereof, on the later of (a) the thirtieth

SMRH:4845-5321-0342.1
041621

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 38 of 158

(30th) day after the occurrence of the Effective Date, or (b) in the event of a timely expungement challenge, entry of a final order adjudicating an Avoidance Action with respect to a lien on that Real Property.

During the pendency of the Avoidance Action, the Claim of such objecting DOT Noteholder shall be deemed to be a Disputed Claim.

Without the foregoing Plan compromise, the Debtors would have been required to spend hundreds of thousands of dollars prosecuting Avoidance Actions against hundreds of DOT Noteholders based on thousands of transfers involving thirty (30) Real Properties. Such Avoidance Actions would be necessary to clear title to the properties to facilitate sales or refinancings of the properties under the Plan. The compromise saves the expense to the Estates of pursuing such Avoidance Actions to judgment.

### 4. Proposed Settlement Relating to PFI LLC Members

The LLC/LP Debtors, which own over one-half of the Real Properties, were placed into bankruptcy protection prior to the filing of the Plan pursuant to a process negotiated among the Ad Hoc LLC Members Committee, the Debtors and the other Committees. This strategic decision was done, in part, to enable the LLC/LP Debtors to preserve the value of the Real Properties for the benefit of their Investors and creditors (including through the benefit of the automatic stay), and facilitate a process to maximize the value of their real estate portfolio through the removal of any "taint" caused by the prepetition Ponzi scheme. Further, in order to ensure equal treatment for all Investors who are victims of the Ponzi (since funds of each investor group were unknowingly used to fund the investments of other investor groups – *see* Article II.B.1, above), the Ad Hoc LLC Members Committee, the Debtors and the other Committees collectively agreed to a compromise pursuant to which (1) all of the Real Properties, however title was held, will be consolidated and the proceeds of the income and/or disposition of the Real Properties will be distributed to all Investors and other creditors as provided in the Plan; and (2) all equity interests of Investors in the LLC/LP Debtors will be elevated to debt relating back to the date of their investments so that such Investors will receive distributions under the Plan in the same ranking as PISF Straight Noteholders and DOT Noteholders.

### 5. Proposed Settlement Relating to TIC Interests

Holders of TIC Interests have the option of maintaining their TIC ownership interest in an amount equal to such ownership percentage in the Real Property (as set forth in the grant deed of the Real Property, unless there is an applicable TIC Agreement, in which case the ownership percentage in the TIC Agreement will control, unless otherwise ordered by the Bankruptcy Court). In such case, if the Holder of the TIC Interest also asserts a separate Claim against the Debtors, such TIC Claim will be treated in the same manner as Class 7 Other Unsecured Claims. Such TIC Interests shall not be substantively consolidated under the Plan and will not be treated as Estate Assets, PFI Trust Assets or OpCo Assets. However, to the extent a TIC Interest was obtained using rolled over funds or funds that were otherwise commingled or traceable to PFI, the Debtors or PFI Trust, as applicable, reserves all rights in connection therewith.

Alternatively, Holders of TIC Claims may transfer their TIC Interests to the Debtors or PFI Trust, as applicable, and elect to be treated as Investors. If such a election is made, the TIC Claim will be calculated using the same netting and aggregation principles applicable to Investors and set forth in the Special Provisions Relating to Investor Claims and Special Provisions Relating to Individual Investor-Specific Claims (Plan sections 2.11.2 and 2.11.3, respectively).

### 6. Provisions Relating to Avoidance Actions and Other Causes of Actions

To the extent, and only to the extent, an Investor's Claim is Allowed, no Avoidance Action may be brought, directly or indirectly, on account of a payment to an Investor outside the Investor Lookback Period, unless such Investor is an Excluded Party. The PFI Trustee also shall have discretion, subject to the PFI Trust Agreement, in determining whether and how to make demand upon, or sue, Investors with a Net Prepetition Investor Recovery, including but not limited to the discretion not to bring suit or make a demand because of the Investor's financial hardship. That discretion shall be exercised in accordance with guidelines (i) agreed to by the Committees before the Effective Date, or, if no such guidelines are agreed to (ii) developed by the PFI Trustee and approved by the BOV subject to the PFI Trust Agreement.

Finally, nothing in the Plan will impair the right of Investors to independently pursue claims in which they have independent legal standing against third parties that are unique to such Investors ("Individual Investor-Specific Claims"). By way of example, and not limitation, such unique claims

SMRH:4845-5321-0342.1
04162]
732L-319169

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 40 of 158

include claims based on loss of lien or loss of lien priority, claims against investors' professional advisors, claims against retirement servicers and similar claims that may be asserted based on such investors' particular circumstances. The Individual Investor-Specific Claims do not include Investor Claims common to all Investors and/or claims to recover commissions or referral fees paid by the Debtors to third parties in connection with an Investor's investment with the Debtors.

**B.** **The Settlement Provisions in the Plan are Fair and Reasonable and in the Best Interest of All Creditors.**

In sum, the Plan facilitates the near-term resolution of the myriad complex legal issues and disputes that have arisen in the Chapter 11 Cases. The proposed Plan resolves several major issues that would otherwise have to be judicially determined through lengthy, expensive, and inherently uncertain litigation. Moreover, if such issues were litigated, it could be years before Investors received distributions, if any, from the PFI Trust. In contrast, the Plan provides a mechanism for significant Distributions to be made to these Creditors in a more timely and orderly fashion.

The Plan also is a vehicle to clear the "taint" of the prepetition fraudulent enterprise from the real estate assets. Absent the proposed restructuring, which includes substantive consolidation of the LLC Debtors' valuable real estate assets and the removal of all Investor liens from the Real Properties, it would be impossible to monetize the assets without severely diminishing their value.

Furthermore, the Plan Proponents are strongly of the view that all elements of the comprehensive compromise and settlement to be effected under the Plan are superior to the disorderly and uncertain alternatives. The terms of the global resolution under the Plan were heavily negotiated by the Debtors, the Unsecured Creditors' Committee, and the two Ad Hoc Committees, each of which acted at arm's length and had the benefit of sophisticated external advisers.

Here, the Plan Proponents believe that consideration of the foregoing factors demonstrates that the terms of the comprehensive compromise and settlement to be effected by the Plan are fair and reasonable, and that its approval is in the best interests of the Estates and all stakeholders. The Plan Proponents will provide further evidence and argument supporting approval of this comprehensive compromise and settlement, including the elements detailed above, at the Confirmation Hearing.

## RISK FACTORS

Prior to voting on the Plan, each Holder of a Claim or Equity Interest entitled to vote should consider carefully the risk factors described below, as well as all other information contained in this Disclosure Statement, including the schedules and exhibits hereto. These risk factors should not be regarded as the only risks involved in connection with the Plan and its implementation.

**A.    Parties May Object to the Plan's Classification of Claims and Equity Interests**

Bankruptcy Code section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Plan Proponents believe that the classification of the Claims and Equity Interests under the Plan complies with this requirement. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**B.    The Plan Proponents May Not Be Able to Obtain Confirmation of the Plan**

With regard to any proposed plan, the Plan Proponents may not receive the requisite acceptances to confirm a plan.  In the event that votes with respect to Claims in the Classes entitled to vote are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Plan Proponents intend to seek Confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Plan Proponents may not be able to obtain Confirmation of the Plan. Even if the requisite acceptances of the proposed Plan are received, the Bankruptcy Court still might not confirm the Plan as proposed if the Bankruptcy Court finds that any of the statutory requirements for confirmation under Bankruptcy Code section 1129 have not been met.

If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan would be on terms as favorable to any Holders of Claims as the terms of the Plan. In addition, there can be no assurance that the Plan Proponents will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtors' creditors.

**C.    The Conditions Precedent to the Effective Date of the Plan May Not Occur**

As more fully set forth in the Plan, the Effective Date is subject to several conditions precedent. There can be no assurance that any or all of such conditions will be satisfied (or waived).

If such conditions precedent are not met or waived, the Effective Date will not occur. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Effective Date will occur.

### D. Claims Estimation and Allowance of Claims

There can be no assurance that the estimated Claim amounts set forth in this Disclosure Statement are correct, and the actual amount of Allowed Claims may differ significantly from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

Distributions to Holders of Allowed Class 4, Class 5, Class 6, and Class 7 Claims will be affected by the pool of Allowed Claims in each respective Class. Upon completion of further analysis of Filed Claims, which will likely lead to Claims objection litigation and related matters, the total amount of Claims that ultimately become Allowed Claims in each Class may differ from the Debtors' estimates, and such difference could be material. As a result, the amount of Distributions that may be received by a particular Holder of an Allowed Claim in Class 4, Class 5, Class 6 or Class 7 may be either adversely or favorably affected by the aggregate amount of Claims ultimately Allowed.

### E. Potential Pursuit of PFI Trust Actions Against Creditors and Others

In accordance with Bankruptcy Code section 1123(b), after the Effective Date, the PFI Trustee shall have and retain and may enforce any PFI Trust Actions. Accordingly, a Holder of a Claim may be subject to one or more such PFI Trust Actions being asserted against it.

The failure to specifically identify in the Disclosure Statement or the Plan any potential or existing Avoidance Actions or Causes of Action as a PFI Trust Action is not intended to and shall not limit the rights of the PFI Trust to pursue any such Avoidance Actions or Causes of Action. The Debtors expressly reserve all Avoidance Actions and Causes of Action, other than those Avoidance Actions and Causes of Action that are expressly waived, relinquished, released, compromised, or settled in the Plan, pursuant to the Confirmation Order, or pursuant to any other order of the Bankruptcy Court, as PFI Trust Actions for later adjudication, and no preclusion doctrine (including the doctrines of res judicata, collateral estoppel, judicial estoppel, equitable estoppel, issue

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 43 of 158

preclusion, claim preclusion, and laches) shall apply to such Avoidance Actions or Causes of Action as PFI Trust Actions on or after the Effective Date.

Moreover, no Person may rely on the absence of a specific reference in the Plan, the Confirmation Order, the PFI Trust Agreement, or the Disclosure Statement to any Contributed Claims against such Person as any indication that the PFI Trust will not pursue any and all available Contributed Claims against such Person. The objection to the Allowance of any Claims will not in any way limit the ability or the right of the PFI Trust to assert, commence, or prosecute any Contributed Claims. Nothing contained in the Plan, the Confirmation Order, the PFI Trust Agreement, or the Disclosure Statement will be deemed to be a waiver, release, or relinquishment of any Contributed Claims which the Contributing Claimants had immediately prior to the Effective Date. The PFI Trust shall have, retain, reserve, and be entitled to assert all Contributed Claims fully as if the Contributed Claims had not been contributed to the PFI Trust in accordance with the Plan and the PFI Trust Agreement.

Without limiting the generality of the preceding two paragraphs and associated reservations, the Debtors note that all parties in interest should review **Exhibit D**, which is a non-exclusive analysis of the PFI Trust Actions that are being preserved under the Plan.

## F.    Risks Regarding Real Estate

Subject to any Alternative Restructuring Transactions, the Plan relies, in large part, on the OpCo generating proceeds from rental operations and/or the sale of the Real Properties to produce Cash for distribution to creditors. In the event that rental income is insufficient to cover costs incurred in maintaining and operating the Real Properties, sales are delayed, costs incurred with respect to the Real Properties prior to sale exceed estimates, or markets decline due to economic conditions or other constraints, payments may be correspondingly delayed.

The OpCo's ability to monetize the OpCo Assets is subject to certain risks associated with the real estate industry in general, including: economic conditions; the supply and demand for properties, particularly of the sorts owned or controlled by the Debtors; the potential impact of COVID on demand for the types of properties owned by the Debtors; the financial conditions for tenants, buyers, and sellers of properties; changes in interest rates; changes in environmental laws or regulations, planning laws and other governmental roles and fiscal and monetary policies; changes in

SMRH:4845-5321-0342.1
041621
732L-319169

real property tax rates and related tax deductions; negative developments in the economy that depress travel and retail activity; uninsured casualties; force majeure acts, terrorist events, under-insured or uninsurable losses; and other factors that are beyond the reasonable control of the OpCo. In addition, real estate assets are subject to long-term cyclical trends that can give rise to significant volatility in values. Real estate investing and development may be subject to a higher degree of market risk because of concentration in a specific industry, sector, or geographic sector. Real estate investments may be subject to other general and specific risks, including declines in the value of real estate generally, risks related to general and economic conditions, changes in the value of the comparable properties, and defaults by real estate borrowers within the particular market or the broader economy.

Also, a variety of work is projected to be undertaken with respect to the real estate to be sold, the cost of which is not susceptible to precise determination. Unexpected conditions at the properties, weather, labor issues and a variety of other variables may affect the actual cost of the projected work being undertaken and thus affect, potentially adversely, the net proceeds of the sales of the real estate.

### G. Securities Law Considerations

There are several material securities law considerations, risks, and uncertainties associated with consummation of the Plan. Holders of Claims, Holders of Equity Interests, and other interested parties should read carefully the discussion set forth in Article VII for a discussion of certain securities law consequences of the transactions contemplated under the Plan.

Holders of Claims or Equity Interests should consult their own advisors regarding any securities law consequences of the treatment of their Claims or Equity Interests under the Plan.

The PFI Trust may, by reason of the amount of its total assets and the number of the holders of record of its PFI Trust Interests as of the last day of its first fiscal year, become subject to the registration requirements of the Exchange Act. It is likely that the PFI Trust will need to seek relief from or modification of certain technical requirements of the Exchange Act (such as the filing of pre-Effective Date financial information of the Debtors), which the PFI Trust intends to do in connection with such registration. While the Debtors have been advised that such relief and modifications have been granted by the SEC in the past with respect to other liquidating trusts

formed in connection with chapter 11 bankruptcies, such relief and modification have not yet been obtained with respect to the PFI Trust and no assurance can be given that such relief or modification will become available. If the PFI Trust becomes required to register and fails to do so in accordance with the requirements of the Exchange Act, it may become subject to civil fines, injunctive relief or other disciplinary action on the part of the SEC.

### H.     Tax Considerations

There are several material income tax considerations, risks, and uncertainties associated with consummation of the Plan. Holders of Claims, Holders of Equity Interests, and other interested parties should read carefully the discussion set forth in Article VIII for a discussion of certain U.S. U.S. federal income tax consequences of the transactions contemplated under the Plan.

<div align="center">

**VI.**

**<u>CONFIRMATION OF THE PLAN</u>**

</div>

### A.     The Confirmation Hearing

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing regarding Confirmation of the Plan. Bankruptcy Code section 1128(b) provides that any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing to commence on [•]**, 2021, at __:____ __.m.** (prevailing Pacific Time), before the Honorable Hannah L. Blumenstiel, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Northern District of California, San Francisco, California 94102. The Confirmation Hearing Notice, which sets forth the time and date of the Confirmation Hearing, has been included along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be Filed and served so that they are actually received by no later than [•]**, 2021, at 4:00 p.m.** (prevailing Pacific Time). **Unless objections to Confirmation of the Plan, as well as objections to final approval of the Disclosure Statement, are timely served and Filed in compliance with the Solicitation Procedures Order, they may not be considered by the Bankruptcy Court**.

**B.    Requirements for Confirmation of the Plan**

Among the requirements for the Confirmation of the Plan is that the Plan (i) is accepted by all Impaired Classes of Claims, or, if rejected by an Impaired Class of Claims, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Impaired Class of Claims; (ii) is feasible; and (iii) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Bankruptcy Code section 1129. The Plan Proponents believe that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Plan Proponents have complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. More specifically, the Plan Proponents believe that the Plan satisfies or will satisfy the following applicable Confirmation requirements of Bankruptcy Code section 1129:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of a Claim in an Impaired Class of Claims has accepted the Plan, or each such Holder will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code.

- The Classes of Claims that are entitled to vote on the Plan will have accepted the Plan, or at least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class, and the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims that is impaired under, and has not accepted, the Plan.

- Except to the extent a different treatment is agreed to, the Plan provides that all Allowed Administrative Claims and Allowed Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- All accrued and unpaid fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid through the Effective Date.

## C. Best Interests of Creditors

Often called the "best interests of creditors" test, Bankruptcy Code section 1129(a)(7) requires that a bankruptcy court find, as a condition to confirmation of a chapter 11 plan, that the plan provides, with respect to each impaired class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7 on the effective date of the plan. Based on their review, the Debtors and their advisors have prepared the liquidation analysis attached hereto as **Exhibit C** (the "Liquidation Analysis").

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage.

Conversion to chapter 7 of the Bankruptcy Code would mean the establishment of a new claims bar date, which could result in new Claims being asserted against the Estates, thereby diluting the recoveries of other Holders of Allowed Claims.

Significantly, the benefits of the Investor Claims Special Provisions, the terms of which are substantially incorporated into the Plan, are available only under the Plan. The Plan embodies a comprehensive, extensively negotiated settlement and compromise of myriad novel and complex legal and factual issues relating to the Investors of the Debtors. In the event of conversion, the chapter 7 trustee, Investors, and other creditors would have to confront the pursuit of extensive litigation to resolve these and other issues, or would need to try to negotiate an alternative settlement, all without the benefit of committee representation for creditors. This process would be extremely time-consuming and costly, and would very likely reduce and delay any recoveries available for creditors of the Estates.

In addition, a chapter 7 trustee likely would act quickly to sell or otherwise monetize the Debtors' assets, including because (i) a chapter 7 trustee probably would not have adequate staffing or funding to dispose of the Debtors' Real Properties over an extended period of time, and (ii) a chapter 7 trustee would need to seek authorization to operate the Debtors' remaining business, which

SMRH:4845-5321-0342.1
04162021
732L-319169

is relief that should be granted only "for a limited period" in any event, *see* 11 U.S.C. § 721. Such a forced sale by a chapter 7 trustee would likely ultimately result in substantially lower recoveries from the sale of the Debtors' assets, as set forth in the Liquidation Analysis.

On balance, the Plan Proponents believe that a chapter 7 trustee would be less likely to maximize the value available from all the Estate Assets and would be unable to obtain the benefits of the compromises and settlements available under the Plan. Therefore, the Plan Proponents believe that confirmation of the Plan will provide each Investor and other creditors with an equal or greater recovery than such party would receive pursuant to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

### D. Feasibility

Bankruptcy Code section 1129(a)(11) requires that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtors, or any successor to the Debtors (unless such liquidation or reorganization is proposed in the plan). The Plan Proponents believe that this requirement is satisfied, and the Debtors believe the Debtors' Cash and any additional proceeds from the PFI Trust Assets will be sufficient to allow the PFI Trustee to make all payments required to be made under the Plan. Accordingly, the Plan Proponents believe that the Plan is feasible.

### E. Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

A class is "impaired" unless a plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Bankruptcy Code section 1126(c) defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of

SMRH:4845-5321-0342.1
04162
73ZL-319169

allowed claims in that class, counting only those claims held by creditors that actually voted to accept or reject the plan. Thus, a Class of Impaired Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

### F. Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code section 1129(b) allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted that plan, *provided* that the plan has been accepted by at least one impaired class of claims, determined without including the acceptance of the plan by any insider. Notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Plan Proponents will request Confirmation of the Plan under Bankruptcy Code section 1129(b). The Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

#### 1. No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that reject or are deemed to have rejected a plan and that are of equal priority with another class of claims or interests that is receiving different treatment under such plan. The test does not require that the treatment of such classes of claims or interests be the same or equivalent, but that such treatment be "fair" under the circumstances. In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account various factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. The Plan Proponents submit that if they are required to "cramdown" the Plan pursuant to Bankruptcy Code section 1129(b), the Plan is structured such that it does not "discriminate unfairly" against any rejecting Class.

SMRH:4845-5321-0342.1
04162169

732L-319169

## 2. Fair and Equitable Test

The "fair and equitable" test applies to classes that reject or are deemed to have rejected a plan and are of different priority and status vis-à-vis another class (*e.g.*, secured versus unsecured claims, or unsecured claims versus equity interests), and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class, including interest. As to the rejecting class, the test sets different standards depending on the type of claims or interests in such rejecting class. The Plan Proponents submit that if they are required to "cramdown" the Plan pursuant to Bankruptcy Code section 1129(b), the Plan is structured such that the applicable "fair and equitable" standards are met.

## G. Alternatives to Confirmation and Consummation of the Plan

The Plan Proponents believe that the Plan affords Holders of Claims the potential for a materially better realization on the Estate Assets than a chapter 7 liquidation, and, therefore, is in the best interests of all such Holders. If, however, the requisite acceptances of the voting Classes of Claims are not received, or no Plan is confirmed and consummated, the theoretical alternatives include: (a) formulation of an alternative chapter 11 plan or plans, or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

If the requisite acceptances are not received or if the Plan is not confirmed, the Plan Proponents or another party in interest could attempt to formulate and propose a different plan or plans. The Plan Proponents believe that the Plan enables creditors to realize the greatest possible value under the circumstances, and, as compared to any alternative plan, has the greatest chance to be confirmed and consummated.

The Chapter 11 Cases may also be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a statutory trustee would be elected or appointed to complete the liquidation of the Estate Assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. As described above, the Plan Proponents believe that the Plan will provide each Investor and other creditor with an equal or greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

## VII.

## CERTAIN SECURITIES LAW CONSEQUENCES OF THE PLAN

SMRH:4845-5321-0342.1
04162)

73ZL-319169

## A. General

### 1. Status as Securities

The Plan provides for the establishment of the PFI Trust and for the issuance of the PFI Trust Interests to Holders of Allowed Class 4, Class 5, Class 6, and Class 7 Claims. In general, beneficial interests in trusts may sometimes be subject to regulation under applicable non-bankruptcy law, including federal and state securities laws. As discussed below, the Plan Proponents believe that the PFI Trust Interests will either (a) not constitute "securities" or (b) will be issued in compliance with such federal and state securities laws.

## B. Exemption From Offer and Sale of Securities Act and Blue Sky Laws

### 1. Issuance of PFI Trust Interests under Plan

Unless an exemption is available, the offer and sale of a security generally is subject to registration with the SEC under Section 5 of the Securities Act of 1933, as amended (the "Securities Act"). The Debtors believe that the PFI Trust Interests, regardless of whether they are certificated and/or non-transferable, may be considered a "security" within the definition of Section 2(a)(1) of the Securities Act at the time of their issuance.

In the event that the PFI Trust Interests are deemed to constitute securities, under the Plan, the PFI Trust Interests will be issued to holders of Allowed Class 4, Class 5, Class 6, and Class 7 Claims in reliance upon section 1145 of the Bankruptcy Code, to the extent such exemption is available.

Section 1145 of the Bankruptcy Code provides that the securities registration requirements of federal and state securities laws do not apply to the offer or sale of stock, warrants or other securities of a debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan if: (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in or claim for administrative expense against the debtor or such affiliate of the debtor; and (c) the securities are issued in exchange for such a claim or interest or are issued principally in such exchange and partly for cash and property.

This exemption is not available for an "underwriter." Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

SMRH:4845-5321-0342.1
04162)

732L-319169

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 52 of 158

(A)     purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

(B)     offers to sell securities offered under a plan of reorganization for the holders of those securities;

(C)     offers to buy those securities from the holders of the securities, if the offer to buy is (x) with a view to distributing those securities and (y) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization or with the offer or sale of securities under the plan of reorganization; or

(D)     is an issuer with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act, which includes any person directly or indirectly controlling the issuer or any person under direct or indirect common control of the issuer.

Persons will not be deemed underwriters under Section 1145(b)(1)(A)-(C) of the Bankruptcy Code by virtue of "ordinary trading transactions." The staff of the SEC has stated that a person will be deemed to engage in ordinary trading transactions with respect to resales on a national securities exchange or in the over the counter market, so long as there is no concerted action among the sellers, the only informational material used in connection with the sale is the disclosure statement, and there are no payments other than ordinary brokerage commissions.

For purposes of Section 1145(b)(1)(D) of the Bankrtupcy Code, "control" is assumed to have its general meaning under the federal securities laws. A person controls an issuer if it possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the issuer, whether through the ownership of voting securities, by contract or otherwise. Officers and directors of an issuer, and persons holding a significant percentages of an issuer's voting securities, may be deemed to "control" the issuer.

Securities received under a plan of reorganization by an underwriter as defined under Section 1145(b)(1)(A)-(C) are "restricted securities" for purposes of the federal securities laws. According to the staff of the SEC, however, securities received under a plan of reorganization by an underwriter as defined under Section 1145(b)(1)(D) are "control securities" and not "restricted securities" for

federal securities law purposes. The treatment of restricted securities and control securities for purposes of Rule 144 is described below..

>    **2.**      **Securities Issued in Reliance of Section 4(a)(2) of the Securities Act, Regulation D and/or Regulation S**

If the exemption provided by Section 1145(a) of the Bankruptcy Code in unavailable for the issuance of PFI Trust Interests under Plan, including for persons who are deemed "underwriters" under Section 1145(b)(1)(A)-(C) of the Bankruptcy Code, the PFI Trust Interests will be issued to Holders of Allowed Class 4, Class 5 and Class 6 Claims in reliance upon the federal securities law exemptions provided in Section 4(a)(2) of the Securities Act ("Section 4(a)(2)") and/or Regulation D or Regulation S under the Securities Act.

Section 4(a)(2) provides an exemption from the registration requirements under the Securities Act for transactions not involving any public offering. Transactions meeting the requirements of Regulation D are deemed to qualify for the exemption provided for in Section 4(a)(2). If PFI Trust Interests cannot be issued pursuant to Section 1145(a) of the Bankruptcy Code, the PFI Trust Interests will be issued if possible pursuant to Regulation D, as securities issued in accordance with Regulation D will be exempt from the registration requirements of state securities laws. Otherwise, if the PFI Trust Interests are issued pursuant to the federal exemption provided by Section 4(a)(2) (and not Regulation D), such PFI Trust Interests will be issued pursuant to available exemptions under state securities laws. Holders of Allowed Class 4, Class 5, Class 6, and Class 7 Claims receiving PFI Trust Interests issued pursuant to Section 4(a)(2) and/or Regulation D will be required to certify that they are "accredited investors," as that term is defined by the SEC for the purposes of Regulation D. Such securities will be deemed "restricted securities" for purposes of the federal securities laws.

Regulation S promulgated under the Securities Act provides an exemption for offers and sales of securities in certain offshore transactions, and may be used to issue PFI Trust Interests under the Plan to persons outside of the United States.

### 3. Resale of PFI Trust Interests After Plan Effective Date

#### (a) General

PFI Trust Interests that are issued pursuant to Section 1145(a) of the Bankruptcy Code may be resold without registration pursuant to section 4(a)(1) of the Securities Act and corresponding exemptions under state securities laws.

Holders of PFI Trust Interests that are "restricted securities" or "control securities" may be resold only in compliance with the registration requirements of, or pursuant to an available exemption from registration under, federal and state securities laws. Among potential federal securities law exemptions is Rule 144, which is described further below.

Regulation S has its own provisions regarding resales and, among other restrictions, imposes certain "anti-flow back" rules which restrict the transfer of such securities back into the United States for specified time periods.

#### (b) Rule 144

PFI Trust Interests that are restricted securities and/or control securities may be resold pursuant to the limited safe harbor resale provisions under Rule 144 under the Securities Act ("Rule 144"), to the extent available, and in compliance with applicable state securities laws.

Generally, Rule 144 provides that persons who hold restricted securities or control securities may resell such securities, and will not be deemed to be an underwriter in connection with such resale, if certain conditions are met. Restricted securities are subject to a statutory holding period of six months, if the issuer is subject to the public reporting requirements of the Securities Exchange Act of 1934, and 12 months otherwise. Other than compliance with the applicable holding period, resales of restricted securities that are not also control securities, are not subject to any other limitations or qualifications under Rule 144. Resales under Rule 144 of control securities are subject

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 55 of 158

to the public availability of certain information regarding the issuer, a limitation on the amount of securities that may be sold in any three-month period, the requirement that the securities be sold in a "brokers' transaction" or in a transaction directly with a "market maker" and a requirement that notice of the resale be filed with the SEC on Form 144.

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE ANY OPINIONS OR ADVICE WITH RESPECT TO, THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND EACH OTHER PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER THE PFI TRUST INTERESTS ARE "SECURITIES" FOR SECURITIES LAW PURPOSES, WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

## VIII.

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.**

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 56 of 158

**ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS**

This discussion is provided for informational purposes only, and is based on provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect on the date hereof. Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims (including Claims within the same Class) and Equity Interests, the holder's status and method of accounting (including holders within the same Class) and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are subject to significant uncertainties. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. Further, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the holders of Claims and Equity Interests. Any such changes or interpretations may be retroactive and could significantly, and adversely, affect the United States federal income tax consequences of the Plan.

The following summary is based in part on the assumption that, if the Plan is adopted, the Claims of the PFI LLC Members in the PFI-Managed LLCs will be recharacterized as Non-DOT Investor Claims, with such recharacterization to be retroactive on a case-by-case basis in each instance to the date or dates on which such PFI LLC Member tranferred funds in to the respective PFI-Managed LLC(s) in exchange for purported equity interests in such PFI-Managed LLCs, and that each PFI LLC Member should therefore be properly treated for U.S. federal tax purposes as never having owned any equity interest in any of the PFI-Managed LLCs. Holders should consult their own tax advisors for advice with respect to their particular situation and circumstances.

The following summary does not address the U.S. federal income tax consequences to the Holders of Claims or Equity Interests not entitled to vote to accept or reject the Plan. In addition, to the extent that the following discussion relates to the consequences to Holders of Claims entitled to vote to accept or reject the Plan, it is limited to Holders that are United States persons within the meaning of the IRC. For purposes of the following discussion, a "United States person" is any of the following:

- An individual who is a citizen or resident of the United States;

- A corporation created or organized under the laws of the United States or any state or political subdivision thereof;

- An estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- A trust that (a) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of its particular facts and circumstances, or to certain types of Holders subject to special treatment under the IRC. Examples of Holders subject to special treatment under the IRC are governmental entities and entities exercising governmental authority, foreign companies, persons who are not citizens or residents of the United States, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, small business investment companies, regulated investment companies, persons that have a functional currency other than the U.S. dollar, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction. This discussion does not address the tax consequences to holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local or estate and gift taxation is addressed.

The tax treatment of Holders of Claims and the character, amount, and timing of income, gain, or loss recognized as a consequence of the Plan and the Distributions provided for by the Plan may vary, depending upon the following factors, among others: (i) whether the Claim or portion

SMRH:4845-5321-0342.1
04162)
732L-319169
Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 58 of
158

thereof constitutes a Claim for principal or interest; (ii) the type of consideration, if any, received by the Holder in exchange for the Claim, and whether the Holder receives Distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken theft loss deduction with respect to the Claim or any portion thereof in the current or prior taxable years; (viii) whether the Holder has previously included in gross income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules apply to the Holder. Therefore, each Holder should consult such Holder's own tax advisor for tax advice with respect to that Holder's particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

A significant amount of time may elapse between the date of the Disclosure Statement and the receipt of a final Distribution under the Plan. Events occurring after the date of the Disclosure Statement, such as new or additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any Holder of a Claim. This discussion is not binding upon the IRS or other taxing authorities. No assurance can be given that the IRS or another authority would not assert, or that a court would not sustain, a different position from any discussed herein.

THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.

**ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT SUCH HOLDER'S INDEPENDENT TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME TAX CONSEQUENCES OF THE PLAN.**

### A. Certain U.S. Federal Income Tax Consequences of the PFI Trust

Under the terms of the Plan, the PFI Trust Assets will be transferred to the PFI Trust, and the remaining assets (the OpCo Assets) to the OpCo, in a taxable disposition. For U.S. federal income tax purposes, the transfer of the PFI Trust Assets to the PFI Trust will be treated as a sale or other disposition of assets (except for the assets transferred to the Disputed Ownership Fund as provided in Section 6.9 of the Plan) to the PFI Trust Beneficiaries in exchange for their claims in the Chapter 11 Cases. Any income or gain from the transfer of assets to the PFI Trust shall be recognized by the transferring Debtor (or, in the case of a Debtor that is classified as a partnership or "disregarded" entity for U.S. federal income tax purposes, to the partners or sole owner of such Debtor), who will be responsible to pay any resulting tax liability.

The tax consequences of the Plan, however, are subject to many uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law. Uncertainties with regard to U.S. federal income tax consequences of the Plan also arise due to the inherent nature of estimates of value that will impact the determination of the amount of income or gain from the transfer of assets to the PFI Trust.

As of the Effective Date, the PFI Trust shall be established for the benefit of all PFI Trust Beneficiaries. As soon as reasonably practicable after the PFI Trust Assets are transferred to the PFI Trust, the The PFI Trustee will make a good faith valuation of the PFI Trust Assets. In order to ensure that the PFI Trust can qualify as a "liquidating trust" for U.S. federal income tax purposes (as discussed further below), all parties (including, without limitation, the PFI Trustee and the PFI Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes.

Assuming that the PFI Trust is validly characterized as a "liquidating trust" for U.S. federal income tax purposes, it will allocate any taxable income it may recognize following the Effective Date (other than taxable income allocable to a Distribution Reserve) among PFI Trust Beneficiaries in accordance with the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 60 of 158

732L-319169

deemed distribution, the PFI Trust had distributed all of its assets (valued at their tax book value, and other than assets allocable to a Distribution Reserve) to the holders of the beneficial interests in the PFI Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the PFI Trust. For U.S. federal income tax purposes, the PFI Trust Beneficiaries shall be treated as the grantors of the PFI Trust and deemed to be the owners of the assets of the PFI Trust. The transfer of the PFI Trust Assets to the PFI Trust shall be deemed a transfer to the PFI Trust Beneficiaries by the Debtors, followed by a deemed transfer by such PFI Trust Beneficiaries to the PFI Trust. The Debtors, the PFI Trust Beneficiaries, and the PFI Trust will consistently report the valuation of the assets transferred to the PFI Trust. Such consistent valuations and revised reporting will be used for all U.S. federal income tax purposes. Similarly, taxable loss of the PFI Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a distribution in liquidation of the remaining PFI Trust Assets. The tax book value of the PFI Trust Assets for this purpose shall be equal to the fair market value of the PFI Trust Assets on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the PFI Trustee of an IRS private letter ruling if the PFI Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the PFI Trustee), the PFI Trustee will (a) elect to treat any PFI Trust Assets allocable to a Distribution Reserve (a reserve for amounts and PFI Trust Interests retained on account of, Contingent Claims, Disputed Claims or Unliquidated Claims) as a "disputed ownership fund" governed by Treasury Regulation Section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, the Distribution Reserves will be subject to tax annually on a separate entity basis on any net income earned with respect to the PFI Trust Assets in such reserves, and all distributions from such reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the PFI Trustee and the holders of beneficial interests in the PFI Trust) will be required to report for tax purposes consistently with the foregoing.

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 61 of
158

The PFI Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes within the meaning of Treasury Regulation section 301.7701-4(d). In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (*i.e.*, a pass-through entity) with respect to its beneficiaries. The Internal Revenue Service ("<u>IRS</u>"), in Revenue Procedure 94-45, 1994-28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The PFI Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with the guidelines set forth in Revenue Procedure 94-45, all parties (including the PFI Trustee and the holders of beneficial interests in the PFI Trust) are required to treat for U.S. federal income tax purposes, the PFI Trust as a grantor trust of which the holders of PFI Trust Interests are the owners and grantors. Although the following discussion assumes that the PFI Trust would be so treated for U.S. federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the PFI Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the PFI Trust as a grantor trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the PFI Trust and the holders of PFI Trust Interests could vary from those discussed herein, and, thus, there could be less Available Cash than projected, resulting in lower recoveries for holders of PFI Trust Interests.

**B.      Consequences to Holders of Claims Generally**

In general, each Holder of an Allowed Claim will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such Holder in satisfaction of its Claim, and (ii) such Holder's adjusted tax basis in such Claim. The "amount realized" by a Holder will equal the sum of cash and the aggregate fair market value of the property received by such Holder pursuant to the Plan (such as a Holder's undivided beneficial interest in the assets transferred to the PFI Trust). Where gain or loss is recognized by a Holder in respect of its Allowed Claim, the character of such gain or loss (*i.e.*, long-term or short-term capital, or ordinary income) will be determined by a number of factors including the tax status of the Holder, whether the Claim constituted a capital asset in the hands of the Holder and how long it had been held, whether the

SMRH:4845-5321-0342.1
04162)
732L-319169
Case: 20-30604      Doc# 572      Filed: 04/16/21      Entered: 04/16/21 18:37:04      Page 62 of
158

Claim was originally issued at a discount or acquired at a market discount and whether and to what extent the Holder had previously claimed a theft loss in respect of the Claim.

Generally, a Holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for Cash or other property, in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the Holder, and (ii) the adjusted tax basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income). It is possible that any loss, or a portion of any gain, realized by a Holder of a Claim may have to be deferred until all of the Distributions to such Holder are received.

When gain or loss is recognized by a Holder, such gain or loss may be long-term capital gain or loss if the Claim disposed of is a capital asset in the hands of the Holder and has been held for more than one year. Each Holder of an Allowed Claim should consult such Holder's own tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

A Holder of an Allowed Claim who receives, in respect of the Holder's Allowed Claim, an amount that is less than that Holder's tax basis in such Allowed Claim may be entitled to a bad debt deduction under IRS Section 166 or a theft loss deduction under IRC Section 165(e). The rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed. Rules relating to theft loss deductions, which are described in more detail below, are also potentially complex, and the timing and amount of any such loss may be affected by whether a Holder elects to apply certain IRS safe harbor procedures relating to losses realized by investors in certain frauduletn investment schemes. Holders of Allowed Claims, therefore, are urged to consult their own tax advisors with respect to the ability to take either a bad debt or theft loss deduction. A Holder that has previously recognized a loss or deduction in respect of that Holder's Allowed Claim may be required to include in gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Allowed Claim.

SMRH:4845-5321-0342.1
04162\
732L-319169

Holders of Allowed Claims who were not previously required to include any accrued but unpaid interest with respect to an Allowed Claim may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. A Holder previously required to include in gross income any accrued but unpaid interest with respect to an Allowed Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

A Holder of an Allowed Claim constituting an installment obligation for tax purposes may be required to currently recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than at face value or distributed, transmitted, sold or otherwise disposed of within the meaning of IRC section 453B.

Holders of Disallowed Claims will not receive any Distribution as part of the Plan. Accordingly, because such a Holder may receive an amount that is less than that Holder's tax basis in such Claim, such Holder may be entitled to a deduction, and are urged to consult with their own tax advisors with respect to the amount and character of any available deduction.

### C. Consequences to PFI Trust Beneficiaries

After the Effective Date, any amount that a PFI Trust Beneficiary (as a Holder of a PFI Trust Interest) receives as a distribution from the PFI Trust in respect of its beneficial interest in the PFI Trust should not be included, for U.S. federal income tax purposes, in the Holder's amount realized in respect of its Allowed Claim but should be separately treated as a distribution received in respect of such Holder's beneficial interest in the PFI Trust. In general, a Holder's aggregate tax basis in its undivided beneficial interest in the assets transferred to the PFI Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the Holder's holding period in such assets will begin the day following the Effective Date. Distributions to any Holder of an Allowed Claim will be allocated first to the original principal portion of such Claim as determined for federal tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim. However, there is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.

For all U.S. federal income tax purposes, all parties (including the PFI Trustee and the Holders of PFI Trust Interests) shall treat the transfer of the PFI Trust Assets to the PFI Trust, in

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 64 of
158

accordance with the terms of the Plan, as a transfer of those assets directly to the Holders of Allowed Claims (and, with respect to the Contingent Claims, Disputed Claims and Unliquidated Claims, to the Distribution Reserve) followed by the transfer of such assets by such Holders to the PFI Trust. Consistent therewith, all parties shall treat the PFI Trust as a grantor trust of which such Holders are to be the owners and grantors. Thus, such Holders (and any subsequent Holders of interests in the PFI Trust) shall be treated as the direct owners of an undivided beneficial interest in the assets of the PFI Trust. Accordingly, each Holder of a beneficial interest in the PFI Trust will be required to report on its U.S. federal income tax return(s) the Holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the PFI Trust. The PFI Trust's taxable income will be allocated to the Holders of PFI Trust Interests in accordance with each such Holder's pro rata share of the PFI Trust Interests in the PFI Trust Assets. The character of items of income, deduction and credit to any Holder and the ability of such Holder to benefit from any deductions or losses may depend on the particular situation of such Holder. The U.S. federal income tax reporting obligation of a Holder of a beneficial interest in the PFI Trust is not dependent upon the PFI Trust distributing any cash or other proceeds. Therefore, a Holder of a beneficial interest in the PFI Trust may incur a U.S. federal income tax liability regardless of the fact that the PFI Trust has not made, or will not make, any concurrent or subsequent distributions to the Holder. If a Holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its PFI Trust Interest in the PFI Trust, the Holder may be allowed a subsequent or offsetting loss.

The PFI Trustee will file with the IRS returns for the PFI Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The PFI Trustee will also send to each Holder of a beneficial interest in the PFI Trust a separate statement setting forth the Holder's share of items of income, gain, loss, deduction or credit and will instruct the Holder to report such items on its U.S. federal income tax return. Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could also change the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder.

A PFI Trust Beneficiary who is a victim of a Ponzi scheme might be entitled to claim a loss dependent on such PFI Trust Beneficiary's individual circumstances. Such losses that arise out of

SMRH:4845-5321-0342.1
04162l
732L-319169

property used in a trade or business or a transaction entered into for profit are deductible in the year in which the loss is sustained and in an amount not to exceed the adjusted tax basis of the property involved. A theft loss generally cannot be deducted in a tax year to the extent that there are reasonable prospects of a recovery of some or all of the loss. In that event, the deduction is postponed until it can be ascertained with reasonable certainty the likelihood and amount of any reimbursement that will be received. The loss generally must be deducted in the first year a reasonable prospect of recovery no longer exists, and cannot be claimed in any subsequent year. The reasonable prospect of reimbursement rule applies only to that part of the loss for which reimbursement is available. However, in 2009, the IRS issued Rev. Proc. 2009-20, 2009-14 I.R.B. 735, to provide an optional safe harbor treatment for taxpayers that experienced losses in certain investment arrangements discovered to be fraudulent and in which a lead figure has been charged with a crime. Under these safe harbor provisions, a qualified investor may deduct 95% of qualified investment in the discovery year (i.e., the year in which an indictment, information, or complaint described in section 4.02 of Revenue Procedure 2009-20 is filed) if the qualified investor does not pursue any potential third-party recovery. A 75% deduction is available in the discovery year if a qualified investor is pursuing or intends to pursue any potential third-party recovery. The details for qualification for the safe harbor deduction are set forth in Rev. Proc. 2009-20.

In 2011, the IRS issued Rev. Proc. 2011-58, 2011-58 I.R.B. 849, which modified the provisions of Rev. Proc. 2009-20. Under Rev. Proc. 2011-58, the safe harbor provisions of Rev. Proc. 2009-20 may be utilized if a lead figure, or an associated entity involved in the specified fraudulent arrangement, was the subject of one or more civil complaints or similar documents that a state or federal governmental entity filed with a court or in an administrative agency enforcement proceeding, and:

(a) The civil complaint or similar documents together allege facts that comprise substantially all of the elements of a specified fraudulent arrangement conducted by the lead figure;

(b) The death of the lead figure precludes a charge by indictment, information, or criminal complaint against that lead figure; and

(c) A receiver or trustee was appointed with respect to the arrangement or assets of the arrangement were frozen.

SMRH:4845-5321-0342.1
04162

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 66 of 158

A strict reading of Rev. Proc. 2011-58 would require that, unless the lead figure's death precludes the filing of a criminal indictment or criminal complaint, there must be an indictment or criminal complaint filed against the lead figure in order for safe harbor rules of Rev. Proc. 2009-20 to be available to victims of a Ponzi scheme. As noted herein, Ken Casey, the founder of PFI, who maintained control over some or all of the Debtors during relevant times, died in May 2020. PFI Trust Beneficiaries should consult with their own tax advisors to determine if a theft loss deduction is permissible, as well as the timing, amount, and applicable limitations for any such theft loss deduction.

### D. Withholding on Distributions, and Information Reporting

All Distributions to Holders of Allowed Claims under the Plan and any Distributions to the holders of beneficial interests in the PFI Trust are subject to any applicable tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the payment recipient (i) fails to furnish the recipient's social security number or other taxpayer identification number; (ii) furnishes an incorrect taxpayer identification number; (iii) fails to properly report interest or dividends; or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the taxpayer's identification number provided is the recipient's correct taxpayer identification number and that such recipient is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, a Holder of an Allowed Claim that is a not a United States person may be subject to additional withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate. As to certain Claims, it is possible that withholding may be required with respect to distributions by the Debtor making such Distribution or by the PFI Trust, as applicable, even if no withholding would have been required if payment was made prior to the Chapter 11 Cases. A Holder that is not a United States person may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed

SMRH:4845-5321-0342.1
04162021

above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to Holders that are not United States persons, and such Holders are urged to consult their own tax advisors regarding potential withholding on Distributions under the Plan.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their own tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holder's tax returns.

*[Remainder of page intentionally left blank]*

SMRH:4845-5321-0342.1
04162L
732L-319169

## IX.

## RECOMMENDATION

The Plan Proponents believe that confirmation and implementation of the Plan are the best alternative under the circumstances and urge all Impaired Creditors entitled to vote on the Plan to vote in favor of and support confirmation of the Plan. Provided herewith as a separate document is a brief summary of the Plan, and the statements of the Ad Hoc Committees in support of the Plan, which all Investors are encouraged to read in their entirety.

Dated: April 16, 2021

SHEPPARD MULLIN RICHTER & HAMPTON LLP

By      _/s/ Ori Katz_
ORI KATZ
J. BARRETT MARUM
MATT KLINGER

Counsel for Debtors

Dated: April 16, 2021

PACHULSKI STANG ZIEHL & JONES LLP

By      _/s/ Debra Grassgreen_
DEBRA GRASSGREEN
JOHN D. FIERO
CIA H. MACKLE

Counsel for the Official Committee of Unsecured Creditors

1  **EXHIBIT A**

2

3  **Joint Chapter 11 Plan**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Ori Katz (CA Bar No. 209561)
   J. Barrett Marum (CA Bar No. 228628)
2  Matt Klinger (CA Bar No. 307362)
   Gianni Segretti (CA Bar No. 323645)
3  SHEPPARD, MULLIN, RICHTER
   & HAMPTON LLP
4  (A Limited Partnership Including Professional
   Corporations)
5  Four Embarcadero Center, 17th Floor
   San Francisco, CA 94111-4019
6  Telephone:    (415) 434-9100
   Facsimile:    (415) 434-3947
7  Email:        okatz@sheppardmullin.com
                 bmarum@sheppardmullin.com
8                mklinger@sheppardmullin.com
                 gsegretii@sheppardmullin.com
9

10 Counsel to Debtors and Debtors in Possession

Debra I. Grassgreen (CA Bar No. 169978)
John D. Fiero (CA Bar No. 136557)
Cia H. Mackle (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, CA  94111
Telephone:    (415) 263-7000
Facsimile:    (415) 263-7010
E-mail:       dgrassgreen@pszjlaw.com
              jfiero@pszjlaw.com
              cmackle@pszjlaw.com

*Counsel to the Official Committee of
Unsecured Creditors*

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PROFESSIONAL FINANCIAL INVESTORS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-30604<br><br>(Jointly Administered)<br><br>**AMENDED JOINT CHAPTER 11 PLAN OF PROFESSIONAL FINANCIAL INVESTORS, INC. AND ITS AFFILIATED DEBTORS PROPOSED BY THE DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND SUPPORTED BY THE AD HOC LLC MEMBERS COMMITTEE AND THE AD HOC DOT NOTEHOLDERS COMMITTEE** |

---

[1] A complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses is attached hereto as **Exhibit 1**.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

DEFINED TERMS AND RULES OF INTERPRETATION.............................................1

ARTICLE I. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ...........................17

    1.1.    Summary and Classification of Claims.............................................17

    1.2.    Classification & Voting Controversies ..................................................18

ARTICLE II. TREATMENT OF CLAIMS AND EQUITY INTERESTS ..............................18

    2.1    Unclassified Claims ..............................................................................18

    2.2    Class 1: Non-Investor First-Priority Lender Claims ...............................19

    2.3    Class 2: Non-Investor Other Secured Claims .........................................21

    2.4    Class 3: Priority Claims ........................................................................22

    2.5    Class 4: DOT Noteholder Claims ........................................................22

    2.6    Class 5: Non-DOT Investor Claims.....................................................23

    2.7    Class 6: Other Unsecured Claims .......................................................24

    2.8    Class 7: Other Subordinated Claims ...................................................25

    2.9    Class 8: Equity Interests.......................................................................25

    2.10    Comprehensive Settlement of Claims and Controversies.......................25

ARTICLE III. ACCEPTANCE OR REJECTION OF THE PLAN ......................................27

    3.1    Impaired Class of Claims Entitled to Vote ...........................................27

    3.2    Acceptance by an Impaired Class .......................................................27

    3.3    Presumed Acceptances by Unimpaired Classes ...................................27

    3.4    Impaired Classes Deemed to Reject Plan ............................................27

    3.5    Modifications of Votes ..........................................................................27

    3.6    Confirmation Pursuant to Bankruptcy Code Section 1129(b) ..............27

    3.7    Elimination of Vacant Classes .............................................................28

    3.8    Severability of Joint Plan.......................................................................28

ARTICLE IV. IMPLEMENTATION OF THE PLAN ...................................................................28

4.1    Implementation of the Plan. ..............................................................................28

4.2    Streamlining of the Debtors' Corporate Affairs .................................................28

4.3    PFI Trust .........................................................................................................29

4.4    Alternative Restructuring Transactions. ...........................................................35

4.5    Preservation of Privileges and Defenses. .........................................................35

4.6    Preservation of Rights of Action. .....................................................................35

4.7    Cancellation of Instruments. ............................................................................36

4.8    Substantive Consolidation Including of Professional Investors 28, LLC and PFI Glenwood LLC .........................................................................................36

ARTICLE V. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...............................37

5.1    Assumption of Certain Executory Contracts and Unexpired Leases. ..................37

5.2    Rejection of Executory Contracts and Unexpired Leases. ..................................39

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .............................................39

6.1    Distributions TO SENIOR CLAIMS; SENIOR CLAIMS RESERVE. ...............39

6.2    Timing of Distributions for Allowed Claims. ...................................................39

6.3    calculating distributions and related matters. ...................................................40

6.4    Application of the Schedule of Allowed Netted Claims. .....................................40

6.5    Interest and Other Amounts Regarding Claims. ................................................40

6.6    Means of Cash Payment. ..................................................................................40

6.7    Form of Currency for Distributions. .................................................................41

6.8    Fractional Distributions. ..................................................................................41

6.9    No Distributions With Respect to Certain Claims. .............................................41

6.10    Delivery of Distributions. ................................................................................41

6.11    Application of Distribution Record Date & Other Transfer Restrictions. .............41

6.12    Withholding, Payment, and Reporting Requirements Regarding Distributions. ...42

| | | |
|---|---|---|
| **6.13** | Defenses and Setoffs. | 42 |
| **6.14** | Allocation of Distributions. | 42 |
| **6.15** | Joint Distributions. | 42 |
| **6.16** | Forfeiture of Distributions. | 43 |

ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND DISTRIBUTIONS WITH RESPECT THERETO ...43

| | | |
|---|---|---|
| 7.1 | Objections to and Resolution of Disputed Claims, Including Any Claims of Excluded Parties or Disputing Claimants. | 43 |
| 7.2 | Claim objections. | 43 |
| 7.3 | Estimation of Certain Claims. | 43 |
| 7.4 | Distributions Following Allowance. | 44 |
| 7.5 | Disposition of Assets in Reserves After Disallowance. | 44 |

ARTICLE VIII. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ...44

| | | |
|---|---|---|
| **8.1** | Conditions to the Effective Date. | 44 |
| **8.2** | Waiver of Conditions to the Effective Date. | 45 |
| **8.3** | Effect of Non-Occurrence of Conditions to the Effective Date. | 45 |
| **8.4** | Notice of the Effective Date. | 45 |

ARTICLE IX. RETENTION OF JURISDICTION AND POWER ...45

| | | |
|---|---|---|
| **9.1** | Scope of Retained Jurisdiction and Power. | 45 |
| **9.2** | Reserved Rights to Seek Bankruptcy Court Approval. | 46 |
| **9.3** | Non-Exercise of Jurisdiction. | 47 |

ARTICLE X. MISCELLANEOUS PROVISIONS ...47

| | | |
|---|---|---|
| **10.1** | Lien expungement procedures. | 47 |
| **10.2** | Administrative Claims. | 47 |
| **10.3** | Professional Fee Claims. | 47 |
| **10.4** | Payment of Statutory Fees. | 48 |
| **10.5** | SEC related Provisions. | 48 |

**10.6**    Post-Effective-Date Reporting.................................................................48

**10.7**    Dissolution of the Committees..........................................................48

**10.8**    Modifications and Amendments. ........................................................48

**10.9**    Severability of Plan Provisions. .......................................................49

**10.10**   Compromises and Settlements. .........................................................49

**10.11**   Binding Effect of Plan. ....................................................................49

**10.12**   Non-Discharge of the Debtors; Injunction.........................................49

**10.13**   Releases and Related Matters. .........................................................50

**10.14**   Exculpation and Limitation of Liability. ..........................................50

**10.15**   Term of Injunctions or Stays............................................................51

**10.16**   Revocation, Withdrawal, or Non-Consummation. .............................51

**10.17**   Exemption from Transfer Taxes. ......................................................51

**10.18**   Computation of Time. .......................................................................51

**10.19**   Transactions on Business Days.........................................................51

**10.20**   Good Faith. ......................................................................................51

**10.21**   Governing Law. ................................................................................52

**10.22**   Notices. ............................................................................................52

**10.23**   Final Decree. ....................................................................................52

**10.24**   Additional Documents. .....................................................................52

**10.25**   Conflicts with the Plan.....................................................................52

ARTICLE XI. REQUEST FOR CONFIRMATION AND RECOMMENDATION ...................53

**11.1**    Request for Confirmation. ................................................................53

**11.2**    Recommendation. .............................................................................53

## INTRODUCTION[1]

The Debtors and the Unsecured Creditors Committee jointly hereby propose this Plan, which provides for the resolution of the outstanding Claims asserted against and Equity Interests in the Debtors. This Plan was developed after extensive negotiations by and among the Debtors, the Unsecured Creditors Committee, the Ad Hoc LLC Members Committee and the Ad Hoc DOT Noteholders Committee and, as presented, is backed by the full support and recommendation of all three (3) Committees and the Debtors. Provided herewith as a separate enclosure is a brief summary of the Plan, as well as the statements of the Ad Hoc Committees in support of this Plan, which all Investors are encouraged to read in their entirety in conjunction with this Plan and other documents referenced herein.[2]

Further reference is made to the Disclosure Statement for (i) a discussion of the Debtors' history, businesses, properties and other assets, and results of operations and other financial information; (ii) a summary and analysis of this Plan; and (iii) certain related matters, including risk factors relating to the consummation of this Plan and Distributions to be made under this Plan.

The Debtors and the Unsecured Creditors' Committee are the proponents of the Plan within the meaning of Bankruptcy Code section 1129. Subject to certain restrictions and requirements set forth in Bankruptcy Code section 1127, Bankruptcy Rule 3019, and Sections 10.8 and 10.16 of the Plan, the Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw the Plan prior to its substantial consummation.

No solicitation materials, other than the Disclosure Statement and related materials transmitted therewith, have been approved for use in soliciting acceptances and rejections of this Plan. Nothing in the Plan should be construed as constituting a solicitation of acceptances of the Plan unless and until the Disclosure Statement has been approved and distributed to Holders of Claims to the extent required by Bankruptcy Code section 1125.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ CAREFULLY THE DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS AND SCHEDULES THERETO) AND THE PLAN, EACH IN ITS ENTIRETY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## DEFINED TERMS AND RULES OF INTERPRETATION

For purposes of the Plan, except as expressly provided or unless the context otherwise requires:

(a)    all Defined Terms shall have the meanings ascribed to them in this Article I of the Plan;

(b)    any term used in the Plan that is not a Defined Term, but that is used in the Bankruptcy Code or Bankruptcy Rules has the meaning assigned to such term in the Bankruptcy Code or Bankruptcy Rules, as applicable;

---

[1] Capitalized terms used in this Introduction have the meanings ascribed to those terms in Article I below.

[2] In the event of any inconsistencies between the terms of the Plan and information and descriptions in the above-referenced Plan summary, the terms of the Plan shall control.

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 76 of 158

(c)     whenever the context requires, terms shall include the plural as well as the singular number, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(d)     any reference in the Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such agreement or document shall be substantially in such form or substantially on such terms and conditions;

(e)     any reference in the Plan to an existing document, instrument, or exhibit means such document, instrument, or exhibit as it may have been or may be amended, modified, or supplemented from time to time;

(f)     any reference to a specific Person includes any successors or lawful assigns of such Person, and all rights, benefits, interests, and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, trustee, liquidator, rehabilitator, conservator, successor, or lawful assign of such Person;

(g)     unless otherwise indicated, the phrase "under the Plan" and similar words or phrases refer to the Plan in its entirety rather than to only a particular portion of the Plan;

(h)     unless otherwise specified, all references in the Plan to sections, articles, schedules, and exhibits are references to sections, articles, schedules, and exhibits of or to the Plan;

(i)     the words "herein," "hereof," "hereto," "hereunder," "herewith," and other words of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan;

(j)     whenever the Plan uses the word "including," such reference shall be deemed to mean "including, without limitation,";

(k)     captions and headings to articles and sections are intended to be a part of the Plan;

(l)     whenever the Plan provides that a document or thing must be "acceptable" or "satisfactory" to any Person, such requirement shall in each case be subject to a reasonableness qualifier;

(m)     the definition given to any term or provision in the Plan supersedes and controls any different meaning that may be given to that term or provision in the Disclosure Statement, on any Ballot, or in any other document other than the Confirmation Order; and

(n)     all other rules of construction set forth in Bankruptcy Code section 102 and in the Bankruptcy Rules shall apply.

The following Defined Terms shall have the respective meanings specified below:

**1.1     Ad Hoc Committees:** The Ad Hoc LLC Members Committee and the Ad Hoc DOT Noteholders Committee.

**1.2     Ad Hoc DOT Noteholders Committee:**  The *ad hoc* committee composed of certain DOT Noteholders.

**1.3     Ad Hoc LLC Members Committee:** The *ad hoc* committee composed of certain PFI LLC Members.

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 77 of 158

**1.4** **Administrative Claim:** A Claim, to the extent not previously paid, otherwise satisfied, or withdrawn, for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date or the Order for Relief Date, as applicable, until and including the Effective Date, of preserving the Estates and operating the Debtors' businesses; (b) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code; and (c) all Section 503(b)(9) Claims.

**1.5** **Administrative Claims Bar Date:** The last date by which any Person must File a request for payment of an Administrative Claim other than a Professional Fee Claim, which date shall be the first Business Day that is at least thirty (30) calendar days after the Effective Date. For the avoidance of doubt, post-petition statutory tax Claims shall not be subject to the Administrative Claims Bar Date. For the further avoidance of doubt, the Claims Bar Date for Section 503(b)(9) Claims is the General Claims Bar Date.

**1.6** **Allowed**, **Allowed Claim**, or **Allowed [ ] Claim:**

    (a)    with respect to a Claim arising prior to the Petition Date (including a Section 503(b)(9) Claim):

        (i)    either (A) a proof of claim was timely Filed by the applicable Claims Bar Date, or (B) a proof of claim is deemed timely Filed either as a result of such Claim being Scheduled or by a Final Order; and

        (ii)    either (A) the Claim is not a Contingent Claim, a Disputed Claim, an Unliquidated Claim, or a Disallowed Claim; or (B) the Claim is expressly allowed by a Final Order or under the Plan;

    (b)    with respect to a Claim arising on or after the Petition Date (excluding a Section 503(b)(9) Claim), a Claim that has been allowed by a Final Order or under the Plan.

Unless otherwise specified in the Plan or by a Final Order, an "Allowed Administrative Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest, penalties, fees, or late charges on such Administrative Claim or Claim from and after the Petition Date. Moreover, any portion of a Claim that is withdrawn, expunged, satisfied, released, or waived during the Chapter 11 Cases or following the Effective Date is not an Allowed Claim. For the avoidance of doubt, any and all Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder. Notwithstanding any of the foregoing, Investor Claims will be Allowed as set forth in Section 6.4 of the Plan.

**1.7** **Alternative Restructuring Transactions:** Such arrangements, restructurings, continuances, transfers, dispositions, liquidations, dissolutions, mergers, amalgamations, consolidations and/or other corporate transactions, if any, that the Debtors, after consultation with each of the Committees, may determine to be necessary to implement the Plan, as an alternative to or in addition to one or more of the transactions contemplated under the Plan, whether based on tax, corporate, business and/or other considerations.

**1.8** **Alternative Restructuring Transactions Memorandum:** An exhibit which sets forth the steps to be carried out to effectuate the Alternative Restructuring Transactions, if applicable, on and after the Effective Date, and which will be reasonably acceptable to each of the Committees. Articles III and V of the Plan are subject to any modifications set forth in the Alternative Restructuring Transactions Memorandum, if applicable. The Alternative Restructuring Transactions Memorandum (if any) will be Filed no later than seven (7) days prior to the Confirmation Hearing and be available at https://www.donlinrecano.com/Clients/pfi/Index.

SMRH:4816-5664-3557.1
040921

73ZL-319169

**1.9** **Available Cash:** All Cash held by the Debtors on the Effective Date or by the PFI Trust on and after the Effective Date; in each case, after payments, allocations, or reserves in accordance with the Plan and the PFI Trust Agreement.

**1.10** **Avoidance Actions:** Any and all causes of action, claims, remedies, or rights that may be brought by or on behalf of the Debtors or the Estates under Bankruptcy Code sections 506(c), 510, 542, 544, 545, 547, 548, 549, 550, 551, 552(b) or 553, or under related state or federal statutes, or pursuant to any theory or cause of action under common law, regardless whether such action has been commenced prior to the Effective Date.

**1.11** **Ballot:** The ballot form distributed to each Holder of a Claim entitled to vote to accept or reject the Plan.

**1.12** **Bankruptcy Code:** Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as the same may be amended from time to time to the extent applicable to the Chapter 11 Cases.

**1.13** **Bankruptcy Court:** The United States Bankruptcy Court for the Northern District of California, or in the event such court ceases to exercise jurisdiction over any Chapter 11 Case, such other court or adjunct thereof that exercises jurisdiction over such Chapter 11 Case in lieu of the United States Bankruptcy Court for the Northern District of California.

**1.14** **Bankruptcy Rules:** The Federal Rules of Bankruptcy Procedure promulgated by the Supreme Court of the United States under 28 U.S.C. § 2075, as the same may be amended from time to time to the extent applicable to the Chapter 11 Cases.

