SHEPPARD, MULLIN, RICHTER &
  HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
ORI KATZ, Cal. Bar No. 209561
J. BARRETT MARUM, Cal. Bar No. 228628
MATT KLINGER, Cal. Bar No. 307362
GIANNA SEGRETTI, Cal. Bar No. 323645
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:    415.434.9100
Facsimile:     415.434.3947
Email:    okatz@sheppardmullin.com
            bmarum@sheppardmullin.com
            mklinger@sheppardmullin.com
            gsegretti@sheppardmullin.com

Counsel for Debtors

Richard A. Lapping (SBN: 107496)
TRODELLA & LAPPING LLP
540 Pacific Avenue
San Francisco, CA 94133
Telephone:     (415) 399-1015
Facsimile:      (415) 651-9004
Email:  Rich@TrodellaLapping.com

Conflicts Counsel for Debtors and Counsel for
Professional Investors 28, LLC and PFI
Glenwood, LLC

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>PROFESSIONAL FINANCIAL INVESTORS, INC., a California corporation, *et al.*,<br><br>Debtors. | Case No. 20-30604<br><br>(Jointly Administered)<br><br>Chapter 11<br><br>**DECLARATION OF DAVID ALFARO** |

I, David Alfaro, declare and state as follows:

1.      Except as otherwise indicated herein, the facts set forth in this Declaration are within my personal knowledge or are based upon information provided to me by the Debtors' employees or advisors and maintained in the ordinary course of the Debtors' business. If called upon to testify as a witness, I could and would testify competently thereto.

2.      I submit this Declaration to provide background and other relevant financial, accounting, and operational information (as defined in ¶1) to assist Michael Goldberg, the independent director of Professional Financial Investors, Inc. ("PFI") and Professional Investors Security Fund, Inc. ("PISF," and together with PFI and other related entities, including limited partnerships and limited liability companies, the "Company"), in his determination of whether or

SMRH:4818-3806-5382.1

-1-

DECLARATION OF DAVID ALFARO

1  not the Company was operated as a Ponzi scheme by Kenneth Casey and Lewis Wallach from at

2  least January 1, 2007 until Mr. Casey's death in May 2020.

3        3.      I serve as a Senior Managing Director at FTI Consulting, Inc. (together with its

4  wholly owned subsidiaries, agents and independent contractors, "FTI" [1]) and, as such, am

5  authorized to make this declaration of behalf of FTI.

6  **I.**      **EXPERIENCE AND QUALIFICATIONS**

7        4.      I am over the age of 21 years and am legally competent to make this Declaration. A

8  copy of my Curriculum Vitae ("CV"), which summarizes my education and relevant work

9  experience, is attached hereto as **Appendix A**. As more fully enumerated in my CV, I have

10  provided testimony in numerous matters involving alleged federal trademark infringement,

11  misappropriation of trade secrets, unfair competition, intentional interference with prospective

12  business, breach of fiduciary obligation, theft, fraud, RICO,[2] and other similar allegations, which

13  depended upon the recovery and analysis of financial, accounting, human resource, and

14  operational data.

15        5.      I regularly provide privileged consulting and expert witness services to financial

16  institutions, investment organizations, and corporations relating to enterprise-wide operations,

17  including the assessment of their conformance to policies and procedures and the identification

18  and quantification of breaches thereon that may have resulted in various forms of customer and /

19  or investor harm.

20        6.      During my professional career I have provided services on over 200 engagements,

21  over 100 of which have been investigative in nature, including landmark cases such as Bernie

22  Madoff, Scott Rothstein, Enron, and many more high-profile Ponzi or Ponzi-like cases where my

23  involvement was not of public record.

---

[1]   FTI is a global business advisory firm with offices in major business centers in the United States and around the world. The firm provides forensic accounting, financial and economic analyses, strategic financial advisory services, and other business consulting solutions to many of the world's largest business enterprises and top 100 law firms.

[2]   Racketeer Influenced and Corrupt Organizations Act ("RICO").

7.     In the capacity of investigator and fact finder, I have been designated and approved by the Financial Industry Regulatory Authority ("FINRA") as the independent third-party examiner over a major financial institution to review and assess alleged violations of federal securities laws. I have also been approved by the Federal Trade Commission (the "FTC") as the independent compliance monitor over a large financial services company to conduct biennial reviews of the company's end-to-end operations, including their debt servicing. As the current monitor, I regularly provide the FTC with a periodic and objective assessment of the company's compliance with their settlement with the government, which includes investigating ongoing complaints of alleged wrongdoing received by the FTC, the Consumer Financial Protection Bureau ("CFPB"), Better Business Bureau, and other Federal and State agencies.

8.     Over my career, and in relation to investigations that I have conducted, I have provided formal and informal testimony to the Federal Bureau of Investigation (the "FBI"), the U.S. Securities and Exchange Commission (the "SEC"), the U.S. Department of Justice (the "DOJ"), the U.S. Attorney's Office, the U.S. Department of the Treasury, the U.S. Department of the Interior, the CFPB, the FTC, FINRA and other Federal agencies. I have also provided formal testimony in Federal and State Courts (*See* **Appendix A**).

## II.    THE EVENTS LEADING UP TO OR AROUND FTI'S RETENTION

9.     PFI and PISF are real estate investment firms specializing in multi-unit residential and commercial properties in Northern California. At the time of Mr. Casey's death, PFI and PISF collectively owned or had interests in entities that in turn owned approximately 71 properties.[3] PISF's primary activity was raising capital through notes purportedly secured by limited partnership interests of certain limited partnerships that each owned real property ("PISF Notes").

10.    Shortly after Mr. Casey's death in early May 2020, concerns arose regarding the structure and investment practices of the Company. These concerns were identified by Eric Sternberger of Ragghianti Freitas LLP, counsel representing Charlene Albanese, the trustee of Mr.

---

[3]    *See* **Exhibit 1** for a listing of the current properties.

Case: 20-30604    Doc# 592    Filed: 04/29/21    Entered: 04/29/21 13:20:44    Page 3 of
54

Casey's estate and Mr. Casey's ex-wife.[4] Based on his review of the Company's financial records in mid-May 2020, Mr. Sternberger suspected that Mr. Casey, along with PFI's then President, Mr. Wallach, may have engaged in fraudulent conduct in connection with the operation of the Company. Subsequently, on behalf of the Trustee, Mr. Sternberger alerted law enforcement agencies about this potential fraud.[5]

11.     Shortly after being alerted of the potential fraud, the FBI commenced an investigation into suspected wire fraud, embezzlement, and money laundering involving both PFI and PISF, as well as Mr. Casey and Mr. Wallach.[6]

12.     In June 2020, Mr. Sternberger, as the Company's counsel, informed the investors of the Company that:

(a)     Questions existed involving the structure and investment history of the Company;[7]

(b)     The SEC is conducting a fact-finding investigation and that the Company is working with the SEC to analyze the investors' investments;[8] and

---

[4]     It is my understanding that Ms. Albanese is the trustee of an irrevocable trust holding PFI shares and the trustee of a revocable trust holding PISF shares. Mr. Casey was the trustor of both trusts. Ragghianti Freitas LLP was retained by PFI pursuant to Ms. Albanese's authority as director of PFI and by PISF in her capacity as the trustee of the revocable trust. It is my further understanding that Mr. Sternberger was engaged by Ms. Albanese to assist with the ownership transition and management of the Company. Source: "Memo to File" prepared by Eric Sternberger, dated May 27, 2020, p. 1.

[5]     Source: Declaration of Michael Hogan in Support of the Bankruptcy Filing and Early Case Administration Motions, filed on July 26, 2020.

[6]     Source: Declaration of Federal Bureau of Investigation Special Agent Mario C. Scussel, dated September 3, 2020, p. 2.

[7]     Source: Letters from Mr. Sternberger to the investors of the Company, dated June 4, 2020.

[8]     Source: Letter from Mr. Sternberger to the investors of the Company, dated June 14, 2020.

Case: 20-30604    Doc# 592    Filed: 04/29/21    Entered: 04/29/21 13:26:44    DECLARATION OF DAVID ALFARO
Page 4 of 54

        (c)      Michael Hogan of Armanino LLP ("Armanino") had agreed to serve as the Chief Restructuring Officer ("CRO") of PFI.[9]

13.     In June and July 2020, Mr. Hogan informed the Company's investors of corporate governance changes involving the resignation of each of the PFI corporate officers as well as the resignation of Ms. Albanese from the PFI board of directors once an independent director was retained. In a July 14, 2020 letter, Mr. Hogan also indicated that the Company had insufficient equity to permit the return of all of investors' principal, and that the initial investigation of irregularities identified complex investment relationships, including conversions from one investment type to another creating complexities that would need to be addressed.[10]

14.     On July 2, 2020, a class action complaint was filed in Marin County, California Superior Court against PFI, PISF, Mr. Wallach, and Ms. Albanese (the "Class Action Complaint"). The filing included the following claims: California statutory securities fraud, sale of unregistered securities, breach of fiduciary duty, negligent misrepresentation, and breach of contract.[11]

15.     On July 16, 2020, certain creditors of PISF commenced an involuntary Chapter 11 bankruptcy action against PISF, Case No. 20-30579 (the "PISF Case").[12] On July 26, 2020, PISF filed a consent to the entry of an Order for relief in the PISF Case, which the court entered on July 26, 2020.[13]

---

[9]   Source: Declaration of Michael Hogan in Support of the Bankruptcy Filing and Early Case Administration Motions, dated July 26, 2020, p. 2, lines 7-10. Subsequently, in July 2020, Mr. Hogan was appointed as the CRO of PISF.

[10]  Source: Letter from Mr. Hogan to the investors of the Company, dated July 14, 2020.

[11]  Source: Susan Aiken, individually and on behalf of all others similarly situated v. Professional Financial Investors Security Fund, Inc., a California corporation; Lewis Wallach; and Charlene Albanese, personal representative of the Kenneth J. Casey Estate, deceased, filed July 2, 2020 in Superior Court of the State of California In and For Marin County, Case No. 2001560.

[12]  Source: Official Form 205, Involuntary Petition Against a Non-Individual, United States Bankruptcy Court for the Northern District of California, Chapter 11, Professional Investors Security Fund, Inc., filed July 16, 2020, Case No. 20-30579.

[13]  Source: Consent to Entry for Order for Relief, United States Bankruptcy Court for the Northern District of California, Chapter 11, Professional Investors Security Fund, Inc., filed July 26, 2020. Case No. 20-30579.

DECLARATION OF DAVID ALFARO

16. On July 26, 2020 (the "Petition Date"), PFI filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, Case No. 20-30604 (the "PFI Case", and together with the PISF Case, the "Bankruptcy Cases") and sought joint administration with the PISF Case, which the court granted on July 27, 2020.[14]

17. Also, on July 26, 2020, a declaration by Mr. Hogan was filed in support of the bankruptcy filing. The declaration set forth, among other things, the following:

    (a)    "[O]ver a period of at least three decades, Mr. Casey appears to have operated a fraudulent scheme in which investors loaned funds to the [Company], with a significant portion of those funds being used to service the debt owed to existing investors and to personally enrich Mr. Casey himself."[15]

    (b)    "Others associated with the [Company] also appear to have been involved and benefitted from the scheme…"[16]

    (c)    "The [Company], under their new management led by [Mr. Hogan], initiated a forensic review of the investments by and payouts of the [Company], as well as their financial operations and reporting and are continuing to review and analyze a significant number of additional documents and conduct further investigation to determine the extent of such liabilities and assets."[17]

---

[14] Source: Official Form 201, Voluntary for Non-Individuals Filing for Bankruptcy, United States Bankruptcy Court for the Northern District of California, Chapter 11, Professional Financial Investors, Inc., filed July 26, 2020, Case No. 20-30604; Application Requesting Joint Administration of Chapter 11 Cases, United States Bankruptcy Court for the Northern District of California, Chapter 11, Professional Financial Investors, Inc., filed July 26, 2020, Case No. 20-30604; Order Directing the Joint Administration of Related Cases, United States Bankruptcy Court for the Northern District of California, Chapter 11, Professional Financial Investors, Inc., filed July 27, 2020, Case No. 20-30604.

