SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
ORI KATZ, Cal. Bar No. 209561
J. BARRETT MARUM, Cal. Bar No. 228628
JEANNIE KIM, Cal. Bar No. 270713
MATT KLINGER, Cal. Bar No. 307362
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:    415.434.9100
Facsimile:    415.434.3947
Email:      okatz@sheppardmullin.com
          bmarum@sheppardmullin.com
          jekim@sheppardmullin.com
          mklinger@sheppardmullin.com

Counsel for the Debtors

TRODELLA & LAPPING LLP
RICHARD A. LAPPING, Cal. Bar No. 107496
540 Pacific Avenue
San Francisco, CA 94133
Telephone:    (415) 399-1015
Facsimile:    (415) 651-9004
Email:  Rich@TrodellaLapping.com

Conflicts Counsel for the Debtors and Counsel for
Professional Investors 28, LLC and PFI Glenwood, LLC

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA , SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>PROFESSIONAL FINANCIAL INVESTORS, INC., *et al.*,<br><br>               Debtors. | Case No. 20-30604<br><br>(Jointly Administered)<br><br>Chapter 11<br><br>**DEBTORS' MOTION FOR ORDER (A) APPROVING BID PROCEDURES FOR THE PORTFOLIO SALE OF CERTAIN REAL AND PERSONAL PROPERTY ASSETS; (B) APPROVING RELATED NOTICE PROCEDURES; (C) AUTHORIZING DEBTORS TO ENTER INTO STALKING HORSE AGREEMENT AND APPROVING BREAK-UP FEE; (D) SCHEDULING A SALE HEARING; AND (E) GRANTING CERTAIN RELATED RELIEF**<br><br>*Declaration of Gregory Gotthardt in Support Filed Concurrently Herewith*<br><br>*Hearing Requested on Shortened Time for:*<br>Date:     July 9, 2021<br>Time:     10:00 a.m.<br>Place:    **Telephonic/Video Appearances Only**<br>         450 Golden Gate Avenue, 16th Floor<br>         Courtroom 19<br>         San Francisco, CA  94102<br>Judge:   Hon. Hannah L. Blumenstiel |

SMRH:4828-0587-0720.1                                                      BID PROCEDURES MOTION

# I.

## INTRODUCTION

The Debtors[1] in these jointly administered cases (the "Bankruptcy Cases") hereby move (the "Motion") the Court for an order, in the form attached hereto as **Exhibit A** (the "Bid Procedures Order"), (a) establishing bid and sale procedures outlined on Exhibit 1 to the Bid Procedures Order (the "Bid Procedures") with regard to the proposed portfolio sale (the "Sale") of certain of the Debtors' real and personal property assets (collectively, the "Property"); (b) approving the proposed notice procedures with respect to the Bid Procedures, Auction, and Sale (defined herein); (c) authorizing each of the Debtors, including without limitation Professional Investors 28, LLC ("28 LLC") and PFI Glenwood, LLC ("PFI Glenwood"), through PFI to enter into the Stalking Horse APA (defined herein) notwithstanding the need for any Debtor to obtain any third-party consent or authorization to do so and approving certain customary bid protections for Hamilton Zanze & Company as the proposed "Stalking Horse Bidder" (or "Hamilton Zanze"); (d) scheduling a hearing to approve the Sale at auction (the "Auction"); and (e) granting certain related relief.

The Debtors have been marketing the Property and have agreed to enter into an agreement with the Stalking Horse Bidder (the "Stalking Horse APA") attached as **Exhibit A** to the Declaration of Gregory Gotthardt (the "Gotthardt Declaration"), subject to Court approval. As described more fully below, the Stalking Horse Bidder, along with its commercial property owning affiliate, Graham Street Realty ("Graham Street") specializes in the acquisition, asset management, and hands-on operation of apartment communities and commercial properties in its target markets nationally. Hamilton Zanze and Graham Street, together with their affiliates, provide a fully integrated ownership, asset management, property management, financial reporting and back-office infrastructure with an extensive background in finance, operations, leasing, and

---

[1] "Debtors" means, collectively, Professional Financial Investors, Inc. ("PFI"), Professional Investors Security Fund, Inc. ("PISF"), the affiliated debtors in the above-captioned jointly administered chapter 11 case, and, subject to Court approval of the *Debtors' Motion to Amend Order Granting Substantive Consolidation of Non-Debtor Affiliates Professional Investors 28, LLC And PFI Glenwood, LLC With Debtors* (the "Motion for Amended Order"), 28 LLC and PFI Glenwood (each as defined herein).

acquisition of apartment and commercial properties. Under the terms of the Stalking Horse APA, the Stalking Horse Bidder has agreed, among other things, to pay Four Hundred Thirty-Four Million Dollars ($434,000,000.00), plus the value of Assumed Obligations (as defined in the Stalking Horse APA) for the Property, subject to overbid and Court approval at a separate hearing to approve the Sale (the "Sale Hearing"). As set forth herein, the Debtors anticipate filing a separate motion to approve the Sale (the "Sale Motion") in furtherance of the confirmed *Second Amended Joint Chapter 11 Plan of Professional Financial Investors, Inc. and Its Affiliated Debtors Proposed by the Debtors and Official Committee of Unsecured Creditors and Supported by the Ad Hoc LLC Members Committee and the Ad Hoc DOT Noteholders Committee* (the "Plan").[2]

Pursuant to the Bid Procedures proposed by this Motion, interested bidders of the Property will be able to participate in the Auction to purchase the Property, provided such bidders submit a "Qualified Competing Bid" as described herein. The bid by any such interested purchaser must provide for consideration that consists of cash or cash-equivalent funds in an amount that exceeds Four Hundred Forty-Two Million, Six Hundred Eighty Thousand Dollars ($442,680,000.00), plus the value of Assumed Obligations and otherwise meet the financing and other requirements set forth in this Motion to be a "Qualified Competing Bid."

This Motion is made pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), and Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 6004 and 6006. The Debtors respectfully request that the Court approve the Bid Procedures described in greater detail below in connection with the contemplated Auction and Sale of the Property. Further, this Motion is based on the discussion below, the supporting Gotthardt Declaration filed concurrently herewith, the notice of this Motion, all other relevant

---

[2] On June 9, 2021, the Court entered the *Order Finally Approving Amended Disclosure Statement And Confirming Second Amended Joint Chapter 11 Plan Of Professional Financial Investors, Inc. And Its Affiliated Debtors Proposed By The Debtors And Official Committee Of Unsecured Creditors And Supported By The Ad Hoc LLC Members Committee And The Ad Hoc Dot Noteholders Committee (Dated May 20, 2021)* as Docket No. 678.

papers of record in this case, and any evidence or argument that may be presented to the Court prior to or at the hearing on the Motion.

In support of the Motion, the Debtors respectfully represent as follows:

## II.

## FACTUAL BACKGROUND

**A.** **Background of the Debtors' Bankruptcy**

The Debtors incorporate herein by this reference the summary of the events, including fraud by the Debtors' former management, that culminated in the entry of orders for relief in each of the Debtors' respective bankruptcy cases, whether voluntarily or by consent, as set forth in the numerous pleadings and papers previously filed in these cases, including, but not limited to, the *Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Professional Financial Investors, Inc. and Its Affiliated Debtors Proposed by the Debtors and Official Committee of Unsecured Creditors and Supported by the Ad Hoc LLC Members Committee and the Ad Hoc DOT Noteholders Committee* filed with the Court on April 16, 2021, as Docket No. 572 (the "Disclosure Statement"). As set forth in the Disclosure Statement, on August 19, 2020, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors ("Official Committee"). Meanwhile, certain parties claiming membership interests in limited liability companies formed and controlled by PFI are represented by an ad hoc committee of LLC members while certain lenders to the Debtors claiming liens secured by deeds of trust on property owned by one of the Debtors have also formed into an ad hoc committee of DOT holders.

**B.** **Background Regarding the Property**

The "Property," as more fully described in section 1.1 of the Stalking Horse APA, includes (1) Real Property (as defined in the Stalking Horse APA) consisting of (a) 60 fee interests[3] in commercial and multifamily residential real properties as more particularly described on Exhibit A-1 to the Stalking Horse APA (as defined in the Stalking Horse APA, the "Land"); and (b) the

---

[3] As described more fully below, there are six Real Properties in which the Debtors own only a tenant-in-common interest in the respective Real Properties. Pursuant to the Stalking Horse APA, the Debtors shall use commercially reasonable efforts to deliver the entire fee to these Real Properties to the Stalking Horse Bidder.

Improvements (as defined in the Stalking Horse APA) to the Land in the form of buildings, structures, improvements, and fixtures that the Debtors own and that are located on the Land; (2) tangible personal property used by the Debtors in the operation and management of the Real Property (the "Business"), including, but not limited to, the Debtors' books and records related to the Real Property, all removable furnishings at each of (x) the Real Properties, and (y) PFI's corporate headquarters located at 350 Ignacio Blvd, Suite 100 ("PFI HQ") including, without exception, artwork, furniture, equipment, and inventory located at the PFI HQ, Debtors' maintenance shops (whether any such maintenance shop is located at the PFI HQ or elsewhere), and in the common areas of each Real Property (collectively, "Common Areas"), (iii) other equipment (including, information technology equipment), tools, machinery, inventory used in the Business whether located at the PFI HQ, the Common Areas, or elsewhere on each of the Real Properties, (iv) vehicles, and (v) leasehold improvements (collectively, "Personal Property"), (3) certain intellectual and intangible property (collectively, "Intellectual Property");[4] and (4) certain Leases and Contracts (each as defined in the Stalking Horse APA and referenced herein as the "Executory Contracts and Leases") that the Stalking Horse Bidder may elect to have the Debtors assume and assign to the Stalking Horse Bidder ("Purchased Contracts and Leases").