**1.15** **Bar Date Order:** The order of the Bankruptcy Court setting and establishing, among other things, the General Claims Bar Date.

**1.16** **BOV:** A board for the PFI Trust, whose initial, volunteer members shall be selected by the Committees and identified in the Plan Supplement. If any member of the BOV later becomes unavailable for any reason, any replacement member shall be selected and appointed as provided in the PFI Trust Agreement.

**1.17** **Business Day:** Any day other than a Saturday, a Sunday or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

**1.18** **Cash:** Cash and cash equivalents, including bank deposits, wire transfers, checks representing good funds, and legal tender of the United States of America or instrumentalities thereof.

**1.19** **Cash Collateral Orders:** Collectively, all orders entered by the Bankruptcy Court authorizing the applicable Debtors to use cash collateral pursuant to section 363 of the Bankruptcy Code.

**1.20** **Causes of Action:** Any and all claims, rights, actions, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, rights of setoff, third-party claims, subordination claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross claims, damages, or judgments whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, foreseen or unforeseen, asserted or unasserted, existing or hereafter arising, in law, at equity, by statute, whether for tort, fraud, contract, or otherwise.

SMRH:4816-5664-3557.1
040921

73ZL-319169

**1.21** **Chapter 11 Cases:** The voluntary and involuntary chapter 11 bankruptcy cases commenced by the Debtors, which are being jointly administered under the case caption *In re Professional Financial Investors, Inc., et al.*, Case No. 20-30604 (Bankr. N.D. Cal.).

**1.22** **Claim:** Any "claim," as defined in Bankruptcy Code section 101(5), against any of the Debtors or against any property of the Debtors.

**1.23** **Claim Objection Deadline:** Subject to extension as set forth in Section 70 of the Plan, the date that is the first Business Day that is at least 180 calendar days after the Effective Date. For the avoidance of doubt, the Claim Objection Deadline may be extended one or more times by order of the Bankruptcy Court.

**1.24** **Claims Agent:** Donlin, Recano & Co., Inc., the Debtors' court-appointed claims, noticing, and balloting agent.

**1.25** **Claims Bar Date:** As applicable, the Administrative Claims Bar Date, the General Claims Bar Date, the Governmental Claims Bar Date, the Rejection Claims Bar Date, or any additional bar date set by the Bankruptcy Court with respect to Investor Claims.

**1.26** **Class:** A category of Claims or Equity Interests designated pursuant to the Plan, or any subclass thereof.

**1.27** **Class A PFI Trust Interests:** The PFI Trust Interests to be distributed to: (a) Investors under the Plan and the PFI Trust Agreement on account of any Investor Restitution Claim; and (b) Holders of Other Unsecured Claims on account of their Allowed Class 6 Claims.

**1.28** **Class B PFI Trust Interests:** The PFI Trust Interests to be distributed to Investors under the Plan and the PFI Trust Agreement on account of any Investor Subordinated Claim.

**1.29** **Closing Date:** The date on which all of the Chapter 11 Cases have been closed in accordance with Section 10.23 of the Plan.

**1.30** **Collateral:** Any Estate Asset that is subject to a Lien to secure the payment or performance of a Claim, which Lien is perfected and not subject to avoidance under the Bankruptcy Code or otherwise invalid or unenforceable under the Bankruptcy Code or applicable nonbankruptcy law.

**1.31** **Collateral Source Recoveries:** Any recoveries from other sources (other than those pursuant to the Plan) that an Investor receives on account of losses represented by its Investor Claim, including, without limitation, proceeds of insurance, litigation, or settlements.

**1.32** **Committees:** Collectively, the Ad Hoc LLC Members Committee, the Ad Hoc DOT Noteholders Committee, and the Unsecured Creditors' Committee.

**1.33** **Confirmation:** Entry by the Bankruptcy Court of the Confirmation Order.

**1.34** **Confirmation Hearing:** The hearing or hearings held by the Bankruptcy Court to consider Confirmation of the Plan as required by Bankruptcy Code section 1128(a), as such hearing may be continued from time to time.

**1.35** **Confirmation Order:** The order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code section 1129 in a form reasonably acceptable to the Debtors and each of the Committees.

**1.36** **Contingent Claim:** Any Claim that is Scheduled or Filed as contingent.

SMRH:4816-5664-3557.1
040921

73ZL-319169

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 80 of 158

**1.37** **Contributed Claims:** All Causes of Action (1) that are legally assignable (including Causes of Action that are legally assignable solely because of the preemptive effect of the Plan) that an Investor has against any Person that is not a Released Party and that are related in any way to the Debtors, their predecessors, their respective affiliates, or any Excluded Parties, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of any investments related to the Debtors; (b) all Causes of Action for unlawful dividend, fraudulent conveyance, fraudulent transfer, voidable transaction, or other avoidance claims under state or federal law; (c) all Causes of Action based on, arising out of, or related to the misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; (d) all Causes of Action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation of, any of the wrongful conduct described in the Disclosure Statement, including in respect of any alleged fraud related thereto; and (e) all Causes of Action based on aiding or abetting, entering into a conspiracy with, or otherwise supporting torts committed by the Debtors or their agents, and (2) for which a Contributing Claimant elects to contribute such Causes of Action on its Ballot. For the avoidance of doubt, the following are <u>not</u> Contributed Claims: (i) Causes of Action based upon loss of liens or lien priority, and (ii) Causes of Action by Investors against their own professionals, investment advisers, or investment managers related to their decision to invest in PFI, PISF or any of the LLC/LP Debtors or the handling of such investments; *provided, however,* that any recoveries on such Causes of Action shall be Collateral Source Recoveries.

**1.38** **Contributing Claimants:** The Investors that elect on their Ballots to contribute Contributed Claims to the PFI Trust.

**1.39** **Contributing Claimants' Enhancement Multiplier:** Five percent (5%) (*i.e.*, the applicable Investor's Allowed Investor Claim amount will be increased by 5%).

**1.40** **Corporate Action:** Any action, approval, authorization, decision, or other act of any kind that would be necessary on the part of any Person for any corporation, limited liability company, or other Person to in turn act.

**1.41** **Creditor:** Any Holder of a Claim.

**1.42** **Cure Payment:** The payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) that is necessary to cure any and all defaults under an executory contract or unexpired lease so that such contract or lease may be assumed, or assumed and assigned, pursuant to Bankruptcy Code section 1123(b)(2).

**1.43** **Debtor** or **Debtors:** Individually and collectively, each of the entities listed on **Exhibit 1** hereto, as the same may be amended from time to time, including, without limitation, the Plan-Consolidated Debtors as of the Effective Date.

**1.44** **Defined Term:** Any capitalized term that is defined in this Article I of the Plan.

**1.45** **Disallowed Claim:** Any Claim that (a) is not Scheduled, or is listed thereon as contingent, unliquidated, disputed, or in an amount equal to zero, and whose Holder failed to timely File a proof of claim by the applicable Claims Bar Date (unless late filing was permitted by a Bankruptcy Court order), but excluding any Claim that is expressly Allowed by a Final Order or under the Plan; or (b) has been disallowed pursuant to an order of the Bankruptcy Court.

**1.46** **Disclosure Statement:** That certain disclosure statement relating to the Plan, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to Bankruptcy Code section 1125, as it subsequently may be amended, modified, or supplemented by the Plan Proponents.

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 81 of 158

**1.47** **Disputed Claim:** Any Claim:

(a) that is disputed in whole or in part under the Plan or that is Scheduled as disputed, contingent, unliquidated, or in an amount equal to zero; or

(b) that is asserted by any of the Excluded Parties or any Disputing Claimant, which are Disputed Claims in their entirety and, as such, will have no right to receive any Distributions under the Plan unless and until such Claims are affirmatively Allowed by a Final Order; or

(c) that

    (i) is not expressly Allowed by a Final Order or under the Plan; and

    (ii) as to which a proof of claim is Filed or is deemed Filed as a result of such Claim being Scheduled; and

    (iii) as to which either:

        (1) an objection or request for estimation or subordination (A) has been timely Filed within the applicable period of limitations fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order under which the applicable period of limitation has expired, and (B) has not been denied by a Final Order or withdrawn; or

        (2) the Claim Objection Deadline has not passed as to such Claim (unless the PFI Trust has determined that it will not object to such Claim).

**1.48** **Disputing Claimant:** An Investor (other than an Excluded Party) that disputes the amounts set forth for such Person in the Schedule of Allowed Netted Claims in accordance with the deadlines and procedures to be established by further order of the Bankruptcy Court or that challenges the expungement of such Investor's lien in Real Property under the Plan.

**1.49** **Distribution:** Any initial or subsequent issuance, payment, or transfer of consideration made under the Plan or the PFI Trust Agreement.

**1.50** **Distribution Agent:** (i) The PFI Trustee solely in his, her or its capacity as distribution agent under the Plan with respect to Distributions to Holders of Allowed Administrative Claims (including Professional Fee Claims), Involuntary Gap Claims, Priority Tax Claims, and Claims in Classes 1, 2 and 3 on account of such Allowed Claims, or (ii) any party designated by the PFI Trustee to serve in such capacity.

**1.51** **Distribution Date:** Any date on which a Distribution is made.

**1.52** **Distribution Fund:** Cash that is and becomes available for funding the Distributions to the PFI Trust Beneficiaries in accordance with the Plan and the PFI Trust Agreement.

**1.53** **Distribution Record Date:** The record date for determining entitlement of Holders of Claims to receive Distributions under the Plan, which date shall be the Effective Date.

**1.54** **Distribution Reserve:** One or more reserves in respect of Contingent Claims, Disputed Claims, or Unliquidated Claims established under the Plan for PFI Trust Interests distributable under the Plan with respect to such Claims and amounts payable under the Plan with respect to such Claims or on account of such reserved PFI Trust Interests.

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 82 of 158

**1.55     DOT Noteholder Claims:** Claims of DOT Noteholders.

**1.56     DOT Noteholders:** Those certain Investor lenders to PFI in the form of promissory notes that are purportedly secured by deeds of trust on certain of the Real Properties owned by PFI. Although such deeds of trust were typically junior or subordinated, it is understood that some DOT Noteholders may hold, or assert that they hold, senior deeds of trust on certain Real Properties, and both types are included within this definition.

**1.57     DOT Noteholders' Deeds of Trust:** Any and all deeds of trust that secure notes held by DOT Noteholders, regardless of whether such deeds of trust are senior or junior in priority to other deeds of trust.

**1.58     Effective Date:** The date that is the first Business Day on which each condition set forth in Article VIII of the Plan has been satisfied or waived as set forth therein but in no event later than 120 days after the Confirmation Date, unless otherwise ordered by the Bankruptcy Court.

**1.59     Equity Interests:** All previously issued and outstanding common stock, preferred stock, membership interests, or other ownership interests in any of the Debtors (including, without limitation, the Plan-Consolidated Debtors) outstanding immediately prior to the Effective Date, including restricted stock, treasury stock, and all options, warrants, calls, rights, puts, awards, commitments, appreciation rights, or any other agreements of any character to convert, exchange, exercise for, or otherwise receive any such common stock, preferred stock, membership interests, or other ownership interests. For the avoidance of doubt, any and all purported equity interests of an Investor in any Debtor shall be deemed Investor Claims of the Investor pursuant to the Plan, regardless of the pre-petition designations used by the Debtors and/or Investors.

**1.60     Estate Assets:** Collectively, (a) any and all right, title, and interest of the Debtors and the Estates in and to property of whatever type or nature, including books and records, the Real Properties, all Avoidance Actions and Causes of Action as of the Effective Date; and (b) any assets contributed to or recovered by the PFI Trust or the OpCo on or after the Effective Date.

**1.61     Estates:** The chapter 11 estates of the Debtors created by Bankruptcy Code section 541(a).

**1.62     Excluded Parties:** Any prepetition Insider of any of the Debtors, any non-debtor affiliates of the Debtors or Insider of any such non-debtor affiliates, any prepetition employee of any of the Debtors involved in any way in the marketing, sale, or collecting or handling of any funds regarding the investments of the Investors, and any other Person (including any "broker," salesperson, consultant, affiliated entity, or professional) involved in any way in the marketing, sale, or collecting or handling of any funds regarding the investments of the Investors, including those Persons identified on the Schedule of Excluded Parties.

**1.63     Exculpated Parties:** Collectively, (a) the Debtors, (b) the Committees and their respective current and former members (in their capacities as such), and (c) each of the preceding's respective Related Parties; *provided, however*, that the Exculpated Parties shall not include any Excluded Party.

**1.64     File**, **Filed**, or **Filing:** Duly and properly filed with the Bankruptcy Court and reflected on the docket of the Chapter 11 Cases, except with respect to proofs of claim that must be filed with the Claims Agent, in which case "File" or "Filed" means duly and properly filed with the Claims Agent and reflected on the official claims register maintained by the Claims Agent.

**1.65     Final Decree:** An order entered pursuant to Bankruptcy Code section 350, Bankruptcy Rule 3022, and Local Rule 3022-1 closing the Chapter 11 Cases.

Case: 20-30604     Doc# 572     Filed: 04/16/21     Entered: 04/16/21 18:37:04     Page 83 of 158

**1.66**  **Final Order:** An order or judgment of the Bankruptcy Court entered on the docket of the Chapter 11 Cases:

  (a)  that has not been reversed, rescinded, stayed, modified, or amended;

  (b)  that is in full force and effect; and

  (c)  with respect to which (i) the time to appeal or to seek review, rehearing, remand, or a writ of certiorari has expired and as to which no timely filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending; or (ii) any such appeal or petition has been dismissed or resolved by the highest court to which the order or judgment was appealed or from which review, rehearing, remand, or a writ of certiorari was sought.

For the avoidance of doubt, no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Bankruptcy Code section 502(j), Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rules 9023 or 9024 may be or has been filed with respect to such order.

**1.67**  **General Claims Bar Date:** [•], 2021, which is the general deadline set pursuant to the Bar Date Order for filing proofs of claim for any Claims against the Debtors that arose prior to the Petition Date, other than Claims of governmental units or Investors.

**1.68**  **General Unsecured Claims:**  All Non-DOT Investor Claims, TIC Claims, and Other Unsecured Claims.

**1.69**  **Governmental Claims Bar Date:** [•], 2021, which is the deadline set pursuant to the Bar Date Order for filing proofs of claim for any Claims of governmental units against the Debtors that arose prior to the Petition Date.

**1.70**  **Holder:** The Person that is the owner of record of a Claim, Equity Interest, or PFI Trust Interest, as applicable.

**1.71**  **Impaired:** Any Class of Claims or Equity Interests that is impaired within the meaning of Bankruptcy Code section 1124.

**1.72**  **Individual Investor-Specific Claims:** As defined in Section 2.10.3(a) of the Plan.

**1.73**  **Insider:** Any "insider," as defined in Bankruptcy Code section 101(31), and with respect to a limited liability company, any director, officer, person in control or relative of any of the foregoing. For clarity purposes, an insider as used herein does not include any PFI LLC Member or LP Interest Holder but does include Excluded Parties.

**1.74**  **Intercompany Claim:** Any Claim of one Debtor against another Debtor, except any postpetition claim arising from an "Intercompany Transaction" authorized in the several Cash Management Orders, e.g., Docket 354, issued in these Chapter 11 Cases.

**1.75**  **Intercompany Lien:** Any Lien securing an Intercompany Claim.

**1.76**  **Initial PFI Trustee:** Michael Goldberg in his capacity as the PFI Trustee of the PFI Trust as of the Effective Date.  Mr. Goldberg was jointly selected by the Committees as the Initial PFI Trustee.

**1.77**  **Investor:** A Person or Entity that purchased an investment product or made an investment offered by any Debtor, including, without limitation, any investments, interests and/or other rights

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 84 of 158

with respect to any Debtor that were styled, marketed or sold as, among others, "PISF LP notes," "PFI DOT notes," "straight notes," "DOT notes," or "membership interests" in limited liability companies. Investors include, without limitation, PISF Straight Noteholders, DOT Noteholders, LP Interest Holders, and PFI LLC Members, but expressly excludes any of the Debtors, the Excluded Parties, and Holders of TIC Interests.

**1.78   Investor Claims:**   Any and all Claims of an Investor against any Debtor, which shall be composed of (i) an Investor Restitution Claim and (ii) an Investor Subordinated Claim.

**1.79   Investor Claims Special Provisions:** As defined in Section 2.10.2 of the Plan.

**1.80   Investor Lookback Period:**  The prepetition period commencing July 26, 2013 (*i.e.*, seven (7) years prior to the Petition Date for PISF).

**1.81   Investor Restitution Claim:**  A Claim for restitution of an Investor to be treated *pari passu* with Other Unsecured Claims. Such claim is in lieu of contractual or other rights to return of principal investment, and is calculated as follows for a particular Investor: total Outstanding Principal Amount minus the Prepetition Distribution. For clarity purposes, although the calculation set forth herein is based on a method accounting for the Debtors' record keeping methods, in plain terms, the Investor Restitution is intended to be a "netted claim," that, in broad terms, calculates the remaining principal owed to a "cash-Investor" by looking at the "starting balance" plus "cash-in" minus "cash-out" transactions during the relevant time periods.

**1.82   Investor Subordinated Claim:**  A Claim of an Investor that is subordinated to Investor Restitution Claims and Other Unsecured Claims under the Plan, but senior in priority to Other Subordinated Claims, comprised of (i) seven percent (7%) interest, compounded annually, on the Investor's principal investments from the Ponzi Start Date until July 26, 2020, and (ii) any amount (if any) that is paid by the Investor to the PFI Trust on account of an Avoidance Action.  For avoidance of doubt, an Allowed Investor Subordinated Claim shall be reduced dollar for dollar on account of any Collateral Source Recoveries the Investor receives on account of the losses represented by its Investor Claim, and if such Allowed Investor Subordinated Claim is reduced to zero, the Investor's Allowed Investor Restitution Claim will be reduced dollar for dollar on account of any additional Collateral Source Recoveries that may be received by the Investor.  Investors who were paid referral fees shall not receive an Investor Subordinated Claim on account of such fee.

**1.83   Involuntary Gap Claim:**  A Claim specified in Bankruptcy Code section 502(f) and entitled to priority against the applicable Debtors and Estates under Bankruptcy Code section 507(a)(3).

**1.84   Lien:**  Has the meaning ascribed in Bankruptcy Code section 101(37), including any lien, security interest, pledge, title retention agreement, encumbrance, leasehold, charge, mortgage, deed of trust, assignment of rents, assignment or hypothecation to secure payment of a debt or performance of an obligation, other than, in the case of securities and any other equity ownership interests, any restrictions imposed by applicable United States or foreign securities laws.

**1.85   LLC/LP Debtors:**  All of the Debtors listed on **Exhibit 1** attached to the Plan other than Debtors PFI and PISF.

**1.86   Local Rules:** The Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of California, as amended from time to time.

**1.87   LP Interest Holder**:  A holder of an interest in an LP Debtor.

**1.88   Net PFI Trust Action Proceeds:**  As defined in Section 4.3.10 of the Plan.

SMRH:4816-5664-3557.1
040921
HU333043

**1.89  Net Prepetition Investor Recovery:**  With respect to a specific Investor, (a) the total Cash value remitted to the Investor during the Investor Lookback Period (whether the payment was considered a return on the investment, a referral fee, or a repayment of principal), minus (b) the total Cash value invested prepetition as principal by the Investor, provided that the value of (a) is greater than the value of (b).

**1.90  Net Recovery:** As defined in Section 2.10.3(b) of the Plan.

**1.91  Non-Compensatory Penalty Claims:**  Any Claim, secured or unsecured, for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, to the extent such fine, penalty, or damages are not compensation for actual pecuniary loss suffered by the Holder of such Claim.

**1.92  Non-DOT Investor Claims:**  Investor Claims other than DOT Noteholder Claims.  For the avoidance of doubt, Non-DOT Investor Claims include Claims of PISF Straight Noteholders, PFI LLC Members, and LP Interest Holders.

**1.93  Non-Investor First-Priority Lender:**  A lender to a Debtor or an affiliate of a Debtor (including, without limitation, a retail or commercial bank) that is not an Investor and that asserts a Secured Claim on account of a first-priority deed of trust or Lien against one or more of the Real Properties.

**1.94  Non-Investor First-Priority Lender Claims:**  Any and all Secured Claims of Non-Investor First Priority Lenders in relation to one or more of the Real Properties.

**1.95  Non-Investor Other Secured Claims:**  Any and all Secured Claims of a Person that is not an Investor or a Non-Investor First-Priority Lender.

**1.96  Nonpayment Default:** As defined in subsection 2.2.3(a) of the Plan.

**1.97  OpCo:**  A new operating company established on the Effective Date in accordance with the terms of the Plan and the PFI Trust Agreement for the sole purpose of managing, operating and monetizing the OpCo Assets for the benefit of the PFI Trust and the PFI Trust Beneficiaries thereunder.

**1.98  OpCo Assets:**  Collectively, all Estate Assets (including all partnership or membership interests in a Debtor entity, as determined by the PFI Trust) and other assets or entities that may be transferred or otherwise provided, directly or indirectly, to or for the benefit of the Debtors (after the Petition Date but before the Effective Date) or the OpCo (on or after the Effective Date) by any Person, but not including the PFI Trust Assets (including the PFI Trust Actions), the Senior Claims Reserve, the Distribution Reserve or the Professional Fee Reserve.

**1.99  Order for Relief Date:**  (a) July 26, 2020, when used in reference to PISF (the date that the Bankruptcy Court entered the order for relief in the Chapter 11 Case of PISF); (b) December 11, 2020, when used in reference to the LLC/LP Debtors (the date that the Bankruptcy Court entered the respective orders for relief in the Chapter 11 Cases of the LLC/LP Debtors); and (c) the other respective dates specified in **Exhibit 1** hereto, when used in reference to other Debtors (other than PISF, PFI and the LLC/LP Debtors).

**1.100  Other Subordinated Claim:** Collectively, (a) any Non-Compensatory Penalty Claims and (b) any other Claim that is subordinated to General Unsecured Claims pursuant to Bankruptcy Code section 510, a Final Order, or by consent of the Creditor holding such Claim, but not any Investor Claims.

SMRH:4816-5664-3557.1
040921

73ZL-319169

**1.101** **Other Unsecured Claim:** Any unsecured, non-priority Claim asserted against any of the Debtors or the Estates that is not a Non-Investor First-Priority Lender Claim, Investor Claim, TIC Claim or Other Subordinated Claim, including, for the avoidance of doubt, all Rejection Claims, but excluding (a) any Claims arising from any executory contracts or unexpired leases that are assumed during the Chapter 11 Cases and (b) any vendor or other Claims satisfied in the ordinary course of business or pursuant to an order of the Bankruptcy Court.

**1.102** **Outstanding Principal Amount:** When used in reference to an Investor Claim, an amount equal to the aggregate of the Investor's balance at the Ponzi Start Date, inclusive of interest actually accrued prior to the Ponzi Start Date, and actual dollars invested at any time between the Ponzi Start Date and the Petition Date (whether or not rolled over from another investment by an Investor or from the account of another Investor) on account of the Investor Claim held by the applicable Investor.

**1.103** **Person:** Any person or organization created or recognized by law, including any association, company, cooperative, corporation, entity, estate, fund, individual, joint stock company, joint venture, limited liability company, partnership, trust, trustee, unincorporated organization, government or any political subdivision thereof, or any other entity or organization of whatever nature.

**1.104** **Petition Date:** (a) July 16, 2020, when used in reference to PISF (the date that an involuntary petition for relief under chapter 11 of the Bankruptcy Code was filed against PISF); (b) July 26, 2020, when used in reference to PFI that filed its voluntary chapter 11 petition on such date; (c) the other respective dates specified in **Exhibit 1** hereto, when used in reference to the LLC/LP Debtors; and (d) July 26, 2020, when used in reference to the Plan-Consolidated Debtors.

**1.105** **PFI:** Professional Financial Investors, Inc., a Debtor.

**1.106** **PFI LLC Member:** An Investor who is a member of a PFI-Managed LLC.

**1.107** **PFI-Managed LLC:** A limited liability company that is managed by PFI and/or in which PFI holds an interest.

**1.108** **PFI Trust Actions:** Collectively, all Avoidance Actions and Causes of Action held by the Debtors or the Estates and any Causes of Action that are contributed to the PFI Trust as Contributed Claims, in each case as against any Person that is not a Released Party.

**1.109** **PFI Trust Assets:** Collectively, (a) the PFI Trust Actions, (b) 100% of the equity interests in the OpCo (including all proceeds and distributions from OpCo), (c) Available Cash as of the Effective Date and Available Cash that is possessed by or turned over to the PFI Trust after the Effective Date, excluding the Senior Claims Reserve and the Professional Fee Reserve, and (d) other assets or entities that may be transferred or otherwise provided, directly or indirectly, to or for the benefit of the PFI Trust (on or after the Effective Date) by any Person.

**1.110** **PFI Trust Beneficiary:** Each Holder of a PFI Trust Interest. PFI Trust Interests are to be Distributed to Holders of Allowed Investor Claims and Allowed Other Unsecured Claims in accordance with Sections 2.5, 2.6 and 2.7 of the Plan.

**1.111** **PFI Trust Expenses:** Any and all reasonable fees, costs, and expenses incurred by the PFI Trustee in managing and operating the PFI Trust not inconsistent with the Plan or the PFI Trust Agreement, including the maintenance or disposition of the PFI Trust Assets and the OpCo Assets (including PFI Trustee fees, indemnity reserves, attorneys' fees, the fees of professionals, and other Persons retained by the PFI Trustee or by the OpCo, personnel-related expenses, and any taxes

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 87 of
158

imposed on the PFI Trust, in respect of the PFI Trust Assets, the OpCo or the OpCo Assets), and any other expenses incurred or otherwise payable in accordance with the PFI Trust Agreement.

**1.112  PFI Trust Indemnified Parties:** The PFI Trustee, the BOV, and their respective Related Parties, each in their respective capacity as such.

**1.113  PFI Trust Interests:**  Any Class A PFI Trust Interests distributed to Investors and other creditors and Class B PFI Trust Interests distributed to Investors under the Plan and the PFI Trust Agreement.

**1.114  PFI Trust Interests Waterfall:** As defined in Section 4.3.10 of the Plan.

**1.115  PFI Trustee:** The Initial PFI Trustee (Michael Goldberg), who was jointly selected by the Committees, and any successor thereto appointed pursuant to the PFI Trust Agreement, in each case acting in the capacity as trustee of the PFI Trust.

**1.116  PISF Straight Noteholders:**  Those certain lenders to PISF evidenced in the form of promissory notes that are purportedly secured by PISF's interests in limited partnerships that are Debtors or affiliated with a Debtor.

**1.117  Plan:** This *Amended Joint Chapter 11 Plan of Professional Financial Investors, Inc. and Its Affiliated Debtors Proposed By the Debtors and Official Committee of Unsecured Creditors and Supported By the Ad Hoc LLC Members Committee and the Ad Hoc DOT Noteholders Committee* and all exhibits thereto, including the Plan Supplement, as the same may be amended, modified, or supplemented in the Plan Proponents' reasonable discretion after consultation with each of the Ad Hoc Committees.

**1.118  Plan-Consolidated Debtors:** Professional Investors 28, LLC and PFI Glenwood LLC.

**1.119  Plan Proponents:**  The Debtors and the Unsecured Creditors' Committee, as proponents of the Plan.

**1.120  Plan Supplement:** The ancillary documents regarding the implementation and effectuation of the Plan, which will be Filed on or before the date that is seven (7) calendar days prior to the Voting Deadline, as such documents may be amended and supplemented prior to the Confirmation Hearing in the Plan Proponents' reasonable discretion after consultation with each of the Committees.  The Plan Supplement may include, without limitation, the form of the PFI Trust Agreement, the Schedule of Assumed Agreements, and additional information relating to tax matters.

**1.121  Ponzi Start Date:** January 1, 2007.

**1.122  PFI Trust:** A trust established on the Effective Date for the benefit of the PFI Trust Beneficiaries in accordance with the terms of the Plan and the PFI Trust Agreement.

**1.123  PFI Trust Agreement:** The agreement substantially in the form Filed in the Plan Supplement and reasonably acceptable to each of the Committees establishing and delineating the terms and conditions of the PFI Trust, including the rights and duties of the PFI Trustee and the BOV.

**1.124   Prepetition Distribution:** Any readily identifiable consideration (including distributions, payments, referral fees, roll-overs to other investments of an Investor, and transfers to accounts of other Investors) that was transferred any time between the Ponzi Start Date and the Petition Date from any Person to an Investor on account of any of the Investor's investments related to the Debtors. Such consideration shall include any transfers, whether or not denominated as "principal," "interest,"

SMRH:4816-5664-3557.1
040921

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 88 of
158

73ZL-319169

"roll-overs," "dividends," or other similar terms on account of investments held at any time even if such investment had been paid or was otherwise no longer existing as of the Petition Date.

**1.125  Priority Claim:** A Claim that is entitled to priority under Bankruptcy Code section 507(a), other than an Administrative Claim, Professional Fee Claim, an Involuntary Gap Claim, and a Priority Tax Claim.

**1.126  Priority Tax Claim:** A Claim that is entitled to priority under Bankruptcy Code section 507(a)(8).

**1.127  Pro Rata:** Proportionately so that the ratio of (a) the amount of consideration distributed on account of a particular Allowed Claim or PFI Trust Interest to (b) the amount or number of that Allowed Claim or PFI Trust Interest, is the same as the ratio of (x) the amount of consideration available for Distribution on account of, as applicable, all Allowed Claims in the Class in which the particular Allowed Claim is included or all applicable PFI Trust Interests to (y) as applicable, the amount of all Allowed Claims of that Class or the number of applicable PFI Trust Interests, as adjusted to take into account any applicable Distribution Reserves.

**1.128  Professional:** Any professional employed in the Chapter 11 Cases pursuant to Bankruptcy Code sections 327, 328, 363, 1103, or 1104 or any professional or other Person seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Bankruptcy Code section 503(b)(3) or 503(b)(4).

**1.129  Professional Fee Claim:** A Claim of a Professional for compensation or reimbursement of costs and expenses (or of members of the Committees for reimbursement of expenses) relating to services provided during the period from the applicable Petition Date through and including the Effective Date.

**1.130  Professional Fee Reserve:** The reserve established and funded by the PFI Trust pursuant to Section 10.3 of the Plan to provide sufficient funds to satisfy in full all unpaid Allowed Professional Fee Claims.

**1.131  Real Properties:**  Any and all real property locations (primarily consisting of apartment buildings and commercial office parks) in which a Debtor holds a direct or indirect ownership interest, including the real property locations listed on <u>Schedule 1</u> to the Disclosure Statement.

**1.132  Rejection Claim:** Any Claim for monetary damages as a result of the rejection of any prepetition executory contract or unexpired lease, whether rejected pursuant to the Confirmation Order or otherwise.

**1.133  Rejection Claims Bar Date:** To the extent not previously established by prior order of the Bankruptcy Court, the first Business Day that is at least thirty (30) calendar days after the Effective Date.

**1.134  Related Parties:** Collectively, all of the respective accountants, agents, assigns, attorneys, bankers, consultants, directors, employees, executors, financial advisors, investment bankers, managers, members, officers, partners, predecessors, principals, professional persons, representatives, and successors of the referenced Person; *provided, however,* that the Debtors' Related Parties will be limited to the following Persons: the directors, officers, attorneys, accountants, consultants, professionals, and employees who are employed by the Debtors on the Effective Date.