[15] Source: Declaration of Michael Hogan in Support of the Bankruptcy Filing and Early Case Administration Motions filed on July 26, 2020, p. 4, lines 18-21.

[16] *Id.*, p. 4, lines 21-22.

[17] *Id.*, p. 5, lines 12-16.

SMRH:4818-3806-5382.1

-6-

DECLARATION OF DAVID ALFARO

|   |   |   |
|---|---|---|
| | (d) | "During the pendency of the SEC's review, the [Company] suspended making principal and/or interest payments to the PISF Straight Lenders…also suspended payment on the second lien deeds of trust. New debt financing and investments have also been halted…"[18] |
| | (e) | "The finances of the [Company] are such that, without accepting new investment or monies from PISF Straight Lenders, neither PISF nor PFI have sufficient cashflow to meet their monthly interest obligations to the existing PISF Straight Lenders or the PISF Junior DOT Lenders, the PFI Junior DOT Lenders, or pay promised quarterly returns to certain LLC members."[19] |

18. On August 10, 2020, Mr. Goldberg was appointed as the independent and sole director of the Company.

19. On August 19, 2020, the United States Trustee appointed the official committee of the unsecured creditors (the "OCUC") for the Bankruptcy Cases, pursuant to section 1102 of the Bankruptcy Code.[20] Since the financing activities of the Company involved a variety of different types of fundraising, including a variety of reported debt instruments and equity interests, the creditors subsequently formed various committees to evaluate the standing of their claims, which include the *Ad-hoc* Committee of LLC Members, the *Ad-hoc* Committee of Deed of Trust Holders, and other special sub-committees formed by the investor body (together with the OCUC, the "Committees").

---

[18] *Id.*, p. 8, lines 10-13.

[19] *Id.*, p. 7, lines 24-28. Although Mr. Hogan described the DOTs as "Junior", such description was not entirely accurate.

[20] Source: Notice of Appointment of Official Committee of Unsecured Creditors, United States Bankruptcy Court for the Northern District of California, Chapter 11, Professional Financial Investors, Inc., Professional Investors Security Fund, Inc., filed August 19, 2020, Case No. 20-30604.

Case: 20-30604   Doc# 592   Filed: 04/29/21   Entered: 04/29/21 13:20:44   Page 7 of 54

20.     On September 29, 2020, the SEC filed a complaint against Mr. Wallach alleging that he "misappropriated more than $26 million from investors as part of a larger fraudulent scheme, devised by PFI's now deceased founder, in which approximately $330 million was raised from more than 1,300 investors in PFI,…PISF…and other related entities" from at least September 2015 through May 2020.[21] The SEC also alleged that "a significant portion of investor funds was used in a Ponzi-like fashion to pay existing investors."[22] Also, according to the SEC, Mr. Casey and Mr. Wallach knew that the revenues generated by PFI properties could not meet the obligations of PFI and PISF to pay interest and distributions, but that they hid the truth from investors, and continued to falsely reassure investors, even during the COVID-19 pandemic, that PFI had the financial reserves to survive.[23]

## III.     FTI'S RETENTION AND ASSIGNMENT OF WORK

21.     Effective September 3, 2020, FTI began its forensic accounting analysis of the Company. FTI was formally retained by the Company through an employment application approved by the Bankruptcy Court on October 13, 2020.[24]

22.     As further enumerated under **Section IV** of this Declaration, FTI was asked to perform an investigation of the operations of the Debtors at the direction of Mr. Goldberg, which included an evaluation of the historical finances of the Company (the "Assignment"). In addition to the Assignment, FTI also fulfilled numerous tangential investigations in response to information requests made by the Committees and counsel for certain committees.

23.     I and other FTI professionals working under my direction (collectively, the "FTI Forensics Team") have reviewed hundreds of thousands of paper and electronic records as well as performed numerous analyses in connection with the Assignment. Although our work related to

---

[21]   Source: Securities and Exchange Commission *v.* Lewis I. Wallach, Complaint dated September 29, 2020, p. 1, lines 23-28, and p. 2, line 1.

[22]   *Id.*, p. 2, lines 6-7.

[23]   *Id.*, p. 10, lines 11-26, and p. 11, lines 1-4.

[24]   Source: Order Approving Debtors' Employment and Retention of FTI Consulting, Inc. as Financial Advisors to the Debtors Effective as of September 3, 2020, dated October 13, 2020.

Case: 20-30604   Doc# 592   Filed: 04/29/21   Entered: 04/29/21 13:20:44   Page 8 of 54

the Ponzi scheme is substantively completed, residual work is ongoing. Any reference of "we", "our", or "FTI" in this Declaration refers to the FTI Forensics Team.

## IV. FTI SCOPE OF SERVICES & COMPANY RECORD KEEPING

### A. Scope of Services

24. FTI's work in connection with the Assignment was planned, supervised, and staffed in accordance with applicable professional standards that are common practice in similarly sized investigations of this nature. FTI's "Scope of Services" included, but were not limited to, the following:[25]

    (a) Identifying, inventorying, and preserving relevant paper and electronic information to support a forensic analysis of, but not limited to, the Company's:[26]

        i. Current and historical financial reporting.

        ii. Property purchases and refinancings.

        iii. Movement of cash between the Company's corporate accounts.

        iv. Investor entitlements.

        v. Cashflow.

    (b) Synthesizing and validating the information collected for the purpose of supporting the Assignment, which included assessing and responding to allegations of fraud and/or other illegal activities, including, but not limited to, tracing the depth and breadth of such

---

[25] The complete scope of services rendered by FTI are not included in this Declaration—rather—this Declaration focuses on FTI's forensic findings associated with its investigation into the alleged Ponzi scheme.

[26] In context of this effort and to support the broader Assignment, we also performed the following: (*i.*) validating and augmenting existing inventories of the Company's paper and electronic records as necessary; (*ii.*) scanning relevant paper documents and performing optical character recognition of scanned images as necessary; and (*iii.*) implemented a document review platform. Although FTI has secured a copy of the Company's available email data, we have not conducted an email review to gain further insights into the business activities among and between the Company' personnel and third-parties.

Case: 20-30604    Doc# 592    Filed: 04/29/21    Entered: 04/29/21 13:20:44    Page 9 of 54

activity (*e.g.*, how far back such activity occurred and how widespread such activity was). In context of this effort and to support the broader Assignment, we also performed (or in some instances are continuing to perform) the following:

    i.    Identified net cash in, net cash movement, and net cash out by investor.

    ii.    Identified the nature of ownership rights across the various properties subject to the Company's direct or indirect interests, including an assessment of the perfection (and in some instances removal and re-perfection) of encumbrances (such as deeds of trust).

(c)    Evaluating evidence related to the allegation that the Company's prior management engaged in fraudulent activity over a period of multiple decades, including, but not limited to:

    i.    Performing a review of the Company's corporate and property bank accounts.

    ii.    Conducting an analysis of cash commingling across the Company's corporate accounts and across the properties in which the Company has a direct or indirect interest.

(d)    Assessing and responding to inquiries and/or *ad-hoc* requests submitted by government agencies.

(e)    Assessing and responding to *ad-hoc* requests by Mr. Goldberg, Debtors' Counsel, Counsel to certain Committees & Sub-Committees, and investors.

(f)    Regularly summarizing and presenting interim forensic findings to Mr. Goldberg, Debtors' Counsel, Counsel to each Committee, Committees, and Sub-Committees.

25.     Although the FTI Forensics Team has spent a significant amount of time rendering the above Scope of Services in addition to fulfilling information requests submitted by interested parties,[27] Counsel to the Committees requested that we restrict this Declaration to only those facts that have been gathered thus far that are relevant to whether or not Mr. Casey and Mr. Wallach operated PFI, PISF and related entities as a Ponzi scheme.[28]

**B.    Company Record Keeping**

26.     The Scope of Services performed by the FTI Forensics Team were (and continue to be) significantly impacted by the nature and form of the Company's record keeping, which necessitated a significant amount of manual review and extensive data reconciliation of financial, accounting, and operations data. For example, the Company does not maintain an electronic system to record or track all investor activity. Instead, a significant amount of investor activity and balances are tracked manually across myriad Microsoft Excel spreadsheets that have no uniform structure across time.[29]

---

[27]  Interested parties include the Independent Director, Counsel to Committees, Committee Chairs, Committees, Sub-Committees, investors, and the SEC.

[28]  In context of this Declaration, "relevant facts" refer to attributes that are common to a Ponzi scheme. For example, the Ninth Circuit Court of Appeals has described a Ponzi scheme as "…an arrangement whereby an enterprise makes payments to investors from the proceeds of a later investment rather than from profits of the underlying business venture, as the investors expected. The fraud consists of transferring proceeds received from the new investors to previous investors, thereby giving other investors the impression that a legitimate profit-making business opportunity exists, where in fact no such opportunity exists." *See Auza v. United Dev., Inc. (In re United Dev. Inc.)*, 2007, p. 11, lines 24-28; *Hayes v. Palm Seedlings Partners (In re Agric Research)* 916 F.2d 528, p. 1-2; (9th Cir. 1990) (Citing, *Cunningham v. Brown*, 265 U.S. 1, 7-8, 44 S.Ct. 424, 425, 68 L. Ed. 873 (1924); *Wyle v. C. H. Rider & Family (In re United Energy Corp.)* 944 F.2d 589, p. 1 (9th Cir. 1991).

[29]  For example: (*i.*) unique account numbers are not ascribed to each investor, nor are unique identifiers ascribed to each investment; (*ii.*) transfers from one investment type to another are not stored in a data-searchable format to efficiently qualify or quantify (as if were in a database)—but rather they are stored piecemeal across spreadsheets that require manual review to determine the underlying amount of principal versus interest related to transferred amounts; and (*iii.*) numeric and/or financial data recorded in the Excel spreadsheets are often combined with text, rendering summary computations near impossible without manual interaction with the data.

Case: 20-30604    Doc# 592    Filed: 04/29/21    Entered: 04/29/21 13:20:42    Page 11 of
54

DECLARATION OF DAVID ALFARO

27.     Additionally, a large volume of the Company's operational and financial records is only available in hard copy or in an unstructured electronic file format,[30] including the records associated with the purchase of the underlying properties, operations of the properties, and debt service. For example:

(a)     The first complete year the Company has their accounting records available in a structured accounting system is 2007, making it exceedingly challenging for the FTI Forensics Team to assess the Company's operating activity in 2006 and prior.

(b)     Payment data related to investor interest, distributions, principal paydowns, and payoffs is not maintained in one central repository, but rather in various unstructured repositories (*e.g.*, excel spreadsheets, third-party payment processor files, hardcopy investor files, *etc.*), all of which need to be reviewed or reconciled to develop a comprehensive payment history for each investor.

(c)     Only a subset of bank statements was available in electronic format and for only a limited time. For example, the FTI Forensics Team identified over 300 bank accounts, only 87 of which have statements in electronic file format (none earlier than April 2015). Overall, the FTI Forensics Team has identified approximately 112 bank accounts with complete statement histories, approximately 155 bank accounts with partial statement histories, and evidence of approximately 51 additional bank accounts, of which we have been unable to find any statement histories.[31]

---

[30]   Unstructured electronic file format refers to data that has no pre-defined format or organization, rendering such data much more difficult to collect, process, and analyze. By way of example, the Company's unstructured data includes spreadsheets, text documents, communications, presentations, electronically stored images, and other similar types of records that were relevant to the investigation, and that required substantial manual review.

[31]   These 51 additional bank accounts were identified during FTI's review of various account lists and other documentation obtained from the Company. Information on these accounts was

Case: 20-30604   Doc# 592   Filed: 04/29/21   Entered: 04/29/21 13:20:42   Page 12 of 54

# V.     <u>BACKGROUND OF THE COMPANY</u>

28.     Mr. Casey founded PISF in November 1983 and served as its sole shareholder, officer, and director until his death on May 6, 2020.[32] Mr. Casey's shares in PISF are held in a revocable trust, and upon Mr. Casey's death, Ms. Albanese became the trustee and beneficiary of the trust.[33]

29.     Mr. Casey founded PFI in August 1990[34] and was its sole officer, director, and shareholder until 1998, when he relinquished his corporate positions and placed his shares in an irrevocable trust for his ex-wife, Ms. Albanese.[35]

30.     Unlike PISF, PFI was the arm of the Company that owned real properties and managed operations, and also served as the property manager for the Company's real properties.