Notwithstanding the foregoing, the Property shall not include any of the Debtors' right, title, or interest in or to the following (collectively, the "Excluded Assets"): (i) any lump sum or upfront payments paid to or earned by the Debtors or their predecessors under any of the Executory Contracts and Leases that are not assumed and assigned to Stalking Horse Bidder, (ii) any unearned insurance premiums, (iii) any insurance policies or insurance contracts owned or held by the Debtors and their affiliates in connection with the Property prior to the Closing Date, (iv) any and all deposits, cash and other accounts owned or held by the Debtors and their affiliates, except for any unapplied refundable tenant security deposits, (v) Executory Contracts and Leases

---

[4] The Stalking Horse APA provides for the sale of all of the Debtors' Intellectual Property, including the contact information for their investors. The Stalking Horse Bidder, in consultation with the Debtors, may contact investors regarding the Property and the potential for investing in the Property related to the Sale. The Debtors, in consultation with the Stalking Horse Bidder and the Official Committee, will file a motion requesting approval of a procedure whereby investors are allowed to opt out of having their personal identifiable information shared.

Case 20-30604 Doc# 713 Filed: 06/28/21 Entered: 06/28/21 18:21:50 Page 5 of 40
SMRH:4833-0518-0587.2 BID PROCEDURES MOTION

1  that are not assumed by and assigned to the Stalking Horse Bidder, (vi) any and all claims,

2  demands, lawsuits, legal proceedings, awards, judgments, or settlement amounts related to or

3  arising from the Debtors' purchase of the Real Property from the prior owner(s), the Debtors'

4  prepetition management team, or other third parties, excluding, however, Environmental Claims

5  (as defined in the Stalking Horse APA), and personal property included on Exhibit A-3 of the

6  Stalking Horse APA.

7  **C.**     <u>**Marketing of the Property**</u>

8      The filing of the Debtors' bankruptcy cases has generated significant interest from

9  potential buyers.  Indeed, potential purchasers began contacting the Debtors shortly after the cases

10  were filed in 2020.  Following Mr. Hinkelman's retention as the Debtors' Chief Restructuring

11  Officer ("<u>CRO</u>") in early 2021, the Debtors informed potential purchasers and industry contacts

12  that they were exploring the sale of the Debtors' portfolio of properties.  Interested bidders were

13  invited to access a data room that the Debtors set up regarding their properties to formulate offers.

14  At the time of the Debtors' selection of Hamilton Zanze as the Stalking Horse Bidder,

15  approximately thirty-six (36) interested parties signed confidentiality/non-disclosure agreements

16  (each a "<u>Confidentiality Agreement</u>") to obtain access to the data room.

17      As a result of these efforts, the Debtors received numerous expressions of interest,

18  including five (5) offers for the Debtors' entire portfolio; three (3) offers for the Debtors'

19  residential portfolio; one (1) offer for the Debtors' commercial portfolio; and more than seventeen

20  (17) offers for individual or groups of the Debtors' properties.  Three (3) potential purchasers

21  emerged from this process as potential lead bidders, and the Debtors negotiated with them

22  extensively before selecting the Stalking Horse Bidder.

23      The Debtors have continued to market the Property and, subsequent to the Debtors'

24  selection of Hamilton Zanze as the Stalking Horse Bidder, additional interested parties have

25  executed Confidentiality Agreements to conduct diligence regarding the Property and even more

26  additional parties continue to contact the Debtors requesting access to diligence materials

27  regarding the Property.

28

**D.** **Proposed Sale**

To effectuate the Plan, the Debtors intend to monetize all of their real and personal property assets for the benefit of their creditors. In furtherance of the Debtors' goals under the Plan, the Debtors have determined in their business judgment that a sale of the Property, subject to overbid at an auction sale, will maximize the value of the Property. The Debtors have reached this conclusion in large part based on discussions with their financial advisors, the operating and cash flow characteristics of the Debtor entities, the current market trends with respect to real property valuations in Northern California (where the Property is located) and the efforts over many months to market portions of the Debtors' real property portfolio.

**III.**

**THE PROPOSED BIDDING PROCEDURES**

**A.** **The Stalking Horse Bidder**

Founded in 2001 in the Presidio of San Francisco by Mark Hamilton and Tony Zanze, Hamilton Zanze focuses on multifamily investments by specializing in the pursuit, acquisition, and hands-on operation of apartment communities in its target markets. By seeking opportunities especially where it can improve performance, Hamilton Zanze generates distributable cash flow, protects investor principal, and achieves appreciation. Hamilton Zanze has deep experience in all phases of the multifamily investment lifecycle – from acquisitions, dispositions, and financing, to operations, asset management, property management, risk management, and construction management. Hamilton Zanze acquired its first multifamily investment properties in and around the San Francisco Bay Area, and currently owns properties across the Pacific Northwest, Mountain states, lower Midwest, Texas, Georgia, Virginia, and Maryland.

In 2007, the principals of Hamilton Zanze founded Graham Street to focus on the acquisition and operation of commercial property assets. Graham Street currently owns over 1.1 million square feet of commercial office and industrial properties in Northern California, Colorado, and Washington, and, if the Debtors sell the Property to Hamilton Zanze, will be responsible for operating the commercial assets of the portfolio. Hamilton Zanze also intends that Paramount Property Company ("Paramount"), a majority of which the principals of Hamilton

Zanze also own, will provide property management services to the entire portfolio. Paramount currently manages 3.5 million square feet of commercial and industrial property in Northern California, Colorado and Washington for Graham Street and other clients, with 2.7 million square feet under management in Northern California alone.

Simply put, the breadth and depth of Hamilton Zanze, Graham Street, and Paramount across real estate disciplines – combined with the locations of each of their home offices in the San Francisco Bay Area – make the vertically-integrated Hamilton Zanze family of companies well-qualified to purchase and operate Property.

**B.     The Stalking Horse Bid**

The Stalking Horse Bidder's purchase price for the Property, subject to overbid as described below, consists of (1) cash in the amount of Four Hundred Thirty-Four Million Dollars ($434,000,000.00), comprised of: (a) Twenty-Five Million Dollars ($25,000,000.00)[5] to be held in escrow as the "Auction Deposit"; and (b) Four Hundred Nine Million Dollars ($409,000,000.00) to be delivered to the Escrow Holder (as defined in the Stalking Horse APA) if the Stalking Horse Bidder is approved by the Court as the Successful Bidder (defined herein) on the Closing Date, and (2) the aggregate amount of: (a) cure costs, if any, associated with any Executory Leases and Contracts that the Stalking Horse Bidder determines to require the Debtors to assume and assign to it under section 365 of the Bankruptcy Code; (b) assumed Post-Petition Liabilities associated with the Post-Petition Construction Contract (each as defined in the Stalking Horse APA); and (c) accrued vacation and paid time off (collectively, "PTO") due and owing by the Debtors to certain Hired Employees (as defined in the Stalking Horse APA) (amounts in (a), (b) and (c) are referred to as "Assumed Obligations"), provided however, that the ultimate purchase price for the Property shall be reduced by the Allocated Purchase Price attributable to

---

[5] The Opening Escrow Deposit is $5 million, which deposit amount will be increased in connection with the extension, if any, of the initial Contingency Date to August 16, 2021 and upon such date to $10 million, provided the Stalking Horse Bidder does not elect to terminate the Agreement, and thereafter the deposit amount will be increased to $25 million after receiving notice from the Debtors that there is a Qualified Competing Bid and the Auction is going forward.

any Excluded Unsigned Properties (as defined in the Stalking Horse APA and herein) and certain other items as described in the Stalking Horse APA (collectively, "Purchase Price").

**C.** **The TIC Properties**

One or more of the Debtors own a tenant-in-common interest in the following properties identified by their common address: (i) 16914 Sonoma Highway, Sonoma, CA; (ii) 19 Merrydale Road, San Rafael, CA; (iii) 109 Professional Center Parkway, San Rafael, CA; (iv) 100 Sycamore Avenue, San Anselmo, CA; (v) 240 Tamal Vista, Corte Madera, CA; and (vi) 1441 Casa Buena Drive, Corte Madera, CA (individually, "TIC Property, collectively, "TIC Properties"). With respect to these TIC Properties, the Debtors and the Stalking Horse Bidder have agreed to allocate the Purchase Price (the "Allocated Purchase Price") so that the amount of consideration flowing from the sale of a particular TIC Property is known and disclosed in a separate side letter executed in connection with the Stalking Horse APA.

As provided in the Stalking Horse APA, the Debtors shall use commercially reasonable efforts to deliver an executed stipulation from each of the other tenants-in-common of the TIC Properties ("TIC Owner"), which, in part, shall provide that a respective TIC Owner approves the sale of their tenant-in-common interest in their respective Real Property and that such TIC Owner will deliver the applicable grant deed and any other document that the Escrow Holder requests to transfer the TIC Owner's interest in the TIC Property (collectively, "TIC Documents") to the Stalking Horse Bidder or Successful Bidder, as applicable, at Closing. At Closing, the Debtors intend to deliver to the Stalking Horse Bidder, the TIC Documents to those TIC Properties where the TIC Owners have consented to the Sale. If necessary, the Debtors will initiate adversary proceedings against TIC Owners that refuse to give their consent to the Debtors' proposed sale of their respective interest in a TIC Property. If the Debtors are unable to obtain consensually executed TIC Documents with respect to a TIC Property even after commencing litigation or are unable to obtain a judgment by the Closing Date, at the election of the Stalking Horse Bidder, such property may be excluded from the sale ("Excluded Unsigned Properties"), which will result in a

Purchase Price reduction in the amount of the Allocated Purchase Price attributable to such property.[6]

**D.      Break-Up Fee and Expense Reimbursement**

Additionally, the Stalking Horse APA provides that the Stalking Horse Bidder will be entitled to a break-up and expense reimbursement fee in the amount of Six Million, Sixty Hundred Eighty Thousand Dollars ($6,680,000.00) (the "Break-Up Fee and Expense Reimbursement") if (1) the Stalking Horse Bidder is not the Successful Bidder (defined herein) or (2) the Debtors default under the Stalking Horse APA.  The Break-up Fee and Expense Reimbursement will be paid solely from (i) the proceeds of the sale to the Successful Bidder, including its Good Faith Deposit (as defined below), (ii) from the Successful Bidder's or other bidder's forfeited Good Faith Deposit, or (iii) the proceeds of any subsequent sale of the Property, or part thereof, by the Debtors to any other party or parties, and shall have priority as an administrative expense under sections 503(b) and 507(a) of the Bankruptcy Code.  The Break-up Fee and Expense Reimbursement, at approximately 1.5% of the proposed Purchase Price under the Stalking Horse APA, is a very reasonable amount to compensate the Stalking Horse Bidder for its legal, accounting, and other professional fees incurred in connection with the proposed sale if it is not the Successful Bidder or the Debtors default.  This is especially the case given that the Stalking Horse has agreed to deliver certain non-privileged materials it obtains from third-party consultants in connection with its due diligence process ("Non-privileged Materials") to the Debtors for posting in the data room so other Potential Bidders (as defined below) have access to the material.