**1.135  Released Parties:** Collectively, (a) the Debtors, (b) the Committees and their respective current and former members including any ex-officio members (in their capacities as such), and (c)

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 89 of 158

each of the preceding's respective Related Parties; *provided, however*, that the Released Parties shall not include any Excluded Party.

**1.136** **Releasing Parties:** Collectively, (a) the Debtors, (b) the Estates, and (c) any Person exercising or seeking to exercise any rights of the Estates (but solely in that capacity), including each of the Committees (but not their individual members), the PFI Trustee, and any other successor to the Debtors or any other estate representative that is or could be appointed or selected pursuant to Bankruptcy Code section 1123(b)(3) or otherwise.

**1.137** **Schedule of Allowed Netted Claims:** A schedule, or any applicable portion thereof, that will be served on Investors by a deadline to be established by the Bankruptcy Court that indicates both the Outstanding Principal Amount and the Prepetition Distributions for each Investor that is not an Excluded Party.

**1.138** **Schedule of Assumed Agreements:** The schedule of those certain executory contracts and unexpired leases that the Debtors have determined, in the Debtors' reasonable discretion after consultation with each of the Committees, the Debtors may assume and assign to the PFI Trust or the OpCo, as applicable, on the Effective Date. The initial Schedule of Assumed Agreements will be Filed as part of the Plan Supplement, but remains subject to any modifications that may be made prior to the Effective Date pursuant to Section 55.1.1 of the Plan.

**1.139** **Schedule of Excluded Parties:** A non-exclusive schedule to the Disclosure Statement that lists certain of the Excluded Parties.

**1.140** **Scheduled:** Set forth in the Schedules.

**1.141** **Schedules:** The respective Schedules of Assets and Liabilities and Statements of Financial Affairs Filed by the Debtors, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009.

**1.142** **SEC:** The U.S. Securities and Exchange Commission.

**1.143** **Section 503(b)(9) Claim:** A Claim arising under Bankruptcy Code section 503(b)(9) for the value of any goods received by the Debtors within twenty (20) calendar days before the applicable Petition Date and that were sold to the Debtors in the ordinary course of their business.

**1.144** **Secured Claim:** A Claim that is secured by a valid, perfected, and enforceable Lien on property in which the Debtors or the Estates have an interest, which Lien is valid, perfected, and enforceable under applicable law and not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law. A Claim is a Secured Claim only to the extent of the value of the Holder's interest in the Debtors' interest in the Collateral or to the extent of the amount subject to setoff against a Cause of Action held by the Debtors, whichever is applicable, and as determined under Bankruptcy Code section 506(a). To the extent that the value of such interest in the Debtors' interest in the subject Collateral or the amount subject to setoff against a Cause of Action held by the Debtors (as applicable) is less than the amount of the Claim which has the benefit of such security or is supported by such setoff right, such portion of the Claim is unsecured and shall be treated as a General Unsecured Claim unless, in any such case, the Class of which the Secured Claim is a part makes a valid and timely election in accordance with Bankruptcy Code section 1111(b) to have such Claim(s) treated as a Secured Claim to the extent Allowed. For the avoidance of doubt, Investor Claims are not defined, classified, or treated as Secured Claims under the Plan.

**1.145** **Securities Act:** The Securities Act of 1933, as amended.

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 90 of 158

**1.146** **Senior Claims Reserve**: One or more reserves of Cash in respect of, as applicable, Administrative Claims (other than Professional Fee Claims), Involuntary Gap Claims, Priority Tax Claims, Non-Investor First Priority Lender Claims, Non-Investor Other Secured Claims, and Priority Claims (including such Claims that are Contingent Claims, Disputed Claims, or Unliquidated Claims), in amounts to be established by the PFI Trustee, after consultation with the Debtors and the Committees, on or as soon as reasonably practicable after the Effective Date, out of which (i) the Distribution Agent will make Distributions to the Holders of the foregoing Claims (if and to the extent Allowed) in accordance with the Plan, and (ii) the PFI Trustee and his, her or its agents, including the Distribution Agent (if not the PFI Trustee), will be reimbursed from such monies for reasonable costs and expenses incurred by said parties (including fees and costs to litigate and otherwise resolve Contingent Claims, Disputed Claims or Unliquidated Claims, and administer and make Distributions out of the Senior Claims Reserve).

**1.147** **Solicitation Procedures Order:** The order conditionally approving the Disclosure Statement, authorizing the Plan Proponents to solicit acceptances of the Plan, and establishing certain related procedures and deadlines.

**1.148** **TIC Agreements:** All tenancy-in-common agreements, as amended or modified from time to time, between PFI and any Holder of a TIC Interest.

**1.149** **TIC Claim:** Any and all Claims of a Holder of TIC Interests against any Debtor with respect to his or her TIC Interests.

**1.150** **TIC Interests:** The respective tenant-in-common interests of non-debtor parties in Real Properties owned in part by PFI or limited liability companies that are managed by PFI or affiliated with a Debtor.

**1.151** **TIC Investor Treatment Election:** The option provided to each Holder of a TIC Claim on his or her Ballot or by written agreement with the Debtors or PFI Trustee, as applicable, to elect to transfer his or her TIC Interests to the Debtors or PFI Trust, as applicable, and receive the treatment provided to Holders of Class 5 Non-DOT Investor Claims, including the Special Provisions Relating to Investor Claims and Special Provisions Relating to Individual Investor-Specific Claims as set forth in sections 2.11.2 and 2.11.3, respectively.

**1.152** **Unimpaired:** Any Class of Claims that is not impaired within the meaning of Bankruptcy Code section 1124.

**1.153** **Unliquidated Claim:** Any Claim that is Scheduled as unliquidated or that was Filed in an unliquidated amount.

**1.154** **Unsecured Creditors' Committee:** The official committee of unsecured creditors, as provided for under Bankruptcy Code section 1102, which was appointed in the Chapter 11 Cases of PFI and PISF, as it may be reconstituted from time to time.

**1.155** **U.S. Trustee:** The Office of the United States Trustee for the Northern District of California.

**1.156** **Voting Deadline:** The date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the Solicitation Procedures Order.

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 91 of 158

# ARTICLE I.
## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

**1.1.    SUMMARY AND CLASSIFICATION OF CLAIMS**.  This Section classifies Claims – except for Administrative Claims, Professional Fee Claims, Involuntary Gap Claims, and Priority Tax Claims, which are not classified – for all purposes, including confirmation, Distributions, and voting. A Claim is classified in a particular Class only to the extent that the Claim falls within the Class description. To the extent that part of a Claim falls within a different Class description, that part of the Claim is classified in that different Class.  The following table summarizes the Classes of Claims under the Plan:

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|---|---|---|---|
| None | Administrative Claims | Unimpaired | Not Entitled to Vote |
| None | Professional Fee Claims | Unimpaired | Not Entitled to Vote |
| None | Involuntary Gap Claims | Unimpaired | Not Entitled to Vote |
| None | Priority Tax Claims | Unimpaired | Not Entitled to Vote |
| Class 1 | Non-Investor First-Priority Lender Claims[3] | Impaired | Entitled to Vote |
| Class 2 | Non-Investor Other Secured Claims[4] | Unimpaired | Not Entitled to Vote (deemed to accept) |
| Class 3 | Priority Claims | Unimpaired | Not Entitled to Vote (deemed to accept) |
| Class 4 | DOT Noteholder Claims[5] | Impaired | Entitled to Vote |
| Class 5 | Non-DOT Investor Claims | Impaired | Entitled to Vote |
| Class 6 | TIC Claims | Impaired | Entitled to Vote |
| Class 7 | Other Unsecured Claims | Impaired | Entitled to Vote |
| Class 8 | Other Subordinated Claims | Impaired | Not Entitled to Vote (deemed to reject) |

[3] For voting purposes and to comply with Bankruptcy Code section 1122(a), each Allowed Non-Investor First-Priority Lender Claim shall be deemed to be in its own subclass.

[4] For voting purposes and to comply with Bankruptcy Code section 1122(a), each Allowed Non-Investor Other Secured Claim shall be deemed to be in its own subclass.

[5] For voting purposes and to comply with Bankruptcy Code section 1122(a), Allowed DOT Noteholder Claims shall be deemed to be in their own subclass on a property by property basis.

SMRH:4816-5664-3557.1
040921

73ZL-319169

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|-------|-------------|---------------------|---------------|
| Class 9 | Equity Interests | Impaired | Not Entitled to Vote (deemed to reject) |

**NOTWITHSTANDING ANY OTHER TERM OR PROVISION OF THE PLAN, NO DISTRIBUTIONS WILL BE MADE ON ACCOUNT OF ANY CLAIM THAT IS NOT AN ALLOWED CLAIM, AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF ANY CLAIM THAT IS A DISALLOWED CLAIM. IN ADDITION, THE PROPOSED CLASSIFICATION AND TREATMENT OF ANY CLAIMS SET FORTH HEREIN, INCLUDING, WITHOUT LIMITATION, THE DESIGNATION OF ANY CLASS AS IMPAIRED OR UNIMPAIRED, SHALL NOT BE DEEMED A WAIVER OR RELEASE OF ANY CAUSE OF ACTION OR AVOIDANCE ACTION AGAINST ANY HOLDER OF A CLAIM OR ANY OTHER PARTY, INCLUDING, WITHOUT LIMITATION, THE DEBTORS' OR THE PFI TRUST'S RIGHT TO SEEK SUBORDINATION OF ANY CLAIM AND RECLASSIFY SUCH CLAIMS INTO CLASS 7, AND ALL SUCH CAUSES OF ACTION AND AVOIDANCE ACTIONS ARE HEREBY PRESERVED UNDER THE PLAN.**

**1.2.    CLASSIFICATION & VOTING CONTROVERSIES**.

(a)    If a controversy arises regarding whether any Claim is properly classified under the Plan, then the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing.

(b)    If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the Holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan.

<div align="center">

**ARTICLE II.**
**TREATMENT OF CLAIMS AND EQUITY INTERESTS**

</div>

**2.1    UNCLASSIFIED CLAIMS**.

**2.1.1    Administrative Claims.** Except as otherwise provided for herein, and subject to the requirements of the Plan, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) thirty (30) calendar days following the date on which an Administrative Claim becomes an Allowed Administrative Claim, (c) the date on which such Allowed Administrative Claim is otherwise due and payable, or (d) such other date as may be mutually agreed to by the PFI Trust and the Holder of such Allowed Administrative Claim, the Holder of such Allowed Administrative Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Claim or (b) such other less favorable treatment as to which such Holder and the PFI Trust shall have agreed upon in writing.

**2.1.2    Professional Fee Claims.** Professional Fee Claims shall be paid as set forth in Section 10.3 of the Plan.

SMRH:4816-5664-3557.1
040921

73ZL-319169

**2.1.3   Involuntary Gap Claims.**  To be eligible to receive Distributions under the Plan on account of an Involuntary Gap Claim, a proof of Claim must be Filed or deemed Filed with the Bankruptcy Court so as to be received on or before the applicable Claims Bar Date.  Any Holder of an Involuntary Gap Claim that does not properly assert such Claim shall have its Claim be deemed Disallowed under the Plan and be forever barred from asserting such Claim against PISF, any of the other Debtors, and/or any of their respective Estates, assets or property.  Any such Claim shall be Disallowed and the holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.  Except as otherwise provided for herein, and subject to the requirements of the Plan, on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) thirty (30) calendar days following the date on which an Involuntary Gap Claim becomes Allowed, the Holder of such Allowed Involuntary Gap Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Involuntary Gap Claim, (a) Cash equal to the unpaid portion of such Allowed Involuntary Gap Claim or (b) such other less favorable treatment as to which such Holder and the PFI Trust shall have agreed upon in writing.

**2.1.4   Priority Tax Claims.** In full satisfaction, settlement, and release of and in exchange for such Claims, Allowed Priority Tax Claims shall be paid, at the PFI Trust's option, as follows: (a) Cash equal to the unpaid portion of such Allowed Priority Tax Claim on the later of the Effective Date and thirty (30) calendar days following the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim; (b) in regular installment payments in Cash over a period not exceeding five (5) years after the Petition Date, plus interest on the unpaid portion thereof at the rate determined under applicable nonbankruptcy law as of the calendar month in which the Effective Date occurs (*provided* that such election shall be without prejudice to the right to prepay any such Allowed Priority Tax Claim in full or in part without penalty); or (c) such other treatment as to which the Holder of an Allowed Priority Tax Claim and the PFI Trust shall have agreed upon in writing.

## 2.2   CLASS 1: NON-INVESTOR FIRST-PRIORITY LENDER CLAIMS.

Class 1 consists of all Non-Investor First Priority Lender Claims. Class 1 is Impaired under the Plan and entitled to vote. The treatment of Class 1 will not be changed, altered, amended or modified by any Alternate Restructuring Transaction referred to in section 4.4 or elsewhere in the Plan.

**2.2.1**   The legal, equitable, contractual, Lien and priority rights of Holders of Class 1 Claims are unaltered by the Plan except to the extent provided in subsections 2.2.2, 2.2.3, and 2.2.4, and, notwithstanding substantive consolidation of the Debtors and vesting of the PFI Trust Assets and the OpCo Assets (including, without limitation, the Real Properties) in the PFI Trust and the OpCo, as applicable, either directly or indirectly, the Liens of the Holders of Class 1 Claims will continue to attach to their respective Collateral, and such Holders shall retain all rights and defenses, including rights of setoff and recoupment, that would apply had substantive consolidation not occurred and such Holders shall not be prejudiced by and may take advantage of substantive consolidation in asserting any rights or defenses, provided that all such Claims shall remain subject to any and all objections, defenses, counterclaims, and setoff or recoupment rights of the Debtors, the Post-Effective Date Trust, and the OpCo with respect thereto.  PFI Trust or OpCo, as applicable, shall make, execute and deliver to the Holder of a Class 1 Claim such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents, amendments, modifications, assumptions and other agreements as such Holder or its attorney may reasonably request after the Effective Date and from time to time thereafter to evidence and secure such Holder's Claim and loan and to perfect and maintain the priority of all Liens.  For avoidance of doubt, the Holders of Class 1 Claims shall not be affected by subsection 4.8.3 of this Plan.

SMRH:4816-5664-3557.1
040921

73ZL-319169

**2.2.2**  Unless the PFI Trust and the Holder of a Class 1 Claim agree to other treatment, on or as soon as is reasonably practicable after the Effective Date, each Holder of a Class 1 Claim will receive either: (i) in the event of a sale or refinance concerning the Collateral, cash in the Allowed Amount of such Holder's Class 1 Claim that shall be immediately paid from escrow in exchange for release of such Holder's Lien; or (ii) the return by the PFI Trust or OpCo, as applicable, and subject to mutual agreement or court order, by deed in lieu of foreclosure, surrender, or termination of any stay, of the Collateral securing such Class 1 Claim, without representation or warranty by any Person; or (iii) (A) reinstatement of the maturity of such Class 1 Claim in the Allowed Amount as the maturity existed before any default, (B) payment of any taxes, contractual legal fees, cost and other charges, and past due installments of principal or interest, and (C) continuation thereafter of payments of principal, interest and other obligations when and as the same come due. In no event will a sale or refinance of the Collateral of any such Holder as provided in (i) above close without payment in full of the Allowed Amount of such Holder's Class 1 Claim or if such claim is subject to objection, the Holder's lien shall attach to the refinance or sale net proceeds after payment of costs of sale, property taxes and senior liens, if any. The disputed amount of net proceeds will be held in a segregated interest bearing account from which the Allowed Amount, including interest, fees, costs and other charges provided under agreement or applicable nonbankruptcy law, will be paid upon Final Order determining the claim objection or upon agreement of the Holder and the PFI Trustee. For the avoidance of doubt, and in addition to the foregoing, Holders of Class 1 Claims shall be entitled to payment of any reasonable costs, including attorneys' fees and filing fees, associated with the implementation of the Plan and the treatment provided under this section 2.2.

**2.2.3**  (a)    Unless the PFI Trust and the Holder of a Class 1 Claim agree in writing otherwise, each Holder of a Class 1 Claim shall be deemed to have irrevocably waived as of the Effective Date any and all defaults or breaches of contract listed in the following clauses (i) through (xi) that occurred or arose, or may have occurred or arose, prior to the Effective Date, whether discovered or undiscovered, whether continuing thereafter or not, and any fees or penalties in connection therewith (i) of the kind specified in Bankruptcy Code section 365(b)(2); (ii) related to failure to pay property taxes provided that all such taxes shall be brought current by the Effective Date; (iii) related to allowing or granting junior liens or encumbrances against or transfer of the Collateral securing the Class 1 Claim; (iv) arising from any misrepresentations or omissions made by any Debtor or any Person on behalf of a Debtor, or any breach of any covenant to provide financial, operating, or other reports, in or in connection with the contracts, agreements, or promissory notes executed by any Debtor; (v) related to the Debtors' participation in the Ponzi scheme; (vi) related to any Debtor's misuse or diversion of funds in violation of any covenant; (vii) related to any Debtor's neglect of repair or maintenance of, or physical waste with respect to, any Collateral securing the Class 1 Claim; (viii) related to any default or breach by Lewis Wallach or any Debtor or other Person under any guaranty provided to a Holder of an Class 1 Claim, including any breach of a representation or warranty thereof; (ix) related to any default arising from a change in management or control of or transfer of any interest in a Debtor, including transfers of partnership or limited partnership or limited liability company membership interests; (x) arising from or related to the substantive consolidation of the Debtors or the transfer to and vesting of the PFI Trust Assets and the OpCo Assets (including, without limitation, the Real Properties) in the PFI Trust and the OpCo, as applicable, either directly or indirectly; and (xi) related to any nonpayment breach by any Debtor of any other nonpayment covenant in any loan or security agreement between a Debtor and the Holder of a Class 1 Claim. The foregoing defaults and breaches listed in clauses (i) through (xi) are each a "Nonpayment Default," and for the avoidance of doubt, a Holder of a Class 1 Claim is not deemed to have waived any default or breach of contract that is not a Nonpayment Default.

(b)    In consideration of the waivers in clause (a) of subsection 2.2.3 and in recognition of the oversecured status of all Class 1 Claims, no Avoidance Action, cause of action, or claim for relief based on constructive intent, insolvency or lack of reasonable exchange value shall be asserted or lie against any Holder of a Class 1 Claim.

SMRH:4816-5664-3557.1
040921

73ZL-319169

(c)    For the avoidance of doubt, the Liens of each Holder of a Class 1 Claim are hereby modified to prohibit post-Effective Date enforcement of any remedy or other provision of any contract, agreement, or promissory note on account of any Nonpayment Default deemed to have been waived by the Plan as set forth in subsections 2.2.2 and 2.2.3, including without limitation the assessment of a default rate of interest or similar penalty or charge, late charges, other penalties, or acceleration of the maturity date of any loan, provided however, that nothing contained in the Plan shall affect the ability of a Holder of a Class 1 Claim to declare an event of default related to a Nonpayment Default  triggered by new facts first arising after the Effective Date of the Plan or any other breach, default or event of default, including any payment default, arising after the Effective Date of the Plan. The waivers and modifications set forth in this subsection 2.2.3 shall only apply to the ability of a Holder of a Class 1 Claim to enforce rights and remedies with respect to such Claim, and shall not operate to waive, modify, or impair any right or  defense the Holder of a Class 1 Claim may have to any claims asserted against such Holder, including Avoidance Actions and Causes of Action. Nor shall such waivers or modifications relieve the PFI Trust or OpCo from the performance post-Effective Date of (i) any covenant or obligation requiring the repair or maintenance of the Real Properties and (ii) any duty, covenant, negative covenant, representation, warranty or obligation required to be performed under applicable law and the applicable contracts, instruments, documents or agreements, including, without limitation, any requirement to prepare financial reports, repair or maintain Collateral or to pay the costs, expenses and attorneys' fees related to post-Effective Date default. Notwithstanding the foregoing, any deferred repairs, maintenance and/or physical waste, whenever having occurred, with respect to any Collateral shall be promptly addressed, remedied and abated, within six months after the Effective Date.

(d)    For the avoidance of doubt, if the Effective Date does not occur, the modifications and waivers of the rights of Holders of Class 1 Claims in this Section 2.2 and this Plan shall be null and void and of no effect.

**2.2.4**    The Bankruptcy Court shall retain jurisdiction and power to determine the Allowed Amount necessary to satisfy any Class 1 Claim for which treatment is elected under clause (i) or clause (iii) of subsection 2.2.2.

## 2.3    CLASS 2: NON-INVESTOR OTHER SECURED CLAIMS.

Class 2 consists of all Non-Investor Other Secured Claims. Class 2 is Unimpaired under the Plan.

The legal, equitable, and contractual rights of Holders of Allowed Class 2 Claims are unaltered by the Plan, and, notwithstanding substantive consolidation of the Debtors and vesting of the PFI Trust Assets and the OpCo Assets (including, without limitation, the Real Properties) in the PFI Trust and the OpCo, as applicable, either directly or indirectly, the Liens of the Holders of Allowed Class 2 Claims will continue to attach to their respective Collateral, provided that all such Claims shall remain subject to any and all defenses, counterclaims, and setoff or recoupment rights with respect thereto. Unless the PFI Trust and the Holder of an Allowed Class 2 Claim agree to other treatment, on or as soon as is reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim shall receive, at the PFI Trust's option: (i) Cash from the PFI Trust in the Allowed amount of such Holder's Allowed Class 2 Claim; or (ii) the return by the PFI Trust of the Collateral securing such Allowed Class 2 Claim, without representation or warranty by any Person (and without recourse against any Person regarding such Non-Investor Other Secured Claim); or (iii) (A) the cure of any default, other than a default of the kind specified in Bankruptcy Code section 365(b)(2), that Bankruptcy Code section 1124(2) requires to be cured, with respect to such Holder's Allowed Class 2 Claim, without recognition of any default rate of interest or similar penalty or charge, and upon such cure, no default shall exist; (B) the reinstatement of the maturity of such Allowed Class 2 Claim as the maturity existed before any default, without recognition of any default rate of interest or similar penalty or charge; and (C) retention of its unaltered legal, equitable, and

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 96 of 158

contractual rights with respect to such Allowed Class 2 Claim, including through the retention of any associated Lien on the specific Collateral securing such Allowed Class 2 Claim.

The Bankruptcy Court shall retain jurisdiction and power to determine the amount necessary to satisfy any Allowed Class 2 Claim for which treatment is elected under clause (i) or clause (iii) of the immediately foregoing paragraph. With respect to any Allowed Class 2 Claim for which treatment is elected under clause (i), any Holder of such Allowed Class 2 Claim shall release (and by the Confirmation Order shall be deemed to release) all Liens against any Estate Assets securing such Allowed Class 2 Claim.

## 2.4 CLASS 3: PRIORITY CLAIMS.

Class 3 consists of all Priority Claims. Class 3 is Unimpaired under the Plan.

On, or as soon as reasonably practicable after, the later of (i) the Effective Date and (ii) the date on which a Priority Claim becomes payable pursuant to and as specified by an order of the Bankruptcy Court, the Holder of such Allowed Priority Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Priority Claim, either (a) Cash from the PFI Trust equal to the unpaid portion of such Allowed Priority Claim or (b) such other less favorable treatment from the PFI Trust to which such Holder and the PFI Trust shall have agreed upon in writing.

## 2.5 CLASS 4: DOT NOTEHOLDER CLAIMS.

Class 4 consists of all DOT Noteholder Claims, including such claims of Investors whose notes are allegedly secured by a first priority deed of trust. Class 4 is Impaired under the Plan. For purposes of distributions under the Plan, Holders of DOT Noteholder Claims in Class 4 are considered to be in separate subclasses within Class 4 on a property by property basis (*i.e.*, Class 4A is composed of all DOT Noteholder Claims relating to Real Property A, Class 4B is composed of all DOT Noteholder Claims relating to Real Property B, *etc.*), and each such subclass for each applicable Real Property is deemed to be a separate Class for purposes of the Plan.

To the extent (a) the Real Properties securing the liens of DOT Noteholders have not been sold prior to the Effective Date, or (b) the liens of DOT Noteholders have attached to the proceeds of the sale of any Real Properties and have not been otherwise removed and expunged pursuant to an order of the Bankruptcy Court, DOT Noteholder Claims shall be compromised as follows: (1) Holders of DOT Noteholder Claims will be treated as general unsecured creditors for purposes of distribution; (2) the Confirmation Order shall include provisions expunging the liens of the DOT Noteholders from the record of the Real Properties, or the sale proceeds thereof, such expungement to become effective with respect to each Real Property, or the sale proceeds thereof, on the later of the thirtieth (30th) day after entry of the Confirmation Order or the date of entry of a final order adjudicating an Avoidance Action with respect to a lien on that Real Property or the sale proceeds thereof; (3) any DOT Noteholder that wishes to challenge the expungement of its lien shall file an objection with the Bankruptcy Court no later than twenty (20) days after entry of the Confirmation Order and serve its objection on the Debtors or PFI Trustee, as applicable; (4) the Debtors or PFI Trustee, as applicable, shall file the Avoidance Action no later than thirty (30) days after service of the objection.

With regard to the foregoing provision (1), the Holders of Allowed Class 4 Claims will receive on or as soon as reasonably practicable after the Effective Date, (i) one (1) Class A PFI Trust Interest for each dollar of Allowed Investor Restitution Claims held by the applicable Investor and one (1) Class B PFI Trust Interest for each dollar of Allowed Investor Subordinated Claims (any resulting fractional PFI Trust Interests will be rounded to the nearest hundredth of such PFI Trust Interest with five thousandths thereof rounded up to the next hundredth), and (ii) the other

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 97 of
158

consideration provided for in the Investor Claims Special Provisions set forth in Section 2.10.2 of the Plan. As set forth more fully herein, subsequent Distributions of Cash on account of the PFI Trust Interests will be made by the PFI Trust in accordance with the PFI Trust Interests Waterfall.

The treatment of any and all Investor Claims under the Plan is not intended to and will not reduce, impair, satisfy, limit, or otherwise affect any rights that any Investor may have against any Person that is not a Released Party (including those rights that may be included in the Contributed Claims and contributed to the PFI Trust by making the Ballot election described below).

Each Holder of an Investor Claim (including a Class 4 DOT Noteholder Claim) may agree, by electing on its Ballot, to contribute its Contributed Claims to the PFI Trust. By electing such option on its Ballot, the Investor agrees that, subject to the occurrence of the Effective Date and the formation of the PFI Trust, it will be deemed, without further action, (i) to have contributed its Contributed Claims to the PFI Trust and (ii) to have agreed to execute any documents reasonably requested to memorialize such contribution. The relative share of PFI Trust recoveries for any so electing Investor will be enhanced by having the amounts that otherwise would be its Allowed Investor Restitution Claim and its Allowed Investor Subordinated Claim each increased by the Contributing Claimants' Enhancement Multiplier. Investors also may choose to make such election because aggregating all Contributed Claims and similar PFI Trust Actions may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner.

**2.6    CLASS 5: NON-DOT INVESTOR CLAIMS.** Class 5 consists of all Non-DOT Investor Claims.  Class 5 is Impaired under the Plan.

In full satisfaction, settlement, and release of and in exchange for such Claims, the Holders of Allowed Class 5 Claims will receive on or as soon as reasonably practicable after the Effective Date, one (1) Class A PFI Trust Interest for each dollar of Allowed Investor Restitution Claims held by the applicable Investor and one (1) Class B PFI Trust Interest for each dollar of Allowed Investor Subordinated Claims (any resulting fractional PFI Trust Interests will be rounded to the nearest hundredth of such PFI Trust Interest with five thousandths thereof rounded up to the next hundredth), and (ii) the other consideration provided for in the Investor Claims Special Provisions set forth in Section 2.10.2 of the Plan.  As set forth more fully herein, subsequent Distributions of Cash on account of the PFI Trust Interests will be made by the PFI Trust in accordance with the PFI Trust Interests Waterfall.

The treatment of any and all Investor Claims under the Plan is not intended to and will not reduce, impair, satisfy, limit, or otherwise affect any rights that any Investor may have against any Person that is not a Released Party (including those rights that may be included in the Contributed Claims and contributed to the PFI Trust by making the Ballot election described below).

Each Holder of an Investor Claim (including a Class 5 Non-DOT Investor Claim) may agree, by electing on its Ballot, to contribute its Contributed Claims to the PFI Trust. By electing such option on its Ballot, the Investor agrees that, subject to the occurrence of the Effective Date and the formation of the PFI Trust, it will be deemed, without further action, (i) to have contributed its Contributed Claims to the PFI Trust and (ii) to have agreed to execute any documents reasonably requested to memorialize such contribution. The relative share of PFI Trust recoveries for any so electing Investor will be enhanced by having the amounts that otherwise would be its Allowed Investor Restitution Claim and its Allowed Investor Subordinated Claim each increased by the Contributing Claimants' Enhancement Multiplier. Investors also may choose to make such election because aggregating all Contributed Claims and similar PFI Trust Actions may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner.

On the Effective Date, the interests of the PFI LLC Members in the PFI-Managed LLCs and LP Interest Holders shall automatically be recharacterized as Non-DOT Investor Claims, with such

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 98 of 158

recharacterization to be retroactive in each instance to the date or dates on which such PFI LLC Member or LP Interest Holder transferred funds to the respective PFI-Managed LLC(s) or LP Debtor. Such recharacterized claims shall be treated as Non-DOT Investor Claims.

**2.7    CLASS 6: TIC CLAIMS**.

Class 6 consists of all TIC Claims. Class 6 is Impaired under the Plan.  Holders of Allowed Class 6 Claims will receive either:

(a)    In full satisfaction, settlement, and release of and in exchange for such Claims, the Holders of Allowed Class 6 Claims will receive on or as soon as reasonably practicable after the Effective Date, one (1) Class A PFI Trust Interest for each dollar of Allowed TIC Claims held by the applicable Holder (any resulting fractional Class A PFI Trust Interests will be rounded to the nearest hundredth of such Class A PFI Trust Interest with five thousandths thereof rounded up to the next hundredth).  As set forth more fully herein, subsequent Distributions of Cash on account of the Class A PFI Trust Interests will be made by the PFI Trust in accordance with the PFI Trust Interests Waterfall.  Under this treatment option, a Holder of TIC Interests will maintain such Holder's ownership interest equal to such tenant in common's ownership percentage in the Real Property (as set forth in the grant deed of the Real Property, unless there is an applicable TIC Agreement, in which case the ownership percentage in the TIC Agreement will control).  To the extent a TIC Interest was obtained using rolled over funds or funds that were otherwise commingled or traceable to PFI, the Debtors or PFI Trust, as applicable, reserves all rights in connection therewith.  TIC Interests shall not be substantively consolidated under the Plan and will not be treated as Estate Assets, PFI Trust Assets or OpCo Assets.  Any and all of any Debtor's interests in the applicable Real Property that is an Estate Asset prior to the Effective Date will become a PFI Trust Asset or an OpCo Asset, as applicable; or

(b)    If the Holder of a TIC Claim makes a valid TIC Investor Treatment Election on his or her timely-returned Ballot or by written agreement with the Debtors or PFI Trustee, as applicable, the Holder of a TIC Claim, in exchange for transferring his or her TIC Interests to the Debtors or PFI Trust, as applicable, in a manner satisfactory to the Debtors or PFI Trustee, as applicable, shall receive the treatment provided to Holders of Class 5 Non-DOT Investor Claims, including the Special Provisions Relating to Investor Claims and Special Provisions Relating to Individual Investor-Specific Claims as set forth in sections 2.11.2 and 2.11.3, respectively.  By making the TIC Investor Treatment Election, the Holder of a TIC Interest shall only be entitled to the equivalent of his or her Investor Claim, and shall not be entitled to any additional Claim for damages related to his or her TIC Interest.  If such an election is made, all provisions in the Plan applicable to Investors shall apply to Holders of TIC Interests who made the TIC Investor Treatment Election.