31.     Although PFI, PISF, and the related companies that owned or managed the Company's properties were separate entities, they appeared to be operated and managed as a single enterprise—with overlapping staff, common accounting and record-keeping systems, and a common office space in Novato, California. The combined corporate activities of PFI and PISF are referred to as the "PFI/PISF Corporate Activities" throughout this Declaration. The PFI/PISF Corporate Activities and the activities of the underlying properties will be referred to as the "PFI Enterprise" throughout this Declaration.

---

compiled to facilitate other forensic analyses of the Company's records and was not a primary source of information used to validate each investor's net claim. Moreover, FTI does not believe nor expects that the transaction histories associated with these 51 bank accounts would materially change our conclusions or findings, should they be recovered.

[32]  Source: California State Certificate of Status / Incorporation for PISF; Declaration of Michael Hogan in Support of the Bankruptcy Filing and Early Case Administration Motions filed on July 26, 2020, p. 4, lines 6-8.

[33]  Source: Declaration of Michael Hogan in Support of the Bankruptcy Filing and Early Case Administration Motions filed on July 26, 2020, p. 4, lines 10-12.

[34]  Source: California State Certificate of Status / Incorporation for PFI. Although on paper Mr. Casey abdicated control of PFI in 1998, it appears that he maintained complete *de facto* control over PFI until his death in May 2020 (based upon the evidence reviewed by the FTI Forensics Team).

[35]  Source: Declaration of Michael Hogan in Support of the Bankruptcy Filing and Early Case Administration Motions filed on July 26, 2020, p. 4, lines 3-8.

Case: 20-30604   Doc# 592   Filed: 04/29/21   Entered: 04/29/21 13:20:42   Page 13 of 54
DECLARATION OF DAVID ALFARO

**A.   Property Financing & Acquisitions**

32.     The Company raised capital to purchase residential and commercial rental properties from banks and investors. Capital raised from banks was in the form of mortgage debt, which was often refinanced. The Forensics Team observed that the proceeds from subsequent bank mortgage refinancings were typically deposited directly into PFI/PISF corporate bank accounts, of which only a portion was in-turn transferred to the refinanced property bank accounts for payment of debt service and operating expenses of the property on which the mortgage was placed.[36]

33.     Aside from bank mortgages, the Company also raised capital from investors to fund property acquisitions.[37] Currently, the Company owns a direct or indirect interest in approximately 71 properties in California.[38] Each of the 71 properties fall within the following direct or indirect ownership interest categories:

> (a)     Limited Partnerships ("LPs"). Between 1983 and 1995, Mr. Casey formed 18 LPs to acquire individual properties. In doing so, Mr. Casey obtained mortgage debt from banks and raised additional capital from investors to fund the LPs. The Company currently maintains 10 of these LPs, the other 8 were liquidated. As of 2020, the majority of the LP equity investors were bought out or converted their interests into other forms of investments offered by the Company.

---

[36]   FTI's observations are predicated upon probative sampling as we have not completed a comprehensive assessment of all refinancings.

[37]   If adequate funds could not be raised from banks or investors for a particular acquisition, then PFI would use available cash at the PFI Enterprise level to cover the remaining balance necessary to purchase the property.  Illustrative examples of this are found later in this Declaration.

[38]   While in the capacity of CRO of the Company, Mr. Hogan obtained a Broker's Opinion of Value ("BOV") for each property in the portfolio, which in aggregate totaled approximately $550 million. The FTI Forensics Team has not qualified nor validated the BOVs, and therefore considers the aggregate amount to represent a proxy of the potential fair value of the properties.

Case: 20-30604    Doc# 592    Filed: 04/29/21    Entered: 04/29/21 13:20:42    Page 14 of 54

(b) <u>PFI Owned Properties</u>. Between 2003 and 2019, PFI acquired 31 properties (including one property acquired as part of a limited liability company owned in part by PFI). The properties acquired were financed through traditional bank mortgage debt, DOT Holders, and Tenancy in Common agreements (commonly referred to as a "TIC," and the co-owner referred to as a "TIC Holder"). Current DOT Holders include investors who invested cash in fractionalized notes and investors who exchanged and/or transferred all or a portion of their prior investments into newly acquired properties.[39] These cashless rollovers ("Rollovers") required the PFI Enterprise to source new cash equal to the designated transfer amounts in order to fund the acquisition of each subject property.[40] The primary means by which the PFI Enterprise was able to raise new money appears to have been through PISF Notes—the proceeds of which typically flowed through commingled PFI/PISF corporate accounts to the escrow accounts.

(c) <u>Limited Liability Companies ("LLCs")</u>. Between 2013 and 2020, Mr. Casey formed 30 LLCs to acquire individual properties. The LLCs were generally structured in a manner that granted a 30% ownership interest to PFI.[41] The properties acquired were generally

---

[39] The process by which investors moved and/or transferred their investments between investment types is hereinafter referred to as "Investment Rollovers" and/or "Rollovers"—*See* Investment Rollovers described below.

[40] The raising of new money was substantively required because the older investment proceeds had already been depleted to maintain and support the PFI Enterprise.

[41] PFI holds a 20% membership stake in LLCs 20 and 21, 35% membership stake in LLCs 33 and 44, 40% membership stake in LLC 22 and 36, and 30% membership stake in all other LLCs. These percentages represent the PFI general membership interest and is not inclusive of any additional PFI contributions (*e.g.*, subsequent acquisition of other investor's shares or additional capital to initially fund the property).

Case: 20-30604    Doc# 592    Filed: 04/29/21    Entered: 04/29/21 13:20:42    Page 15 of
54

financed through traditional bank mortgage debt, sale of
membership interests in the LLCs, and TIC Holders. The funding of
the LLC properties also included Investment Rollovers.

34. The Company serves as the property manager for all 71 LP, PFI Owned, and LLC properties in which it continues to hold a direct or indirect interest.[42]

**B.** **Investor Types**

35. FTI understands from the evidence that it has reviewed that Mr. Casey and Mr. Wallach solicited investments from five types of investors:

    (a)    Deed of Trust Holders, for properties owned by PFI ("PFI DOTs" and/or "DOT Holders"). Most investors in PFI-owned properties were PFI DOTs ("PFI DOT Holders") who had either a subordinated debt behind the traditional bank lenders (*i.e.*, the bank mortgages on the properties) or a first priority deed of trust on real properties owned by PFI.[43] Generally, PFI DOTs were promised a stated return ranging from approximately 9% to 10.5%.[44] .

---

[42] PFI was also entitled to an administrative and/or management fee.

[43] During the course of its work, the FTI Forensics Team identified a common theme related to the recordings of certain deeds of trusts associated with DOT Holders: DOTs were recorded, then subsequently released (commonly around refinancing), then subsequently re-recorded (commonly around the completion of the refinancing). In some instances, the DOT was not re-recorded. Source: probative sampling of LexisNexis Real Property Voluntary Lien Transaction Reports.

[44] Source: unstructured schedules that were used by the Company to manually track investor debt balances, distributions, and accrued interest (referred hereinafter as "Off-Ledger Schedules"). These Off-Ledger Schedules were not maintained in a structured database system, rather the investor balances were tracked through manual notations in Excel spreadsheets (among other unstructured documents). If the investor had elected to accrue interest rather than receiving cyclical payments, their interest accrual would only be updated by the Company when there was a principal balance change—resulting in underreported accrued interest in the Company's Off-Ledger Schedules. FTI calculated that the aggregated underreported accrued interest in the Off-Ledger Schedules across all applicable investors was approximately $21 million as of July 2020. The Company also maintained a property management accounting system ("Yardi" and/or the "Yardi system"), although the Company also did not record the full accrued interest balance in this system. Hereinafter, "On-Ledger Records" refer to the unaudited financial and

SMRH:4818-3806-5382.1

-16-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(b)  Deed of Trust Holders, for properties owned by limited partnerships ("PISF DOTs"). These investors are similar to the PFI DOT investors except their interests are secured by Deeds of Trust on the properties owned by the LPs. They were promised a stated return generally ranging from approximately 9% to 10.5%.[45]

(c)  Members in LLC's managed by PFI ("LLC Members"). The LLC arrangements did not promise a fixed distribution to investors—however—in practice the Company paid a consistent quarterly distribution generally ranging from approximately 6% to 9%.[46] This consistent distribution to LLC Members resulted in these investments being akin to a debt arrangement as investors were receiving a consistent cash payment that was not solely reliant on the ultimate cashflows generated by the underlying property owned by the LLC.

(d)  TIC Holders to properties owned by PFI or the LLCs. Based on the evidence that we have reviewed, the FTI Forensics Team has observed that most of these investors did not remit funds directly to PFI but rather remitted their funding directly to the escrow agent prior to settling the purchase. TIC Holders were promised a stated interest rate generally of 6%.[47]

---

accounting records maintained in the Yardi system. In limited circumstances the stated return for certain PFI DOTs was less than 9% for properties without a bank mortgage.

[45] Source: Off-Ledger Schedules. In limited circumstances the stated return for certain PISF DOTs was less than 9% for properties without a bank mortgage.

[46] Over 75% of LLCs consistently paid distributions of 6% to investors. The remaining LLCs paid distributions ranging from 6% to 9%.

[47] The ownership interests of the TIC Holders was generally attached to the property by the escrow agent.

SMRH:4818-3806-5382.1

Case: 20-30604    Doc# 592    Filed: 04/29/21    Entered: 04/29/21 13:20:42    Page 17 of 54

(e)    Noteholders to PISF (*i.e.*, PISF Notes). Starting at least from the late 1980s or early 1990s, PISF raised funds from investors in the form of notes called PISF Straight Notes or PISF Promissory Notes. These notes are referred to as the PISF Notes throughout this Declaration. The PISF Note Holders were promised a stated annual interest rate generally ranging from 9% to 12%. Unlike the other capital raising activities of the Company, which involved purported ownership or security interests in specific properties, the PISF Notes were purportedly collateralized by PISF's equity interest in the LP properties.[48] However, FTI has found no evidence indicating that PFI disclosed to investors that the LP properties were nearly and/or fully encumbered by other debts at the time the PISF Notes were issued or anytime thereafter—effectively rendering such collateralization worthless.

36.    Although we have not seen any direct evidence indicating what specifically Mr. Casey and Mr. Wallach represented to investors with respect to how the PISF Notes would be secured, in its complaint, the SEC alleges that Mr. Wallach "made verbal representations to these investors that monies raised would be primarily used to purchase real property and make improvements to real property already owned by PFI or PISF."[49] Additionally, in the Class Action Complaint, Plaintiff investors characterized the PISF Notes as allowing "investors to participate in PFI's real estate projects without participating in any specific deal" and further allowing "investors to share in profits from the rental and ultimate sale of the properties managed and owned by [the Company]."[50]

---

[48] Source: Off-Ledger Schedules and PISF Notes agreements.

[49] Source: Securities and Exchange Commission *v.* Lewis I. Wallach, Complaint dated September 29, 2020, p. 6, lines 23-26.

[50] Source: Susan Aiken, individually and on behalf of all others similarly situated *v.* Professional Financial Investors Security Fund, Inc., a California corporation; Lewis Wallach; and Charlene Albanese, personal representative of the Estate Kenneth J. Casey, deceased, filed July 2, 2020

**C.** **Investor Rollovers**

37. PFI commonly allowed a practice of exchanging and/or transferring an investor's existing investment associated with a single property to an investment in another property within the PFI Enterprise (*i.e.*, Rollovers). Rollovers, in context of a Ponzi scheme, allow a Ponzi to continue by avoiding the need to pay-out investors as debt increases over time. As more fully enumerated under **Sections VI** and **VII** of this Declaration, the evidence suggests that this same technique was followed by Mr. Casey and Mr. Wallach to continue their Ponzi-like activities by avoiding the need to pay existing investors interest and principal when due—while at the same time raising new capital from banks and new investors to obfuscate mounting losses within the PFI Enterprise.