**E.      Proposed Timeline for Solicitation of Bids**

The Debtors have been marketing the Property for many months.  The marketing process has been robust and given the current real estate market in Northern California, the Debtors have received a substantial number of inquiries for the purchase and sale of some or all of the Property. The Debtors believe, in their business judgment that it is critical to close on the Sale of the Properties expeditiously to maximize value as well as the return to their creditors.  In light of these

---

[6] The Stalking Horse Bidder also has the option under this circumstance to acquire just the Debtors' ownership interest and consenting TIC Owners' interest in such real property.

-10-

BID PROCEDURES MOTION

exigencies, the Debtors propose the following timeline for the solicitation of bids, the Auction (defined herein), and the Sale Hearing, which timeline is premised on the Stalking Horse Bidder completing its diligence on August 16, 2021. In the event that the Stalking Horse Bidder completes its diligence prior to August 16, 2021, the Debtors request authority to advance the dates reflected in the below timeline (with the exception of the Bid Procedures Objection Deadline and the Bid Procedures Hearing) to be consistent with the below pacing, with any necessary adjustments to ensure that a date does not fall on a holiday or weekend. To the extent necessary, the Debtors will file and serve an amended notice of Bid Procedures, Auction, and Sale Hearing within two (2) business days of their receipt of notice that the Stalking Horse Bidder has completed its diligence.

| Event | Date |
| --- | --- |
| **Bid Procedures Objection Deadline** | **July 8, 2021** |
| **Bid Procedures Hearing** | **July 9, 2021, or as soon thereafter as is convenient to the Court** |
| **Service of Sale Motion and Cure Notice** | **August 17, 2021** |
| **Sale and Cure Objection Deadline** | **September 1, 2021** |
| **Bid Deadline** | **September 7, 2021, at 5:00 p.m. (PT)** |
| **Notice of Qualified Competing Bid and Auction** | **September 9, 2021, at 11:00 a.m. (PT)** |
| **Auction** | **September 13, 2021, at 11:00 a.m. (PT)** |
| **Adequate Assurance Objection Deadline** | **September 15, 2021** |
| **Sale Hearing** | **September 15, 2021, or as soon thereafter as is convenient to the Court** |

**F.    Participation Requirements**

As described above, a Qualified Competing Bid must exceed Four Hundred Forty-Two Million Six Hundred Eighty Thousand Dollars ($442,680,000.00), plus the value of Assumed Obligations and otherwise meet the financing and other requirements set forth below. Any person desiring to bid for the Property (a "Potential Bidder") at the Auction will be required to deliver, on or before 5:00 p.m. PST at least four (4) business days before the date of the Auction (the "Bid

Deadline"), the following in addition to the other materials required hereby (collectively, the "Participation Requirements"):

1. An executed Confidentiality Agreement substantially similar form to that attached to the Gotthardt Declaration as Exhibit B;

2. Proof that the Potential Bidder has available funds sufficient to consummate the Sale satisfactory to the Debtors, including if requested by the Debtors, supporting documents such as bank statements, to support the representation;

3. A representation that the Potential Bidder is duly authorized to submit the bid and close the transaction and has already obtained all necessary approvals (*e.g.*, board approvals), plus, if requested by the Debtors, supporting documents satisfactory to the Debtors in their reasonable discretion;

4. A deposit of Twenty-Five Million Dollars ($25,000,000.00) in immediately available funds (the "Good Faith Deposit");

5. An executed asset purchase agreement ("APA") substantially in the form of the Stalking Horse APA attached as Exhibit A to the Gotthardt Declaration, marked to show any changes from the Stalking Horse APA, which shall provide, among other things, (i) no contingencies to closing the transaction, including, without limitation, financing, inspection, and due diligence contingencies, and (ii) a closing to occur by no later than the "Closing Date," which date shall be fifteen (15) days after the entry of the order approving the Sale (the "Sale Order"). Any marked APA submitted by a Potential Bidder **must** provide a price allocation for TIC Properties to which the Stalking Horse Bidder has provided price allocations so that the Debtors may properly evaluate the Qualified Competing Bids. Potential Bidders shall also provide Debtors with a side letter with respect to price allocaton for all other Real Properties for purposes of paragraphs 3.3.1, 6.1.4, 6.1.5, and 17.1 of the Stalking Horse APA;

6. A commitment to serve as the "Back-up Bidder," or to commit to purchasing the Property at the Potential Bidder's last bid amount in the event that the Successful

Case: 20-30604 Doc# 713 Filed: 06/28/21 Entered: 06/28/21 18:21:50 Page 12 of 40    BID PROCEDURES MOTION

Bidder fails to close the Sale on or before fifteen (15) days following the entry of the Sale Order, in which case the Debtors must close the Sale with the Back-up Bidder not later than ten (10) days after the Sale to the Successor Bidder does not close.

Additionally, any Potential Bidder must demonstrate to the Debtors' satisfaction the financial capability to timely consummate the Sale. Also, a Qualified Competing Bid must be irrevocable, must waive substantial contribution claims, not seek any break-up fees or expense reimbursement, and must consent to the jurisdiction of the Bankruptcy Court to resolve all disputes. In addition, Potential Bidders must identify with particularity (i) which Executory Contracts and Leases the Potential Bidder would assume and provide in detail the Potential Bidder's proposal for cure amounts and adequate assurance of future performance with respect to such Executory Contracts and Leases, (ii) the Hired Employees with respect to quantifying the aggregate amount of PTO that will be part of Assumed Obligations, and (iii) the Post-Petition Liabilities associated with the Post-Petition Construction Contracts that will be assumed. A Potential Bidder that meets each of the foregoing requirements to the Debtors' satisfaction, after consultation with the Official Committee, shall be deemed a "Qualified Bidder." In accordance with the Stalking Horse APA, Hamilton Zanze (the Stalking Horse Bidder) shall be deemed to be a Qualified Bidder upon delivery of the Auction Deposit.

**G.      Due Diligence**

Subject to the execution of a Confidentiality Agreement, the Debtors will provide any Potential Bidder access to all due diligence materials in the data room, including the Non-privileged Materials delivered by Stalking Horse Bidder to the Debtors as they are received. After the Contingency Date, the Debtors also may provide any Potential Bidders additional due diligence access to the Real Property. However, additional due diligence material will not be provided after the Auction, nor will any due diligence contingency provision be permitted as part of any Qualified Competing Bid.

Interested parties requesting information about the qualification process, and Qualified Bidders requesting information in connection with their due diligence, should contact Greg

Gotthardt or Sofi Daar, each of FTI Consulting, Inc. at: greg.gotthardt@fticonsulting.com, 213-452-6323 or sofi.daar@fticonsulting.com, 213-452-6077.

**H.      Proposed Sale Notice Procedures**

Within one (1) week after the entry of the Bid Procedures Order, the Debtors (or their agents) shall give notice of the Auction and the Sale by serving a notice in substantially the form appended hereto as **Exhibit B** (the "Bid Procedures, Auction, and Sale Notice") by first-class mail, postage prepaid, upon all creditors and parties in interest in the Debtors' Bankruptcy Cases and potential interested bidders identified by the Debtors (the "Bid Procedures Notice Parties"), *provided, however*, that if the Stalking Horse Bidder completes its diligence prior to August 16, 2021, the Debtors will advance the proposed timeline for the proposed Sale, including the Auction, Bid Deadline, and Sale Hearing, and file and serve on the Bid Procedures Notice Parties an amended notice of Bid Procedures, Auction, and Sale Hearing within two (2) business days of their receipt of notice that the Stalking Horse Bidder has completed its diligence.  Further, the Debtors shall give notice of the Sale Hearing concurrently with the filing of the Sale Motion.

**I.      Auction Participation**

Unless otherwise agreed to by the Debtors, the Official Committee and the Stalking Horse Bidder, the only parties eligible to attend and participate in the Auction will be Qualified Bidders, the Debtors, the Official Committee, the Stalking Horse Bidder, their respective counsel, and their respective legal or financial professionals.

**J.      Auction**

The Debtors' counsel or CRO will conduct the Auction for the sale of the Property.  Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

The Auction shall take place on September 13, 2021, at 11:00 a.m. at FTI Consulting's San Francisco Office located at 50 California Street, Suite 1900, provided that conducting the Auction in person will fully comply with local health orders.  The Debtors reserve the right to conduct the Auction via videoconference should they determine in their sole and absolute discretion that an Auction by videoconference is appropriate given the COVID-19 pandemic.  At the Auction, only

-14-

Qualified Bidders (including the Stalking Horse Bidder) will be permitted to bid.  Qualified Bidders may participate in person or by authorized representative.  The Auction shall be conducted pursuant to the procedures set forth below.