**2.8    CLASS 7: OTHER UNSECURED CLAIMS**.

Class 7 consists of all Other Unsecured Claims. Class 7 is Impaired under the Plan.

In full satisfaction, settlement, and release of and in exchange for such Claims, the Holders of Allowed Class 7 Claims will receive on or as soon as reasonably practicable after the Effective Date, one (1) Class A PFI Trust Interest for each dollar of Allowed Other Unsecured Claims held by the applicable Holder (any resulting fractional Class A PFI Trust Interests will be rounded to the nearest hundredth of such Class A PFI Trust Interest with five thousandths thereof rounded up to the next hundredth). As set forth more fully herein, subsequent Distributions of Cash on account of the Class A PFI Trust Interests will be made by the PFI Trust in accordance with the PFI Trust Interests Waterfall.

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 99 of 158

**2.9     CLASS 8: OTHER SUBORDINATED CLAIMS.**

Class 8 consists of all Other Subordinated Claims. Class 8 is Impaired under the Plan.

The Holders of Allowed Other Subordinated Claims will retain a residual right to receive Available Cash that remains in the PFI Trust after the final administration of all PFI Trust Assets and OpCo Assets, and the complete satisfaction of all senior payment rights within the PFI Trust Interests Waterfall, including satisfaction of all Investor Subordinated Claims. The Plan Proponents have determined not to solicit the votes of the Holders of any Other Subordinated Claims, and such Holders shall be deemed to have rejected the Plan and, therefore, such Holders are not entitled to vote on the Plan.

**2.10    CLASS 9: EQUITY INTERESTS.**

Class 9 consists of all Equity Interests in the Debtors. Class 9 is Impaired under the Plan.

As of the Effective Date, subject to the Alternative Restructuring Transactions (if any), all Equity Interests shall be deemed void, cancelled, and of no further force and effect. On and after the Effective Date, Holders of Equity Interests shall not be entitled to, and shall not receive or retain any property or interest in property under the Plan on account of such Equity Interests. Class 9 is deemed to have rejected the Plan and, therefore, Holders of Equity Interests are not entitled to vote on the Plan.

For the avoidance of doubt, any and all purported Equity Interests of an Investor in any Debtor shall be deemed void, cancelled, and of no further force and effect; such Claims shall be treated as Investor Claims of the Investor pursuant to the Plan, regardless of the pre-petition designations used by the Debtors and/or Investors.

**2.11    COMPREHENSIVE SETTLEMENT OF CLAIMS AND CONTROVERSIES.**

**2.11.1    <u>Generally.</u>** Pursuant to Bankruptcy Code sections 1123(a)(5), 1123(b)(3), and 1123(b)(6), as well as Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims and controversies relating to the rights that a Holder of a Claim or an Equity Interest may have against any Debtor with respect to any Claim, Equity Interest, or any Distribution on account thereof, as well as of all potential Intercompany Claims, Intercompany Liens, and Causes of Action against any Debtor. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise and settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises and settlements are (i) in the best interest of the Debtors, the Estates, and their respective property and stakeholders; and (ii) fair, equitable, and reasonable. This comprehensive compromise and settlement is a critical component of the Plan and is designed to provide a resolution of myriad disputed Claims, Liens, and Causes of Action that otherwise could take years to resolve, which would delay and undoubtedly reduce the Distributions that ultimately would be available for all Creditors. This Section 2.11.1 shall not apply to Holders of Class 1 Claims.

**2.11.2    <u>Special Provisions Relating to Investor Claims.</u>** The Plan effectuates, among other things, the following (the "**<u>Investor Claims Special Provisions</u>**"):

(a)        Unless held by Excluded Parties or Disputing Claimants or where a Cause of Action has been commenced against an Investor, including, without limitation, any Avoidance Action (in which case any Claims held by such Excluded Parties, Disputing Claimants or Investors against whom Causes of Action are commenced are deemed Disputed Claims), all Investor Claims are

deemed Allowed under the Plan in the amounts set forth in the Schedule of Allowed Netted Claims prepared by the Debtors and/or the PFI Trust.

(b)     The Holders of Allowed Investor Claims will receive the treatment provided for such Holders under the Plan.  For the avoidance of doubt, any and all purported equity interests of an Investor in any Debtor shall be deemed and treated as Investor Claims of the Investor pursuant to the Plan, regardless of the pre-petition designations used by the Debtors and/or Investors.

(c)     The PFI Trust will be created to effectively and efficiently pursue the PFI Trust Actions for the collective benefit of all the PFI Trust Beneficiaries, as well as to own the interests of the OpCo, establish and hold the Distribution Reserves, and receive and distribute to the holders of PFI Trust Interests the net proceeds of the monetization or other disposition of the PFI Trust Assets in accordance with the Plan and the PFI Trust Agreement.

(d)     No Avoidance Action may be brought, directly or indirectly, on account of a payment to an Investor outside the Investor Lookback Period, unless such Investor is an Excluded Party.

(e)     The PFI Trustee shall have discretion, subject to the PFI Trust Agreement, to determine whether and how to make demand upon, or sue, Investors liable for a Net Prepetition Investor Recovery, including but not limited to the discretion not to bring suit or make a demand because of the Investor's financial hardship. That discretion shall be exercised in accordance with guidelines developed by the PFI Trustee and thereafter approved by the BOV subject to the PFI Trust Agreement.  No party should assume that they will be entitled to the exercise of such discretion.

### 2.11.3  Special Provisions Relating to Individual Investor-Specific Claims.

(a)     Nothing in the Plan will impair the right of Investors to independently pursue claims in which they have independent legal standing against third parties that are unique to such Investors ("**Individual Investor-Specific Claims**"). By way of example, and not limitation, such unique claims include claims based on loss of lien or loss of lien priority, claims against investors' professional advisors, claims against retirement servicers and similar claims that may be asserted based on such investors' particular circumstances. The Individual Investors Claims do not include Investor Claims common to all Investors and/or claims to recover commissions or referral fees paid by the Debtors to third parties in connection with an Investor's investment with the Debtors.

(b)     Any recoveries on Individual Investor Claims shall reduce the amount of distributions from the PFI Trust to the individual Investor receiving such recovery as follows:

(i)     Any recovery, net of reasonable fees and expenses actually incurred (the "**Net Recovery**"), shall first be applied to reduce the applicable Investor Subordinated Claim (to the extent the Investor has an Investor Subordinated Claim) and then, after such subordinated claim is reduced to $0, shall next be applied to reduce the individual Investor's Investor Restitution Claim.

By way of example, in the year prior to the Petition Date, Investor A invested $500,000 at one time with the Debtors and received $45,000 in cash distributions on such claim prior to the bankruptcy, representing a 9% per annum return on the investment during that year. Under the claims netting process, Investor A shall receive: (i) a $455,000 Investor Restitution Claim (original investment amount of $500,000 minus the $45,000 distribution received); and (ii) a $35,000 Investor Subordinated Claim (representing a 7% per annum interest on the $500,000 investment). If Investor A brings an Individual Investor-Specific Claim against a third party, recovers $30,000 and incurs $10,000 in reasonable legal fees and costs, Investor A's Net Recovery is $20,000. The $20,000 Net Recovery shall be applied first to reduce Investor A's Investor Subordinated Claim from $35,000 to

$15,000, and Investor A's Investor Restitution Claim shall not be affected (*i.e.,* it will remain a claim in the amount of $455,000).

By way of a second example, assume Investor A brings an Individual Investor-Specific Claim against a third party and recovers $100,000 and incurs $30,000 in reasonable legal fees and costs. Investor A's Net Recovery is thus $70,000. Under this example, where Investor A has an Investor Subordinated Claim of $35,000, the $70,000 Net Recovery is first applied to reduce the Investor Subordinated Claim to $0 (*i.e.,* $35,000 - $35,000 = $0). The remaining $35,000 of Investor A's Net Recovery would then be applied to reduce Investor A's Investor Restitution Claim of $455,000 – resulting in a reduced Investor Restitution Claim of $420,000 (*i.e.,* $455,000 - $35,000 = $420,000).

(ii)     Each individual Investor has an affirmative duty to report, in writing, to the Debtors or the PFI Trustee, as appropriate, the Net Recoveries on account of their Individual Investor Claims. Such report shall be made within thirty (30) days of the receipt of such Net Recoveries and include the gross amount recovered, and the fees and expenses incurred in obtaining such Net Recoveries. If requested, the individual Investor shall provide documentation in support of such fees and expenses. The failure to comply with the obligation to timely report Net Recoveries shall result in the individual Investor's claim against the Debtors being automatically disallowed, and the clawback of any previously received distributions under the Plan.

## ARTICLE III.
## ACCEPTANCE OR REJECTION OF THE PLAN

**3.1     IMPAIRED CLASS OF CLAIMS ENTITLED TO VOTE**. Only the votes of Holders of Allowed Claims in Class 1, Class 4, Class 5, Class 6, and Class 7 shall be solicited with respect to the Plan.

**3.2     ACCEPTANCE BY AN IMPAIRED CLASS**. In accordance with Bankruptcy Code section 1126(c), and except as provided in Bankruptcy Code section 1126(e), the Holders of Claims in any Class (including any subclass) entitled to vote on the Plan shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims in such Class (or subclass) that have timely and properly voted to accept or reject the Plan.

**3.3     PRESUMED ACCEPTANCES BY UNIMPAIRED CLASSES**. Classes 2 and 3 are Unimpaired under the Plan. Under Bankruptcy Code section 1126(f), the Holders of Claims in such Unimpaired Classes are conclusively presumed to have accepted the Plan, and, therefore, the votes of such Holders shall not be solicited.

**3.4     IMPAIRED CLASSES DEEMED TO REJECT PLAN.** The Plan Proponents have determined not to solicit the votes of Holders of any Claims in Class 8, and such Holders shall be deemed to have rejected the Plan and, therefore, such Holders are not entitled to vote on the Plan. Holders of Equity Interests in Class 9 are not entitled to receive or retain any property or interests in property under the Plan. Under Bankruptcy Code section 1126(g), such Holders are deemed to have rejected the Plan, and, therefore, the votes of such Holders shall not be solicited.

**3.5     MODIFICATIONS OF VOTES**. Following the Voting Deadline, no Creditors entitled to vote on the Plan will be able to change their votes cast on the Plan or any attendant elections or preferences without the written consent of the Plan Proponents, which consent may be given or withheld in the Plan Proponents' reasonable discretion after consultation with the Ad Hoc Committees.

**3.6     CONFIRMATION PURSUANT TO BANKRUPTCY CODE SECTION 1129(B).**

SMRH:4816-5664-3557.1
040921

73ZL-319169

Because at least one Impaired Class is deemed to have rejected the Plan, the Plan Proponents will and hereby request confirmation of the Plan under Bankruptcy Code section 1129(b). The Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

**3.7** **ELIMINATION OF VACANT CLASSES**. Any Class of Claims or Equity Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for purposes of determining acceptance of the Plan by such Class under Bankruptcy Code section 1129(a)(8).

**3.8** **SEVERABILITY OF JOINT PLAN**. This Plan represents a joint plan comprised of individual plans for each of the Debtors. As further discussed in Section 10.7 of the Plan, the Plan Proponents may alter, amend, or modify this Plan at or before the Confirmation Hearing, including to remove one or more Debtors from this Plan, in the Plan Proponents' reasonable discretion after consultation with each of the Ad Hoc Committees.

<div align="center">

**ARTICLE IV.**
**IMPLEMENTATION OF THE PLAN**

</div>

**4.1** **IMPLEMENTATION OF THE PLAN**. Subject to the Alternative Restructuring Transactions, the Plan will be implemented by various acts and transactions as set forth in the Plan, including, among other things, the establishment of the PFI Trust, the OpCo, the BOV and the PFI Trustee, and the making of Distributions by the PFI Trust in accordance with the Plan.

**4.2** **STREAMLINING OF THE DEBTORS' CORPORATE AFFAIRS**.

    **4.2.1** **Debtors' Existing Directors, Officers, and Managers.** On the Effective Date, each of the Debtors' existing directors, officers, and managers shall be terminated automatically without the need for any Corporate Action and without the need for any corporate or limited liability company filings, and shall have no ongoing rights against or obligations to the Debtors or the Estates, including under any applicable prepetition agreements (all of which will be deemed terminated). On the Effective Date, the PFI Trustee shall succeed to all such powers as would have been applicable to the Debtors' officers and managers in respect of all PFI Trust Assets, the OpCo and the OpCo Assets; *provided, however,* that the PFI Trustee may continue to consult with or employ the Debtors' former directors, officers, employees, and managers to the extent required to comply with applicable law and/or to implement the Plan, the OpCo and/or PFI Trust.

    **4.2.2** **The OpCo.** On the Effective Date, the OpCo Assets shall be assigned or otherwise transferred or conveyed to the OpCo in form and substance acceptable to the PFI Trustee in his discretion in consultation with the BOV, and subject to the Liens of each Holder of Class 1 Claims with respect to its Collateral. Without the need for any Corporate Action and without the need for any corporate, limited liability company or limited partnership filings, (a) all Equity Interests of the Debtors issued and outstanding immediately before the Effective Date shall be automatically cancelled and extinguished on the Effective Date and (b) as of the Effective Date, a new equity interest in the OpCo, representing all of the issued and outstanding equity interests in the OpCo shall be issued to the PFI Trust, which new equity interests so issued shall be deemed to have been offered and sold to the PFI Trust in reliance on the exemption from registration under the Securities Act afforded by section 4(a)(2) thereof. On and after the Effective Date, the OpCo will be a wholly-owned subsidiary of the PFI Trust, and the PFI Trust may expend with respect to the OpCo such amounts as the PFI Trust determines is appropriate, in its discretion. The OpCo (a) shall have the PFI Trust as its sole equity interest holder, (b) shall be treated as a disregarded entity for income tax purposes, (c) shall have a purpose consistent with the purpose of the PFI Trust as set forth in Section

Case 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 103 of 158

4.3.4 of the Plan, and (d) shall be subject to the same limitations imposed on the PFI Trustee under the terms of this Plan and the PFI Trust Agreement. The PFI Trust will have all additional rights regarding the OpCo as are set forth in the Plan and the PFI Trust Agreement.

**4.2.3** **Dissolution of the Debtors.** Subject to any Alternative Restructuring Transactions (if any), on the Effective Date, each of the Debtors will be dissolved automatically without the need for any Corporate Action, without the need for any corporate or limited liability company filings, and without the need for any other or further actions to be taken by or on behalf of such dissolving Debtor or any other Person or any payments to be made in connection therewith; *provided, however*, that the PFI Trust may in its discretion file any certificates of cancellation as may be appropriate in connection with dissolution of the Debtors. Subject to any Alternative Restructuring Transactions (if any), on and as of the earlier of the Closing Date and the date on which the PFI Trustee Files with the Bankruptcy Court a notice of dissolution as to a Debtor, such Debtor will be dissolved automatically without the need for any Corporate Action, without the need for any corporate or limited liability company filings, and without the need for any other or further actions to be taken by or on behalf of such dissolving Debtor or any other Person or any payments to be made in connection therewith; *provided, however*, that the PFI Trust may in its discretion file any certificates of cancellation as may be appropriate in connection with dissolution of any Debtors. Any dissolution of a Debtor under the Plan or any Alternative Restructuring Transactions shall have no impact on the rights of a Holder of a Class 1 Claim with respect to its Collateral, and any Liens of such Holders shall be retained.

**4.2.4** **Corporate Documents and Corporate Authority.** On the Effective Date, the certificates of incorporation, bylaws, operating agreements, and articles of organization, as applicable, of all the Debtors shall be deemed amended to the extent necessary to carry out the provisions of the Plan. The entry of the Confirmation Order shall constitute authorization for the Debtors, the OpCo and the PFI Trustee, as applicable, to take or cause to be taken all actions (including, if applicable, Corporate Actions and any Alternative Restructuring Transactions) necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on, and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act, or action under any applicable law, order, rule, or regulation.

## 4.3 **PFI TRUST**.

### 4.3.1 **Appointments**.

(a)     On and after the Effective Date, the Initial PFI Trustee shall become and serve as PFI Trustee. The PFI Trustee's compensation and other related information will be more specifically set forth in the PFI Trust Agreement.

(b)     On and after the Effective Date, the initial BOV shall begin to serve without further action, consistent with the Plan and the PFI Trust Agreement, and shall oversee the PFI Trustee's performance of his, her or its duties and otherwise serve the functions described in the Plan and the PFI Trust Agreement. The BOV members shall serve on a voluntary basis without compensation, but they shall be reimbursed by the PFI Trust for any reasonable expenses in accordance with the PFI Trust Agreement.

### 4.3.2 **Creation and Governance of the PFI Trust.** On the Effective Date, the PFI Trustee shall execute the PFI Trust Agreement and shall take any other steps necessary to establish the PFI Trust in accordance with the Plan and the beneficial interests therein. For federal income tax purposes, the transfer of the assets to the PFI Trust will be treated as a sale or other disposition of assets (except for the assets transferred to the Disputed Ownership Fund as provided in Section 6.9 of the Plan) to the PFI Trust Beneficiaries in exchange for their claims in the Chapter 11 Cases. Any

SMRH:4816-5664-3557.1
040921

73ZL-319169

income or loss from the transfer of assets to the PFI Trust shall flow through to the ultimate taxpaying member of each Debtor who will be responsible to pay the tax liability, if any. For federal income tax purposes, the PFI Trust Beneficiaries shall be treated as the grantors of the PFI Trust and deemed to be the owners of the assets of the PFI Trust. The transfer of the PFI Trust Assets to the PFI Trust shall be deemed a transfer to the PFI Trust Beneficiaries by the Debtors, followed by a deemed transfer by such PFI Trust Beneficiaries to the PFI Trust. The Debtors, the PFI Trust Beneficiaries, and the PFI Trust will consistently report the valuation of the assets transferred to the PFI Trust. Such consistent valuations and revised reporting will be used for all federal income tax purposes. Income deductions, gain, or loss from the PFI Trust shall be reported to the beneficiaries of the PFI Trust in conjunction with the filing of the PFI Trust's income tax returns. Each PFI Trust Beneficiary shall report income, deductions, gain, or loss on such PFI Trust Beneficiary's income tax returns. The PFI Trust shall be governed by the PFI Trust Agreement and administered by the PFI Trustee. The powers, rights, and responsibilities of the PFI Trustee shall be specified in the PFI Trust Agreement. After an objection to a Disputed Claim is resolved or a Contingent Claim or Unliquidated Claim has been determined in whole or in part by a Final Order or by agreement, the PFI Trust Interests and/or Cash held in the Disputed Ownership Fund shall be transferred as described in the PFI Trust Agreement.

**4.3.3 <u>Vesting of PFI Trust Assets, Free and Clear of Liens and Interests; Monies from Governmental Units.</u>** On the Effective Date, and subject to Section 2.2, the PFI Trust shall be automatically vested with all of the Debtors' and the Estates' respective rights, title, and/or interest in and to all PFI Trust Assets, and the OpCo shall be automatically vested with all of the Debtors' and the Estates' respective rights, title and/or interest in and to all OpCo Assets. Except as specifically provided in the Plan or the Confirmation Order, in accordance with Bankruptcy Code section 1141, the PFI Trust Assets, the OpCo Assets and any other assets shall automatically vest in the PFI Trust and the OpCo, as applicable, free and clear of all Claims, Liens, or interests (including, without limitation, any and all DOT Noteholders' Deeds of Trust), subject only to the PFI Trust Interests and the PFI Trust Expenses, as provided for in the PFI Trust Agreement, and such vesting shall be exempt from any stamp, real estate transfer, other transfer, mortgage reporting, sales, use, or other similar tax. The PFI Trustee shall be the exclusive trustee of the PFI Trust Assets (including all ownership interests in the OpCo) for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to Bankruptcy Code section 1123(b)(3) regarding all PFI Trust Assets, the OpCo and the OpCo Assets. The PFI Trust shall hold and distribute the PFI Trust Assets and shall collect and distribute all proceeds from the operations and/or sale of the OpCo and the OpCo Assets in accordance with the provisions of the Plan and the PFI Trust Agreement. The vesting of the PFI Trust Assets and the OpCo Assets will not affect the rights of a Holder of a Class 1 Claim with respect to its Collateral, including to assert rights and defenses, including setoff and recoupment, as if those Assets were retained by such Holder's single borrower.

Notwithstanding the foregoing or any other provision in the Plan, in the event that the PFI Trust receives any monies from the United States or any other governmental unit (as defined in Bankruptcy Code section 101(27)), obtained as forfeited assets (or otherwise) by the governmental unit for the benefit of the investor victims of the Debtors' prepetition Ponzi scheme, all such monies shall not constitute Estate Assets, PFI Trust Assets or OpCo Assets, and the PFI Trustee is authorized to and shall distribute all such monies only to Investors who are Holders of Class A PFI Interests or Class B PFI Interests on account thereof, subject to the Plan and the PFI Trust Agreement; provided that the PFI Trustee and his, her or its agents will be reimbursed from such monies for reasonable costs and expenses incurred by said parties related to the PFI Trust's collection, administration, and distribution of such monies to the applicable Investors.

**4.3.4 <u>Purpose of the PFI Trust.</u>** The PFI Trust shall be established for the purpose of pursuing, collecting from and/or monetizing the PFI Trust Assets and the OpCo Assets and making Distributions from the proceeds of such assets to the PFI Trust Beneficiaries in accordance with

SMRH:4816-5664-3557.1
040921

Case 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 105 of 158

Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business other than as sole owner of the OpCo.

**4.3.5   Authority.** Subject to the authority and supervision of the BOV as set forth in the PFI Trust Agreement, the PFI Trustee shall have the authority and right on behalf of the PFI Trust, without the need for Bankruptcy Court approval (in each case, unless otherwise provided in the Plan and the PFI Trust Agreement), to carry out and implement all applicable provisions of the Plan, including to:

(a)    appear on behalf of the PFI Trust in the Chapter 11 Cases and any proceedings related thereto;

(b)    review, reconcile, compromise, settle, or object to Claims and resolve such objections as set forth in the Plan, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules;

(c)    calculate and make Distributions and calculate and establish reserves under and in accordance with the Plan;

(d)    retain, compensate, and employ professionals and other Persons to represent the PFI Trustee, including, without limitation, assisting in managing and representing the OpCo, with respect to and in connection with its rights and responsibilities;

(e)    establish, maintain, and administer documents and accounts of the Debtors as appropriate, which shall be segregated to the extent appropriate in accordance with the Plan;

(f)    maintain, conserve, collect, settle, and protect the PFI Trust Assets and the OpCo Assets, including, without limitation, any Real Properties (subject to the limitations described herein and in the PFI Trust Agreement);

(g)    sell, monetize, transfer, assign, distribute, abandon, or otherwise dispose of the PFI Trust Assets and OpCo Assets (including, without limitation, any Real Properties) or any part thereof or interest therein upon such terms as the PFI Trustee determines to be necessary, appropriate, or desirable, subject to the provisions of the PFI Trust Agreement;

(h)    pursue, prosecute, settle or abandon any PFI Trust Actions;

(i)    negotiate, incur, and pay the PFI Trust Expenses, including the expenses of the OpCo;

(j)    prepare and file any and all informational returns, reports, statements, returns, and other documents or disclosures relating to the Debtors that are required under the Plan, by any governmental unit, or by applicable law;

(k)    compile and maintain the official claims register, including for purposes of making Distributions under the Plan;

(l)    take such actions as are necessary or appropriate to manage and, when appropriate, wind-down and dissolve the OpCo;

(m)    comply with the Plan, exercise the PFI Trustee's rights, and perform the PFI Trustee's obligations; and

(n)    exercise such other powers as deemed by the PFI Trustee to be necessary and proper to implement the Plan.

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 106 of 158

To the extent necessary to give full effect to its administrative rights and duties under the Plan, the PFI Trustee shall be deemed to be vested with all rights, powers, privileges, and authorities of (i) an appropriate corporate or limited liability company officer or manager of the OpCo and each of the Debtors under any applicable nonbankruptcy law and (ii) a "trustee" of the OpCo and each of the Debtors under Bankruptcy Code sections 704 and 1106.

**4.3.6** <u>**Limitation of Liability.**</u> The PFI Trustee and the BOV shall enjoy all of the rights, powers, immunities, and privileges applicable to a Bankruptcy Code chapter 7 trustee with respect to limitations of liability, subject to the PFI Trust Agreement. The PFI Trustee and the BOV may, in connection with the performance of their respective functions, in their sole and absolute discretion, consult with their attorneys, accountants, advisors, and agents, and shall not be liable for any act taken, or omitted to be taken, or suggested to be done in accordance with advice or opinions rendered by such Persons, regardless of whether such advice or opinions were in writing. Notwithstanding such authority, neither the PFI Trustee nor the BOV shall be under an obligation to consult with any such attorneys, accountants, advisors, or agents, and their determination not to do so shall not result in the imposition of liability on the PFI Trustee or the BOV, as applicable, unless such determination is based on willful misconduct, gross negligence, or fraud. Except with regard to gross negligence, fraud or willful misconduct by the PFI Trustee or the BOV, Persons dealing with the PFI Trustee and the BOV shall look only to the PFI Trust Assets to satisfy any liability incurred by the PFI Trustee or the BOV to such Person in carrying out the terms of the Plan or the PFI Trust Agreement, and the PFI Trustee and the BOV shall have no personal obligation to satisfy such liability.

**4.3.7** <u>**Indemnification.**</u> The PFI Trust shall indemnify the PFI Trust Indemnified Parties for, and shall defend and hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost, or expense (including the reasonable fees and expenses of their respective professionals) incurred without gross negligence or willful misconduct on the part of the PFI Trust Indemnified Parties (which gross negligence or willful misconduct, if any, must be determined by a final, non-appealable order of a court of competent jurisdiction) for any action taken, suffered, or omitted to be taken by the PFI Trust Indemnified Parties in connection with the acceptance, administration, exercise, and performance of their duties under the Plan or the PFI Trust Agreement, as applicable. An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute gross negligence or willful misconduct. In addition, the PFI Trust shall, to the fullest extent permitted by law, indemnify, defend, and hold harmless the PFI Trust Indemnified Parties, from and against and with respect to any and all liabilities, losses, damages, claims, costs, and expenses, including attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the PFI Trust or the implementation or administration of the Plan if the PFI Trust Indemnified Party acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the PFI Trust. To the extent the PFI Trust indemnifies, defends, and holds harmless any PFI Trust Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the PFI Trustee in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as PFI Trust Expenses. The costs and expenses incurred in enforcing the right of indemnification in this Section shall be paid by the PFI Trust.

**4.3.8** <u>**Insurance.**</u> The PFI Trustee shall be authorized, but not required, to obtain any insurance coverages deemed to be reasonably necessary, at the PFI Trust's sole expense, for itself and its agents, and the BOV, including coverage with respect to the liabilities, duties, and obligations of the PFI Trustee and the BOV, which insurance coverage may, at the sole discretion of the PFI Trustee, be extended for a reasonable period after the termination of the PFI Trust.

**4.3.9** <u>**Tax Reporting.**</u>

(a) The PFI Trustee shall timely file tax returns for the PFI Trust treating the PFI Trust as

a grantor trust pursuant to Treasury Regulation section 1.671-4(a).

(b)     The PFI Trust shall be responsible for timely payment of all taxes (if any) imposed on and payable by the PFI Trust, the OpCo, or any PFI Trust Assets.

(c)     The PFI Trust shall distribute such tax-related notices, beneficiary statements, and information returns, as applicable, to the applicable Holders of Allowed Claims as are required by applicable law or that the PFI Trustee determines are otherwise necessary or desirable.

(d)     The PFI Trust is authorized to file a request for expedited determination under Bankruptcy Code section 505(b) for any tax returns filed with respect to the Debtors.

**4.3.10  Distributions to PFI Trust Beneficiaries.**

(a)     After the payment of or reserve for all senior claims (including, without limitation, Administrative Claims, Non-Investor First Priority Lender Claims, Involuntary Gap Claims, Priority Tax Claims, and Priority Claims) in accordance with the Plan and the PFI Trust Agreement, the PFI Trust will make Distributions of Available Cash from the Distribution Fund to the PFI Trust Beneficiaries pursuant to the following sequence and related provisions (the "**PFI Trust Interests Waterfall**"):

(i)     The PFI Trust shall distribute Available Cash to each Holder of Class A PFI Trust Interests on a Pro Rata basis (based on such Holder's number of Class A PFI Trust Interests) until all Allowed Investor Restitution Claims and Allowed Other Unsecured Claims have been paid in full (without post-petition or post-Confirmation interest);

(ii)     Thereafter, the PFI Trust shall distribute Available Cash to each Holder of Class B PFI Trust Interests on a Pro Rata basis (based on such Holder's number of Class B PFI Trust Interests) until all Allowed Investor Subordinated Claims have been paid in full (without post-petition or post-Confirmation interest);

(iii)     The net proceeds of any PFI Trust Actions recovered by the PFI Trust ("**Net PFI Trust Action Proceeds**") will be shared equally among all Investors and Holders of Other Unsecured Claims, first on account of Class A PFI Interests, until all Allowed Investor Restitution Claims and Allowed Unsecured Claims have been paid in full (without post-petition or post-Confirmation interest) (also taking into account payments made pursuant to subsection (1) above), and second on account of Class B PFI Interests, until all Allowed Investor Subordinated Claims have been paid in full (without post-petition or post-Confirmation interest) (also taking into account payments made pursuant to subsection (2) above).

(b)     The PFI Trust, in the PFI Trustee's discretion, may make periodic Distributions to the PFI Trust Beneficiaries at any time following the Effective Date, provided that such Distributions are otherwise permitted under, and not inconsistent with, the PFI Trust Interests Waterfall, the other terms of the Plan, the PFI Trust Agreement, and applicable law.

(c)     No later than (i) the first Business Day that is at least 180 calendar days after the Effective Date and (ii) the last Business Day of each subsequent 180-calendar-day period after the Effective Date until the Closing Date, the PFI Trustee shall calculate the Distributions that could potentially be made to the PFI Trust Beneficiaries based on the amount of then-available Available Cash and, based on such calculation, promptly thereafter may make Distributions, if any, of the amount so determined.

**4.3.11  Cash Investments.** Except as may be otherwise provided in the PFI Trust Agreement, the PFI Trustee may invest Cash of the PFI Trust, including any earnings thereon or proceeds

SMRH:4816-5664-3557.1
040921
4153384.3

73ZL-319169

Case 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 108 of 158

therefrom, any Cash realized from the monetization of the PFI Trust Assets, or any Cash that is remitted to the PFI Trust from the OpCo, which investments, for the avoidance of doubt, will not be required to comply with Bankruptcy Code section 345(b); *provided, however,* that such investments must be investments that are permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable guidelines, rulings, or other controlling authorities, except as may be otherwise provided in the PFI Trust Agreement.

**4.3.12  Exemption.** To the extent the PFI Trust Interests are deemed to be "securities," the issuance of such interests under the Plan are exempt, pursuant to Bankruptcy Code section 1145, from registration under the Securities Act and any applicable state and local laws requiring registration of securities.