38. Rollovers in the PFI Enterprise generally included rolling over a note at maturity to a new note secured by the same collateral, transferring an investor's interest from one investment type to another (*e.g.*, a DOT to a PISF Note), or from one property to another (*e.g.*, from one DOT property to a different DOT property). Moreover, we commonly observed instances where an investor's interest was rolled over multiple times, resulting in the deferral of actual cash payments to investors for years. Based upon the evidence reviewed, we estimate that approximately 60% of all investment accounts contain some form of Rollover.[51]

---

in Superior Court of the State of California In and For Marin County, Case No. 2001560, p.3, lines 2-6.

[51] Source: Off-Ledger Schedules. The Company did not utilize its accounting system to track investor contributions, distributions, balances, and exchanges (such as Rollovers)—rather—such activity was manually recorded and maintained in unstructured files that regularly changed in format and content over time. These files, combined with the large number of Rollovers, require a substantial amount of manual effort by FTI to identify and reconcile actual investor cash paid to PFI (versus accrued interest earned and not disbursed, then subsequently rolled over to a new investment, which often appears as new capital contributions in the unstructured files). Said otherwise, differentiating principal and interest requires a comprehensive review of each investor's history and any affiliated accounts to identify and separate accrued interest from actual cash invested for the purpose of analyzing and calculating investor net claims. This comprehensive review is ongoing, and as such, the 60% Rollover rate may increase.

39.     There were three primary forms of Rollovers that we observed.  The first form involved taking an investor's existing investment in a property and rolling over the investment at loan maturity to a new note secured by the same property.  The second form involved exchanging and/or transferring all or a portion of an investor's interest from one investment to another—whereas the subsequent investment did not involve the acquisition of a new property into the PFI Enterprise (*i.e.*, cash distributions to the investor were avoided by rolling over the investor's principal and/or accrued interest).   The third form of Rollover involved exchanging and/or transferring all or a portion of an investor's existing interests to a newly acquired property or to a newly established LLC set up to acquire a new property.[52]  Similar to the first and second forms of Rollover, cash distributions were avoided—however—this particular form of Rollover typically required the PFI Enterprise to *also* source new cash equal to the designated Rollover amount in order to fund the acquisition of the subject property (*i.e.*, the actual cash attributable to the Rollover investment was typically not available as it had already been depleted by the PFI Enterprise in an earlier period).

## VI.     SUMMARY OF RELEVANT FORENSIC ACCOUNTING FINDINGS

40.     Based on our review of the Company's available financial, accounting, and operational records in context of our Assignment and the Scope of Services described herein, and in consideration of the attributes that are common to a Ponzi scheme,[53] we have found the following to be true:

> (a)     The PFI Enterprise has negative equity and lacks liquidity:
>
> > i.      Debts significantly exceed the BOV of the properties.
> >
> > ii.     Cashflows from the underlying properties are currently inadequate to pay operating expenses, bank debt service, and investors without raising additional investor funds.

---

[52]  If the investor had unpaid interest that was included in the total amount of the Rollover, PFI did not differentiate interest from principal in the accounting of the amount rolled over to the new investment.

[53]  *See* above reference to the Ninth Circuit Court of Appeals' description of a Ponzi scheme.

(b)     Since at least January 1, 2007, debt interest and equity distributions paid were dependent in large part upon raising new capital, since the cashflows from operations were insufficient:

    i.     Distributions included commingled funds raised from current and new investors on an ongoing basis, a significant portion of which came from the issuance of PISF Notes.

    ii.     Investors that were accruing unpaid interest in lieu of receiving monthly payments helped enable the PFI Enterprise to continue operating as the Company avoided the need to source new proceeds to cover such payments when due (*i.e.*, given the insufficiency of cash generated by the PFI Enterprise to meet their total debt service obligations). We estimate the total amount of accrued and unpaid interest due investors as of July 31, 2020 to be approximately $41.6 million (with approximately $39.6 million due to PISF Note holders).[54]

(c)     Investor cash was commingled with *other investor cash* and *PFI/PISF corporate cash* across the PFI Enterprise as a whole:

    i.     Funds were transferred to-and-fro based on cash needs across the overall PFI Enterprise (*e.g.*, between property accounts and PFI/PISF accounts to service debt and expense obligations when due):

    (1)     Every individual property within the PFI Enterprise periodically received transfers to its bank accounts from PFI/PISF bank accounts.

---

[54]    Source: Off-Ledger Schedules.

SMRH:4818-3806-5382.1

| | | |
|---|---|---|
| | (2) | Every individual property within the PFI Enterprise periodically transferred cash **to** PFI/PISF bank accounts. |
| ii. | | Commingled cashflows created intercompany receivables and payables between all the properties and the Company, but there were inadequate resources to settle these intercompany obligations.[55] |
| iii. | | Funds were commonly commingled during the property purchasing cycle. |
| iv. | | Funds were commonly commingled during each property's operating cycle. |
| v. | | Funds were commonly commingled at the PFI/PISF Corporate Activities level. |

(d) Mr. Casey and Mr. Wallach removed tens-of-millions of dollars from the Company.

    i.    Funds were removed in various forms including, but not limited to, reported operating expenses that were for the personal benefit of both and other direct cash disbursements to, or on the behalf of, both that were not expensed, but rather capitalized in various forms on the Company's balance sheet.

(e) The available evidence is consistent with attributes that are common to a Ponzi scheme since at least January 1, 2007.[56]

---

[55] For example, each property had an intercompany receivable and/or payable with the Company.

[56] *See* above reference to the Ninth Circuit Court of Appeals' description of a Ponzi scheme.

SMRH:4818-3806-5382.1

1      i.      PISF Notes were a key instrument in raising funds to make

2              payments to previous investors in excess of the cashflows

3              generated by the properties since at least January 1, 2007.

4      (f)     There is limited utility gained from establishing the commencement

5              of the Ponzi prior to 2007 compared against the cost to investigate

6              further.

7   **VII.  BASIS AND EVIDENCE IN SUPPORT OF RELEVANT FORENSIC ACCOUNTING FINDINGS**

8       **A.    The PFI Enterprise Has Negative Equity and Lacks Liquidity**

9           1.    Negative Equity

10      41.     Equity in an entity represents the total assets the entity owns minus total liabilities

the entity owes to related or third-parties.[57] As of July 2020, the Company and the properties it has

a direct or indirect ownership interest in have a total estimated negative equity of over $250

million based upon the BOV obtained by Mr. Hogan *less* the total reported interest-bearing debts

(*See* **Chart 1** below).

---

[57] As an illustration: assume entity **A** owns a single asset, a real estate property worth $500,000, and entity **A** owes only two liabilities, a first mortgage due to a bank in the amount of $350,000 and a second mortgage due to a third-party investor in the amount of $100,000. In this example, entity **A's** equity is positive $50,000. Conversely, all else held equal, if the second mortgage due to a third-party investor is $250,000, then entity **A's** equity is negative $100,000.

Case: 20-30604   Doc# 592   Filed: 04/29/21   Entered: 04/29/21 13:20:42   Page 23 of
54
DECLARATION OF DAVID ALFARO

**Chart 1[58]**
**PFI/PISF's Estimated Equity (*in millions*)**

| Interest Bearing Debt | Amount |
|---|---:|
| Mortgage Debt[59] | ($309.5) |
| LLC and TIC Equity Membership Contributions, Net of Distributions[60] | ($112.8) |
| PISF Notes Debt, Including Accrued Interest[61] | ($276.6) |
| DOT and TIC Debt[62] | ($101.5) |
| Total Interest-Bearing Debt[63] | **($800.4)** |
| **BOV of Real Estate[64]** | **$549.5** |
| **Estimated Equity** | **($250.9)** |

Note: hereinafter, dollar amounts in parentheses "()" and/or red represent negative amounts.

42.    Regardless of the underlying property's actual cashflow, the PFI Enterprise generally promised its investors fixed rates of return across all of the various investment types it offered, including the membership interests in LLCs and TICs (*i.e.*, investors were paid a consistent cash return akin to a debt instrument). Accordingly,[65] references to debt and debt servicing in this Declaration include bank mortgage debt as well as returns promised to investors across all PFI Enterprise investment types (collectively, "Debt Service").

### 2.    Lack of Liquidity

43.    In 2019, the most recent full fiscal year prior to Mr. Casey's death, the Company, including the properties it has a direct or indirect interest in, lacked sufficient liquidity to service existing debts without raising additional capital. In that year, the PFI Enterprise generated net

---

[58]  Amounts are based upon information obtained from (*i.*) the On-Ledger Records; (*ii.*) the Off-Ledger Schedules; and (*iii*) BOVs.

[59]  Source: On-Ledger Records.

[60]  *Ibid.*

[61]  Source: Off-Ledger Schedules.

[62]  *Ibid.*

[63]  Excludes other assets and liabilities, including working capital, as such amounts are relatively insignificant according to On-Ledger Records.

[64]  Source: BOVs, which were prepared in June 2020 and July 2020.

[65]  Unless otherwise indicated.

Case: 20-30604    Doc# 592    Filed: 04/29/21    Entered: 04/29/21 13:20:42    Page 24 of 54

operating income of $20.1 million,[66] which was insufficient to service the approximate $47.0 million of the PFI Enterprise Debt Service.[67] This deficit was funded by raising additional capital with the largest cash inflow attributable to PISF Notes.

**B.** **Since At Least January 1, 2007, Debt Interest And Equity Distributions Paid To Investors Were Dependent In Large Part Upon Raising New Capital, Since The Cashflows From Operations Was Insufficient**

1. History Of Debts

44. Since 2007, the PFI Enterprise has raised debts that have consistently exceeded the funds needed to purchase properties. As illustrated in **Chart 2**, the combined debts raised from bank mortgages (including subsequent refinancings), DOTs, PISF Notes, and LLCs since 2007 far exceed the reported cost basis to acquire the underlying properties.

---

[66] Source: On-Ledger Records. Net Operating Income ("NOI") is defined as the individual property's revenues *less* operating expenses before reported interest, depreciation, amortization, and income taxes. In this context, interest includes mortgage, DOT, PISF Note, and affiliate interest, as well as LLC and TIC distributions. During this same period, the PFI Enterprise reported $16.8 million spent in capitalized improvements and an increase in mortgage debts due to refinancing bank mortgages of $8.3 million.

[67] The interest expense recorded in the On-Ledger Records was $47.5 million. Included in this amount was $0.5 million of expenses identified as accrued interest, which has been excluded to arrive at the estimated $47.0 million of Debt Service. Of note, we observed $12.6 million paid to banks for mortgages, $33.2 million paid to investors via a third-party payment processor (Payroll Resource Group, or "PRG"), and $1.5 million paid to investors outside of PRG (*i.e.*, totaling $47.3 million in observed payments).

Case: 20-30604    Doc# 592    Filed: 04/29/21    Entered: 04/29/21 13:20:42    Page 25 of 54

**Chart 2[68]**
**Historical Debts from 2007 to July 2020**



45.     Because the majority of debts were interest-bearing, as debts increased so did the ultimate required Debt Service due to investors and banks.  The following section compares this increasing level of Debt Service to the reported cash generated from operations.

2.     <u>Funds From Properties Were Insufficient To Cover Total Debt Service Obligations</u>

46.     By way of illustration, in fiscal year 2007, NOI of the PFI Enterprise was approximately $3.3 million before Debt Service of approximately $11.4 million, leaving a cash shortfall of approximately ($8.1) million.[69] The issuance of approximately $4.7 million in DOTs

---

[68]     Source: On-Ledger Records (LLC and TIC Equity net of Distributions; Mortgage Debt; and the Cost Basis of Acquired Property); Off-Ledger Schedules (PISF Notes and DOTs). The accrued interest obligation calculations recorded in these schedules were not completely updated as of July 31, 2020, which we estimate to be approximately $21 million of incremental accrued interest. The total estimated obligation for accrued interest as of July 2020 is approximately $41.6 million. LLC amounts include the equity portion owned by PFI, which was generally 30%. "Cost Basis of Acquired Property" includes the general ledger accounts for "Land" and "Building," but excludes capital improvements of approximately $20 million as of December 31, 2014 and approximately $61 million as of July 31, 2020.

[69]     Source: On-Ledger Records.