**K.**     **Auction Procedures**

The Auction procedures are as follows:

1. All Qualified Bidders desiring to participate in the Auction must submit written initial bids to the Debtors' CRO as described above which, in part, shall include an initial bid in an amount that is no less than Four Hundred Forty-Two Million Six Hundred Eighty Thousand Dollars ($442,680,000.00) plus Assumed Liabilities (as defined in the Stalking Horse APA) or at least Eight Million Six Hundred Eighty Thousand Dollars ($8,680,000.00) greater than the amount of the Purchase Price of the Stalking Horse Bidder, by no later than 5:00 p.m. PST four (4) business days before the Auction.  ***A Qualified Competing Bid <u>must</u> be for the entirety of the Property.***

2. At the Auction, the Debtors will provide all Qualified Bidders with a bid sheet showing the Purchase Price of the Stalking Horse Bidder and the amounts of the initial bids and the identity of the Qualified Bidders.  The bid sheet will identify the highest of the initial bids of the Qualified Bidders ("<u>Baseline Bid</u>").

3. Following circulation of the bid sheet, bidding will commence in Five Hundred Thousand ($500,000.00) increments for the first round of bidding above the Baseline Bid and, for each round thereafter, in Two Million Dollar ($2,000,000.00) increments.  All bids must be supported by proof of immediately available funds sufficient to pay the bid amount satisfactory to the Debtors in their sole and absolute discretion.

4. The highest and best bid submitted at the Auction will win (the "<u>Successful Bid</u>").  The Qualified Bidder submitting such Successful Bid shall become the "<u>Successful Bidder</u>," and shall have such rights and responsibilities of a purchaser, as set forth

in the Stalking Horse APA.  The Successful Bid and the Successful Bidder are subject to approval of the Court.

**L.     Acceptance of Qualified Bids**

The Debtors intend to sell the Property to the Qualified Bidder that submits the highest and best bid in connection with the Auction.  The Debtors' presentation to the Court for approval of any Successful Bid does not constitute the Debtors' acceptance of such bid.  The Debtors will be deemed to have accepted a bid only when the Court approves such bid.

**M.     Bidding Results**

As soon as practicable, but no later than one (1) business day after the Bid Deadline, the Debtors shall alert parties submitting bids as to whether more than one Qualified Bid has been received and whether the Debtors will proceed with the Auction.

**N.     Auction Results**

As soon as practicable, but no later than one (1) business day, after the conclusion of the Auction, the Debtors shall provide electronic notice of the results thereof on the docket of the Debtors' lead Bankruptcy Case.

**O.     Payment of Break-up Fee and Expense Reimbursement**

If Hamilton Zanze is not the prevailing bidder and a final Sale Order is entered authorizing the Debtors to sell to a party other than Hamilton Zanze, or the Debtors' default under the Stalking Horse APA, the Break-up Fee and Expense Reimbursement owed to Hamilton Zanze as the stalking horse bidder shall be an allowed administrative expense of the Debtors pursuant to sections 503(b) and 507(a) of the Bankruptcy Code and be satisfied solely from: (1) the proceeds of the sale to the Successful Bidder, including its Good Faith Deposit, (2) the Successful Bidder's or other bidder's forfeited Good Faith Deposit, or (3) the proceeds of any subsequent sale of the Property, or part thereof, by the Debtors to any other party or parties.

**P.     Modifications**

The Debtors, in consultation with the Official Committee, may (1) determine, which bid or bids, if any, constitute the highest or otherwise best offer for the Property; (2) reject, at any time before entry of an order of the Court approving any bid as the Successful Bid, any bid that is (a)

inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code or the Bid Procedures, or (c) contrary to the best interests of the Debtors, their estates and their creditors; and (3) withdraw, after consultation with the Official Committee, any motion to approve the consummation of the Sale if contrary to the best interests of the Debtors, their estates and their creditors, except with respect to the Stalking Horse Bidder and the Stalking Horse APA. After consultation with the Official Committee and agreement with Stalking Horse Bidder, the Debtors may extend or alter any deadline contained in the Stalking Horse APA that will better promote the maximization of the value of their estates. The Bid Procedures set forth herein are for the benefit of the Debtors and their estates. The Debtors may waive or modify these provisions or adopt additional procedures after consultation with the Official Committee as long as such waiver or modification do not conflict with the terms and requirements of the Stalking Horse APA, unless agreed to by the Stalking Horse Bidder.

Notwithstanding the foregoing, the Debtors may not modify the Bid Procedures in a way that conflicts with the requirements of the Stalking Horse APA.

**Q.    Sale Hearing**

The Debtors will seek, after consultation with the Official Committee, entry of an order by the Court at the Sale Hearing to be held at least one (1) business day following the Auction, to approve and authorize the Sale to the Successful Bidder or the Back-Up Bidder (defined below) on terms and conditions determined in accordance with the Bid Procedures. In this regard, the Debtors anticipate filing the Sale Motion and giving notice of the Sale Hearing in accordance with the timeline contemplated by the proposed Bid Procedures.

**R.    Back-Up Bidder and Return of Good Faith Deposit**

As determined by the Debtors in consultation with the Official Committee, and subject to Court approval, the Qualified Bidder with the next highest or otherwise best Qualified Bid (including the Stalking Horse Bidder's bid if the Stalking Horse Bidder has notified the Debtors of its election to serve as a Back-Up Bidder) at the Auction shall be required to serve as the Back-Up Bidder and keep such bid (the "Back-Up Bid") open and irrevocable until three (3) business days after the closing of the Sale with the Successful Bidder. Following the Auction, the Debtors shall

-17-

return to the Back-Up Bidder all of its Good Faith Deposit, less Five Million Dollars ($5,000,000), which amount shall serve as the "<u>Back-Up Deposit</u>." Following the Sale Hearing, if the Successful Bidder fails to consummate the approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized to consummate the Sale with the Back-Up Bidder without further order of the Court.

Except as otherwise provided herein or in the Stalking Horse APA, Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder by no later than the fifth (5th) business day following the Sale Hearing.

**IV.**

**<u>RELIEF REQUESTED</u>**

By this Motion, the Debtors seek entry of the Bid Procedures Order, substantially in the form attached hereto as Exhibit A: (a) approving the Bid Procedures attached as Exhibit 1 to the proposed Bid Procedures Order in connection with the Sale; (b) approving the proposed notice procedures with respect to the Bid Procedures, Auction, and Sale; (c) authorizing each of the Debtors, including, without limitation 28 LLC and PFI Glenwood, subject to the Court's granting of the Motion for Amended Order, through PFI, to enter into the Stalking Horse APA notwithstanding the need for any Debtor to obtain any third-party consent or authorization to do so and approving the Break-up Fee and Expense Reimbursement described in the Stalking Horse APA; (d) scheduling the Sale Hearing; and (e) granting such other relief that the Court deems just and necessary.

**V.**

**<u>AUTHORITY FOR REQUESTED RELIEF</u>**

**A.** **<u>The Bid Procedures Are Adequate and Reasonable Under the Circumstances</u>**

The proposed Bid Procedures serve the best interests of the Debtors' bankruptcy estates. The Bankruptcy Code provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 does not specify a standard for approving bid procedures, the

-18-

Ninth Circuit Bankruptcy Appellate Panel has established a standard based on the debtor's sound business judgment. Under this standard, the "bankruptcy court has considerable discretion in deciding whether to approve or disapprove the use of estate property by a debtor in possession, in the light of sound business justification." *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 16 (9th Cir. 1988); *see also In re Cont'l Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3rd Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2nd Cir. 1983); *In re Psychometric Sys., Inc.*, 367 B.R. 670, 674 (Bankr. D. Colo. 2007) (collecting cases).

In determining whether the debtor in possession has complied with the sound business judgment rule, the Court must consider whether: (a) there has been "[a]ny improper or bad motive," (b) the "price is fair and the negotiations or bidding has occurred at arm's length" and (c) the sale followed "[a]dequate procedures, including proper exposure to the market and accurate and reasonable notice to all parties in interest." *In re Castre*, 312 B.R. 426, 428 (Bankr. D. Colo. 2004). When applying the rule, "the bankruptcy court should presume that the debtor in possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate." *Agarwal v. Pomona Valley Med. Group, Inc. (In re Pomona Valley Med. Group, Inc.)*, 476 F.3d 665, 670 (9th Cir. 2007) (considering the rule in the context of the debtor's decision to reject a contract). In the context of this rule, courts often approve overbid procedures. *See, e.g., In re Crown Corp.*, 679 F.2d 774, 777 (9th Cir. 1982).

Of course, this Court enjoys broad powers to approve such measures. "The Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986); *accord In re Geothermal Res. Int'l*, 93 F.3d 648, 651 (9th Cir. 1996); *In re Lionel Corp.*, 722 F.2d 1063, 1069 (2nd Cir. 1983) (noting a bankruptcy judge's "broad administrative power" and "substantial freedom to tailor [his or her] orders" to a case at hand).

Here, the Bid Procedures comport with the Debtors' sound business judgment and were developed in close consultation with the Official Committee. The Debtors believe that their

ability to select the highest and best bidder at the Auction enhances and benefits the marketing process by providing a motivation for Qualified Bidders to submit a Qualified Bid with a high market value. Principally, the Bid Procedures permit Qualified Bidders to submit overbids. In this way, the Bid Procedures embody an arm's-length process and ensure competitive bidding over the price and terms of sale. By making the Sale competitive, the Bid Procedures provide proper exposure of the Property to the market. This, in turn, will maximize the sale price of the Property for the benefit of all creditors and the Debtors' estates. In addition, the Bid Procedures require Prospective Bidders to deposit a sum into escrow and to reveal their financial information, thus ensuring that only earnest and fiscally capable buyers bid. The Bid Procedures also provide reasonable notice of the sale to all parties in interest, including parties who might potentially be interested in bidding at the Auction.