**4.3.13  Contribution of Contributed Claims.** On the Effective Date, all Contributed Claims will be irrevocably contributed to the PFI Trust and shall thereafter be deemed included in the PFI Trust Actions for all purposes. No Person may rely on the absence of a specific reference in the Plan, the Confirmation Order, the PFI Trust Agreement, or the Disclosure Statement to any Contributed Claims against such Person as any indication that the PFI Trust will not pursue any and all available Contributed Claims against such Person. The objection to the Allowance of any Claims will not in any way limit the ability or the right of the PFI Trust to assert, commence, or prosecute any Contributed Claims. Nothing contained in the Plan, the Confirmation Order, the PFI Trust Agreement, or the Disclosure Statement will be deemed to be a waiver, release, or relinquishment of any Contributed Claims that the Contributing Claimants had immediately prior to the Effective Date. The PFI Trust shall have, retain, reserve, and be entitled to assert all Contributed Claims fully as if the Contributed Claims had not been contributed to the PFI Trust in accordance with the Plan and the PFI Trust Agreement. For the avoidance of doubt, (a) the Contributed Claims shall not include the rights of any of the Contributing Claimants to receive the Distributions, if any, to which they are entitled under the Plan; (b) a Contributed Claim shall not include a Cause of Action that could not be successfully maintained by a hypothetical Investor who invested in PISF straight notes at the same time(s) the actual Investor made his or her investments, after receiving the same information which the Debtors or their agents had provided the actual Investor; (c) claims based upon loss of liens or lien priority, and claims by an Investor against their own professionals, investment advisers, or investment managers related to their decision to invest in PFI or PISF are not Contributed Claims; (d) the Contributed Claims shall not include any Causes of Action against any of the Released Parties; and (e) in the exercise of its reasonable discretion and in accordance with the PFI Trust Agreement, the PFI Trust shall not be obligated to pursue all or any given Contributed Claims.

**4.3.14  Pursuit and Resolution of PFI Trust Actions.** The PFI Trust, as a successor in interest to the Debtors, the Estates, and the Contributing Claimants, may, and will have the exclusive right, power, and interest on behalf of itself, the Debtors, the Estates, and the Contributing Claimants, subject to the PFI Trust Agreement, to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw any and all PFI Trust Actions without any further order of the Bankruptcy Court, except as otherwise provided in the PFI Trust Agreement. From and after the Effective Date, the PFI Trust, in accordance with Bankruptcy Code section 1123(b)(3), shall serve as a representative of the Estates with respect to any and all PFI Trust Actions that were Estate Assets and shall retain and possess the right to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all PFI Trust Actions in any court or other tribunal.

**4.3.15  Termination of the PFI Trust.** The PFI Trustee, the PFI Trust and the OpCo shall be discharged or terminated, as the case may be, at such time as: (a) the PFI Trustee determines that the pursuit of additional PFI Trust Actions is not likely to yield sufficient additional proceeds to justify further pursuit of such PFI Trust Actions; (b) the PFI Trustee determines that the continued operation of the OpCo is not likely to yield sufficient additional proceeds to justify further operation

of the OpCo or the OpCo Assets; and (c) all Distributions required to be made by the PFI Trust to the Holders of Allowed Claims and to the PFI Trust Beneficiaries under the Plan and the PFI Trust Agreement have been made, but in no event shall the PFI Trust be terminated later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six (6) months before the end of the preceding extension), determines that a fixed period extension (subject to the terms of the PFI Trust Agreement) is necessary to facilitate or complete the recovery on, and monetization of, the PFI Trust Assets and the OpCo Assets. Upon termination of the PFI Trust, any remaining PFI Trust Assets and OpCo Assets that exceed the amounts required to be paid under the Plan may be transferred by the PFI Trustee to a non-profit organization of his, her or its choosing.

**4.3.16** <u>**Control Provision.**</u> To the extent there is any inconsistency between the Plan as it relates to the PFI Trust and the PFI Trust Agreement, the specific provisions in the PFI Trust Agreement shall control.

**4.4** <u>**ALTERNATIVE RESTRUCTURING TRANSACTIONS**</u>. Notwithstanding any other provision of the Plan, but subject to Section 2.2, in the event that the Debtors file an Alternative Restructuring Transactions Memorandum, on and after the Effective Date, the PFI Trust shall be authorized to consummate the Alternative Restructuring Transactions and take all actions to effectuate the Alternative Restructuring Transactions consistent with the Alternative Restructuring Transactions Memorandum.

**4.5** <u>**PRESERVATION OF PRIVILEGES AND DEFENSES**</u>. The actions taken by the Debtors, the PFI Trust, the OpCo, or any of their respective Related Parties in connection with the Plan shall not be (or be deemed to be) a waiver of any privilege or defense of the Debtors, the PFI Trust, or the OpCo, as applicable, including any attorney-client privilege or work-product doctrine. Notwithstanding any Debtors providing any privileged information related to any PFI Trust Actions to the PFI Trustee, the PFI Trust, the OpCo, or any Person associated with any of the foregoing, such privileged information shall be without waiver in recognition of the joint, common, or successor interest in prosecuting the PFI Trust Actions and shall remain privileged. The PFI Trust shall retain the right to waive its own privileges. Only the PFI Trustee shall have the right to waive the attorney-client privilege, work-product doctrine, or other protections as to the Debtors, the OpCo, and the PFI Trust.

**4.6** <u>**PRESERVATION OF RIGHTS OF ACTION**</u>.

**4.6.1** <u>**Maintenance of Avoidance Actions and Causes of Action.**</u> Except as otherwise provided in the Plan or the Confirmation Order (including in the Investor Claims Special Provisions), from and after the Effective Date, the PFI Trust will retain all rights to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all of the Debtors' or Estates' Causes of Action and Causes of Action that are Contributed Claims (whether existing as of the Petition Date or thereafter arising), and all Avoidance Actions, all as PFI Trust Actions, in each case in any court or other tribunal, including in an adversary proceeding Filed in the Chapter 11 Cases, subject to the requirements set forth in the Plan and the PFI Trust Agreement. The PFI Trust shall have the exclusive right, power, and interest on behalf of itself, the Debtors, the Estates, and the Contributing Claimants to, enforce, sue on, settle, compromise, transfer, or assign (or decline to do any of the foregoing) any or all of the PFI Trust Actions without notice to or approval from the Bankruptcy Court, subject to the PFI Trust Agreement. In accordance with the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court, from and after the Effective Date, the PFI Trust may compromise and settle PFI Trust Actions, subject to the PFI Trust Agreement. It is anticipated that the PFI Trust will pursue PFI Trust Actions primarily under alternate fee arrangements and not a typical hourly fee structure, employing the services of professionals selected by (i) the Debtors, in consultation with

SMRH:4816-5664-3557.1
040921

73ZL-319169

the Committees, prior to the Effective Date or (ii) the PFI Trustee, as provided in the PFI Trust Agreement, on and after the Effective Date.

**4.6.2** <u>**Preservation of All PFI Trust Actions Not Expressly Settled or Released.**</u> The failure to specifically identify in the Disclosure Statement (including the exhibits and schedules thereto) or the Plan any potential or existing Avoidance Actions or Causes of Action as a PFI Trust Action is not intended to and shall not limit the rights of the PFI Trust to pursue any such Avoidance Actions or Causes of Action. Unless a PFI Trust Action is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors expressly reserve such PFI Trust Action for later resolution by the PFI Trust (including any Avoidance Actions or Causes of Action not specifically identified or of which the Debtors may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist). As such, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches will apply to any such Avoidance Actions or Causes of Action upon or after Confirmation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except when such Avoidance Actions or Causes of Action have been expressly released. In addition, the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor, the PFI Trust, or the OpCo is a plaintiff, defendant, or an interested party is fully reserved as against any Person that is not a Released Party, including the plaintiffs or co-defendants in such lawsuits.

**4.7** <u>**CANCELLATION OF INSTRUMENTS**</u>. Except as otherwise provided in the Plan, including Section 2.2, and except with respect to any executory contracts and unexpired leases that are assumed and assigned pursuant to a Final Order, any agreement, bond, certificate, contract, indenture, lease, note, security, warrant, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors shall be deemed cancelled on the Effective Date, and all Liens, mortgages, pledges, grants, trusts, and other interests relating thereto shall be automatically cancelled, and all obligations of the Debtors thereunder or in any way related thereto shall be discharged.

**4.8** <u>**SUBSTANTIVE CONSOLIDATION INCLUDING OF PROFESSIONAL INVESTORS 28, LLC AND PFI GLENWOOD LLC**</u>

**4.8.1** On the Effective Date, PFI, PISF, the LLC/LP Debtors, Professional Investors 28, LLC, and PFI Glenwood LLC (collectively, the "**Consolidated Estates**") shall be substantively consolidated pursuant to sections 105(a), 541, 1123, and 1129 of the Bankruptcy Code. As a result of the substantive consolidation, on the Effective Date, all property, rights and claims of the Consolidated Estates and all Claims against the Consolidated Estates shall be deemed to be pooled for purposes of distributions under the Plan and, in the PFI Trustee's discretion, other purposes. Further, as a result of this substantive consolidation, all claims between and among the Consolidated Estates shall be cancelled, subject to any Alternative Restructuring Transactions. Holders of Allowed Claims shall be entitled to only one satisfaction on account of such Claims, and any contingent or otherwise duplicative Claims against one or more of the Consolidated Estates based upon claims for which one or more of the Consolidated Estates are also liable shall be disallowed.

**4.8.2** Entry of the Confirmation Order shall constitute the approval, pursuant to Bankruptcy Code sections 105(a), 541, 1123, and 1129, of the substantive consolidation of all of the Debtors (including the Plan-Consolidated Debtors) and in the manner set forth in this Section; *provided, however*, that (i) while all Debtors shall be substantively consolidated for purposes of distribution to creditors, such that all Investors shall have claims against a single pool of the Debtors' consolidated assets, the actual substantive consolidation of entities, particularly for tax purposes, shall be at the option of the Debtors or the PFI Trust, and subject to any Alternative Restructuring Transactions,

and (ii) any and all TIC Interests in the Real Properties that are held by any Debtor shall not be substantively consolidated. Notwithstanding the substantive consolidation to be implemented under the Plan, fees payable pursuant to 28 U.S.C. § 1930 shall be due and payable by each individual Debtor through the Effective Date.

**4.8.3** The substantive consolidation effected pursuant to the Plan shall not affect, without limitation, (i) the Debtors', the OpCo's, or the PFI Trust's defenses to any Claim, Avoidance Action, or other Cause of Action, including the ability to assert any counterclaim; (ii) the Debtors', the OpCo's, or the PFI Trust's setoff or recoupment rights; (iii) requirements for any third party to establish mutuality prior to substantive consolidation in order to assert a right of setoff against the Debtors, the OpCo, or the PFI Trust; (iv) distributions to the Debtors, the Estates, the OpCo, or the PFI Trust out of any insurance policies or proceeds of such policies or (v) the rights of Holders of Class 1 Claims as provided in Section 2.2.

**4.8.4** Any Intercompany Claims that could be asserted by one Debtor against another Debtor (including any Plan-Consolidated Debtors) will be extinguished immediately before the Effective Date with no separate recovery on account of any such Claims and any Intercompany Liens that could be asserted by one Debtor regarding any Estate Assets owned by another Debtor will be deemed released and discharged on the Effective Date; *provided, however*, that solely with respect to any Secured Claim of a non-Debtor Person or Entity as to which the associated Lien would be junior to any Intercompany Lien, the otherwise released Intercompany Claim and associated Intercompany Lien will be preserved for the benefit of, and may be asserted by, the PFI Trust as to any Collateral that is Cash and, otherwise, the OpCo so as to retain the relative priority and seniority of such Intercompany Claim and associated Intercompany Lien; *and provided, however*, and for the avoidance of doubt, this subsection 4.8.4 shall not affect the rights of any Holder of a Class 1 Claim whose cash collateral was used in an "Intercompany Transaction" authorized in the several Cash Management Orders, e.g., Docket 354, issued in these Chapter 11 Cases.

**4.8.5** The Disclosure Statement and the Plan shall be deemed to be a motion requesting that the Bankruptcy Court approve the substantive consolidation contemplated by the Plan. Unless an objection to the proposed substantive consolidation is made in writing by any Creditor purportedly affected by such substantive consolidation on or before the deadline to object to Confirmation of the Plan, or such other date as may be fixed by the Bankruptcy Court, the substantive consolidation contemplated by the Plan may be approved by the Bankruptcy Court at the Confirmation Hearing. In the event any such objections are timely filed, a hearing with respect thereto shall be scheduled by the Bankruptcy Court, which hearing may, but need not, be the Confirmation Hearing.

## ARTICLE V.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**5.1 ASSUMPTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

**5.1.1** <u>Assumption of Agreements.</u>

Subject to the Alternative Restructuring Transactions (if applicable), on the Effective Date, the Debtors shall assume all executory contracts and unexpired leases that are listed on the Schedule of Assumed Agreements, and shall assign such contracts and leases to the PFI Trust or the OpCo, as appropriate. The Confirmation Order will constitute a Bankruptcy Court order approving the assumption and assignment or rejection, as applicable, of executory contracts and unexpired leases consistent with the foregoing.

The Debtors reserve the right to amend the Schedule of Assumed Agreements at any time prior to the Effective Date, in the Debtors' reasonable discretion after consultation with each of the Committees, (i) to delete any executory contract or unexpired lease and provide for its rejection under the Plan or otherwise, or (ii) to add any executory contract or unexpired lease and provide for its assumption and assignment under the Plan. The Debtors will provide notice of any amendment to the Schedule of Assumed Agreements to the party or parties to those agreements affected by the amendment.

Unless otherwise specified on the Schedule of Assumed Agreements, each executory contract and unexpired lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is also listed on the Schedule of Assumed Agreements.

### 5.1.2 <u>Cure Payments</u>.

Any amount that must be paid under Bankruptcy Code section 365(b)(1) to cure a default under and compensate the non-debtor party to an executory contract or unexpired lease to be assumed under the Plan is identified as the "Cure Payment" on the Schedule of Assumed Agreements. Unless the parties mutually agree to a different date, such payment shall be made in Cash within thirty (30) days following the later of: (i) the Effective Date and (ii) entry of a Final Order resolving any disputes regarding (A) the amount of any Cure Payment, (B) the ability of the Debtors or their successors under the Plan to provide "adequate assurance of future performance" within the meaning of Bankruptcy Code section 365 with respect to a contract or lease to be assumed, to the extent required, or (C) any other matter pertaining to assumption and assignment.

Pending the Bankruptcy Court's ruling on any such dispute, the executory contract or unexpired lease at issue shall be deemed assumed by the Debtors, unless otherwise agreed by the parties or ordered by the Bankruptcy Court.

### 5.1.3 <u>Objections to Assumption/Cure Payment Amounts</u>.

Any Person that is a party to an executory contract or unexpired lease that will be assumed and/or assigned under the Plan and that objects to such assumption or assignment (including the proposed Cure Payment) must File with the Bankruptcy Court and serve on parties entitled to notice a written statement and, if applicable, a supporting declaration stating the basis for its objection. This statement and, if applicable, declaration must be Filed and served on or before the deadline established by the Solicitation Procedures Order. Any Person that fails to timely File and serve such a statement and, if applicable, a declaration shall be deemed to waive any and all objections to the proposed assumption and assignment (including the proposed Cure Payment) of its contract or lease.

In the absence of a timely objection by a Person that is a party to an executory contract or unexpired lease, the Confirmation Order shall constitute a conclusive determination regarding the amount of any cure and compensation due under the applicable executory contract or unexpired lease, as well as a conclusive finding that adequate assurance of future performance with respect to such executory contract or unexpired lease has been demonstrated, to the extent required.

### 5.1.4 <u>Resolution of Claims Relating to Assumed Contracts and Leases</u>. Payment of the Cure Payment established under the Plan, by the Confirmation Order, or by any other order of the Bankruptcy Court, with respect to an assumed and/or assigned executory contract or unexpired lease, shall be deemed to satisfy, in full, any prepetition or postpetition arrearage or other Claim (including any Claim asserted in a Filed proof of claim or listed on the Schedules) with respect to such contract or lease (irrespective of whether the Cure Payment is less than the amount set forth in such proof of

claim or the Schedules). Upon the tendering of the Cure Payment, any such Filed or Scheduled Claim shall be disallowed with prejudice, without further order of the Bankruptcy Court or action by any Person.

**5.2     REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

**5.2.1    Rejected Agreements.** On the Effective Date all executory contracts and unexpired leases of the Debtors shall be rejected except for (i) executory contracts and unexpired leases that have been previously assumed or rejected by the Debtors, (ii) all executory contracts and unexpired leases specified as to be assumed in Section 5.1.1 above (including all contracts and leases set forth in the Schedule of Assumed Agreements, as may be amended), and (iii) any agreement, obligation, security interest, transaction, or similar undertaking that the Debtors believe is not executory or a lease, but that is later determined by the Bankruptcy Court to be an executory contract or unexpired lease that is subject to assumption or rejection under Bankruptcy Code section 365. For the avoidance of doubt, executory contracts and unexpired leases that have been previously assumed or assumed and assigned pursuant to an order of the Bankruptcy Court shall not be affected by the Plan. The Confirmation Order will constitute a Bankruptcy Court order approving the rejection, on the Effective Date, of the executory contracts and unexpired leases to be rejected under the Plan.

**5.2.2    Rejection Claims Bar Date.** Any Rejection Claim or other Claim for damages arising from the rejection under the Plan of an executory contract or unexpired lease must be Filed and served no later than the Rejection Claims Bar Date. Any such Rejection Claims that are not timely Filed and served will be forever disallowed, barred, and unenforceable, and Persons holding such Claims will not receive and be barred from receiving any Distributions on account of such untimely Claims. If one or more Rejection Claims are timely Filed pursuant to the Plan, the PFI Trust may object to any Rejection Claim on or prior to the Claim Objection Deadline. For the avoidance of doubt, the Rejection Claims Bar Date established by the Plan does not alter any rejection claims bar date established by a prior order of the Bankruptcy Court with respect to any executory contract or unexpired leases that was previously rejected in these Chapter 11 Cases.

<div align="center">

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

</div>

**6.1     DISTRIBUTIONS TO SENIOR CLAIMS; SENIOR CLAIMS RESERVE.**  On or as soon as reasonably practicable after the Effective Date, the PFI Trustee, after consultation with the Debtors and the Committees, will establish the Senior Claims Reserve out of Available Cash, and the Distribution Agent shall make Distributions out of the Senior Claims Reserve to Holders of, as applicable, Allowed Administrative Claims (other than Professional Fee Claims), Involuntary Gap Claims, Priority Tax Claims, Non-Investor First Priority Lender Claims, Non-Investor Other Secured Claims, and Priority Claims in accordance with the Plan, provided that upon the sale or refinancing of any Collateral subject to a Lien of a Holder of a Class 1 Claim, such Claim shall be paid from the escrow or treated as otherwise provided in subsection 2.2.2. After the payment of all such Claims in accordance with the Plan and the payment of all related reasonable costs and expenses of the PFI Trustee and the Distribution Agent (including fees and costs to litigate and otherwise resolve Contingent Claims, Disputed Claims or Unliquidated Claims, and administer and make Distributions), any remaining Cash in the Senior Claims Reserve will be promptly remitted to the PFI Trust to be used for any purposes subject to the Plan and the PFI Trust Agreement.  The PFI Trustee or its designee shall not be required to give any bond or surety or other security for the performance of any duties as the Distribution Agent.

**6.2     TIMING OF DISTRIBUTIONS FOR ALLOWED CLAIMS.** Except as otherwise provided herein or as ordered by the Bankruptcy Court, all Distributions to Holders of Allowed Claims as of the applicable Distribution Date shall be made on or as soon as practicable after the applicable Distribution Date; *provided, however*, that the PFI Trustee, in its discretion, may defer

SMRH:4816-5664-3557.1
040921
4153343.3

73ZL-319169

Distributions to a given Holder of PFI Trust Interests (other than the final Distribution) if the amount available for Distribution to such Holder is not at least $100. Notwithstanding anything else to the contrary in this Plan, and as provided in section 502(d) of the Bankruptcy Code, the PFI Trustee is not required to make any Distributions to Holders of Allowed Claims, and no such Claims shall be deemed Allowed, unless and until such Holder has paid the Net Prepetition Investor Recovery, or such portion thereof as agreed to as a compromise and settlement, to the PFI Trust or until any PFI Trust Action seeking recovery of the Net Prepetition Investor Recovery is disallowed in its entirety by a Final Order. Distributions on account of Claims that first become Allowed Claims after the applicable Distribution Date shall be made pursuant to Section 7.4 of the Plan and on the day selected by the PFI Trustee. Distributions made as soon as reasonably practicable after the Effective Date or such other date set forth herein shall be deemed to have been made on such date.

**6.3 CALCULATING DISTRIBUTIONS AND RELATED MATTERS.** The PFI Trust shall undertake in its reasonable discretion to make in accordance with the Plan all calculations of Available Cash, Investor Claims, and of other amounts for or relating to Distributions for Holders of Allowed Claims to be made from the PFI Trust or for reserves for Holders of Contingent Claims, Disputed Claims, and Unliquidated Claims to be established by the PFI Trust, and may establish and holdback from Distributions reasonable reserves for other contingencies. When calculating Distributions (and amounts to hold in Distribution Reserves) with respect to Investor Claims, the Outstanding Principal Amounts and Prepetition Distributions to be utilized by the PFI Trust shall be as set forth in the Schedule of Allowed Netted Claims or as determined pursuant to the following section.

**6.4 APPLICATION OF THE SCHEDULE OF ALLOWED NETTED CLAIMS.** For any Investor that is not a Disputing Claimant, all Distributions and reserves shall be made or established based on the applicable amounts in the Schedule of Allowed Netted Claims. For any Investor that is a Disputing Claimant, in connection with a calculation by the PFI Trust for a Distribution or to establish reserves, unless otherwise provided in a Bankruptcy Court order, all calculations with respect to Claims asserted by such Disputing Claimant shall be made based on the aggregate claim amounts asserted by the Disputing Claimant in the objection made by such Disputing Claimant to the amount listed in the Schedule of Allowed Netted Claims for such Disputing Claimant or, for Unliquidated Claims, as estimated in the reasonable discretion of the PFI Trust, and all such PFI Trust Interests and Cash shall be held in a Distribution Reserve unless and until (i) the PFI Trust and the particular Disputing Claimant agree regarding the Outstanding Principal Amounts and Prepetition Distributions to utilize or (ii) a Final Order establishes such Outstanding Principal Amounts and Prepetition Distributions, including, if applicable, after taking into account any PFI Trust Actions that the PFI Trust may pursue against the particular Disputing Claimant (as to which all rights of the PFI Trust are reserved unless otherwise provided in the Plan).

**6.5 INTEREST AND OTHER AMOUNTS REGARDING CLAIMS.** Except to the extent provided (i) in Bankruptcy Code section 506(b) and Allowed by a Final Order or otherwise agreed, (ii) in the Plan, or (iii) in the Confirmation Order, postpetition interest shall not accrue or be paid on any Claims, and no Holder of an Allowed Claim shall be entitled to interest, penalties, fees, or late charges accruing or chargeable on any Claim from and after the Petition Date.

**6.6 MEANS OF CASH PAYMENT.** Cash payments under the Plan shall be made, at the option and in the sole discretion of the PFI Trustee, by (i) checks drawn on or (ii) wire transfer, electronic funds transfer, or ACH from a domestic bank. Cash payments to foreign Creditors may be made, at the option and in the sole discretion of the PFI Trustee by such means as are necessary or customary in a particular foreign jurisdiction. Cash payments made pursuant to the Plan in the form of checks shall be null and void if not cashed within 180 calendar days of the date of the issuance thereof. Requests for reissuance of any check within 180 calendar days of the date of the issuance thereof shall be made directly to the PFI Trustee.

**6.7     FORM OF CURRENCY FOR DISTRIBUTIONS.**  All Distributions under the Plan shall be made in U.S. Dollars. Where a Claim has been denominated in foreign currency on a proof of claim, the Allowed amount of such Claim shall be calculated in U.S. Dollars based upon the currency conversion rate in place as of the Petition Date and in accordance with Bankruptcy Code section 502(b).

**6.8     FRACTIONAL DISTRIBUTIONS.**  Notwithstanding anything in the Plan to the contrary, no payment of fractional cents shall be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

**6.9     NO DISTRIBUTIONS WITH RESPECT TO CERTAIN CLAIMS.** Notwithstanding anything in the Plan to the contrary with the exception of Section 2.2, no Distributions or other consideration of any kind shall be made on account of any Contingent Claim, Disputed Claim, or Unliquidated Claim unless and until such Claim becomes an Allowed Claim, and then only to the extent that such Claim becomes an Allowed Claim and as provided under the Plan for such Allowed Claim. Nonetheless, in undertaking the calculations concerning Allowed Claims under the Plan, including the determination of Distributions due to the Holders of Allowed Claims, each Contingent Claim, Disputed Claim, or Unliquidated Claim shall be treated as if it were an Allowed Claim, including rights conferred by Bankruptcy Code section 506(b) which shall be continue to apply until Distribution to the Holders of Class 1 Claims (which, for Unliquidated Claims, shall mean they shall be treated as if Allowed in such amounts as determined in the reasonable discretion of the PFI Trust), except that if the Bankruptcy Court estimates the likely portion of such a Claim to be Allowed or authorized or the Bankruptcy Court or the Holder of such Claim and the PFI Trustee otherwise determine the amount or number that would constitute a sufficient reserve for such a Claim, such amount or number as determined by the Bankruptcy Court or by agreement of the Holder of such Claim and the PFI Trustee shall be used with respect to such Claim. Distributions due in respect of a Contingent Claim, Disputed Claim, or Unliquidated Claim shall be held in reserve by the PFI Trust in one or more Distribution Reserves. The PFI Trust will elect to treat any Distribution Reserve as a "Disputed Ownership Fund," pursuant to Treasury Regulation section 1.468B-9(c)(2)(ii). As outlined in this election, Creditors holding such Claims are not treated as transferors of the money or property transferred to the "Disputed Ownership Fund." For federal income tax purposes, a "Disputed Ownership Fund" is treated as the owner of all assets that it holds. A "Disputed Ownership Fund" is treated as a C corporation for purposes of the Internal Revenue Code. A "Disputed Ownership Fund" must file all required income and information tax returns and make all tax payments from such fund.

**6.10     DELIVERY OF DISTRIBUTIONS.** Distributions in respect of PFI Trust Interests shall be made to Holders of PFI Trust Interests as of the record date set for such Distribution. Distributions to Holders of PFI Trust Interests or Allowed Claims that have not been converted to PFI Trust Interests shall be made (a) at the addresses set forth in the proofs of claim Filed by such Holders, (b) at the addresses reflected in the Schedules if no proof of claim has been Filed, or (c) at the addresses set forth in any written notices of address changes delivered to the Claims Agent or the PFI Trustee.  If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the PFI Trustee is notified of such Holder's then-current address. The responsibility to provide the Claims Agent or the PFI Trustee with a current address of a Holder of PFI Trust Interests or Claims shall always be the responsibility of such Holder. Amounts in respect of undeliverable Distributions made by the PFI Trustee shall be held in trust on behalf of the Holder of the PFI Trust Interest or Claim to which they are payable by the PFI Trustee until the earlier of the date that such undeliverable Distributions are claimed by such Holder and 180 calendar days after the date the undeliverable Distributions were made.

**6.11     APPLICATION OF DISTRIBUTION RECORD DATE & OTHER TRANSFER**

SMRH:4816-5664-3557.1
040921

73ZL-319169

**RESTRICTIONS.** At the close of business on the Distribution Record Date, the claims registers for all Claims shall be closed, and there shall be no further changes in the record holders of any Claims. Except as provided herein, the PFI Trust and its Related Parties shall have no obligation to recognize any putative transfer of Claims occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the claims registers as of the close of business on the Distribution Record Date irrespective of the number of Distributions to be made under the Plan to such Persons or the date of such Distributions. Nothing in this Section 6.11 is intended to or will impair or limit (i) the transferability of any PFI Trust Interests once such PFI Trust Interests have been Distributed to the record holders of Allowed Investor Claims and Allowed Other Unsecured Claims or (ii) the right of Holders at the record dates established from time to time regarding PFI Trust Interests to receive all Distributions in respect of such PFI Trust Interests when any Distributions are made.

**6.12 WITHHOLDING, PAYMENT, AND REPORTING REQUIREMENTS REGARDING DISTRIBUTIONS.** All Distributions under the Plan shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions shall be subject to any such withholding, payment, and reporting requirements. The PFI Trust shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements, including, to the extent such information is not already available to the PFI Trust, requiring each Holder of a PFI Trust Interest or Claim to provide an executed current Form W-9, Form W-8, or similar tax form as a prerequisite to receiving a Distribution. Notwithstanding any other provision of the Plan, (a) each Holder of a PFI Trust Interest or an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and including, in the case of any Holder of a Disputed Claim that has become an Allowed Claim, any tax obligation that would be imposed on the PFI Trust in connection with such Distribution; and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements reasonably satisfactory to the PFI Trust for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed in connection with such Distribution.

**6.13 DEFENSES AND SETOFFS.** On and after the Effective Date, the PFI Trust shall have all of the Debtors' and the Estates' rights under Bankruptcy Code section 558. Nothing under the Plan except as provided in Section 2.2, shall affect the rights and defenses of the Debtors, the Estates, or the PFI Trust in respect of any Claim, including all rights in respect of legal and equitable objections, defenses, setoffs, or recoupment against such Claims. Accordingly, the PFI Trust may, but shall not be required to, set off against any Claim or any Allowed Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors, the Estates, or the PFI Trust, as applicable, may have against the Holder of such Claim; *provided, however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release of any such claim or rights that may exist against such Holder.

**6.14 ALLOCATION OF DISTRIBUTIONS.** All Distributions received under the Plan by Holders of PFI Trust Interests and Claims shall be deemed to be allocated first to the principal amount of such Claim, or the Claim to which the applicable PFI Trust Interest relates, as determined for United States federal income tax purposes, and then to accrued interest, if any, with respect to such Claim.

**6.15 JOINT DISTRIBUTIONS.** The PFI Trustee may, in its sole discretion, make Distributions jointly to any Holder of a Claim and any other Person that the PFI Trustee has determined to have an interest in such Claim.

SMRH:4816-5664-3557.1
040921

73ZL-319169

**6.16** **FORFEITURE OF DISTRIBUTIONS.** If the Holder of a Claim fails to cash a check payable to it within the time period set forth in Section 6.6, fails to claim an undeliverable Distribution within the time limit set forth in Section 6.106.10, or fails to complete and return to the PFI Trustee the appropriate Form W-8 or Form W-9 within 180 calendar days after a request for the completion and return of the appropriate form pursuant to Section 6.12 (or such later time as approved by a Bankruptcy Court order), then such Holder shall be deemed to have forfeited its right to any reserved and future Distributions under the Plan. Any such forfeited Distributions shall be deemed Available Cash for all purposes, notwithstanding any federal or state escheat laws to the contrary.