Case: 20-30604     Doc# 592     Filed: 04/29/21     Entered: 04/29/21 13:20:42     Page 26 of
54
DECLARATION OF DAVID ALFARO

and approximately $3.5 million in PISF Notes[70] in that same year provided the PISF Enterprise adequate cash to substantially cover this deficit. At year-end, the reported cash was approximately $0.5 million (*See* **Chart 3**).[71]

**Chart 3**[72]
**Primary Cash Inflows and Outflows in 2007 (*in millions*)**

| Primary Inflows and Outflows | Amount |
|---|---|
| Net Operating Income | $3.3 |
| Debt Service | ($11.4) |
| **Net Deficit** | **($8.1)** |
| | |
| Capital Raised from DOTs | $4.7 |
| Capital Raised from PISF Notes | $3.5 |
| **Total Capital Raised** | **$8.2** |

47.     In addition to 2007, we examined the On-Ledger Records that were maintained by the Company from 2015 through 2019.[73] In total, there were 58 properties within the PFI Enterprise tied directly to investors during this five-year period:[74]

(a)     Total NOI across all 58 properties was approximately $82.5 million;[75]

(b)     Total Debt Service was approximately $157.6 million;[76]

---

[70]   Source: Off-Ledger Schedules.

[71]   Source: On-Ledger Records.

[72]   Source: On-Ledger Records and Off-Ledger Schedules.

[73]   FTI selected these years primarily due to the notable increase in total debts during this period (*see* **Chart 2**).

[74]   Excludes reported revenue and operating expenses associated with PISF, PFI Inc., 350 Ignacio (totaling 8 properties), PFI owned properties with no DOT investors (totaling 3 properties), and properties acquired in 2020.

[75]   The total NOI across the properties excludes PFI and PISF's corporate expenses and income. The addition of these amounts would ***decrease*** NOI from $82.5 million to ***$62.2 million***.

[76]   Source: On-Ledger Records, which includes Debt Service attributable to PISF Notes (approximately $54.7 million), DOT holders (approximately $41.4 million), and mortgages (approximately $37.7 million); as well as distributions to LLC and TIC holders (approximately $23.8 million). When including PFI/PISF Corporate Activities, Debt Service ***increases*** from $157.6 million to ***$159.1 million***.

Case: 20-30604   Doc# 592   Filed: 04/29/21   Entered: 04/29/21 13:20:42   Page 27 of 54
DECLARATION OF DAVID ALFARO

(c)     Total net deficit was approximately ($75.1) million.[77]

48.     **Chart 4** below shows this differential in NOI compared to Debt Service for the 58 properties. Note the "Net Deficit" at the bottom of the chart is the difference between "Total NOI" (▧) and "Total Debt Service" (■).



Chart 4[78]
**Investor Property NOI vs. Debt Service from 2015-2019**

49.     We evaluated the NOI of individual investor properties to identify the extent to which each had sufficient NOI to pay their mortgage and investor debt obligations.  This analysis, unlike the preceding analysis, excludes the interest paid to the PISF Note holders, which was

---

[77]   When including PFI and PISF, the deficit *increases* from ($75.1) million to *($97.0) million*. During this same period, the PFI Enterprise properties reported approximately $65.2 million spent in capitalized improvements and an increase in mortgage debts due to refinancing bank mortgages of approximately $48.4 million.

[78]   Source: On-Ledger Records.

• Excludes reported revenue and operating expenses of PISF, PFI, 350 Ignacio, and PFI Properties with no DOT investors.

• Excludes accrued interest that was expensed per the On-Ledger Records for investors electing to defer their interest payments.

• Includes reported distributions from LLCs, including the portion paid to PFI, but does not include return of capital to investors or new contributions from investors.

Case: 20-30604   Doc# 592   Filed: 04/29/21   Entered: 04/29/21 13:20:42   Page 28 of 54

approximately $54.7 million from 2015 to 2019.[79] This analysis also excluded the net operating loss by the PFI/PISF Corporate Activities, which is described in further detail later in this Declaration. For the time period from 2015 through 2019, 47 of the 58 properties analyzed reported insufficient NOI to pay the Debt Service specific to their individual properties (*i.e.*, before considering interest due to PISF Note holders).[80] Of the 11 properties not reporting an operating deficit after Debt Service for the entire period, 6 had at least *one* year within this five-year period that did report an operating deficit after Debt Service. For the remaining 5 properties, we evaluated the funds used to purchase the properties and observed that all five used funds sourced from pooled PFI corporate bank account (*i.e.*, commingled funds). Furthermore, all 58 properties had cash transfers both to and from these same corporate bank accounts during this time period.

### 3. Cash From New Investors Was Used To Pay Existing Investors

50. As described above, the Company's On-Ledger and Off-Ledger records indicate that without the perpetual raising of capital from at least 2007,[81] there was inadequate cash generated by the properties to cover existing Debt Service. Setting aside Debt Service, the PFI Enterprise also had insufficient cash to cover Investment Rollovers that were designated as a source of funds to be used for acquiring new properties.[82] The primary means for raising new capital to pay for Debt Service and to cover Investment Rollovers was PISF Notes. As illustrated in **Chart 5**, beginning in 1997 when the issuance of PISF Notes occurred more frequently, PISF raised approximately $250 million in the intervening years before Mr. Casey's death in May of 2020. Without such proceeds, the PFI Enterprise would not have been able to operate.

---

[79] PISF Notes were not ascribed to specific properties but rather to PISF's equity interest in the basket of LP properties—therefore excluded from the analysis.

[80] Source: On-Ledger Records

[81] Primarily through the issuance of PISF Notes, but inclusive of capital the Company raised through mortgage refinancings, DOTs, LLCs, and TICs).

[82] *See* **Section V.C.** Investment Rollovers.

SMRH:4818-3806-5382.1

**Chart 5**[83]

**Net PISF Notes and Property Purchases from 1998 to 2020 (in millions)**

| Period | Net PISF Notes | Property Purchases |
|---|---|---|
| 1998 - 2002 | $6.5 | $0.0 |
| 2003 - 2006 | $20.7 | $1.5 |
| 2007 - 2012 | $50.7 | $2.1 |
| 2013 - 2020 | $174.0 | $314.9 |

51. In more recent years (2015 through 2019), the PFI Enterprise raised a total of approximately $452.1 million in capital from banks and investors,[84] including approximately $125.7 million from issuing PISF Notes. These funds were used to purchase approximately $246.0 million in properties and to pay approximately $159.1 million in Debt Service.[85] The history of the PISF Notes and noteworthy events are depicted in **Chart 6**.

---

83 Source: Off-Ledger Schedules and On-Ledger Records. "Property Purchases" includes "Land" and "Building". Net PISF Note amounts reflect "as reported", which include a portion of accrued interest. Net PISF Notes prior to 1998 were approximately $3.6 million.

84 Source: Off-Ledger Schedules and On-Ledger Records. Estimated funds raised were (*i.*) $48.4 million from refinancing mortgages, (*ii.*) $150.7 million from new mortgages, (*iii.*) $125.7 million from issuing PISF Notes, (*iv.*) $100.2 million from LLC Equity investors, and (*v.*) $27.1 million from DOT investors.

85 The interest expense recorded in the On-Ledger Records was $165.9 million. Included in this amount was $6.8 million of expense identified as accrued interest, which was excluded to arrive at the estimated $159.1 million of Debt Service. We also observed (*i.*) $39.1 million paid to banks for mortgages, (*ii.*) $119.5 million paid to investors via PRG, and (*iii.*) $2.8 million paid to investors outside of PRG (for a total of $161.3 million in observed payments—difference due to rounding).



Case: 20-30604 Doc# 592 Filed: 04/29/21 Entered: 04/29/21 13:20:42 Page 30 of 54



**Chart 6**[86]
**History of PISF Notes and Noteworthy Events (*in millions*)**



52.     As of July 31, 2020, approximately 35% of the total principal balance of PISF Notes were accruing interest that was due upon maturity versus paying interest at regular intervals prior to maturity.[87] These investors provided cash inflows without subsequently burdening the organization with an immediate need to service the stated interest obligation (*i.e.*, interest payments). The total principal balance of PISF Notes accruing interest as of July 31, 2020 was approximately $83.7 million. The total estimated accrued interest owing to these investors as of July 31, 2020 was approximately $39.6 million.[88]

---

[86]  Source: (*i.*) On-Ledger Records for mortgages, LLCs, TICs, property acquisitions (Land and Building); and (*ii.*) Off-Ledger Schedules for DOTs and PISF Notes. Net PISF Notes amounts reflect "as reported" amounts which include a portion of accrued interest. The Off-Ledger Schedule for the year 2000 has not been located. Of the total property acquisitions between 2013 and July 2020, approximately $10.3 million relates to properties without investors. Property NOI and Property Mortgage / DOT Interest relate to properties with investors.

[87]  On a PISF Note Holder basis (as opposed to dollar basis), approximately 51% were accruing interest.

[88]  The $39.6 million estimate includes both recorded and unrecorded accrued interest. Approximately $2.6 million of this amount is owing to investors that were historically accruing interest but stopped accruing prior to July 2020.

SMRH:4818-3806-5382.1

Case: 20-30604   Doc# 592   Filed: 04/29/21   Entered: 04/29/21 13:20:42   Page 81 of
54

**C.** **Investor Cash Was Commingled With Other Investor Cash And PFI/PISF Corporate Cash Across The PFI Enterprise As A Whole**

    1. <u>Funds Were Transferred To-And-Fro Based On Cash Needs Across The Overall PFI Enterprise</u>

53. Commingling of funds frequently occurs in fraud cases and is notably common in Ponzi schemes. It often occurs when funds belonging to one investor are deposited into the same bank account as funds that belong to a different investor such that an individual investor's dollars cannot be segregated from another investor's dollars within the same bank account since money is fungible. Furthermore, FTI understands that the United States District Court, Central Division has found that the transfer of money between accounts of different entities to meet entities' liabilities qualifies under the definition of commingling.[89] Specific to the PFI Enterprise, the organizational structure and movements of cash are complex and involved pervasive transfers of cash between and across the property specific entity bank accounts and the PFI/PISF corporate bank accounts— thereby rendering the segregation of each investor's dollars impossible.

    2. <u>Commingled Cashflows Created Intercompany Receivables And Payables Among All The Properties And PFI/PISF, But Inadequate Resources Exist To Settle These Intercompany Obligations</u>

54. Consistent with Ponzi-like activity, the Company used complex (multi-stepped, multi-entity) transactions to pool cash across the PFI Enterprise, including cash raised from investors and mortgage refinancings.[90] More specifically, these multi-stepped intercompany transactions were common practice to accumulate the cash resources necessary to fund debt

---

[89] *Wing v. Dockstader,* 2010 WL 5020959 at *2, 5, and 9 (D. Utah 2010).

[90] Simple (single-step, single-entity) transactions at the property-level have thus far been found to be generally accurate. These types of transactions generally involve recognition of a cash receipt at the property level or a singular expenditure (*e.g.*, payments for property repairs or maintenance). However, we have found notable exceptions. For example, certain expenditures recorded as an operating expense were reclassified and capitalized in the Company's property improvement account at year end, which appear to have been a technique employed by the Company to improve the financial health of the properties that were observed to have these types of reclassifications.

SMRH:4818-3806-5382.1

-32-

service and pay certain property level operating expenses (commonly recorded as "due-to/due-from" in the On-Ledger Records maintained by the Company).[91]

55.     For example, if an individual property had insufficient funds to cover a large expenditure, the Company would transfer cash accumulated by PFI or PISF in its bank accounts to the property's bank accounts. The preceding cash transfer activity was recorded in a series of multi-stepped transactions, involving intercompany accounts (as it was common for PFI/PISF to source "as needed" cash from other properties).  This intercompany activity was generally not transacted directly between the individual properties, but rather through the pooling of funds at the PFI/PISF corporate level and then redistributing the as needed cash to the individual properties. According to the On-Ledger Records, every property had intercompany accounting transactions with PFI/PISF, which is consistent with the bank statements that identified that every property had bank transfers both to and from the PFI/PISF bank accounts.[92]

56.     While tracing cashflow within the PFI Enterprise, we also observed that the property-level intercompany accounts and the PFI corporate accounts do not reconcile, whereby the reported intercompany payables / receivables disagree by a significant margin.[93]

3.     Funds Were Commonly Commingled During The Property Purchasing Cycle

57.     Within the PFI Enterprise, we consistently observed commingling of investor funds both during the property purchasing cycle and during the subsequent operating cycle.  With respect to the purchasing cycle, it was generally observed that acquired properties were financed through (*i.*) mortgage debt and (*ii.*) DOT Holders and/or equity investors.  However, it was common practice for the Company to ascribe a portion of the financing to investors who intended to roll over their existing investment(s) into the property being purchased (*i.e.*, Rollovers).  In

---

[91]  Servicing of mortgage debts was generally paid directly from the property's bank account to the lending bank; however, the proceeds in the property's bank account may have been sourced in part through intercompany transfers at the time of the mortgage payment.  Source: Property and PFI/PISF bank statements.