Finally, the sale of the Property as a cohesive whole is appropriate under the circumstances. Selling the Property piecemeal would increase transaction costs and would likely make continuing operations of the Debtors for portions of the Property potentially left behind impractical.

**B.** **The Break-up Fee and Expense Reimbursement Is Reasonable, Appropriate and Beneficial to the Debtors' Estates**

Sellers of assets often employ bidding protections, such as the payment of a break-up fee, to encourage the making of bids. "A 'break-up fee' is a fee paid to a potential acquirer of a business, or certain assets, by the seller, in the event that the transaction contemplated fails to be consummated and certain criteria in the purchase agreement are met." *In re Integrated Res., Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992); *In re APP Plus, Inc.*, 223 B.R. 870, 874 (Bankr. E.D.N.Y. 1998); *In re America West Airlines, Inc.*, 166 B.R. 908, 910 (Bankr. D. Ariz. 1994). A break-up fee is intended to compensate the potential acquirer for the fees and expenses incurred in connection with its efforts to complete the transaction. *See In re Diamond Plus, Inc.*, 233 B.R. 829, 831 (Bankr. E.D. Ark. 1999); *In re APP Plus, Inc.*, 223 B.R. at 874 ("Typically, the break-up fee covers reimbursement of the disappointed purchaser's out-of-pocket expenses related to the proposed acquisition and/or compensation for the time, efforts, resources, lost opportunity costs

-20-

and risks incurred by the disappointed purchaser."); *see also, In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) (break-up fees compensate potential acquirer for the "time and expense it has spent in putting together its offer if the transaction is not completed" and encourages it "to do the due diligence that is prerequisite to any bid").

While the Ninth Circuit has not addressed this issue, courts in this and other circuits have developed three (3) main standards for evaluating the propriety of break-up fees in the context of the sale of estate assets. *See O'Brien*, 181 F.3d at 533-35. Some courts have employed a variation on the business judgment rule. *In re Fifth Ave. Assocs., L.P.*, 96 B.R. 24 (Bankr. S.D.N.Y. 1989); *see also, Integrated Res.*, 135 B.R. at 753.[7] The best-interests-of-the-estate standard adopted by other courts tests "whether the interests of all concerned parties are best served by such a fee." *America West Airlines*, 166 B.R. at 912. Finally, declining to apply either standard, the Third Circuit found instead that *ex post* considerations of break-up fees must be made under the general administrative expense jurisprudence of section 503(b). *O'Brien*, 181 F.3d at 535.

The Debtors submit that, using any of the above standards, the Break-Up Fee is reasonable and proper under the facts and circumstances of this case and should be approved. Among other things, the Stalking Horse Bidder, in its capacity as the proposed stalking horse bidder, has expended significant time and resources and incurred legal fees, and will continue to do so, in completing due diligence, negotiating the Stalking Horse APA, ensuring it can satisfy all bidding requirements, closing conditions and representation and warranties, and participating at the Auction. Further, the Break-up Fee and Expense Reimbursement does not require any separate reimbursement of the Stalking Horse Bidder's actual out-of-pocket costs incurred in connection with the proposed transaction but is a single, fixed amount. Additionally, and unlike any other sale in which Debtors' counsel has been involved, *the Stalking Horse Bidder has agreed to make Non-privileged Material available to the Debtors for posting in the data room for use by*

---

[7] Courts adopting this standard consider whether the proposed break-up fee: (i) was tainted by self-dealing; (ii) chilled rather than encouraged bidding; and (iii) was reasonable relative to the purchase price. *See Integrated Res.*, 147 B.R. at 657.

Case 21-30604-05bg Doc# 713 Filed: 06/28/21 Entered: 06/28/21 18:21:50 Page 21 of 40

***competing bidders***.  Moreover, in negotiating the terms of the Break-up Fee and Expense Reimbursement, the Debtors have exercised their business judgment and reasonably concluded that such Break-up Fee and Expense Reimbursement is necessary to complete the contemplated transaction.  The Debtors and the Stalking Horse Bidder's negotiations have been conducted at arm's-length and are devoid of any bad faith or unfair dealing.  The Break-up Fee and Expense Reimbursement is not the result of any improper leverage exerted by Stalking Horse Bidder.

In addition, given the total amount of the Opening Bid, the Debtors do not believe that the amount of the Break-up Fee and Expense Reimbursement is so substantial as to chill other potential bidders from submitting competing bids.  Rather, the amount of the Break-up Fee and Expense Reimbursement is reasonable compared to the Purchase Price and will only be paid if the Stalking Horse Bidder has been outbid at the Auction or the Debtors default under the Stalking Horse APA.  Moreover, it is important to note that of the multiple offers the Debtors received from potential stalking horse bidders, Hamilton Zanze was the only bid that did <u>not</u> require a separate expense reimbursement <u>and</u> break-up fee as required stalking horse bid protections, and Hamilton Zanze was the only bidder that agreed to share its Non-privileged Material with other Potential Bidders.

Further, the Break-up Fee and Expense Reimbursement is likely to encourage competitive bidding, in that the Debtor believes the Stalking Horse Bidder likely would not have negotiated and executed the Stalking Horse APA without the Break-up Fee and Expense Reimbursement, and the Stalking Horse Bidder certainly would not have agreed to make its Non-privileged Materials available to competing bidders absent the Break-up Fee and Expense Reimbursement.  The break-up fee thus likely will "induc[e] a bid that otherwise would not have been made and without which bidding would [be] limited." *Id*. at 537.  Similarly, the Stalking Horse Bidder's offer would provide a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [assets will be] sold will reflect [their] true worth." *Id*.

**C.**     **The Break-up Fee and Expense Reimbursement Should be Approved as a Use of the Estates' Assets Outside the Ordinary Course of Business**

Case: 21-30604   Doc# 713   Filed: 06/28/21   Entered: 06/28/21 18:21:50   Page 22 of 40

Under section 363(b) of the Bankruptcy Code, the Debtors are permitted to use property of the estate outside the ordinary course of business after notice and a hearing. Here, the Debtors and the Stalking Horse Bidder have agreed on the Break-up Fee and Expense Reimbursement in furtherance of the proposed Sale of the Debtors' Property. The Debtors have exercised their business judgment, in consultation with the Official Committee, and reasonably concluded that the Break-up Fee and Expense Reimbursement is necessary to complete the contemplated transaction and is in the best interests of the Debtors and their bankruptcy estates. To the extent necessary, the Debtors request that the Court approve the Break-up Fee and Expense Reimbursement pursuant to section 363 of the Bankruptcy Code as an appropriate use of the Debtors' property outside the ordinary course of business. As set forth in this Motion, the requested relief is in the best interests of the Debtors and their bankruptcy estates and is justified and appropriate under the circumstances.

## VI.

## CONCLUSION

For the foregoing reasons, the Debtors request that this Court enter (1) an order (a) approving the Bid Procedures attached as Exhibit 1 to the Bid Procedures Order in connection with the Sale; (b) approving the proposed notice procedures with respect to the Bid Procedures, Auction, and Sale; (c) authorizing each of the Debtors, including, without limitation 28 LLC and PFI Glenwood, through PFI, to enter into the Stalking Horse APA notwithstanding the need for any Debtor to obtain any third-party consent or authorization to do so and approving the Break-up Fee and Expense Reimbursement described in the Stalking Horse APA; (d) scheduling the Sale Hearing; and (e) granting such other and further relief as the Court deems just and necessary.

Dated: June 28, 2021

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____
                    */s/ J. Barrett Marum*
                         ORI KATZ
                    J. BARRETT MARUM
                         JEANNIE KIM
                       MATT KLINGER

                  Counsel for the Debtors

Case: 20-30604    Doc# 713    Filed: 06/28/21    Entered: 06/28/21 18:21:50    Page 24 of
40
SMRH:4831-3618-0586.9    BID PROCEDURES MOTION

**Exhibit A**

Proposed Bid Procedures Order

| | |
|---|---|
| In re | Case No. 20-30604 |
| | (Jointly Administered) |
| PROFESSIONAL FINANCIAL | Chapter 11 |
| INVESTORS, INC., *et al.*, | |
| | **[PROPOSED] ORDER (A) APPROVING** |
| Debtors. | **BID PROCEDURES FOR THE** |
| | **PORTFOLIO SALE OF CERTAIN REAL** |
| | **AND PERSONAL PROPERTY ASSETS;** |
| | **(B) APPROVING RELATED NOTICE** |
| | **PROCEDURES; (C) AUTHORIZING** |
| | **DEBTORS TO ENTER INTO STALKING** |
| | **HORSE AGREEMENT AND APPROVING** |
| | **BREAK-UP FEE AND EXPENSE** |
| | **REIMBURSEMENT; (D) SCHEDULING A** |
| | **SALE HEARING; AND (E) GRANTING** |
| | **CERTAIN RELATED RELIEF** |
| | |
| | *Hearing Requested on Shortened Time for:* |
| | Date: July 9, 2021 |
| | Time: 10:00 a.m. |
| | Place: **Telephonic/Video Appearances Only** |
| | 450 Golden Gate Avenue, 16th Floor |
| | Courtroom 19 |
| | San Francisco, CA 94102 |
| | Judge: Hon. Hannah L. Blumenstiel |

Upon the *Debtors' Motion for Order (A) Approving Bid Procedures for the Portfolio Sale of Certain Real and Personal Property Assets; (B) Approving Related Notice Procedures; (C) Authorizing Debtors to Enter into Stalking Horse Agreement and Approving Break-Up Fee; (D) Scheduling a Sale Hearing; and (E) Granting Certain Related Relief* (the "Motion")[1] filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors") on June [•], 2021, as Docket No. [•], and the Court having reviewed the Motion; and the Court having held a hearing, on shortened time, at the above-captioned date and time with appearances as noted on the record; and the Court having determined the relief provided in this Order is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and it appearing that proper

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in the Motion.