### ARTICLE VII.
### PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND DISTRIBUTIONS WITH RESPECT THERETO

**7.1** **OBJECTIONS TO AND RESOLUTION OF DISPUTED CLAIMS, INCLUDING ANY CLAIMS OF EXCLUDED PARTIES OR DISPUTING CLAIMANTS.** From and after the Effective Date, the PFI Trust shall have the exclusive authority to compromise, resolve, and Allow any Disputed Claim without the need to obtain approval from the Bankruptcy Court, except as otherwise provided in the PFI Trust Agreement, and any agreement entered into by the PFI Trust with respect to the Allowance of any Claim shall be conclusive evidence and a final determination of the Allowance of such Claim; *provided, however*, that, under the Plan, all Claims asserted by any of the Excluded Parties or any Disputing Claimant are Disputed Claims in their entirety and will have no right to receive any Distributions under the Plan unless and until such Claims are affirmatively Allowed by a Final Order. Notwithstanding anything else to the contrary herein, and as provided in section 502(d) of the Bankruptcy Code, the PFI Trustee is not required to make any Distributions to Holders of Allowed Claims, and no such Claims shall be deemed Allowed, unless and until such Holder has paid the Net Prepetition Investor Recovery, or such portion thereof as agreed to as a compromise and settlement, to the PFI Trust or until any PFI Trust Action seeking recovery of the Net Prepetition Investor Recovery is disallowed in its entirety by a Final Order.

**7.2** **CLAIM OBJECTIONS.** All objections to Claims (other than Professional Fee Claims, which shall be governed by Section 10.3 of the Plan, but including any Claims of Excluded Parties or Disputing Claimants) shall (i) with respect to non-Investor Claims, be Filed by the PFI Trust on or before the Claim Objection Deadline, which date may be extended by order of the Bankruptcy Court for cause after notice to parties who have Filed requests for notice on motion by the PFI Trust filed prior to the expiration of such period; (ii) with respect to Investor Claims, be filed in accordance with the procedures and deadlines to be set by order of the Bankruptcy Court with respect to the Schedule of Allowed Netted Claims; and (iii) with respect to the expungement of any liens held by Investors in Real Property, be filed in accordance with Section 10.1 of the Plan. With respect to non-Investor Claims, if a timely objection has not been Filed to a proof of claim or the Schedules have not been amended with respect to a Claim that was Scheduled by the Debtors but was not Scheduled as contingent, unliquidated, or disputed, then the Claim to which the proof of claim or Scheduled Claim relates will be treated as an Allowed Claim. With respect to Investor Claims, if an Investor does not file an objection to the amount set forth in the Schedule of Allowed Netted Claims in accordance with further order of the Bankruptcy Court and does not object to the expungement of a lien on Real Property under the Plan, such Investor Claim will be treated as an Allowed Claim in the amounts set forth in the Schedule of Allowed Netted Claims.

**7.3** **ESTIMATION OF CERTAIN CLAIMS.** The PFI Trust may, at any time, move for a Bankruptcy Court order estimating any Contingent Claim, Disputed Claim, or Unliquidated Claim pursuant to Bankruptcy Code section 502(c), subject to Section 2.2 of the Plan, regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction and power to estimate any

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 118 of 158

Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.

**7.4 DISTRIBUTIONS FOLLOWING ALLOWANCE.** Once a Contingent Claim, a Disputed Claim, or an Unliquidated Claim becomes an Allowed Claim, in whole or in part, including pursuant to the Plan, the PFI Trust shall distribute from the applicable Distribution Reserves to the Holder thereof the Distributions, if any, to which such Holder is then entitled under the Plan. Such Distributions, if any, shall be made on the next Distribution Date after the date on which the order or judgment allowing any such Claim becomes a Final Order or on which the Claim otherwise becomes an Allowed Claim, or, if there is no applicable Distribution Date, then within ninety (90) calendar days after the date on which the Claim becomes an Allowed Claim. Unless otherwise specifically provided in the Plan, such as in Section 2.2, or allowed by a Final Order, no interest shall be paid on Contingent Claims, Disputed Claims, or Unliquidated Claims that later become Allowed Claims.

**7.5 DISPOSITION OF ASSETS IN RESERVES AFTER DISALLOWANCE.** After an objection to a Disputed Claim is sustained or a Contingent Claim or Unliquidated Claim has been determined in whole or in part by a Final Order or by agreement, such that the Contingent Claim, Disputed Claim, or Unliquidated Claim is a Disallowed Claim in whole or in part, any Cash held in an applicable Distribution Reserve in respect of the particular Claim in excess of the Distributions due on account of any resulting Allowed Claim shall be used or distributed in a manner consistent with the Plan and any reserved PFI Trust Interests shall be cancelled.

## ARTICLE VIII.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**8.1 CONDITIONS TO THE EFFECTIVE DATE.** The occurrence of the Effective Date shall not occur and the Plan shall not be consummated unless and until each of the following conditions has been satisfied or duly waived pursuant to Section 8.2 of the Plan:

    (a)    the Bankruptcy Court shall have entered the Confirmation Order in a form reasonably acceptable to the Debtors and the Committees;

    (b)    the Confirmation Order shall not be subject to any stay;

    (c)    all governmental and material third-party approvals and consents necessary in connection with the transactions contemplated by the Plan, if any, shall have been obtained and be in full force and effect;

    (d)    all actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable;

    (e)    the Professional Fee Reserve is funded pursuant to Section 10.3 of the Plan;

    (f)    the Committees shall have agreed on and selected the BOV;

    (g)    the Committees shall have agreed on the powers of the BOV to oversee the PFI Trustee, and the mechanism, terms, and conditions under which the BOV may exercise those powers, including the removal of the PFI Trustee, as set forth in the PFI Trust Agreement; and

    (h)    the Committees shall have agreed on a business plan for the OpCo, which shall have been duly organized.

**8.2 WAIVER OF CONDITIONS TO THE EFFECTIVE DATE.** The conditions to the Effective Date set forth in clauses (iii) and (iv) of Section 8.1 of the Plan may be waived in writing by agreement of each of the Committees and the Debtors in their reasonable discretion, at any time without further order.

**8.3 EFFECT OF NON-OCCURRENCE OF CONDITIONS TO THE EFFECTIVE DATE.** If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Sections 8.1 and 8.2 of the Plan, upon notification Filed by the Debtors with the Bankruptcy Court, (i) the Confirmation Order shall be vacated; (ii) no Distributions shall be made; (iii) the Debtors, the Estates, the Committees and all Creditors shall be restored to the *status quo* as of the day immediately preceding the Confirmation Hearing as though the Confirmation Order was not entered; and (iv) all of the Debtors' and the Estates' obligations with respect to Claims shall remain unchanged and nothing contained in the Plan shall constitute a waiver or release of any Causes of Action by or against the Debtors, the Estates, or any other Person or prejudice in any manner the rights, claims, or defenses of the Debtors, the Estates, or any other Person.

**8.4 NOTICE OF THE EFFECTIVE DATE.** Promptly after the occurrence of the Effective Date, the PFI Trust or its agents shall mail or cause to be mailed to all Creditors a notice that informs such Creditors of (i) entry of the Confirmation Order and the resulting confirmation of the Plan; (ii) the occurrence of the Effective Date; (iii) the assumption, assignment, and rejection of executory contracts and unexpired leases pursuant to the Plan, as well as the deadline for the filing of resulting Rejection Claims; (iv) the deadline established under the Plan for the filing of Administrative Claims; and (v) such other matters as the PFI Trustee finds appropriate.

<div align="center">

**ARTICLE IX.**
**RETENTION OF JURISDICTION AND POWER**

</div>

**9.1 SCOPE OF RETAINED JURISDICTION AND POWER.** Under Bankruptcy Code sections 105(a) and 1142, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain jurisdiction and power over all matters arising in, arising under, or related to the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including jurisdiction and power to do the following:

(a) except as otherwise Allowed pursuant to the Plan or in the Confirmation Order, Allow, classify, determine, disallow, establish the priority or secured or unsecured status of, estimate, limit, liquidate, or subordinate any Claim, in whole or in part, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims;

(b) hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under Bankruptcy Code sections 327, 328, 330, 331, 363, 503(b), 1103, and 1129(a)(4);

(c) hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required cure or the liquidation or allowance of any Claims arising therefrom;

(d) effectuate performance of and payments under the provisions of the Plan and enforce remedies on any default under the Plan;

(e) hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases, including the PFI Trust Actions, and with respect to the Plan;

(f) enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created, executed, or contemplated in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

(g) hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements (including, without limitation, the PFI Trust Agreement), documents, or instruments executed in connection with the Plan, or to maintain the integrity of the Plan following consummation;

(h) consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(i) issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

(j) enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(k) hear and determine any matters arising in connection with or relating to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created, executed, or contemplated in connection with any of the foregoing documents and orders;

(l) enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings associated with the Plan or otherwise entered in connection with the Chapter 11 Cases (whether or not any or all of the Chapter 11 Cases have been closed);

(m) except as otherwise limited herein, recover all Estate Assets, wherever located;

(n) hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146;

(o) hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, the Bankruptcy Code and title 28 of the United States Code;

(p) resolve any cases, controversies, suits, or disputes related to the PFI Trust, the BOV, the PFI Trustee, or the OpCo; and

(q) enter a final decree closing the Chapter 11 Cases of the Debtors, other than PFI.

**9.2 RESERVED RIGHTS TO SEEK BANKRUPTCY COURT APPROVAL.** Notwithstanding any provision of the Plan allowing an act to be taken without Bankruptcy Court approval, the PFI Trustee shall have the right to submit to the Bankruptcy Court any question or questions regarding which either of them may desire to have explicit approval of the Bankruptcy Court for the taking of any specific action proposed to be taken by the PFI Trust, including the

administration, distribution, or proposed sale of any of the PFI Trust Assets or OpCo Assets. The Bankruptcy Court shall retain jurisdiction and power for such purposes and shall approve or disapprove any such proposed action upon motion Filed by the PFI Trust.

**9.3** <u>**NON-EXERCISE OF JURISDICTION.**</u> If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Section 9.1 of the Plan, the provisions of this **Error! Reference source not found.** shall have no effect on, and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to, such matter.

<div align="center">

**ARTICLE X.**
**<u>MISCELLANEOUS PROVISIONS</u>**

</div>

**10.1** <u>**LIEN EXPUNGEMENT PROCEDURES.**</u> Any DOT Noteholder that wishes to challenge the expungement of its lien under the Plan shall file an objection with the Bankruptcy Court no later than twenty (20) days after entry of the Confirmation Order (the "**Objection Deadline**") and serve its objection on the PFI Trustee and counsel for the Plan Proponents and Ad Hoc Committees. The Debtors or the PFI Trustee, as applicable, shall file an Avoidance Action no later than thirty (30) days after service of any such objection. Such lien expungement shall automatically become effective with respect to each Real Property on the later of the thirtieth (30th) day after entry of the Confirmation Order, if no objection is timely filed, or if an objection is timely filed, the date of entry of a final order adjudicating the Avoidance Action with respect to a lien on that Real Property.

**10.2** <u>**ADMINISTRATIVE CLAIMS.**</u> Subject to the last sentence of this Section 10.2, all requests for payment of an Administrative Claim must be Filed with the Bankruptcy Court no later than the Administrative Claims Bar Date. In the event of an objection to Allowance of an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. **THE FAILURE TO FILE A MOTION REQUESTING ALLOWANCE OF AN ADMINISTRATIVE CLAIM ON OR BEFORE THE ADMINISTRATIVE CLAIMS BAR DATE, OR THE FAILURE TO SERVE SUCH MOTION TIMELY AND PROPERLY, SHALL RESULT IN THE ADMINISTRATIVE CLAIM BEING FOREVER BARRED AND DISALLOWED WITHOUT FURTHER ORDER OF THE BANKRUPTCY COURT.** Postpetition statutory tax claims shall not be subject to any Administrative Claims Bar Date.

**10.3** <u>**PROFESSIONAL FEE CLAIMS.**</u> All final requests for payment of Professional Fee Claims pursuant to Bankruptcy Code sections 327, 328, 330, 331, 363, 503(b), or 1103 must be made by application Filed with the Bankruptcy Court and served on counsel to the PFI Trust, counsel to the U.S. Trustee, and counsel to the SEC, no later than forty-five (45) calendar days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to such applications must be Filed and served on counsel to the PFI Trust, counsel to the U.S. Trustee, and the requesting Professional in accordance with the instructions set forth in notice(s) to be filed with the Bankruptcy Court. All Professional Fee Claims shall be promptly paid by the PFI Trust to the extent approved by order of the Bankruptcy Court. On the Effective Date, the PFI Trust shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the PFI Trust and shall be maintained by the PFI Trust in accordance with the Plan. The PFI Trust shall fully fund the Professional Fee Reserve on the Effective Date in an amount that is agreed upon by the Debtors and each of the Committees prior to the Confirmation Hearing and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date. If the Debtors and the Committees are unable to agree on an amount by which the Professional Fee Reserve is to be funded, then any of those parties may submit the issue to the Bankruptcy Court, which, following notice and a hearing, shall fix the amount of the required funding. All Professional Fee Claims that have not previously been paid, otherwise satisfied, or withdrawn shall be paid from the Professional Fee Reserve. Any excess funds in the Professional Fee Reserve shall be released to the PFI Trust to be used for other

SMRH:4816-5664-3557.1
040921
4153283.3
73ZL-319169

Case 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 122 of 158

purposes consistent with the Plan. For the avoidance of doubt, the Professional Fee Reserve is an estimate and shall not be construed as a cap on the PFI Trust's obligation to pay in full Allowed Professional Fee Claims.

**10.4** **PAYMENT OF STATUTORY FEES.** All fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date. All such fees that arise after the Effective Date shall be paid by the PFI Trust.

**10.5** **SEC RELATED PROVISIONS. Notwithstanding any provision herein to the contrary or an abstention from voting on the Plan, no provision of the Plan, or any order confirming the Plan: (i) releases any non-debtor person or entity from any claim or cause of action of the SEC; or (ii) enjoins, limits, impairs, or delays the SEC from commencing or continuing any claims, causes of action, proceedings, or investigations against any non-debtor person or entity in any forum.**

**10.6** **POST-EFFECTIVE-DATE REPORTING.**

(a) Beginning the first quarter-end following the Effective Date and continuing on each quarter-end thereafter until the Closing Date, within thirty (30) calendar days after the end of such period, the PFI Trust shall File quarterly reports with the Bankruptcy Court. Each quarterly report shall contain financial, Distributions, settlement, sale and/or such other information as provided for in the PFI Trust Agreement.

(b) The PFI Trust shall, as soon as practicable after the end of each calendar year and upon termination of the PFI Trust, provide or make available a written report and account to the Holders of PFI Trust Interests, which report and account sets forth (i) the assets and liabilities of the PFI Trust at the end of such calendar year or upon termination and the receipts and disbursements of the PFI Trust for such calendar year or period, and (ii) changes in the PFI Trust Assets and actions taken by the PFI Trustee in the performance of its duties under the Plan or the PFI Trust Agreement that the PFI Trustee determines in its discretion may be relevant to Holders of PFI Trust Interests, such as material changes or actions that, in the opinion of the PFI Trustee, may have a material effect on the PFI Trust Assets that were not previously reported. The PFI Trust may provide or make available to Holders of PFI Trust Interests similar reports for such interim periods during the calendar year as the PFI Trustee deems advisable. Such reports may be provided or made available to the Holders of PFI Trust Interests, in the discretion of the PFI Trustee, by any reasonable means, including U.S. mail, electronic transmission, or a virtual data room to which Holders shall have access, or publication to a publicly-available website or by press release distributed via a generally recognized business news service.

**10.7** **DISSOLUTION OF THE COMMITTEES.** The Unsecured Creditors' Committee, together with the Ad Hoc Committees, shall be automatically dissolved on the Effective Date and, on the Effective Date, each member thereof and each Professional retained by the Unsecured Creditors' Committee and the Ad Hoc Committees shall be released and discharged from all rights, duties, responsibilities, and obligations arising from, or related to, the Debtors, their membership on the Unsecured Creditors' Committee or the Ad Hoc Committees, as applicable, the Plan, or the Chapter 11 Cases, except with respect to (a) any matters concerning any Professional Fee Claims held or asserted by any Professional retained by the Unsecured Creditors' Committees or the Ad Hoc Committees; and (b) the rights (if any) of former members of the Unsecured Creditors' Committee and the Ad Hoc Committees to select successor designees on the BOV in accordance with the terms of the PFI Trust Agreement.

**10.8** **MODIFICATIONS AND AMENDMENTS.**

(a)     In the Plan Proponents' reasonable discretion after attempting agreement with the Ad Hoc Committees, the Plan Proponents may alter, amend, or modify the Plan under Bankruptcy Code section 1127(a) at any time at or prior to the conclusion of the Confirmation Hearing, provided that the Schedule of Assumed Contracts may be altered, amended or modified up until the Effective Date or by further order of the Bankruptcy Court. All alterations, amendments, or modifications to the Plan must comply with Bankruptcy Code section 1127. The Debtors shall provide parties in interest with notice of such amendments or modifications as may be required by the Bankruptcy Rules or order of the Bankruptcy Court. A Creditor that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim of such Creditor.

(b)     After entry of the Confirmation Order and prior to substantial consummation (as defined in Bankruptcy Code section 1101(2)) of the Plan, the Plan Proponents or the PFI Trust, as applicable, may, under Bankruptcy Code section 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims under the Plan. Such proceedings must comply with Bankruptcy Code section 1127. To the extent required, prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or an order of the Bankruptcy Court. A Creditor that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim of such Creditor.

**10.9     SEVERABILITY OF PLAN PROVISIONS.** If, at or before the Confirmation Hearing, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. That term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated. The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with this Section, is valid and enforceable under its terms.

**10.10     COMPROMISES AND SETTLEMENTS.** From and after the Effective Date, the PFI Trust may compromise and settle disputes about any Claims or about any PFI Trust Actions, without any further approval by the Bankruptcy Court, subject to the terms and conditions of the PFI Trust Agreement. Until the Effective Date, the Debtors expressly reserve the right to compromise and settle (subject to the approval of the Bankruptcy Court) Claims against them or any Avoidance Actions and Causes of Action belonging to the Estates.

**10.11     BINDING EFFECT OF PLAN.** Upon the Effective Date, Bankruptcy Code section 1141 shall become applicable with respect to the Plan and the Plan shall be binding on all Persons to the fullest extent permitted by Bankruptcy Code section 1141(a). Confirmation of the Plan binds each Holder of a Claim or Equity Interest to all the terms and conditions of the Plan, whether or not such Holder's Claim or Equity Interest is Allowed, whether or not such Holder holds a Claim or Equity Interest that is in a Class that is Impaired under the Plan, and whether or not such Holder has accepted the Plan.

**10.12     NON-DISCHARGE OF THE DEBTORS; INJUNCTION. In accordance with Bankruptcy Code section 1141(d)(3)(A), the Plan does not discharge the Debtors. Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan, including, without limitation, the Real Properties, is free and clear of all Claims**

SMRH:4816-5664-3557.1
040921

73ZL-319169

and Equity Interests against the Debtors, except as otherwise provided with respect to the Non-Investor First-Priority Lenders in Section 2.2 of the Plan. As such, no Person holding a Claim (other than the Non-Investor First-Priority Lenders as provided in Section 2.2) or an Equity Interest may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Person under the Plan. As of the Effective Date, all Persons are precluded and barred from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, Equity Interests, or other action or remedy based on any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.

## 10.13   RELEASES AND RELATED MATTERS.

(a)   On the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Releasing Parties shall be deemed to have forever released, waived, and discharged each of the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whatsoever, whether known or unknown, whether foreseen or unforeseen, whether liquidated or unliquidated, whether fixed or contingent, whether matured or unmatured, existing or hereafter arising, at law, in equity, or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' businesses, the Chapter 11 Cases, or the Plan, except for acts or omissions that are determined in a Final Order to have constituted actual fraud or willful misconduct; *provided, however*, that nothing in this Section 10.12 shall release or otherwise affect any Person's rights under the Plan or the Confirmation Order.

(b)   Entry of the Confirmation Order shall constitute (i) the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Section 10.13; and (ii) the Bankruptcy Court's findings that such releases are (1) in exchange for good and valuable consideration provided by the Released Parties (including performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (2) in the best interests of the Debtors, the Estates, and any Holders of Claims that are Releasing Parties, (3) fair, equitable, and reasonable, (4) given and made after due notice and opportunity for hearing, and (5) a bar to any of the Releasing Parties asserting any released claim against any of the Released Parties.

(c)   Notwithstanding any provision herein to the contrary or an abstention from voting on the Plan, no provision of the Plan, or any order confirming the Plan, (i) releases any non-Debtor Person from any Cause of Action of the SEC; or (ii) enjoins, limits, impairs, or delays the SEC from commencing or continuing any Causes of Action, proceedings, or investigations against any non-Debtor Person in any forum.

## 10.14   EXCULPATION AND LIMITATION OF LIABILITY. On the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, to the maximum extent permitted by law, none of the Exculpated Parties shall have or incur any liability to any Person, including to any Holder of a Claim or an Equity Interest, for any prepetition or postpetition act or omission in connection with, relating to, or arising out of the Debtors, the Chapter 11 Cases, the formulation, negotiation, preparation, dissemination, solicitation of acceptances, implementation, confirmation, or consummation of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created, executed, or contemplated in connection with the Plan, or the administration of the Plan or the property to be distributed under the Plan; *provided, however*, that nothing in this Section 10.14 shall release or otherwise affect any Person's rights under the Plan or the Confirmation

SMRH:4816-5664-3557.1
040921

73ZL-319169

Order; and *provided, further*, that the exculpation provisions of this Section 10.14 shall not apply to acts or omissions constituting actual fraud or willful misconduct by such Exculpated Party as determined by a Final Order. For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court conclusively will be deemed not to constitute actual fraud or willful misconduct unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation, and in all respects, the Exculpated Parties shall be entitled to rely on the written advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and administration thereof. The Confirmation Order shall serve as a permanent injunction against any Person seeking to enforce any Causes of Action against the Exculpated Parties that are encompassed by the exculpation provided by this Section 10.14 of the Plan.

**10.15** <u>**TERM OF INJUNCTIONS OR STAYS.**</u> Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in the Chapter 11 Cases under Bankruptcy Code sections 105 or 362 or otherwise, and extant as of the Confirmation Hearing (excluding any injunctions or stays contained in or arising from the Plan or the Confirmation Order), shall remain in full force and effect through and inclusive of the Effective Date and thereafter shall automatically terminate unless otherwise ordered by the Bankruptcy Court.

**10.16** <u>**REVOCATION, WITHDRAWAL, OR NON-CONSUMMATION.**</u> The Plan Proponents, after consultation with the Ad Hoc Committees, reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Hearing and to File subsequent plans. If the Plan Proponents revoke or withdraw the Plan prior to the Confirmation Hearing, or if the Effective Date does not occur, then (a) the Plan shall be null and void in all respects; and (b) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims against, or any Equity Interests in, any Debtor, or any Causes of Action by or against any Debtor or any other Person, (ii) prejudice in any manner the rights of any Debtor or any other Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person.

**10.17** <u>**EXEMPTION FROM TRANSFER TAXES.**</u> Pursuant to Bankruptcy Code section 1146, the vesting of the PFI Trust Assets in the PFI Trust, the vesting of the OpCo Assets in the OpCo, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge, or other security interest, or the making or assignment of any lease or sublease, or making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

**10.18** <u>**COMPUTATION OF TIME.**</u> In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**10.19** <u>**TRANSACTIONS ON BUSINESS DAYS.**</u> If the Effective Date or any other date on which a transaction may occur under the Plan shall occur on a day that is not a Business Day, any transactions or other actions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day.

**10.20** <u>**GOOD FAITH.**</u> Confirmation of the Plan shall constitute a conclusive determination that: (a) the Plan, and all the transactions and settlements contemplated thereby, have been proposed in good faith and in compliance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules; and (b) the solicitation of acceptances or rejections of the Plan has been in good faith and in compliance with all applicable provisions of the Bankruptcy Code, and the Bankruptcy Rules, and, in each case, that the Plan Proponents and their respective Related Parties have acted in good faith in connection therewith.

**10.21 GOVERNING LAW.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), (a) the laws of the State of California shall govern the construction and implementation of the Plan and (except as may be provided otherwise in any such agreements, documents, or instruments) any agreements, documents, and instruments executed in connection with the Plan and (b) the laws of the state of incorporation or formation of each Debtor shall govern corporate, limited liability company or limited partnership governance matters with respect to such Debtor; in each case without giving effect to the principles of conflicts of law thereof. Any applicable nonbankruptcy law that would prohibit, limit, or otherwise restrict implementation of the Plan based on (i) the commencement of the Chapter 11 Cases, (ii) the appointment of the PFI Trustee, (iii) the wind down of the Debtors, (iv) the monetization of some or all of the PFI Trust Assets, or (v) any other act or action to be done pursuant to or contemplated by the Plan is superseded and rendered inoperative by the Plan and federal bankruptcy law.

**10.22 NOTICES.** Following the Effective Date, all pleadings and notices Filed in the Chapter 11 Cases shall be served solely on (a) the PFI Trust and its counsel, (b) the U.S. Trustee, (c) any Person whose rights are affected by the applicable pleading or notice, and (d) any Person Filing a specific request for notices and papers on and after the Effective Date.

**10.23 FINAL DECREE.** Upon the PFI Trustee's determination that all Claims have been Allowed, disallowed, expunged, or withdrawn and that all PFI Trust Assets and OpCo Assets have been monetized, abandoned, or otherwise administered, the PFI Trust shall move for the entry of the Final Decree. On entry of the Final Decree, the PFI Trustee and the BOV shall be deemed discharged and have no further duties or obligations to the PFI Trust or any other Person.

**10.24 ADDITIONAL DOCUMENTS.** On or before the Effective Date, the Plan Proponents may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and the PFI Trust, as applicable, and all Holders receiving Distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other acts as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**10.25 CONFLICTS WITH THE PLAN.** In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, any other order entered in the Chapter 11 Cases, or any other agreement to be executed by any Person pursuant to the Plan, the provisions of the Plan shall control and take precedence; *provided, however*, that if there is any inconsistency between the Plan, the provisions of the Disclosure Statement, and any other order entered in the Chapter 11 Cases, on the one hand, and the PFI Trust Agreement regarding the protocols, authority and decision-making power of the BOV, on the other hand, the specific provisions in the PFI Trust Agreement regarding the BOV shall control; *provided further* that the Confirmation Order shall control and take precedence in the event of any inconsistency between the Confirmation Order, any provision of the Plan, and any of the foregoing documents.

*[Remainder of page intentionally left blank]*

## ARTICLE XI.
## REQUEST FOR CONFIRMATION AND RECOMMENDATION

**11.1    REQUEST FOR CONFIRMATION.** The Plan Proponents request confirmation of the Plan in accordance with Bankruptcy Code section 1129.

**11.2    RECOMMENDATION.** The Plan Proponents believe that confirmation and implementation of the Plan are the best alternative under the circumstances and urge all Impaired Creditors entitled to vote on the Plan to vote in favor of and support confirmation of the Plan.

Dated:  April 9, 2021

SHEPPARD MULLIN RICHTER & HAMPTON LLP

By    _____
/s/ Ori Katz
ORI KATZ
J. BARRETT MARUM
MATT KLINGER

Counsel for Debtors

Dated:  April 9, 2021

PACHULSKI STANG ZIEHL & JONES LLP

By    _____
/s/ Debra Grassgreen
DEBRA GRASSGREEN
JOHN D. FIERO
CIA H. MACKLE

Counsel for the Official Committee of Unsecured Creditors

SMRH:4816-5664-3557.1
040921

73ZL-319169

**Exhibit 1**

**(List of the Debtors)**

SMRH:4816-5664-3557.1
040921
4153204.3

-1-

73ZL-319169

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 129
of 158

| | Entity Name | Case No. | Date Petition/Invol. Petition Filed | EIN | Address |
|---|---|---|---|---|---|
| 1. | Professional Investors Security Fund, Inc. | 20-30579 | 7/16/20 | 68-0040208 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 2. | Professional Financial Investors, Inc. | 20-30604 | 7/26/20 | 68-0233228 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 3. | Professional Investors Security Fund I, A California Limited Partnership | 20-30908 | 11/20/20 | 68-0022483 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 4. | Professional Investors Security Fund IV, A California Limited Partnership | 20-30909 | 11/20/20 | 68-0049491 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 5. | Professional Investors Security Fund VII, A California Limited Partnership | 20-30911 | 11/20/20 | 68-0115840 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 6. | Professional Investors Security Fund IX, A California Limited Partnership | 20-30910 | 11/20/20 | 68-0184540 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 7. | Professional Investors Security Fund XII, A California Limited Partnership | 20-30912 | 11/20/20 | 68-0233359 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 8. | Professional Investors Security Fund XIII, A California Limited Partnership | 20-30913 | 11/20/20 | 68-0264951 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 9. | Professional Investors Security Fund XIV, A California Limited Partnership | 20-30914 | 11/20/20 | 68-0287489 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 10. | Professional Investors Security Fund XV, A California Limited Partnership | 20-30915 | 11/20/20 | 68-0298084 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 11. | Professional Investors Security Fund XVII, A California Limited Partnership | 20-30916 | 11/20/20 | 68-0322071 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 12. | Professional Investors Security Fund XVIII, A California Limited Partnership | 20-30917 | 11/20/20 | 68-0340123 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 13. | Professional Investors 20, LLC | 20-30919 | 11/20/20 | 46-3353668 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 14. | Professional Investors 21, LLC | 20-30920 | 11/20/20 | 46-5084863 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 15. | Professional Investors 22, LLC | 20-30922 | 11/20/20 | 47-1285602 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 16. | Professional Investors 23, LLC | 20-30923 | 11/20/20 | 47-1699320 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 17. | Professional Investors 24, LLC | 20-30924 | 11/20/20 | 47-3144421 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |

SMRH:4839-0453-0658.1

73ZL-319169

| | | | | | |
|---|---|---|---|---|---|
| 18. | Professional Investors 25, LLC | 20-30925 | 11/20/20 | 47-3879056 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 19. | Professional Investors 26, LLC | 20-30927 | 11/20/20 | 47-4335145 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 20. | Professional Investors 27, LLC | 20-30928 | 11/20/20 | 47-4930703 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 21. | Professional Investors 28, LLC | TBD [Plan-Consolidated Debtor] | TBD [Plan-Consolidated Debtor] | 47-5310122 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 22. | Professional Investors 29, LLC | 20-30929 | 11/20/20 | 81-2625418 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 23. | Professional Investors 30, LLC | 20-30930 | 11/20/20 | 37-1827607 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 24. | Professional Investors 31, LLC | 21-30093 | 2/4/21 | 81-3273083 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 25. | Professional Investors 32, LLC | 20-30934 | 11/20/20 | 81-2625418 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 26. | Professional Investors 33, LLC | 20-30935 | 11/20/20 | 37-1827607 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 27. | Professional Investors 34, LLC | 20-30936 | 11/20/20 | 81-2625418 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 28. | Professional Investors 35, LLC | 20-30937 | 11/20/20 | 37-1827607 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 29. | Professional Investors 36, LLC | 20-30938 | 11/20/20 | 81-2625418 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 30. | Professional Investors 37, LLC | 20-30939 | 11/20/20 | 37-1827607 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 31. | Professional Investors 38, LLC | 21-30082 | 2/3/21 | 82-2734722 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 32. | Professional Investors 39, LLC | 21-30083 | 2/3/21 | 82-3661635 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 33. | Professional Investors 40, LLC | 20-30940 | 11/20/20 | 82-3823200 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 34. | Professional Investors 41, LLC | 20-30941 | 11/20/20 | 82-3839566 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 35. | Professional Investors 42, LLC | 21-30084 | 2/3/21 | 82-5497471 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 36. | Professional Investors 43, LLC | 21-30085 | 2/3/21 | 83-2208999 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |

| | | | | | |
|---|---|---|---|---|---|
| 37. | Professional Investors 44, LLC | 21-30086 | 2/3/21 | 83-2294816 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 38. | Professional Investors 45, LLC | 21-30087 | 2/3/21 | 83-2315445 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 39. | Professional Investors 46, LLC | 20-30942 | 11/20/20 | 84-1743732 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 40. | Professional Investors 47, LLC | 21-30088 | 2/3/21 | 84-2157268 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 41. | Professional Investors 48, LLC | 21-30089 | 2/3/21 | 84-3537563 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 42. | Professional Investors 49, LLC | 21-30094 | 2/4/21 | 84-3792687 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |
| 43. | PFI Glenwood, LLC | TBD [Plan-Consolidated Debtor] | TBD [Plan-Consolidated Debtor] | 82-2779085 | 350 Ignacio Blvd., Suite 300 Novato, CA 94949 |

1

# EXHIBIT B

### Corporate Organizational Chart

# Professional Financial Investors, Inc.
## *Ownership in LLC Entities* [1]





| Professional Financial Investors, Inc. |
|---|

**40.0%** → LLC 22 → **32.9%** → LLC 37 ← **30.4%**

**20.9%** → LLC 21 → **37.6%** → LLC 38 ← **25.3%** ← LLC 20 ← **20.0%** ; **30.0%** → LLC 38

| 30.0% | 35.0% | 39.0% | 45.6% | 29.7% | 31.9% | 19.5% | 44.8% | 31.6% | 33.6% | 34.8% | 30.8% | 32.0% | 44.9% | 30.3% | 31.3% | 30.4% | 30.8% | 81.9% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LLC 23 | LLC 33 | LLC 24 | LLC 25 | LLC 26 | LLC 27 | LLC 28 | LLC 29 | LLC 31 | LLC 34 | LLC 35 | LLC 36 | LLC 39 | LLC 40 | LLC 42 | LLC 43 | LLC 45 | LLC 46 | PFI Glenwood |
| LLC 30 | LLC 44 | | | | | | | | | | | | | | | | | |
| LLC 32 | | | | | | | | | | | | | | | | | | |
| LLC 41 | | | | | | | | | | | | | | | | | | |
| LLC 47 | | | | | | | | | | | | | | | | | | |
| LLC 48 | | | | | | | | | | | | | | | | | | |
| LLC 49 | | | | | | | | | | | | | | | | | | |

## Additional Ownership Detail

| IrieA, LLC | | IrieLee, LLC | |
|---|---|---|---|
| Entity | % Ownership | Entity | % Ownership |
| LLC 20 | 7.8% | LLC 20 | 7.8% |
| LLC 22 | 1.7% | LLC 22 | 1.7% |
| LLC 23 | 1.7% | LLC 23 | 1.7% |
| LLC 26 | 1.8% | LLC 26 | 1.8% |
| LLC 34 | 1.3% | LLC 34 | 1.3% |
| LLC 36 | 8.0% | LLC 36 | 8.0% |
| LLC 37 | 4.1% | LLC 37 | 4.1% |
| LLC 44 | 3.6% | LLC 44 | 3.6% |

**PFI Ownership in LLCs**

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 134 of 158

1.   Detail above reflects % ownership from PFI, PISF and related entities. Remaining, outstanding % ownership is from outside individuals and/or entities.