[92]  On-Ledger Records.

[93]  *Ibid.*

Case: 20-30604     Doc# 592     Filed: 04/29/21     Entered: 04/29/21 13:20:42     Page 33 of
54
DECLARATION OF DAVID ALFARO

these circumstances, it was necessary for the Company to source the cash equal to the amount designated for the Rollover, as the underlying investor's principal (and any unpaid accrued interest) had already been depleted within the PFI Enterprise.[94] Although the Company pooled cash from various sources within the PFI Enterprise to cover the Rollover, the primary source of new cash came in the form of issuing PISF Notes.

58.     Another form of commingling during the purchasing cycle involved the specific bank accounts used to pool investor proceeds.  When properties were purchased, certain investor funds were deposited directly into the property's designated bank account or directly into the escrow account setup for the purchase. However, and in contrast, other investor funds were commonly deposited directly into a PFI or PISF corporate bank account—commingled with general funds pooled across the PFI Enterprise.[95] At or near closing, the balance of funds were transferred to the escrow account from either the specific property's bank accounts, the PFI/PISF corporate bank accounts, or both.  The proceeds from the PFI/PISF corporate accounts were undifferentiated from any other investor's cash who may have made a deposit in the same bank account but for a different investment (*e.g.*, a PISF Note).

59.     <u>Illustration #1: LLC ███ Property Purchase</u>.  In ███, the Company established an LLC and arranged a bank mortgage and investor financing to purchase a property for a total consideration of $20.5 million.[96] The sources of funds raised for the acquisition of the property included:

---

[94] We observed that Rollovers were typically funded from various sources within the PFI Enterprise, including the issuance of PISF Notes and available cash transferred from property accounts to PFI/PISF corporate accounts.

[95] Although we have not performed a comprehensive review of check images, we have identified examples of checks deposited into accounts that were not designated as the payee (*e.g.*, a check written to a property bank account that was deposited into a PFI/PISF corporate account).

[96] Source: Final Escrow Settlement Statement.  This amount excludes closing-related costs of approximately $0.2 million.

Case: 20-30604    Doc# 592    Filed: 04/29/21    Entered: 04/29/21 13:20:42    Page 34 of 54

(a) Approximately $12.3 million was sourced through a traditional bank mortgage.[97]

(b) Approximately $6.8 million was sourced through raising new money from investors.[98] Of this amount:

 i. Approximately $2.6 million was raised from TIC investors, whose cash investment was deposited directly into the designated escrow account.[99]

 ii. Approximately $2.5 million was raised from non-TIC investors, whose cash investment flowed through the LLC bank accounts, then to the escrow account (*i.e.*, investor funds were not commingled within PFI/PISF corporate bank accounts).[100]

 iii. Approximately $1.7 million was raised from non-TIC investors, whose cash investment flowed through PFI/PISF corporate bank accounts (*i.e.*, investor funds were commingled within PFI/PISF corporate bank accounts prior to reaching the escrow account).[101]

(c) Approximately $3.1 million was sourced through contributions made by PFI on behalf of investors who requested a Rollover.[102] As previously stated, these Rollovers represented a non-cash transaction

---

[97] Source: Final Escrow Settlement Statement.

[98] Source: Final Escrow Settlement Statement; PFI/PISF bank statements; property bank statements; Off-Ledger Schedules; and On-Ledger Records.

[99] Source: Final Escrow Settlement Statement and On-Ledger Records.

[100] Of the $2.5 million, $2.3 million flowed through the LLC-specific bank account and $0.2 flowed through *another* LLC bank account.

[101] Source: PFI/PISF bank statements; property bank statements; Off-Ledger Schedules; and On-Ledger Records.

[102] Source: Off-Ledger Schedules; On-Ledger Records; and investor files maintained by the Company (*e.g.*, investor agreements, hand-written notes, *etc.*).

SMRH:4818-3806-5382.1

Case: 20-30604   Doc# 592   Filed: 04/29/21   Entered: 04/29/21 13:20:42   Page 35 of 54

DECLARATION OF SCOTT AVILA / EXPERT REPORT OF AVILA & ALFARO

(meaning no new money was coming into the PFI Enterprise). As such, the Company was forced to source the remaining $3.1 million from across the PFI Enterprise.[103]

60.     Of the approximate $1.6 million in excess cash raised to purchase the property, approximately $0.6 million was retained in the LLC's cash account and $1.0 million was diverted to PFI.[104]

61.     <u>Illustration #2: PFI ██Redacted██ Property Purchase</u>.  In ██Redacted██, PFI purchased a property for a total consideration of $6.3 million.[105] The sources of funds raised for the acquisition of the property included:

(a)     Approximately $4.0 million was sourced through a traditional bank mortgage.[106]

(b)     Approximately $1.7 million was sourced through contributions made by PFI.[107]

(c)     Approximately $0.7 million was sourced through contributions made by PFI on behalf of investors who requested a Rollover.[108]

62.     Similar to the preceding LLC property purchase example, this transaction also involved investors that chose to roll over their existing investments into this property.  In total, the Company sourced approximately $2.4 million of commingled funds from within the PFI

---

[103] This process of sourcing cash across the PFI Enterprise to meet Rollover demands is another illustration of commingling of funds.

[104] Source: On-Ledger Records and property bank statements.

[105] Source: Final Buyer's Closing Statement.  Excludes closing-related costs of approximately $0.1 million.

[106] Source: Final Buyer's Closing Statement.

[107] Source: Final Buyer's Closing Statement and PFI bank statement.

[108] Source: Final Buyer's Closing Statement; PFI bank statement; Off-Ledger Schedules; and investor files maintained by the Company (*e.g.*, investor agreements, hand-written notes, *etc.*).

Case: 20-30604   Doc# 592   Filed: 04/29/21   Entered: 04/29/21 13:20:42   Page 36 of 54
DECLARATION OF MICHAEL ALFARO

Enterprise to purchase the property (including the $0.7 million that was attributable to the investors with the non-cash Rollovers).[109]

63.     Shortly after the property was acquired, the Company raised an additional $2.4 million from DOT investors (becoming part of total DOTs issued on the property). Approximately 90% of the subsequent proceeds raised were deposited into the Company's bank accounts—becoming part of the pool of commingled funds used by the PFI Enterprise.[110] By the end of the same year the property was purchased, the debts against this PFI-owned property totaled $7.02 million,[111] which exceeded the property purchase price nine months earlier of $6.3 million.[112]

          4.     <u>Funds Were Commonly Commingled During Each Property's Operating Cycle</u>

64.     We also observed commingling of funds during the operating cycle following each property's purchase.

65.     Generally, the PFI Enterprise serviced its investor-related debts and the LLC distributions by paying investors through PRG.  We observed that the process used by the Company to accumulate the cash necessary to fund debt interest payments (for the DOT investors) and LLC distributions differed.

66.     <u>LLC Properties:</u>[113] We observed the LLC properties generally made payments directly to PRG on a quarterly basis to fund the distribution payments to LLC members.[114]  We

---

[109]  *Ibid*.

[110]  Source: Final Buyer's Closing Statement; PISF bank statements, property bank statements; and Off-Ledger Schedules.

[111]  Calculated as the sum of (*i.*) bank mortgage totaling $3.96 million and (*ii.*) DOTs of $3.06 million. DOTs of $3.06 million comprises the sum of (*i.*) $0.66 million from Rollovers and (*ii.*) $2.4 million raised from DOT investors post-acquisition.

[112]  Source: Final Buyer's Closing Statement.

[113]  All figures contained in this paragraph represent post purchase cash transfer activity (*i.e.*, it excludes bank transfers made prior to, and including, the month the property purchase occurred).  The LLC properties received a total of $61 million from PFI/PISF corporate bank accounts and transferred a total of $41 million to PFI/PISF corporate bank accounts.

[114]  Exceptions were LLC 28 and LLC 29, which were not paid in whole or part through PRG.

Case: 20-30604   Doc# 592   Filed: 04/29/21   Entered: 04/29/21 13:20:42   Page 37 of DECLARATION OF DAVID ALFARO
54

also observed that the individual LLC properties regularly received cash transfers from PFI/PISF corporate accounts prior to funding PRG, as the individual LLC properties typically had inadequate cash to fund the entire payment to PRG when due.[115]  Specifically, we observed that from 2013 to July 2020,[116] the net cash transferred from PFI/PISF corporate bank accounts to the LLC property bank accounts was $20 million, whereas the total investor payments through PRG for this same period was $28 million.[117] We also noted that every LLC property received transfers from PFI/PISF corporate bank accounts.

67.  <u>DOT Properties:</u>[118] Similar to the LLCs, funds were typically transferred from the PFI/PISF corporate bank accounts to the DOT property bank accounts to ensure that each property had enough cash to pay its DOT investors.  However, unlike the LLCs, the DOT property bank accounts did not directly pay PRG, but rather transferred the pool of commingled cash[119] back to PFI/PISF from which the Company would send the funds to PRG for disbursement.  Specifically, we observed that from 2015 to 2019,[120] the PFI/PISF bank accounts sent $38 million to the DOT property bank accounts, and then the DOT property bank accounts returned $70 million back to the PFI/PISF bank accounts, which in turn sent $45 million to PRG.[121] We also noted that every

---

[115]  Due to cash being fungible, we cannot quantify the exact portion of the funds transferred to LLCs from PFI/PISF that were explicitly used to cover the deficit related to investor payments.

[116]  The first LLC purchase occurred in 2013.

[117]  Total LLC/TIC distributions per the Company's On-Ledger Records was also $28 million (excluding LLC 28 and LLC 29).

[118]  In addition to all the DOT Properties—LLC 28, LLC 29, and 16194 Sonoma (TIC) are subject to the same process described herein.

[119]  Cash generated by each property that was still in their property specific bank accounts and cash transferred to the property accounts from PFI/PISF.

[120]  Time period limited by available bank statements.  All figures contained in this paragraph represent post purchase cash transfer activity (*i.e.*, it excludes bank transfers made prior to, and including, the month the property purchase occurred).

[121]  Total DOT interest expense per On-Ledger Records was $42 million (including LLC 28, LLC 29, and 16194 Sonoma TIC distributions). Of note, the classification of DOT interest was not consistently recorded in the Company's On-Ledger Records as it was occasionally included in mortgage debt interest expense. We also observed that funds were transferred back and forth between the properties and PFI/PISF for other reasons besides the PRG distributions, which

Case: 20-30604   Doc# 592   Filed: 04/29/21   Entered: 04/29/21 13:20:42   Page 38 of 54

single DOT property received bank transfers from PFI/PISF and returned bank transfers to PFI/PISF.[122]

68.     In summary, we did not find any evidence that investors were informed that their interest payments or equity distributions were sourced from other properties, contributions from other investors, or being derived from commingled funds across the PFI Enterprise.

     5.    <u>Funds Were Commonly Commingled At The PFI/PISF Corporate Activities Level</u>

69.     For the years 2015 through 2019, we analyzed the NOI specific to the PFI/PISF Corporate Activities in order to evaluate whether they *provided cash to* or *consumed cash from* the overall PFI Enterprise:[123]

    (a)    The Company's reported revenue was $15.5 million, which mainly consisted of:

        i.    $7.1 million in receipts from administrative and management fees PFI charged to the properties.

        ii.    $5.6 million in receipts from LLC distributions (representing PFI's approximate 30% membership stake in LLCs).[124]

    (b)    The Company's reported operating expenses were $35.9 million, of which $7.1 million were related to administrative and management expenses PFI charged to the properties. We further enumerate these expenses in subsequent paragraphs of this Declaration.