1

1  and adequate notice of the Motion has been given and that no other or further notice is necessary;

2  and upon the record herein; and after due deliberation thereon; and good and sufficient cause

3  appearing therefore;

4        **THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND**

5  **CONCLUSIONS OF LAW:**

6        A.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. section 1334(b)

7  and the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order

8  24 (N.D. Cal.), and Local Rule 5011-1(a).  Venue is proper pursuant to 28 U.S.C. sections 1408

9  and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. section 157(b)(2).

10        B.     The statutory predicates for the relief requested in the Motion are (1) sections 105,

11  and 363 of the Bankruptcy Code; (2) Bankruptcy Rules 2002, 6004, 6006, 9014 and 9018; and (3)

12  B.L.R. 6004-1 and 6006-1.

13        C.     Good and sufficient notice of the Motion, the hearing on the Motion, and the relief

14  granted by this Order has been given, and no further notice is required.  A reasonable opportunity

15  to object or be heard regarding the relief granted by this Order (including, without limitation, with

16  respect to the proposed Break-up Fee and Expense Reimbursement (as defined herein) has been

17  afforded to those parties entitled to notice.  A reasonable and fair opportunity to object to the

18  Motion and the relief granted in this Order has been afforded under the circumstances.

19  Accordingly, no further notice of the Motion, the hearing on the Motion, or the relief granted by

20  this Order shall be required.

21        D.     The assets of  28 LLC and PFI Glenwood have been substantively consolidated

22  with those of PFI, PISF, and the affiliated debtors in the above-captioned jointly administered

23  chapter 11 case.

24        E.     The Debtors' reasons for approval of Bid Procedures, in the form annexed hereto as

25  **Exhibit 1**, based on the record before the Court, satisfy the Court that the Bid Procedures:  (1) are

26  in the best interests of the Debtors and their creditors and their estates; and (2) represent a prudent

27  exercise of the Debtors' business judgment.  The Debtors have articulated good, sufficient, and

28  reasonable business justifications for the selection of the Stalking Horse Bidder as the lead bidder

and the proposed procedures related thereto, which are designed to permit the Debtors to solicit the highest or otherwise best bid for its assets through the Bid Procedures.

F.    The Break-up Fee and Expense Reimbursement is fair and reasonable and provides a benefit to the Debtors' estates and creditors and was a critical element in the Stalking Horse Bidder's decision to enter into the Stalking Horse APA.

G.    The Debtors' payment of the Break-up Fee and Expense Reimbursement under the conditions set forth in the Stalking Horse APA, the Motion, and this Order is (1) an actual and necessary cost of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code, (2) of substantial benefit to the Debtors' estates and creditors and all parties in interest herein, (3) reasonable and appropriate, and (4) necessary to ensure that the Stalking Horse Bidder will continue to pursue the proposed Stalking Horse APA to undertake the sale of the Property.  Notwithstanding anything to the contrary in this or any other order of this Court, the Break-up Fee and Expense Reimbursement shall constitute an administrative expense with priority pursuant to sections 503(b) and 507(a) of the Bankruptcy Code.

H.    The entry of this Order is in the best interests of the Debtor and its estate, creditors, and interest holders and all other parties in interest herein.

Based upon the foregoing and after due consideration and good cause appearing therefor:

**IT IS ORDERED, ADJUDGED AND DECREED BY THE COURT, that:**

1.    The Motion is GRANTED in its entirety.

2.    The Bid Procedures shall apply to the Qualified Bidders and the conduct of the Sale of the Property and the Auction.

3.    Subject to entry of this Order, each of the Debtors, including 28 LLC and PFI Glenwood, is authorized to enter into the Stalking Horse APA notwithstanding the need for any Debtor to obtain any third-party consent or authorization to do so.  Andrew Hinkelman, the Chief Restructuring Officer of PFI is hereby authorized and empowered to execute and deliver any and all documents in connection with the Sale on behalf the Debtors, including 28 LLC and PFI Glenwood.  The Stalking Horse APA shall serve as the "stalking horse" asset purchase agreement.

4.    Hamilton Zanze is entitled to a Break-up Fee and Expense Reimbursement as an

Case: 20-30604    Doc# 713    Filed: 06/28/21    Entered: 06/28/21 18:21:50    Page 27 of 40
SMRH:4845-7818-0587.20                                                    BID PROCEDURES MOTION – EXHIBIT A

allowed priority administrative expense of the Debtors pursuant to sections 503(b) and 507(a) of the Bankruptcy Code if Hamilton Zanze is not the Successful Bidder of the Debtors' Property or the Debtors' default under the Stalking Horse APA.

5. In the event of any conflict between this Order and the Motion, the Order shall control and govern.

6. Nothing in this Order, the Stalking Horse APA or the Motion shall be deemed to or constitute the assumption or assignment of an executory contract or unexpired lease.

7. This Court shall retain jurisdiction with respect to all matters arising or related to the implementation or interpretation of this Order.

8. The Debtors and the Stalking Horse Bidder are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

9. This Order shall be effective immediately upon entry, and any stay of orders provided for in Bankruptcy Rules 6004 or 6006 or any other provision of the Bankruptcy Code or Bankruptcy Rules is expressly lifted. The Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and may, in their discretion and without further delay, take any action and perform any act authorized under this Order. For the avoidance of doubt, the Break-up Fee and Expense Reimbursement approved by this Order shall be immediately appealable and failure to appeal in accordance with the Bankruptcy Rules or other applicable law shall constitute a waiver of such rights.

*[Exhibit 1 to Follow]*

## Exhibit 1

## (Bid Procedures)

The Bid Procedures approved in this Order are as follows:

1. <u>Break-up Fee and Expense Reimbursement</u>. A Break-up Fee and Expense Reimbursement shall be payable to Hamilton Zanze as the Stalking Horse Bidder upon the occurrence of, and pursuant to, the events set forth in this Order in an amount of Six Million, Six Hundred Eighty Thousand Dollars ($6,680,000.00).

2. <u>Timeline for Solicitation of Bids</u>. The following is the anticipated timeline for the solicitation of bids, the Auction, and the Sale Hearing, all of which shall be subject to Court approval. If Hamilton Zanze completes its diligence prior to August 16, 2021, the dates listed below will be advanced in keeping with the below pacing (with the exception of the Bid Procedures Objection Deadline and the Bid Procedures Hearing) and with any necessary adjustments to ensure a date does not fall on a weekend. The Debtors will file and serve a notice of the new dates within two (2) business days of their receipt of notice that Hamilton Zanze has completed its diligence.

| **Event** | **Date** |
|---|---|
| Bid Procedures Objection Deadline | July 8, 2021 |
| Bid Procedures Hearing | July 9, 2021, or as soon thereafter as is convenient to the Court |
| Service of Sale Motion and Cure Notice | August 17, 2021 |
| Sale and Cure Objection Deadline | September 1, 2021 |
| Bid Deadline | September 7, 2021, at 5:00 p.m. (PT) |
| Notification of Qualified Competing Bid and Auction to Stalking Horse Bidder | September 9, 2021 prior to 11:00 a.m. |
| Auction | September 13, 2021, at 11:00 a.m. (PT) |
| Adequate Assurance Objection Deadline | September 15, 2021 |
| Sale Hearing | September 15, 2021, or as soon thereafter as is convenient to the Court |

3. <u>Overbids</u>. In order to be a Qualified Competing Bid, in addition to the items described in paragraph 5 below, a minimum initial overbid increment must be equal to or exceed

Eight Million Six Hundred Eighty Thousand Dollars ($8,680,000.00).  For the avoidance of doubt, a Qualified Competing Bid must exceed Four Hundred Forty-Two Million Six Hundred Eighty Thousand Dollars ($442,680,000.00) plus Assumed Obligations (as defined in the Stalking Horse APA) and otherwise meet the financing and other requirements set forth below.

4.  <u>Bid Increments</u>.  Minimum subsequent bid increments for the first round of bidding at the Auction shall be Five Hundred Thousand ($500,000.00) with all rounds thereafter at Two Million Dollars ($2,000,000.00).

5.  <u>Qualified Bids</u>.  To participate in the Auction, an interested bidder must be designated by the Debtor, after consultation with the Official Committee, as a "<u>Qualified Bidder</u>." To be a Qualified Bidder, the interested bidder must submit a bid package (a "<u>Qualified Bid</u>") to the Debtors' counsel or CRO that includes the following on or before September 7, 2021,[2] at 5:00 p.m. Pacific Time (the "<u>Bid Deadline</u>"):

a.  An executed Confidentiality Agreement in substantially similar form to that attached to the Gotthardt Declaration as Exhibit B;

b.  A representation that the Potential Bidder has available funds sufficient to consummate the Sale satisfactory to the Debtors, including if requested by the Debtors, supporting documents such as bank statements, to support the representation;

c.  A representation that the Potential Bidder is duly authorized to submit the bid and close the transaction and has already obtained all necessary approvals (*e.g.*, board approvals), plus, if requested by the Debtors, supporting documents satisfactory to the Debtors in their reasonable discretion;

d.  A deposit of Twenty-Five Million Dollars ($25,000,000.00) in immediately available funds (the "<u>Good Faith Deposit</u>");

e.  An executed asset purchase agreement ("<u>APA</u>") substantially in the form of the Stalking Horse APA attached as Exhibit A to the Gotthardt Declaration, marked to show any changes from the Stalking Horse APA, which shall provide, among other things,

---

[2] Subject to advancement as discussed above.