# Professional Financial Investors, Inc. and Professional Investors Security Fund, Inc.
## *Ownership in LP Entities* [1]



**Additional Ownership Detail**

| IrieA, LLC | |
|---|---|
| **Entity** | **% Ownership** |
| LP XII | 1.9% |
| LLC XVIII | 0.7% |

**Debtor Ownership in LLCs**

1. Detail above reflects % ownership from PFI, PISF and related entities. Remaining, outstanding % ownership is from outside individuals and/or entities.

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 135 of 158

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **EXHIBIT C**

**Liquidation Analysis / Plan Recovery**

# LIQUIDATION ANALYSIS

As laid out in Article IV entitled "Implementation of the Plan," it will be the responsibility of the PFI Trust and OpCo to generate the best possible return from the Estate Assets. There are three primary categories of Estate Assets (this list is not exclusive):

(a) Available Cash;
(b) The Real Properties;
(c) Litigation claims, including Avoidance Actions, Causes of Action and Contributed Claims.

Although it is not currently possible to predict with precision the total monies that will be realized or expended in connection with the administration of the PFI Trust, the Plan Proponents (in concert with their advisors and the Ad Hoc Committees) believe that the following ranges will prove to be reliable predictors of what creditors can expect.

The Plan assumes both the ultimate sale of the Real Properties and pursuit of the Avoidance Actions, Causes of Action and Contributed Claims. Using two different sets of assumptions regarding the success and expense of the foregoing, the Plan Proponents believe that the Plan will provide holders of Allowed Class 4 and 5 Investor Restitution Claims (which, for investors, will be their claim remaining after "netting") and Allowed Class 6 Other Unsecured Claims with aggregate dividends over a period of years totaling 35% for the low estimate and 50% for the high estimate. The foregoing estimates *do not* take into account the potential effect of capital gains taxes that would be due upon sale of the Real Properties by the PFI Trust, as the Plan Proponents' examination of that subject is ongoing (and as yet incomplete). Such taxes would reduce the foregoing projected percentage dividends.

In contrast, the Plan Proponents believe that the dividends realized in a Chapter 7 liquidation would be substantially lower – primarily because of (a) the accelerated pace of sales of the Real Properties likely to occur in a Chapter 7 liquidation; and (b) the statutory fee due to the Chapter 7 trustee for services in liquidating the assets. Accordingly, in a Chapter 7 liquidation, the Plan Proponents believe general unsecured creditors would receive substantially less over time: 25% estimated low case and 35% estimated high case. Another advantage of the Plan over a Chapter 7 liquidation is the likely ability of LLC and LP investors to avoid paying pass-through capital gains taxes when the Real Properties are sold. Such taxes are generally not expected to pass through to LLC and LP investors under the Plan. Accordingly, the Plan Proponents believe that the Plan is likely to produce an outcome significantly better than what could be expected in a Chapter 7 liquidation.

At this time, the Plan Proponents are not projecting that holders of Allowed Investor Subordinated Claims will receive a dividend under the Plan. This could change, depending primarily on the degree of litigation successes, and the extent of Net PFI Trust Action Proceeds available for distribution.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT D

**Non-Exclusive Description of Preserved PFI Trust Actions**

# POTENTIAL TARGETS

Based upon the limited investigation conducted by the Debtors to date, the following persons may be subject to claims to be filed after confirmation of the Joint Plan of Reorganization ("Plan"). The Debtors currently may be unaware of potential claims against other defendants. The investigation is continuing and will be continued by the Plan Trustee. Capitalized terms used herein have the meanings given to them in the Plan. All rights are reserved.

1.  All employees, officers and directors of the Debtors and their affiliates and their family members, including, without limitation, Lewis Wallach, Leslie Wallach, Charlene Albanese, Michael Casey, Manuel Romero, Jared Romero.

2.  All attorneys and accountants that provided services to the Debtors, including, without limitation, Terry Carlson Law and Terry Carlson.

3.  All real estate brokers that facilitated the purchase or sale of real properties by the Debtors or their affiliates.

4.  All persons who received commissions from the Debtors, in cash or credit, in exchange for soliciting investments.

5.  All investors who received more than 100% of their aggregate investment amount (i.e., claw backs).

6.  All persons that received contributions from Casey, Wallach, PFI or any of their affiliates, including, without limitation, charitable contributions and political contributions.

7.  All parties that received fraudulent transfers within the meaning of Sections §§ 544 and 548 of the Bankruptcy Code, and all parties for whose benefit such transfers were made within the meaning of Section §550 of the Bankruptcy Code.

8.  All financial institutions that maintained deposit accounts for, or made loans to, the Debtors or their affiliates, including, without limitation, Umpqua Bank, Avid Bank, Poppy Bank, Tri Counties Bank, Five Star Bank, Banner Bank, First Foundation Bank, JPMorgan Chase Bank, Pacific Western Bank, Tri-Valley Bank, HomeStreet Bank, Heritage Bank of Commerce. Fremont Bank, Orix Real Estate Capital, and PNC Real Estate, Credit Suisse, and all title insurers and underwritten title companies that were involved in the closing or insurance for such lender interests.

9.  All title companies that were involved in the recordation and reconveyance of DOT Noteholder liens.

10. All contractors and suppliers used by the Debtors and their affiliates, including, without limitation, Avila Construction.

11. All financial advisors that recommended investing in the Debtors and their affiliates, including, without limitation, Wealth Plus.

73ZL-319169
Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 139 of 158

12. All self-directed IRA custodians that facilitated investments in the Debtors and their affiliates.

# <u>SCHEDULE 1</u>

**Schedule of Real Properties**

| Property | Address | City | zip |
|----------|---------|------|-----|
| Ignacio Hills Tennis & Garden Apts. | 475 Ignacio Blvd | Novato | 94949 |
| Ignacio Hills Tennis & Garden Apts. | 551 Alameda Del Prado | Novato | 94949 |
| Albion Terrace Apts. | 225 Nova Albion Way | San Rafael | 94903 |
| Northgate Apts. | 825 Las Gallinas Avenue | San Rafael | 94903 |
| Ignacio Hills Tennis & Garden Apts. | 445 Ignacio Blvd | Novato | 94949 |
| Lincoln Villa | 1825 Lincoln Avenue | San Rafael | 94901 |
| Fairway Apts. | 1000 Ignacio Blvd | Novato | 94949 |
| Country Club Apt. | 980 Ignacio Blvd | Novato | 94949 |
| Oak Hill Apts. | 216 Marin Street | San Rafael | 94901 |
| Ignacio Gardens | 380 - 450 Alameda Del Prado | Novato | 94949 |
| Ignacio Hills Tennis & Garden Apts. | 511 & 531 Alameda Del Prado | Novato | 94949 |
| Ignacio Hills Tennis & Garden Apts. | 401 Ignacio Blvd. & 521 Alameda Del Prado | Novato | 94949 |
| Sonoma Mission Apts. | 120 Orchard Ave / 18161 Happy Lane | Sonoma | 95416 |
| City Center | 1701 Novato Blvd. | Novato | 94947 |
| Baywood Center | 1682 Novato Blvd. | Novato | 94947 |

| Property | Address | City | zip |
|---|---|---|---|
| Creekside | 7 Mt. Lassen Drive | San Rafael | 94903 |
| 100 Tamal Vista | 100 Tamal Vista | Corte Madera | 94925 |
| Novato Business Center | 1500.1510.1516 Grant Ave. | Novato | 94945 |
| Ignacio Hills Tennis & Garden Apts. | 481 Ignacio Blvd | Novato | 94949 |
| The Broadway | 1151 Broadway | Sonoma | 95476 |
| The Redwoods | 1341-1359 Redwood Way | Petaluma | 94945 |
| San Pedro Business Center | 30 North San Pedro Rd | San Rafael | 94903 |
| The Northgate Business Center | 555 North Gate Drive | San Rafael | 94903 |
| Ignacio Place Apartment | 335 Enfrente Rd | Novato | 94949 |
| Gateway Business Center | 851 Irwin Street | San Rafael | 94901 |
| Sequoia Business Center | 1425 North McDowell | Petaluma | 94954 |
| Village Green Apts. | 350 Robinson St. | Sonoma | 95476 |
| Broadway Square | 10 Maple St & 635-651 Broadway | Sonoma | 95476 |
| Northgate Professional Center | 899 Northgate Dr | San Rafael | 94903 |
| 4th Street Business Center | 523 4th St & 930 Irwin St. | San Rafael | 95401 |
| Madrone Apartment Homes | 15411-15499 Marty Drive | Glen Ellen | 95442 |

| Property | Address | City | zip |
|---|---|---|---|
| Marin Heights Apartment Homes | 19 Merrydale Rd | San Rafael | 94903 |
| Northgate Heights Business Center | 1050 Northgate Dr. | San Rafael | 95401 |
| The Height Apartment Homes | 109 Professional Center Parkway | San Rafael | 94903 |
| Sycamore Creek Apartments | 100 & 106 Sycamore Ave | San Anselmo | 94960 |
| The American Building | 1099 D. Street | San Rafael | 95401 |
| Woodland Apartments | 285 Woodland Ave | San Rafael | 95401 |
| Hunt Plaza | 240 Tamal Vista | Corte Madera | 92925 |
| Parc Marin | 1441 Casa Buena Drive | Corte Madera | 94952 |
| Lincoln Redwoods | 1732 Lincoln Ave | San Rafael | 94901 |
| Ignacio Hills Tennis & Garden Apts. | 461 Ignacio Blvd | Novato | 94949 |
| Ignacio Hills Tennis & Garden Apts. | 501 Alameda Del Prado | Novato | 94949 |
| Hammondale | 1 & 5 Hammondale Court | San Rafael | 94901 |
| Mariners Landing | 200 Gate 5 Road | Sausalito | 94965 |
| Duffy Place | 21 - 37 Duffy Place | San Rafael | 94901 |
| Ignacio Lane | 49 Ignacio Lane | Novato | 94949 |

| Property | Address | City | zip |
|---|---|---|---|
| Pacheco Villa | 17-23, 30-42 Clay Court (1, 17, 30, 33 according to Deeds of Trust) | Novato | 94949 |
| 107 Marin | 107 Marin Street | San Rafael | 94901 |
| 885 Broadway | 885 Broadway | Sonoma | 95476 |
| Brookside | 517 B. Street | San Rafael | 94901 |
| Redwood Manor | 355 Boyes Blvd | Sonoma | 95476 |
| North Bay Business Center | 7200 Redwood Blvd. | Novato | 94945 |
| The Keys Center | 353-359 Bel Marin Keys | Novato | 94949 |
| Merrydale View Apartments | 7 Merrydale Road | San Rafael | 94903 |
| Novato Court Apts. | 1506 Vallejo Ave. | Novato | 94945 |
| Las Galinas Business Center | 117-121 Paul Drive | San Rafael | 94903 |
| 16914 Sonoma Hwy | 16914 Sonoma Hwy | Sonoma | 95476 |
| 419 Prospect Drive | 419 Prospect Drive | San Rafael | 94901 |
| Glenwood Apartments | 1222 Irwin St. | San Rafael | 94901 |
| 1129 3rd St. Apts | 1129 3rd St. | Novato | 94945 |
| Rafael Gardens | 1315 Lincoln Ave | San Rafael | 94901 |

| Property | Address | City | zip |
|---|---|---|---|
| Woodland Apartments | 390 Woodland Ave. | San Rafael | 94901 |
| Santa Land | 300 Entrada Dr. | Novato | 94949 |
| Suite 102 | 350 Ignacio Blvd., Suite 100 | Novato | 94949 |
| Suite 101 | 350 Ignacio Blvd., Suite 101 | Novato | 94949 |
| Suite 103 | 350 Ignacio Blvd., Suite 103 | Novato | 94949 |
| Suite 200 | 350 Ignacio Blvd., Suite 200 | Novato | 94949 |
| Suite 201 | 350 Ignacio Blvd., Suite 201 | Novato | 94949 |
| Suite 203 | 350 Ignacio Blvd., Suite 202 | Novato | 94949 |
| Suite 300 | 350 Ignacio Blvd., Suite 300 | Novato | 94949 |

# <u>SCHEDULE 2</u>

**Schedule of Excluded Parties**

**[to be filed later]**

# **SCHEDULE 3**

**Schedule of Non-Investor First-Priority Lender Claims**

Case: 20-30604   Doc# 572   Filed: 04/16/21   Entered: 04/16/21 18:37:04   Page 148
of 158

| *Secured Lender* | *Address of Collateral* |
|---|---|
| Avidbank<br>c/o Ivan L. Kallick<br>Manatt Phelps & Phillips, LLP<br>2049 Century Park East, Suite 1700<br>Los Angeles, CA  90067 | The Keys Center<br>353-359 Bel Marin Keys<br>Novato, CA 94949 |
| Banner Bank<br>c/o Joshua Partington<br>Snell & Wilmer L.L.P.<br>600 Anton Blvd. Suite 1400<br>Costa Mesa, CA  92626s | Hammondale<br>1 & 5 Hammondale Court<br>San Rafael, CA 94901 |
| Banner Bank | Ignacio Hills Tennis & Garden Apts.<br>551 Alameda Del Prado<br>Novato, CA 94949 |
| JPMorgan Chase Bank<br>c/o Brett H. Miller<br>Mark A. Lightner<br>Morrison & Foerster LLP<br>250 West 55th Street<br>New York, NY 10019 | Sonoma Mission Apts.<br>120 Orchard Ave / 18161 Happy Lane<br>Sonoma, CA 95416 |
| JPMorgan Chase Bank | City Center<br>1701 Novato, CA Blvd.<br>Novato, CA 94947 |
| JPMorgan Chase Bank | Baywood Center<br>1682 Novato, CA Blvd.<br>Novato, CA 94947 |
| JPMorgan Chase Bank | Creekside<br>7 Mt. Lassen Drive<br>San Rafael, CA 94903 |
| JPMorgan Chase Bank | 100 Tamal Vista<br>Corte Madera 94925 |
| JPMorgan Chase Bank | Novato Business Center<br>1500.1510.1516 Grant Ave.<br>Novato, CA 94945 |
| JPMorgan Chase Bank | Gateway Business Center<br>851 Irwin Street<br>San Rafael, CA 94901 |
| JPMorgan Chase Bank | 4th Street Business Center<br>523 4th St & 930 Irwin St.<br>San Rafael, CA 95401 |
| JPMorgan Chase Bank | Mariners Landing |

| Secured Lender | Address of Collateral |
|---|---|
| | 200 Gate 5 Road<br>Sausalito 94965 |
| JPMorgan Chase Bank | Duffy Place<br>21 - 37 Duffy Place<br>San Rafael, CA 94901 |
| JPMorgan Chase Bank | 107 Marin Street<br>San Rafael, CA 94901 |
| JPMorgan Chase Bank | Brookside<br>517 B. Street<br>San Rafael, CA 94901 |
| JPMorgan Chase Bank | Woodland Apartments<br>390 Woodland Ave.<br>San Rafael, CA 94901 |
| JPMorgan Chase Bank | Albion Terrace Apts.<br>225 Nova Albion Way<br>San Rafael, CA 94903 |
| JPMorgan Chase Bank | Country Club Apts.<br>980 Ignacio Blvd<br>Novato, CA 94949 |
| JPMorgan Chase Bank | Oak Hill Apts.<br>216 Marin Street<br>San Rafael, CA 94901 |
| First Foundation Bank<br>18101 Von Karman Ste 750<br>Irvine CA 92612 | The Height Apartment Homes<br>109 Professional Center Parkway<br>San Rafael, CA 94903 |
| First Foundation Bank | 419 Prospect Drive<br>San Rafael, CA 94901 |
| First Foundation Bank | Northgate Apts.<br>825 Las Gallinas Avenue<br>San Rafael, CA 94903 |
| Five Star Bank<br>c/o Tom Griffin<br>Hefner Law<br>2150 River Plaza Drive, Suite 450<br>Sacramento, CA  95833 | San Pedro Business Center<br>30 North San Pedro Rd<br>San Rafael, CA 94903 |
| Five Star Bank | Northgate Heights Business Center<br>1050 Northgate Dr.<br>San Rafael, CA 95401 |

| Secured Lender | Address of Collateral |
|---|---|
| Five Star Bank | The American Building<br>1099 D. Street<br>San Rafael, CA 95401 |
| Five Star Bank | Woodland Apartments<br>285 Woodland Ave<br>San Rafael, CA 95401 |
| Five Star Bank | Hunt Plaza<br>240 Tamal Vista<br>Corte Madera, CA 92925 |
| Five Star Bank | Santa Land<br>300 Entrada Dr.<br>Novato, CA 94949 |
| Heritage Bank of Commerce<br>c/o Dennis D. Miller<br>Lubin Olson & Niewiadomski LLP<br>600 Montgomery Street, 14th Floor<br>San Francisco, CA 94111 | Novato Court Apts.<br>1506 Vallejo Ave.<br>Novato, CA 94945 |
| Heritage Bank of Commerce | Las Galinas Business Center<br>117-121 Paul Drive<br>San Rafael, CA 94903 |
| Heritage Bank of Commerce | Suite 203<br>350 Ignacio Blvd., Suite 202 (2C?)<br>Novato, CA 94949 |
| Heritage Bank of Commerce | Suite 300<br>350 Ignacio Blvd., Suite 300<br>Novato, CA 94949 |
| HomeStreetBank<br>c/o David R. Zaro<br>Allen Matkins Leck Gamble<br>  Mallory & Natsis LLP<br>865 South Figueroa Street, Suite 2800<br>Los Angeles, CA 90017 | Lincoln Redwoods<br>1732 Lincoln Ave<br>San Rafael, CA 94901 |
| HomeStreetBank | Ignacio Hills Tennis & Garden Apts.<br>481 Ignacio Blvd<br>Novato, CA 94949 |
| OneUnited Bank<br>3683 Crenshaw Blvd<br>Los Angeles, CA 90016 | Ignacio Hills Tennis & Garden Apts.<br>445 Ignacio Blvd<br>Novato, CA 94949 |
| Opus Bank<br>19900 MacArthur Blvd., 12th Floor | Marin Heights Apartment Homes<br>19 Merrydale Rd |

| Secured Lender | Address of Collateral |
|---|---|
| Irvine, CA 92612 | San Rafael, CA 94903 |
| Pacific Western Bank<br>c/o A. Kenneth Hennesay, Jr.<br>Allen Matkins Leck Gamble<br> Mallory & Natsis LLP<br>1900 Main Street, 5th Floor<br>Irvine, CA  92614 | Ignacio Hills Tennis & Garden Apts.<br>511 & 531 Alameda Del Prado<br>Novato, CA 94949 |
| Pacific Western Bank | Ignacio Hills Tennis & Garden Apts.<br>401 Ignacio Blvd. & 521 Alameda Del Prado<br>Novato, CA 94949 |
| Pacific Western Bank | Sycamore Creek Apartments<br>100 & 106 Sycamore Ave<br>San Anselmo 94960 |
| Pacific Western Bank | Parc Marin<br>1441 Casa Buena Drive<br>Corte Madera 94952 |
| Pacific Western Bank | 885 Broadway<br>Sonoma, CA 95476 |
| Pacific Western Bank | Ignacio Hills Tennis & Garden Apts.<br>475 Ignacio Blvd<br>Novato, CA 94949 |
| Pacific Western Bank | Lincoln Villa<br>1825 Lincoln Avenue<br>San Rafael, CA 94901 |
| Pacific Western Bank | Fairway Apts.<br>1000 Ignacio Blvd<br>Novato, CA 94949 |
| PNC Real Estate<br>26901 Agoura Road # 200<br>Agoura Hills, CA 91301 | Madrone Apartment Homes<br>15411-15499 Marty Drive<br>Glen Ellen, CA 95442 |
| Poppy Bank<br>c/o Mitchell B. Greenberg<br>Abbey, Weitzenberg, Warren & Emery P.C.<br>100 Stony Point Rd, Ste. 200<br>Santa Rosa, CA 95401 | The Redwoods<br>1341-1359 Redwood Way<br>Petaluma 94945 |
| Poppy Bank | Sequoia Business Center<br>1425 North McDowell<br>Petaluma 94954 |
| Poppy Bank | Broadway Square |

| ***Secured Lender*** | ***Address of Collateral*** |
|---|---|
| | 10 Maple St & 635-651 Broadway<br>Sonoma, CA 95476 |
| Poppy Bank | North Bay Business Center<br>7200 Redwood Blvd.<br>Novato, CA 94945 |
| Poppy Bank | The Broadway<br>1151 Broadway<br>Sonoma, CA 95476 |
| RedCapitalGroup<br>10 W. Broad Street 8th Floor<br>Columbus, OH 43215<br>and<br>c/o Orix Real Estate Capital<br>PO BOX 846019<br>Dallas TX 75284-6019 | Merrydale View Apartments<br>7 Merrydale Road<br>San Rafael, CA 94903 |
| Rafael Garde Apartments, LLC<br>c/o Seamus Egan<br>10 Indian Trail Court<br>Novato, CA 94945 | Rafael Gardens<br>1315 Lincoln Ave<br>San Rafael, CA 94901 |
| Steven Stenberg<br>c/o Gregory Rougeau<br>Brunetti Rougeau LLP<br>235 Montgomery Street, Suite 410<br>San Francisco, CA 94104 | Suite 102<br>350 Ignacio Blvd., Suite 100<br>Novato, CA 94949 |
| Situs Asset Management<br>c/o Ron Oliner<br>Duane Morris LLP<br>Spear Tower<br>One Market Plaza, Suite 2200<br>San Francisco, CA 94105 | 16914 Sonoma Hwy<br>Sonoma, CA 95476 |
| Situs Asset Mgmt | Redwood Manor<br>355 Boyes Blvd<br>Sonoma, CA 95476 |
| Situs Asset Mgmt | Glenwood Apartments<br>1222 Irwin St.<br>San Rafael, CA 94901 |
| Tri Counties Bank<br>c/o Thomas G. Mouzes<br>Mark Gorton<br>Boutin Jones, Inc.<br>555 Capitol Mall, Suite 1500<br>Sacramento, CA 95814 | The Northgate Business Center<br>555 North Gate Drive<br>San Rafael, CA 94903 |



Case: 20-30604 Doc# 572 Filed: 04/16/21 Entered: 04/16/21 18:37:04 Page 153 of 158

| Secured Lender | Address of Collateral |
|---|---|
| Tri Counties Bank | Ignacio Place Apartment<br>335 Enfrente Rd<br>Novato, CA 94949 |
| Tri Counties Bank | Village Green Apts.<br>350 Robinson St.<br>Sonoma, CA 95476 |
| Tri Counties Bank | Northgate Professional Center<br>899 Northgate Dr<br>San Rafael, CA 94903 |
| Tri Counties Bank | Ignacio Hills Tennis & Garden Apts.<br>461 Ignacio Blvd<br>Novato, CA 94949 |
| Tri Counties Bank | Ignacio Gardens<br>380 - 450 Alameda Del Prado<br>Novato, CA 94949 |
| Tri Counties Bank | Pacheco Villa<br>1, 17, 30, 33 Clay Court<br>Novato, CA 94949 |

1

# **SCHEDULE 4**

2

3        **Schedule of Properties Subject to DOT Noteholders' Deeds of Trust**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Schedule – 4

Deed of Trust Investor Liens

| Property | Address | Recorded Document | County of Recordation | Recordation Date | Document No. |
|----------|---------|-------------------|----------------------|------------------|--------------|
| Ignacio Hills Tennis & Garden Apts. | 475 Ignacio Boulevard Novato, CA 94949 | Deed of Trust | Marin | 12/13/2019 | 2019-0047363 |
| Albion Terrace Apartments | 225 Nova Albion Way San Rafael, CA 94903 | Deed of Trust and Assignment of Rents | Marin | 4/5/2019 | 2019-0011110 |
| Northgate Apartments | 825 Las Gallinas Avenue San Rafael, CA 94903 | Deed of Trust and Assignment of Rents | Marin | 4/12/2019 | 2019-0012047 |
| Ignacio Hills Tennis & Garden Apts. | 445 Ignacio Boulevard Novato, CA 94949 | Deed of Trust and Assignment of Rents | Marin | 8/8/2019 | 2019-0028245 |
| Lincoln Villa | 1825 Lincoln Avenue San Rafael, CA 94901 | Deed of Trust and Assignment of Rents | Marin | 3/29/2019 | 2019-0010263 |
| | | Deed of Trust | Marin | 2/14/2020 | 2020-005998 |
| Fairway Apartments | 1000 Ignacio Boulevard Novato, CA 94949 | Deed of Trust and Assignment of Rents | Marin | 11/29/2001 | 2001-0080192 |
| | | Deed of Trust and Assignment of Rents | Marin | 4/5/2019 | 2019-0011109 |
| Oak Hills Apartments | 216 Marin Street San Rafael, CA 94901 | Deed of Trust and Assignment of Rents | Marin | 7/12/2019 | 2019-0024503 |
| Ignacio Gardens | 380-450 Alameda Del Prado Blvd. Novato, CA 94949 | Deed of Trust and Assignment of Rents | Marin | 8/9/2019 | 2019-0028392 |

Case: 20-30604    Doc# 572    Filed: 04/16/21    Entered: 04/16/21 18:37:04    Page 156 of 158

| | | | | | |
|---|---|---|---|---|---|
| Ignacio Hills Tennis & Garden Apts. | 461 Ignacio Boulevard Novato, CA 94949 | Deed of Trust and Assignment of Rents | Marin | 5/11/2018 | 2018-0016848 |
| Ignacio Hills Tennis & Garden Apts. | 501 Alameda Del Prado Novato, CA 94949 | Deed of Trust and Assignment of Rents | Marin | 5/18/2017 | 2017-0020109 |
| | | Deed of Trust and Assignment of Rents | Marin | 12/6/2018 | 2018-0041593 |
| Hammondale | 1 Hammondale Court San Rafael, CA 94901 | Deed of Trust and Assignment of Rents | Marin | 8/8/2019 | 2019-0028244 |
| Mariners Landing | 200 Gate 5 Road Sausalito, CA 94965 | Deed of Trust and Assignment of Rents | Marin | 12/6/2018 | 2018-0041582 |
| Duffy Place | 21-37 Duffy Place San Rafael, CA 94901 | Deed of Trust and Assignment of Rents | Marin | 6/24/2019 | 2019-0021826 |
| Ignacio Lane | 49 Ignacio Lane Novato, CA 94949 | Deed of Trust and Assignment of Rents | Marin | 6/24/2019 | 2019-0021824 |
| | | Deed of Trust and Assignment of Rents | Marin | 6/24/2019 | 2019-0021825 |
| 885 Broadway | 885 Broadway Sonoma, CA 95476 | Deed of Trust | Sonoma | 5/15/2020 | 2020-0037072 |
| The Keys Center | 353-359 Bel Marin Keys Novato, CA 94949 | Deed of Trust and Assignment of Rents | Marin | 2/6/2017 | 2017-0005217 |
| Novato Court Apartments | 1506 Vallejo Avenue Novato, CA 94945 | Deed of Trust and Assignment of Rents | Marin | 6/30/2017 | 2017-0026277 |
| Las Gallinas Business Center | 117-121 Paul Drive San Rafael, CA 94903 | Deed of Trust and Assignment of Rents | Marin | 9/26/2016 | 2016-0043476 |
| Prospect Drive | 419 Prospect Drive San Rafael, CA 94901 | Deed of Trust and Assignment of Rents | Marin | 12/27/2017 | 2017-0051553 |
| 1129 3rd Street Apartments | 1129 3rd Street Novato, CA 94945 | Deed of Trust and Assignment of Rents | Marin | 7/19/2019 | 2019-0025468 |

| 350 Ignacio | 350 Ignacio Boulevard, Suite 101 Novato, CA 94949 | Deed of Trust and Assignment of Rents | Marin | 8/28/2019 | 2019-0031011 |
| | | Deed of Trust and Assignment of Rents | Marin | 8/28/2019 | 2019-0031013 |
| 350 Ignacio | 350 Ignacio Boulevard, Suite 103 Novato, CA 94949 | Deed of Trust and Assignment of Rents | Marin | 8/28/2019 | 2019-0031011 |
| | | Deed of Trust and Assignment of Rents | Marin | 8/28/2019 | 2019-0031013 |
| 350 Ignacio | 350 Ignacio Boulevard, Suite 200 Novato, CA 94949 | Deed of Trust and Assignment of Rents | Marin | 2/6/2017 | 2017-0005216 |
| 350 Ignacio | 350 Ignacio Boulevard, Suite 201 Novato, CA 94949 | Deed of Trust and Assignment of Rents | Marin | 5/18/2017 | 2017-0020106 |