---

likely explains why the DOT properties sent $70 million to PFI/PISF despite only paying $45 million to investors.

[122] Due to cash being fungible, we cannot quantify the exact amount of the funds received from PFI/PISF that were explicitly used to cover the deficit related to investor payments, bank debt, or operating expenses.

[123] PFI/PISF Corporate Activities include PFI and PISF general ledger transactions noted in the Company's On-Ledger Records that are associated with 350 Ignacio but exclude all other PFI-owned properties.

[124] Source: On-Ledger Records.

Case: 20-30604    Doc# 592    Filed: 04/29/21    Entered: 04/29/21 13:20:42    Page 39 of 54    DECLARATION OF JOHN P. ALFARO

70.     In summary, the PFI/PISF Corporate Activities generated a net operating loss from 2015 to 2019 of $20.4 million—resulting in a net cash consumption from the PFI Enterprise.[125] As such, and to support the PFI Enterprise, corporate bank accounts were regularly replenished with commingled funds sourced from bank cash-out refinancings, new investments and/or new investors, such as checks and wires deposited into PFI/PISF corporate bank accounts that were designated for LLCs, the sum of which was only later transferred to the LLC bank accounts or directly to an escrow account at or near the closing of the underlying property's purchase.

### D.     Mr. Casey And Mr. Wallach Removed Tens-Of-Millions Of Dollars From The Company

71.     Ponzi schemes often include misappropriation of company funds for personal use. As such, we analyzed operating expenses of PFI and PISF from 2007 and 2019 to evaluate the nature and change in expense levels over time.[126] The purpose of this review was to assess the likelihood and magnitude of funds removed from the Company that were possibly personal in nature. We initiated this review by analyzing the trend-line over the years, noting a substantial increase in more recent years. Accordingly, we focused our review on the most recent five years, 2015 through 2019. Within these years, we dissected the various operating expense categories to determine activity that was possibly personal in nature. In addition to reviewing On-Ledger Records maintained by the Company, we also analyzed bank disbursement activity from the Company's bank accounts from 2015 through August 2020 (to identify outgoing cash to Mr. Wallach or Mr. Casey).

---

[125] *Ibid.*

[126] We did not evaluate whether any expenditures at the property level were made for personal reasons. For example, the PFI Enterprise had a practice of making capital improvements to the acquired properties and certain properties have a significant amount of capital improvements, and we also observed certain amounts initially reported as expenses being recharacterized and capitalized as property improvements, which had the effect of increasing the reported net income. While we analyzed bank disbursements and general ledger transactions, we did not separately analyze whether disbursements reported as capital expenditures qualified for capitalization. Furthermore, we did not separately analyze whether any costs capitalized within the property improvement accounts were attributable to personal disbursements paid to or on behalf of Mr. Wallach and Mr. Casey.

Case: 20-30604     Doc# 592     Filed: 04/29/21     Entered: 04/29/21 13:20:42     Page 40 of 54

1.    Analysis Of PFI/PISF Operating Expenses

72.    Total combined PFI/PISF operating expenses from 2007 through 2019 were $63.1 million, 72% of which related to salaries and personnel expenses (*see* **Chart 7**).[127]



**Chart 7[128]**
**Total PFI and PISF Operating Expenses from 2007 to 2019**

73.    Our analysis found that in the initial years, from 2007 through 2014, the combined PFI/PISF operating expenses averaged $3.8 million annually.[129] Conversely, beginning in 2015 and through 2019 the reported operating expense increased significantly resulting in a five year average of $6.5 million.[130] During this later period reported operating expenses peaked in 2018 at $10.9 million.[131]

74.    Total personnel expenses of $45.2 million during 2007 through 2019 are largely comprised of salaries expense, which averaged $2.7 million annually.[132] **Chart 8** below illustrates reported salaries from 2010 through 2015 were below average in contrast to significantly greater salaries in more recent years, including a relatively large increase in 2018 to $7.6 million.

---

[127]  Source: On-Ledger Records.

[128]  *Ibid.*

[129]  *Ibid.*

[130]  Source: On-Ledger Records.

[131]  *Ibid.*

[132]  *Ibid.*

Case: 20-30604    Doc# 592    Filed: 04/29/21    Entered: 04/29/21 13:20:42    Page 41 of 54



**Chart 8[133]**
**PFI and PISF Personnel Expenses from 2007 to 2019**

75. Total reported aggregated salaries expense between 2015 and 2019 for Mr. Casey and Mr. Wallach were $1.2 million and $2.1 million, respectively.[134] Total remaining salaries expenses of $11.8 million was reported in the same period to other individuals.[135] Additional amounts paid to Mr. Casey and Mr. Wallach include:

    (a)    $5.8 million of reported professional fees[136] were paid to Mr. Casey from 2007 to 2019 – a portion of which included forgiveness of loan balances that were outstanding to Mr. Casey and discussed further below.[137]

---

[133] *Ibid.*

[134] Source: Individual payroll records.

[135] Source: On-Ledger Records.

[136] Recorded in the On-Ledger Records as "Prof. Fees Kc".

[137] Source: On-Ledger Records. The balance of the loans due to the Company by Mr. Casey in July 2020 was reflected as a $4.7 million receivable per the On-Ledger Records (since this amount has been reflected as a receivable on the balance sheet, it is not reflected in the expenses above).

Case: 20-30604   Doc# 592   Filed: 04/29/21   Entered: 04/29/21 13:20:42   Page 42 of 54

|   |   |
|---|---|
| 1 | (b) $0.6 million was paid from PISF on Mr. Wallach's behalf to reduce |
| 2 | his 401(k) loan balance.[138] |

3    76.    Furthermore, we observed $4.2 million was recorded on the general ledger as

4 "salaries expense" by the username "lewis".[139]

5    77.    In addition to salary, Mr. Casey appears to have received a substantial amount of

6 cash benefits as observed from the On-Ledger Records. These additional outflows were initially

7 recorded as a PISF receivable *due from* Mr. Casey.[140] According to the PISF On-Ledger Records,

8 Mr. Casey received benefits from the following cash outflows from 2007 through 2020:

|   |   |
|---|---|
| 9 | (a) $5.4 million disbursed from the Company directly to Mr. Casey's |
| 10 | personal bank account.[141] |
| 11 | (b) $2.1 million reportedly received by Mr. Casey directly from |
| 12 | investors and never deposited into the Company's bank accounts.[142] |
| 13 | (c) $6.2 million disbursed to others on Mr. Casey's behalf.[143] |

14    78.    These receivable balances do not appear to have ever been repaid by Mr. Casey. In

15 fact, the evidence we collected indicates that these amounts were ultimately (*i.*) expensed and

16 included PFI/PISF's operating expenses;[144] (*ii.*) reflected as an equity distribution; or (*iii.*) remain

17 unpaid. Specifically, as of July 31, 2020, $4.7 million remains unpaid and reportedly due from an

18 officer receivable account from Mr. Casey.[145]

19

---

20   [138] Source: On-Ledger Records; PISF bank statement.

21   [139] Source: On-Ledger Records. We have not yet been able to determine if the $4.2 million was paid and to whom.

22   [140] PISF general ledger account number 1177-00-000 ("Officer Due From").

23   [141] Source: On-Ledger Records; spreadsheet recovered from Mr. Casey's personal hard drive that
24   detailed the expenditures and "reimbursements" from PISF.

   [142] Source: On-Ledger Records. These proceeds were not deposited into the Company's bank
25   accounts and include $1.6 million from PISF Note investors and $0.5 million from LLC
26   investors.

   [143] Source: On-Ledger Records.

27   [144] For example, $5.8 million was expensed as "Prof Fees Kc".

28   [145] Source: On-Ledger Records.

Case: 20-30604    Doc# 592    Filed: 04/29/21    Entered: 04/29/21 13:20:42    Page 43 of 54
DECLARATION OF DAVID ALFARO

1      79.      **Chart 9** illustrates the remaining reported combined operating expenses reported

2      by PFI and PISF from 2007 through 2019. The notably higher expenses in 2018 primarily relate to

3      increases in the cost ascribed to obtaining new investors,[146] outside services,[147] and donations

4      expense.

---

25   [146]  Cost to bring on new investors consists of Finders & Association Fees, Promotions, Dues & Subscriptions, and Legal fees.

26   [147]  In **9**, Outside Services in 2007, 2008, and 2018 exclude an intercompany entry between PISF and PFI that created an expense on PISF's books and corresponding "Admin Fee Income" on PFI's books. Amounts were $1.3 million in 2007, $1.9 million in 2008, and $0.3 million in 2018.

Case: 20-30604    Doc# 592    Filed: 04/29/21    Entered: 04/29/21 13:20:42    Page 44 of 54



**Chart 9[148]**
**PFI and PISF Operating Expenses (Excluding Personnel) from 2007 to 2019**

2. <u>Analysis Of Bank Statement Disbursements</u>

80.     In addition to reviewing the On-Ledger Records, we also analyzed the Company's bank statements from January 2015 through August 2020. Upon completing our review, we identified $26.3 million of additional disbursements that were made to Mr. Wallach, Mr. Casey, and their relatives that could not be identified in the On-Ledger reported operating expenses, or the officer receivable account (*due from*).

81.     The largest number of disbursements (measured in dollars) relate to a real estate investment of Mr. Wallach's in Texas (commonly referred to as his personal "Liberty Lakes" investments). Company records indicate that the payments made on behalf of Mr. Wallach were

---

[148]  Source: On-Ledger Records.

SMRH:4818-3806-5382.1

Case: 20-30604   Doc# 592   Filed: 04/29/21   Entered: 04/29/21 13:20:42   Page 45 of 54
DECLARATION OF WILLIAM ALFARO

generally reflected as a reduction to the PISF Note investment balance as reported within the Company's On-Ledger Records.

82.      **Chart 10** itemizes the noteworthy bank disbursements that appear personal in nature and attributable to Mr. Casey, Mr. Wallach, and/or other affiliated persons. In total, we identified approximately $26.3 million of such disbursements.

<div align="center">

**Chart 10**[149]

**Disbursements Identified in Bank Statements that are not in PFI/PISF Operating Expenses between January 2015 and August 2020 (in millions)**

</div>

| Disbursement Category | Amount |
|---|---|
| Disbursements to Liberty Lakes (on behalf of Mr. Wallach) | $15.1 |
| Disbursements Attributed to Mr. Wallach | $4.2 |
| Disbursements to Credit Card Issuers | $3.6 |
| Disbursements Attributed to Mr. Casey | $1.5 |
| Purchases of Precious Metals | $1.2 |
| Disbursements to Relatives | $0.7 |
| **Total Disbursements** | $26.3 |

83.      In order to confirm the nature of the expenditures noted in **Chart 10** and how they flowed through the On-Ledger Records maintained by the Company, we conducted a probative sample of disbursements in each category. In summary, we found that in many instances these transactions were obfuscated by multi-step accounting transactions. In particular, we found that the majority of dollars sampled were not expensed, but rather were recorded via a series of journal entry adjustments in the PISF general ledger to reduce cash while also reducing the general PISF Notes payable balance—most of these entries were performed under the username "lewis"[150] in the Yardi system.[151]

84.      FTI also analyzed the Off-Ledger Schedules of reported PISF Note obligations and estimated that the PFI Enterprise raised approximately $126 million from 2015 to 2019 from the

---

[149] Source: PFI/PISF bank statements. Relatives refer to relatives of Mr. Wallach.

[150] We understand "lewis" is the username assigned to Lewis Wallach.

[151] Journal entry amounts and bank disbursement amounts did not align on a 1:1 basis, making them particularly difficult to track. However, through forensic analysis, we were able to match approximately $9.3 million of disbursements to the reported PISF Notes general ledger account.