Case: 20-30604    Doc# 713    Filed: 06/28/21    Entered: 06/28/21 18:21:50    Page 30 of 40

(i) no contingencies to closing the transaction, including, without limitation, financing, inspection, and due diligence contingencies, and (ii) a closing to occur by no later than the "Closing Date," which date shall be fifteen (15) days after the entry of the order approving the Sale (the "Sale Order"). Any marked APA submitted by a Potential Bidder **must** provide a price allocation for TIC Properties to which the Stalking Horse Bidder has provided price allocations so that the Debtors may properly evaluate the Qualified Competing Bids. Potential Bidders shall also provide Debtors with a side letter with respect to price allocaton for all other Real Properties for purposes of Paragraphs 3.3.1, 6.1.4, 6.1.5, and 17.1 of the Stalking Horse APA;

       f.     A commitment to serve as the "Back-up Bidder," or to commit to purchasing the Property at the Potential Bidder's last bid amount in the event that the Successful Bidder fails to close the Sale on or before eighteen (18) days following the entry of the Sale Order, in which case the Debtors must close the Sale with the Back-up Bidder not later than ten (10) days after the Sale to the Successor Bidder does not close.

       g.     Additionally, any Potential Bidder must demonstrate to the Debtors' satisfaction the financial capability to timely consummate the Sale. Also, a Qualified Competing Bid must be irrevocable, must waive substantial contribution claims, not seek any break-up fees or expense reimbursement, and must consent to the jurisdiction of the Bankruptcy Court to resolve all disputes. In addition, Potential Bidders must identify with particularity (i) which Executory Contracts and Leases the Potential Bidder would assume and provide in detail the Potential Bidder's proposal for cure amounts and adequate assurance of future performance with respect to such Executory Contracts and Leases, (ii) the Hired Employees with respect to quantifying the aggregate amount of PTO that will be part of Assumed Obligations, and (iii) the Post-Petition Liabilities associated with the Post-Petition Construction Contracts that will be assumed. A Potential Bidder that meets each of the foregoing requirements to the Debtors' satisfaction, after consultation with the Official Committee, shall be deemed a "Qualified Bidder." Hamilton Zanze (the Stalking Horse Bidder) shall be deemed to be a Qualified Bidder if it provides its Auction Deposit.

SMRH:4845-7818-0587.20

6.      Auction Participation.  Unless otherwise agreed to by the Debtors after consultation with the Official Committee and the Stalking Horse Bidder, only Qualified Bidders, the Debtors, the Official Committee, the Stalking Horse Bidder, their respective counsel, and their respective legal or financial professionals will be eligible to attend and participate in the Auction.

7.      Auction.  The Debtors' counsel or CRO will conduct an auction for the sale of the Property (the "Auction").  Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.  The Auction shall take place on September 13, 2021,[3] at 11:00 a.m. at FTI Consulting's San Francisco Office located at 50 California Street, Suite 1900, provided that conducting the auction in person will fully comply with local health orders.  The Debtors reserve the right to conduct the Auction via videoconference should they determine, after consultation with the Official Committee, that an Auction by videoconference is appropriate given the COVID-19 pandemic.  At the Auction only Qualified Bidders (including the Stalking Horse Bidder) will be permitted to bid.  Qualified Bidders may participate in person or by authorized representative.  The Auction shall be transcribed by a qualified court reporter and shall be conducted pursuant to the procedures set forth below.

> a.      All Qualified Bidders desiring to participate in the Auction will submit written initial bids to the Debtors' counsel or CRO, as described paragraph 5 above and shall include an initial bid in an amount that is no less than Four Hundred Forty-Two Million Six Hundred Eighty Thousand Dollars ($442,680,000.00) plus Assumed Liabilities, or at least Eight Million, Six Hundred Eighty Thousand Dollars ($8,680,000.00 greater than the amount of the Opening Bid], by no later than 5:00 p.m. PST four (4) business days before the Auction.  ***A Qualified Competing Bid <u>must</u> be for the entirety of the Property.***

---

[3] To the extent that the Stalking Horse Bidder completes its diligence prior to August 16, 2021, and a Qualified Bidder submits a Qualified Competing Bid, the Debtors will advance the Auction and Bid Deadline and give notice of the amended dates as soon as practicable.

b.     At the Auction, the Debtors will provide all Qualified Bidders with a bid sheet showing the Purchase Price of the Stalking Horse Bidder and the identity and amounts of the initial bids of the Qualified Bidders.  The bid sheet will also identify the highest of the initial bids of the Qualified Bidders ("Baseline Bid").

c.     Following circulation of the bid sheet, bidding will commence in Five Hundred Thousand ($500,000.00) increments for the first round of bidding above the Baseline Bid and, for each round thereafter, in Two Million Dollar ($2,000,000.00) increments until only one bidder remains.  All bids must be supported by proof of immediately available funds sufficient to pay the bid amount satisfactory to the Debtors in their sole and absolute discretion.

d.     Upon acceptance by the Debtors, after consultation with the Official Committee, the highest and best bid submitted at the Auction will win (the "Successful Bid").  The Qualified Bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser, as set forth in the Stalking Horse APA.  The Successful Bid and the Successful Bidder are subject to approval of the Court.

8.     Acceptance of Qualified Bids.  The Debtors intend to sell the Property to the Qualified Bidder that submits the highest and best bid.  The Debtors' presentation to the Court for approval of any Successful Bid shall not constitute the Debtors' acceptance of such bid.  The Debtors will be deemed to have accepted a bid only when it has been approved by the Court.

9.     Bidding Results.  As soon as practicable, but no later than one (1) business day, after the Bid Deadline, the Debtors shall alert parties submitting bids as to whether more than one (1) Qualified Bid has been received and whether the Debtors will proceed with the Auction.

10.     Auction Results.  As soon as practicable, but no later than one (1) business day, after the conclusion of the Auction, the Debtors shall provide electronic notice of the results thereof on the docket of the lead Bankruptcy Case.

11.     Payment of Break-up Fee and Expense Reimbursement.  If Hamilton Zanze is not the Successful Bidder of the Property or the Debtors' default under the Stalking Horse APA, the

Break-up Fee and Expense Reimbursement owed to Hamilton Zanze as the stalking horse bidder shall be an allowed administrative expense of the Debtors pursuant to sections 503(b) and 507(a) of the Bankruptcy Code and be satisfied solely from: (1) the proceeds of the sale to the Successful Bidder, including its Good Faith Deposit, (2) the Successful Bidder's or other bidder's forfeited Good Faith Deposit, or (3) the proceeds of any subsequent sale of the Property, or part thereof, by the Debtors to any other party or parties.

12. <u>Sale Hearing and Auction</u>. The hearing on the Sale Motion (the "<u>Sale Hearing</u>") will commence on September 15, 2021 at [•] [a.m./p.m.] (Pacific Time). If competing Qualified Bids are received by the Bid Deadline, the Auction will be held at least one (1) business day prior to the Sale Hearing as described in paragraph 7 hereof. If the Debtors do not receive any Qualified Bids other than the Stalking Horse Bid, the Debtors will not conduct the Auction, and will request at the Sale Hearing that the Stalking Horse Bidder's Opening Bid be designated as the Successful Bid.

13. <u>Revisions to Bid Procedures</u>. The Debtors, in consultation with the Official Committee, may (1) determine, which bid or bids, if any, constitute the highest or otherwise best offer for the Property; (2) reject, at any time before entry of an order of the Court approving any bid as the Successful Bid, any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code or the Bid Procedures, or (c) contrary to the best interests of the Debtors and the Debtors' estates and creditors; and (3) withdraw, in consultation with the Official Committee, any motion to approve the consummation of the Sale if contrary to the best interests of the Debtors and the Debtors' estates and creditors, except with respect to the Stalking Horse Bidder and the Stalking Horse APA. After consultation with the Official Committee, the Debtors may extend or alter any deadline contained herein that will better promote the maximization of the value of its estate. The Bid Procedures set forth herein are for the benefit of the Debtors and their estates. The Debtors may waive or modify these provisions or adopt additional procedures, in consultation with the Official Committee. Notwithstanding the foregoing, the Debtors may not modify the Bid Procedures in a way that conflicts with the requirements of the Stalking Horse APA, without the approval of Hamilton Zanze.

Case: 20-30604   Doc# 713   Filed: 06/28/21   Entered: 06/28/21 18:21:50   Page 34 of 40
SMRH:4845-7818-0587.20                                                    BID PROCEDURES MOTION – EXHIBIT A

14. <u>Due Diligence</u>.  Subject to the execution of a Confidentiality Agreement, the Debtors will provide any Potential Bidder access to all due diligence materials in the data room, including the Non-privileged Materials delivered by Stalking Horse Bidder to the Debtors as they are received.  After the Contingency Date, the Debtors also will provide any Potential Bidders additional due diligence access to the Real Property.  However, additional due diligence material will not be provided after the Auction, nor will any due diligence contingency provision be permitted as part of any Qualified Competing Bid.  Interested parties requesting information about the qualification process, and Qualified Bidders requesting information in connection with their due diligence, should contact Greg Gotthardt or Sofi Daar, each of FTI Consulting, Inc. at: greg.gotthardt@fticonsulting.com, 213-452-6323 or sofi.daar@fticonsulting.com, 213-452-6077

15. <u>Back-Up Bids</u>.  At the commencement of the Auction, Qualified Bidders (including the Stalking Horse Bidder if it has notified the Debtors of its election to serve as a Back-Up Bidder) must confirm their respective commitments to serve as a Back-Up Bidder.  At the Auction, the Qualified Bidder (including the Stalking Horse Bidder if it has notified the Debtors of its election to serve as a Back-Up Bidder) with the next highest or otherwise best Qualified Bid (the "<u>Back-Up Bid</u>"), as determined by the Debtors and subject to Court approval, shall be required to serve as the Back-Up Bidder.  Except with respect to the Stalking Horse Bidder (in which case the Stalking Horse APA shall govern), the Back-Up Bidder shall keep such Back-Up Bid open and irrevocable until three (3) business days after the Closing of the Sale with the Successful Bidder.  Following the Auction, the Debtors shall return to the Back-Up Bidder all of its Good Faith Deposit, less Five Million Dollars ($5,000,000.00), which amount shall serve as the "<u>Back-Up Deposit</u>."  Following the Sale Hearing, if the Successful Bidder fails to consummate the approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be

1  authorized to consummate the Sale with the Back-Up Bidder at the Back-Up Bid[4] without further

2  order of the Court.