Case: 20-30604    Doc# 592    Filed: 04/29/21    Entered: 04/29/21 13:20:42    Page 46 of 54
DECLARATION OF ALFARO

1  sale of PISF Notes. The On-Ledger Records indicated the PISF Note obligation increased

2  approximately $96 million during this period. We observed a significant portion of this $30

3  million difference is attributable to recording certain cash disbursements attributed to Mr. Wallach

4  as a reduction of the PISF Note balance on the On-Ledger Records.[152]

5          3.    <u>Mr. Wallach's Involvement In The Day-To-Day Accounting</u>

6       85.    We understand from interviews of Company employees, that Mr. Wallach was

7  "hands on" and heavily involved with the day-to-day operations, including the accounting

8  functions supporting the PFI Enterprise. Based on this understanding, we focused part of our

9  forensic analysis on manual journal entries posted in the PFI/PISF On-Ledger Records. We also

10  analyzed the usernames ascribed to those entries as recorded by the Yardi system. Although we

11  cannot verify whether usernames were ever compromised or shared among employees, we did

12  observe that the most common username associated with entering manual journal entries was

13  "lewis." From October 2006 to June 2020, the username "lewis" initiated 69% of all manual

14  journal entries (*see* **Chart 11** for a summary of findings).[153]

---

[152] Source: On-Ledger Records and Off-Ledger Schedules.

[153] Statistics of PFI/PISF manual journal entry postings are based upon total dollars. When looking at the number of journal entries entered, username "lewis" entered 51%. Details were obtained from the PFI/PISF On-Ledger Records. There were 20 other usernames with manual journal entries in the PFI/PISF On-Ledger Records.

SMRH:4818-3806-5382.1

DECLARATION OF DAVID ALFARO



**Chart 11**[154]
**% of Manual Journal Entries Posted in PFI/PISF On-Ledger Records by Username**

All Other Users, 31%

"lewis", 69%

**E.** **The Available Evidence Is Consistent With Attributes That Are Common To A Ponzi Scheme Since At Least January 1, 2007**

1. PISF Notes Were A Key Instrument In Raising Funds To Make Payments To Previous Investors In Excess Of The Cashflows Generated By The Properties Since At Least January 1, 2007.

86. The primary records examined to determine when it could first be evidenced that the scheme started were: (a) the On-Ledger Records, and (b) the Off-Ledger Schedules:[155]

(a) The first full year that On-Ledger Records are available with revenue and expense transaction level detail for each property within the PFI Enterprise is 2007.[156]

---

[154] Source: PFI/PISF On-Ledger Records.

[155] As noted above, individual investor investment balances are not tracked or maintained in a structured accounting system—rather, they are manually tracked and maintained in Excel spreadsheets.

[156] Given this insufficiency of accounting data, we are unable to evaluate revenues and operating expenses relative to the Debt Service requirements of the overall PFI Enterprise prior to 2007; nor are we able to sufficiently assess cashflow across the PFI Enterprise. Therefore, we are unable to accumulate sufficient evidence to determine whether Mr. Casey and Mr. Wallach operated a Ponzi scheme prior to 2007.

Case: 20-30604   Doc# 592   Filed: 04/29/21   Entered: 04/29/21 13:20:42   Page 48 of 54

|     |                                                                                                   |
|-----|---------------------------------------------------------------------------------------------------|
| 1   |        (b)    The Off-Ledger Schedules that were used to track investor balances |
| 2   | are generally available from 1997 forward.[157]                                                    |

87. An examination of the PFI Enterprise's accounting records during 2007 identified the following cash activity:

       (a)    The total Debt Service paid of $11.4 million[158] is substantially more than the $6.0 million of NOI associated with the underlying properties,[159] resulting in a cash shortfall of $5.4 million.[160] The results are similar if compared against the NOI of the PFI Enterprise as a whole.[161]

       (b)    The cash resources used to pay the returns (not covered by the NOI) were primarily sourced by issuing new DOTs and PISF Notes.[162]

       (c)    But for the issuance of new DOTs and PISF Notes, the Company would not have been able to meet its obligations to investors in the form of paid returns.

88. As illustrated in **Chart 2**, in 2007 the mortgage and DOT debts far exceeded the reported cost basis of the properties held.

---

[157] Most of the Off-Ledger Schedules that tracked investor balances have been located for all years starting with 1997, except for the year-ending December 31, 2000.

[158] Source: On-Ledger Records in the form of Debt Service (*i.e.,* mortgage interest, DOT interest, and PISF Notes interest).

[159] Source: On-Ledger Records.

[160] *Ibid.*

[161] Source: On-Ledger Records. The total Debt Service paid to investors of $11.4 million compared to the $3.3 million of NOI generated by the PFI Enterprise (including the underlying properties) results in a shortfall of $8.1 million.

[162] Source: Off-Ledger Schedules. Total funds raised from issuing DOT debts and PISF Notes in 2007 were $4.7 million and $3.5 million, respectively.

SMRH:4818-3806-5382.1

2. <u>The PISF Notes Outstanding As Of January 1, 2007, Are Relatively Insignificant In Comparison To The Current Claims Of The Existing Investors</u>

89. The amount of funds raised from PISF Notes in any given year prior to 2007 was relatively insignificant to the current levels of debt maintained by the Company. In any given year prior to 2007, the increase in PISF Notes represents 1% or less of the current total debt.[163]

90. As of the beginning of 2007, the balance of the PISF Notes had grown to approximately $31 million, representing 4% of the current total debt (*see* **Chart 12).**[164]

**Chart 12**[165]
**History of PISF Notes Borrowings**



91. In summary, at least as of January 1, 2007, the PFI Enterprise lacked liquidity (the properties were not generating enough NOI to cover rising Debt Service). Moreover, only by

---

[163] From the date of the first available Off-Ledger Schedule to 2006, the average annual increase in PISF Notes was 0.4% of the current total debt, calculated as average annual increase of $3 million divided by current total debt of approximately $800 million.

[164] Calculated as December 2006 PISF Note balance of $31 million divided by current total debt of approximately $800 million.

[165] Source: Off-Ledger Schedules and On-Ledger Records. As previously noted, the Company's On-Ledger Records and Off-Ledger Schedules understate the accrued interest obligations—which we estimate to be approximately $21 million as of July 2020. Off-Ledger Schedule for the year 2000 has not been located.

SMRH:4818-3806-5382.1

raising new funds from investors could the Company continue operating. In so doing, and unbeknownst to the investors, the Company commingled all sources of funds by pooling resources across the PFI Enterprise to satisfy its financial obligations resulting in the obfuscation of money and its traceability back to individual investors.

**F.** **There Is Limited Utility Gained From Establishing The Commencement Of The Ponzi Prior To 2007 Compared Against The Cost Of Investigating Further**

1. Investors Receiving Interest Payments As Of January 1, 2007

92.     Approximately 78% of the total amount of DOT and PISF Note investments as of the beginning of 2007 were receiving interest payments.[166] Because the interest rates earned on those instruments were generally at or above 9%, and given the time that has elapsed since 2007, virtually all of these investors have either fully recovered their principal investments or have received returns in excess of their principal investment in the form of interest payments before the Company ceased making interest payments in 2020. Accordingly, it would be only under some unexpected or unusual circumstance that any of the pre-2007 investors who were receiving interest payments would have a current net claim against the Company.[167]

2. Investors Not Receiving Interest Payments (Accruing) As Of January 1, 2007

93.     It is our understanding from counsel that investors will not receive credit for unpaid interest that purportedly accrued after the date the scheme is concluded to have commenced.

94.     At the end of 2006, there were approximately $7.1 million and $13.1 million, in PISF Note holder and DOT investments, respectively, that were accruing interest.[168]

---

[166]  This percentage excludes mortgage debts. Per the Off-Ledger Schedules, the DOT and PISF Notes balances as of January 1, 2007 totaled approximately $90 million.

[167]  Investors prior to 2007 were generally receiving 9-12%. The LLC investors generally received 6% distributions, but these were not in place prior to 2013 and are therefore irrelevant to this sensitivity analysis. Similarly, there is a limited population of DOT holders that were receiving 6% (for cases when there was no bank mortgage on a property), such circumstances did not exist as of 2007.

[168]  Source: Off-Ledger Schedule.

SMRH:4818-3806-5382.1
-51-
DECLARATION OF BRIAN A. LOUGHMAN IN SUPPORT OF ALFARO

1    (a)    Analysis of these PISF Note holders revealed that 20 of these PISF
2           Note holders remain in 2020 and comprise less than 2% of the total
3           number of investors in 2020.[169]
4    (b)    Analysis of these DOT investments revealed that in 2010, almost all
5           of the DOT investors whose investments remained as of December
6           31, 2010 had been modified and they were no longer accruing
7           interest, rather they began receiving regular interest payments.[170]
8           Before the Company ceased making interest payments in 2020,
9           those investors would have had their principal fully paid back based
10          on the stated interest rates of these debt instruments and the length
11          of time that has elapsed since 2007, and therefore likely would have
12          been netted-out.

13   95.    We assessed whether using a starting date prior to 2007 would have a significant
14   impact on the group of investors that accrued interest, and observed that any potential benefits
15   would be outweighed by the cost of further investigating the pre-2007 era.

16          (a)    We selected 2003 as a potential alternative starting date based on the
17                 following:
18                 i.    The reported balance of PISF Notes prior to 2003 was
19                       relatively insignificant (*i.e.*, approximately $10 million).[171]
20                 ii.   In 2003, $8 million in PISF Notes were issued, representing
21                       an increase of 80% from the previous year (*i.e.*, this 80%
22                       increase highlights the net proceeds from issuing PISF Notes
23                       in years prior to 2003 were inconsequential).[172]

---

25   [169]  *Ibid.*

26   [170]  At the end of 2006, 225 DOT investors were accruing interest compared to the end of 2010,
              when only 4 DOT investors were observed to be accruing interest.

27   [171]  Source: Off-Ledger Schedule.

28   [172]  *Ibid.*

SMRH:4818-3806-5382.1

-52-

    (b)       Between the beginning of 2004 and the end of 2006, we estimate that a maximum of approximately $3 million of interest could have accrued during this period, which is relatively insignificant to the current level of debt of approximately $800 million. This estimate is based on the stated interest rates investors were earning during this period and the total reported amount of PISF Notes reported outstanding between 2003 and 2007.[173]

    (c)       Given the combined circumstances ascribed to non-interest accruing investors and interest accruing investors during the pre-2007 era (and given the insufficiency of the available records), I do not believe the cost associated with further investigating the pre-2007 era justifies the limited to marginal gain that may be reached (if any).

## VIII. THE PONZI-LIKE SCHEME EXTENDS TO NON-DEBTOR ENTITIES PROFESSIONAL INVESTORS 28, LLC AND PFI GLENWOOD, LLC

96. As with all the entities within the PFI Enterprise, the investments and financial transactions specific to non-debtor entities Professional Investors 28, LLC ("LLC 28") and PFI Glenwood, LLC ("PFI Glenwood") are inextricably entangled with those of the other entities within the PFI Enterprise. For example, an outside investor in LLC 28 rolled over all but approximately $50,000 of his investment from other previous investments in the PFI Enterprise. Additionally, PFI and LLC 28 engaged in numerous intercompany transactions over the years. When LLC 28 refinanced its property in May of 2020, the proceeds from the refinance were wired from the escrow account directly into a PFI corporate bank account rather than LLC 28's account. This in turn appears to have at least partially satisfied the numerous intercompany payables LLC 28 had owed to PFI. LLC 28, however, did not otherwise receive a benefit from the refinancing.

97. At the time of the PFI Glenwood purchase, two investors used Rollover investments from PISF Notes to make their investments in PFI Glenwood (and as noted in Section

---

[173] Source: Off-Ledger Schedules.

Case: 20-30604    Doc# 592    Filed: 04/29/21    Entered: 04/29/21 13:20:42    DECLARATION OF BEALL ALFARO
Page 53 of
54

V, the Rollovers associated with property acquisitions were commonly drawn from comingled funds). Moreover, proceeds these investors received from the refinance of the real property owned by PFI Glenwood were contributed directly to their PISF Notes. One of these particular investors further used proceeds from this refinance to fund an investment to Financial Investors 44, LLC and eventually rolled over his investment in PFI Glenwood into his PISF Note investment.

98. I declare under the penalty of perjury under the laws of the United States of America that to the best of my knowledge the foregoing is true and correct. Executed on April 29, 2021, at San Francisco, CA.

DocuSigned by:

*David Alfaro*

8280CA904A2047B...

David Alfaro
**FTI CONSULTING, INC.**
50 California Street, Suite 1900
San Francisco, CA 94111
Telephone: (415)-283-4220

SMRH:4818-3806-5382.3

SMRH:4818-3806-5382.1

DECLARATION OF DAVID ALFARO