3       16.    <u>Return of Deposits</u>.  Except as otherwise provided herein or in the Stalking Horse

4  APA, Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the

5  Successful Bidder or the Back-Up Bidder by no later than the fifth (5th) business day following

6  the Sale Hearing.  The Back-Up Deposit of the Back-Up Bidder shall be held by the Debtors until

7  three (3) business days after the closing of the Sale with the Successful Bidder.

8                         **\*\*\*END OF [PROPOSED] ORDER\*\*\***

---

[4]  If Hamilton Zanze is the Back-Up Bidder, Paragraph 20.8 of the Stalking Horse APA shall govern, including that at Closing, Hamilton Zanze shall be entitled to a credit against its Back-Up Bid in the amount of the Break-up Fee and Expense Reimbursement.

Case: 20-30604    Doc# 713    Filed: 06/28/21    Entered: 06/28/21 18:21:50    Page 36 of 40

SMRH:4845-7818-0587.20                                                                BID PROCEDURES MOTION – EXHIBIT A

**Exhibit B**

Proposed Notice of Sale, Bid Procedures, Auction, and Sale Hearing

| | |
|---|---|
| In re<br><br>PROFESSIONAL FINANCIAL INVESTORS, INC., *et al*.,<br><br>Debtors.[1] | Case No. 20-30604<br>(Jointly Administered)<br>Chapter 11<br>**NOTICE OF SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING** |

**PLEASE TAKE NOTICE** (the "Notice")[2] that orders for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") have been entered by the United States Bankruptcy Court for the Northern District of California (the "Court") in the above-captioned bankruptcy cases of Professional Financial Investors, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors").

**PLEASE TAKE FURTHER NOTICE** that, on June [•], 2021, the Debtors filed a motion (the "Bid Procedures Motion") with the Court seeking, among other things, (a) an order (the "Bid Procedures Order") (i) authorizing and approving the proposed bidding procedures to be used (the "Bid Procedures") in connection with the portfolio sale (the "Sale") of the Debtors' Property; (ii) approving the Break-up Fee and Expense Reimbursement to be provided by the Debtors to Hamilton Zanze & Company as the Stalking Horse Bidder; (iii) scheduling the auction of the Property (the "Auction"); (iv) setting a hearing to approve the Sale (the "Sale Hearing"), and (v) approving the forms of notice and notice procedures related to the Bid Procedures, Auction and Sale (the "Auction Notice Procedures").

**PLEASE TAKE FURTHER NOTICE** that on July [•], 2021, the Court entered the Bid Procedures Order approving, among other things, the Bid Procedures, which establish the key

---

[1] A complete list of the Debtors and their respective chapter 11 case numbers may be found at www.donlinrecano.com/pfi. The federal tax identification numbers of each of the Debtors is available in the bankruptcy petitions of each Debtor, each of which is also available at the Donlin Recano website.
[2] Capitalized terms not otherwise defined in this Notice shall have the same meanings ascribed to them in the Bid Procedures Motion.

SMRH:4845-7818-0587.20

BID PROCEDURES MOTION – EXHIBIT B

1  dates and times related to the Sale and the Auction. All interested bidders should carefully read

2  the Bid Procedures Order and the Bid Procedures in their entirety.[3]

3       **PLEASE TAKE FURTHER NOTICE** that the Debtors will give separate notice of the

4  Sale Hearing to consider Court approval of the Sale of the Property to the Successful Bidder at the

5  Auction (the "<u>Sale Motion</u>")[4] and the deadline for parties in interest to object or otherwise

6  respond to the Sale Motion in accordance with the applicable Bankruptcy Rules and this Court's

7  Bankruptcy Local Rules.

8  <u>**Important Dates and Deadlines**</u>

9      1.   <u>Bid Deadline</u>. The deadline to submit a Qualified Bid is **September 7, 2021,[5] at**

10  **5:00 p.m. (prevailing Pacific Time).**

11      2.   <u>Auction</u>. In the event that the Debtors timely receive a Qualified Bid in addition to

12  the Qualified Bid of the Stalking Horse Bidder, and subject to the satisfaction of any further

13  conditions set forth in the Bidding Procedures, the Debtors intend to conduct an Auction for the

14  Property. The Auction, if one is held, will commence on **September 13, 2021, at 11:00 a.m.**

15  **(prevailing Pacific Time),** at FTI Consulting's San Francisco Office located at 50 California

16  Street, Suite 1900, provided that conducting the auction in person will fully comply with local

17  health orders. The Debtors reserve the right to conduct the Auction via videoconference should

18  they determine, after consultation with the Official Committee, that an Auction by

19  videoconference is appropriate given the COVID-19 pandemic. At the Auction, only Qualified

20  Bidders (including the Stalking Horse Bidder) will be permitted to bid. Qualified Bidders may

---

[3] To the extent of any inconsistencies between the Bid Procedures and the summary descriptions of the Bid Procedures in this Notice, the terms of the Bid Procedures set forth in the Bid Procedures Order shall control in all respects.

[4] The foregoing is only a general summary of the relief that the Debtors intend to seek by the Sale Motion. All parties are strongly advised to review the Sale Motion itself once filed with the Court. To the extent that the foregoing summary is inconsistent in any way with the relief sought by the Sale Motion, the Sale Motion shall control.

[5] In the event that the Stalking Horse Bidder completes its diligence prior to August 16, 2021, the Debtors intend to advance the Bid Deadline and Auction. To the extent necessary, the Debtors will file and serve an amended notice of Bid Procedures, Auction, and Sale Hearing within two (2) business days of their receipt of notice that the Stalking Horse Bidder has completed its diligence.

SMRH:4845-7818-0587.20
BID PROCEDURES MOTION – EXHIBIT B

participate in person or by authorized representative.  The Debtors shall timely communicate the date, time, and method for conducting the Auction to all parties entitled to attend the Auction.

       3.     <u>Post-Auction Objection and Sale Objection Deadlines</u>.

          a.     The deadline to file an objection with the Court to the Sale (other than objections related to the specific identity of a Successful Bidder other than the Stalking Horse Bidder) is **September 1, 2021** (the "<u>Sale Objection Deadline</u>"), as will be set forth in the forthcoming notice of the Sale Hearing.

          b.     If the Auction is held, parties may object to the conduct of the Auction, the specific identity of the Successful Bidder (other than the Stalking Horse Bidder), the Sale Order and adequate assurance of future performance provided by a Successful Bidder (other than the Stalking Horse Bidder) at the Sale Hearing (the "<u>Post-Auction Objection Deadline</u>").

       4.     <u>Sale Hearing</u>.  As set forth above, the Debtors will give separate notice of the Sale Hearing to approve and authorize the Sale to the Successful Bidder and the specific relief requested by the Sale Motion, which the Court has set for **[September 15, 2021, at 10:00 a.m.] (prevailing Pacific Time),** or such other date and time as determined by the Court, at a later date.

<u>**Contact Person for Parties Interested in Submitting a Bid**</u>

The Bid Procedures set forth the requirements for becoming a Qualified Bidder and submitting a Qualified Bid, and any party interested in making an offer to purchase the Assets must comply strictly with the Bid Procedures.  Only Qualified Bids will be considered by the Debtor, in accordance with the Bid Procedures.

Any party interested in submitting a bid should carefully read the Bid Procedures and the Bid Procedures Order and should contact, as soon as possible:

FTI Consulting, Inc.<br>
50 California Street, Suite 1900<br>
San Francisco, CA  94111<br>
Attn: Greg Gotthardt or Sofi Daar<br>
greg.gotthardt@fticonsulting.com | 213-452-6323<br>
sofi.daar@fticonsulting.com | 213-452-6077

Case: 20-30604   Doc# 713   Filed: 06/28/21   Entered: 06/28/21 18:21:50   Page 39 of 40
SMRH:4845-7818-0587.20                                                    BID PROCEDURES MOTION – EXHIBIT B

**<u>Obtaining Additional Information</u>**

Copies of the Bid Procedures Motion, the Bid Procedures and the Bid Procedures Order, as well as all related exhibits, including the Stalking Horse APA and all other documents filed with the Court, are available free of charge on the Debtors' case information website, http://www.donlinrecano.com/pfi or can be requested by email at pfiinfo@donlinrecano.com, or by calling the toll-free information line at 1-877-283-0316.

**<u>CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION</u>**

*Any party who fails to make a timely objection to the Sale on or before the Sale Objection Deadline in accordance with the Bid Procedures Order and this Notice or the Sale Hearing Notice shall be forever barred from asserting any objection to the Sale, including with respect to the transfer of the Property free and clear of all liens, claims, encumbrances and other interests.*

*Any party who fails to make a timely Post-Auction Objection on or before the Post-Auction Objection Deadline in accordance with the Bid Procedures Order and this Notice shall be forever barred from asserting any Post-Auction Objection, including with respect to the transfer of the Property free and clear of all liens, claims, encumbrances and other interests.*

**NO SUCCESSOR LIABILITY**

*The Sale will be free and clear of, among other things, any claim arising from any conduct of the Debtors prior to the closing of the Sale, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent or otherwise, so long as such claim arises out of or relates to events occurring prior to the closing of the Sale. Accordingly, as a result of the Sale, the Successful Bidder will not be a successor to the Debtors by reason of any theory of law or equity, and the Successful Bidder will have no liability, except as expressly provided in the Asset Purchase Agreement, for any liens, claims, encumbrances and other interests against or in the Debtors under any theory of law, including successor liability theories.*

4