SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
ORI KATZ, Cal. Bar No. 209561
J. BARRETT MARUM, Cal. Bar No. 228628
JEANNIE KIM, Cal. Bar No. 270713
MATT KLINGER, Cal. Bar No. 307362
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:    415.434.9100
Facsimile:     415.434.3947
Email:          okatz@sheppardmullin.com
                    bmarum@sheppardmullin.com
                    jekim@sheppardmullin.com
                    mklinger@sheppardmullin.com

Counsel for the Debtors

TRODELLA & LAPPING LLP
RICHARD A. LAPPING, Cal. Bar No. 107496
540 Pacific Avenue
San Francisco, CA 94133
Telephone:    (415) 399-1015
Facsimile:     (415) 651-9004
Email: Rich@TrodellaLapping.com

Conflicts Counsel for the Debtors

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>PROFESSIONAL FINANCIAL INVESTORS, INC., *et al.*,<br><br>Debtors. | Case No. 20-30604<br><br>(Jointly Administered)<br><br>Chapter 11<br><br>**DECLARATION OF GREGORY GOTTHARDT REGARDING DEBTORS' PORTFOLIO SALE PROCESS AND MARKETING EFFORTS**<br><br>Judge: Hon. Hannah L. Blumenstiel |

I, Gregory Gotthardt, declare:

1. I have over 35 of years of real estate transaction advisory and valuation experience during my professional career. I provided, and continue to provide, financial advisory services to real estate owners and investors (including general and limited partners, and private equity funds), developers, operating companies, Real Estate Investment Trusts ("<u>REITs</u>"), financial institutions, corporations and government authorities in transactions involving billions of dollars of real estate assets and loan portfolios.

2. My work includes advising owners, investors, and users of real estate on asset management and transaction strategies, acquisitions and dispositions, investment due diligence including quality of earnings, development planning and implementation, distressed assets and restructuring/recapitalization, investment underwriting and asset valuation. This experience spans a wide variety of property types, including residential, office, industrial, retail, multifamily, land and mixed-use development.

3. FTI Consulting's Real Estate Solutions group is one of the most prominent global real estate restructuring and advisory firms and has been involved in most of the major real estate-related bankruptcy cases in the past twenty years. FTI has extensive experience in the managing, marketing and sales of large real estate portfolios.

4. I have been responsible, along with Chief Restructuring Officer Andrew Hinkelman, for establishing the asset strategy for the PFI portfolio given its facts and circumstances.

5. The PFI portfolio being purchased by Hamilton Zanze consists of 39 Class B and C apartment buildings ranging from 4 to 96 units primarily constructed in the 1960s and 1970s along with a diverse set of 21 commercial (mostly suburban office) buildings located in Marin and Sonoma counties (collectively, the "Portfolio")[1]. At the time that FTI Consulting took over operational responsibility for the PFI entities in January 2021, the Portfolio was experiencing high vacancy (approximately 10% for the apartments and nearly 30% for the commercial properties)

---

[1] Note that the four properties consisting of 1 apartment building and 3 commercial buildings were excluded from the Portfolio to sell independently based on unsolicited offers that would yield a higher return to PFI investors.

due to pre-bankruptcy neglect, deferred maintenance, and negative effect on demand from Covid-19. Despite FTI's best efforts to reduce vacancies, they presently remain at similar levels.

6. In January and February 2021 on behalf of the Debtors, FTI completed an extensive analysis of the portfolio that estimated market pricing for the Portfolio properties. The Debtors disclosed FTI's Analysis to the Official and Ad Hoc Committees (collectively, the "Committees") on a confidential basis. Unfortunately, FTI's analysis indicated that the Portfolio's likely market pricing was significantly less than indicated by a host of pre-bankruptcy Broker Price Opinions that had been obtained by the previous Chief Restructuring Officer and filed with the Bankruptcy Court which pegged the value range of the portfolio from $543 to $567 million. As FTI conducted its analysis, it became apparent that the firms that issued the Broker Price Opinions had little or no detailed information about the true operating performance of the properties.

7. FTI conducted its market pricing analysis using market-based assumptions including that the Portfolio would return to improved "stabilized" operations within one to three years (depending on the property type and characteristics). <u>FTI's analysis did **not** represent a "fire-sale" or liquidation value.</u> Further, FTI's analysis showed that it would be very difficult, if not impossible, for the PFI entities to continue as a going-concern or as a self-managed trust given a severe cash shortage, deferred maintenance and debt service requirements. In fact, based on FTI's extensive financial analysis, the PFI entities would not have likely been cash flow positive until 2023 and, in the meantime, would be subject to loan maturities and defaults that would further imperil the potential recovery to the creditors defrauded through the Ponzi scheme. Further, no near-term cash distributions would be available to the Creditors without a sale of substantially all of the Debtors' properties.

8. Based on the entirety of the asset strategy analysis (and after extensive review and discussion with the Committees), FTI was authorized in February 2021 by the Committees to solicit initial indications of interest from likely buyers of the Portfolio to determine whether the pricing expectations from FTI's Portfolio analysis would be met or exceeded by market participants.

9. During the time that FTI was completing its extensive financial analysis of the Portfolio, FTI populated a virtual data room ("VDR") with important information that described each of the property's physical, operating and financial characteristics for potentially interested parties. These VDRs are critical to providing potential buyers with pertinent information so such buyers can provide accurate pricing. In February 2021, FTI also began an outreach to a broad group of likely interested buyers, including those experienced with Bay Area apartment and commercial investments. This group of potential buyers also included an initial outreach to all parties that had expressed interest in the properties since the commencement of the bankruptcy proceedings (based on a list compiled by Armanino) as well as FTI's extensive network of real estate investment firms including Real Estate Investment Trusts, private equity firms, real estate operating companies, and hedge funds. During that time, I personally had conversations with dozens of potential buyers and members of the real estate brokerage community to introduce the Portfolio and generate enthusiasm for the opportunity. Importantly, that initial outreach would either confirm FTI's market analysis as a basis for the Portfolio sale strategy or, if we failed to meet pricing expectations, cause us to recommend an alternative strategy to the Committees.[2]

10. Based on the initial marketing efforts, thirty-six (36) potential buyers[3] had signed nondisclosure agreements to obtain access to the VDR. By April 2021, these interested parties resulted in 2,234 unique workspace views and 68,385 downloads in the VDR, representing a very high level of interest (as opposed to "tire-kickers"). As a result of these efforts, the Debtors received numerous expressions of interest, including five (5) offers for the Debtors' entire portfolio; three (3) offers for the Debtors' residential portfolio; one (1) offer for the Debtors' commercial portfolio; and seventeen (17) offers for individual or groups of the Debtors' properties. Three (3) potential purchasers emerged from this process as potential lead bidders, and the Debtors negotiated with them extensively before selecting the Stalking Horse Bidder. Each of

---

[2] FTI did not reveal its valuation analysis to potential buyers during any part of the marketing process. Instead, we referenced the Broker Price Opinions that were previously prepared and told potential buyers that they would have to complete their own analysis.

[3] These 36 parties represent potential buyers. FTI only executed nondisclosure agreements with potential buyers not brokers or advisors.

these potential purchasers had provided initial offers that were lower than FTI's estimate of market pricing. However, over a two week period in April, I negotiated extensively on the Debtors' behalf for the top three offerors to revise their bids upwards to increase their opportunity to be named the stalking horse. The result of this "mini auction" was that the increase in offer prices ranged from $17 million to more than $27 million from their initial indications of interest. The Debtors, in close consultation with the Committees, ultimately selected Hamilton Zanze as the overall best stalking horse offer based on a significant improvement over its initial offer.

11. Hamilton Zanze's stalking horse offer was specifically crafted to maximize the opportunity for overbids in the following ways: 1) Hamilton Zanze agreed to pay for all third-party reports necessary for due diligence (including but not limited to Zoning Reports, ALTA Surveys, Property Condition Reports, and Environmental Studies) and upload those items to the VDR as they were completed so that other potential bidders had access to these important due diligence items; 2) the combined break-up fee and expense reimbursement was only 1.5% of the sales price, which is very low by market standards particularly given Hamilton Zanze's agreement to provide access to the third-party reports for the benefit of other bidders; and 3) the minimum overbid increment was set at $2 million (less than one-half percent). Further, Hamilton Zanze's fronting of the third-party report expenses left the Debtors in a strong position to reject any attempt to lower the stalking horse purchase price following the buyer's due diligence, since Hamilton Zanze would be heavily invested and significantly extended as a result of its out of pocket costs and time commitment.

12. FTI's active marketing process continued throughout the negotiation of the stalking horse Asset Purchase Agreement with Hamilton Zanze. In fact, just before the broader marketing campaign launched on July 19, 2021 (after court approval of the Bid Procedures Motion), there were 49 signed NDAs. Those 49 NDAs were exclusively the result of personal phone calls and emails to qualified and relevant industry contacts. During this period (from the start of marketing in February 2021 up until the email campaign in July 2021), I personally logged over 45 hours in direct conversations with potential buyers and their representatives to solicit interest in the Portfolio.

SMRH:4839-1895-2443.1 -4- DECLARATION OF GREGORY GOTTHARDT
Case: 20-30604    Doc# 909    Filed: 09/14/21    Entered: 09/14/21 16:03:47    Page 5 of 8

13. As is customary once bid procedures are approved by the court, FTI redoubled its efforts to advertise the opportunity for potential buyers to participate in a bankruptcy auction. To advertise the auction, FTI used a specialized web-based real estate marketing platform known as Real Capital Markets (RCM) Lightbox, which is the primary web-based platform that brokers use for portfolios of this size. According to RCM's data, over 50% of all United States commercial real estate sales are brought to market using RCM. More than 300,000 real estate industry professionals have leveraged RCM to transact over $2.4 trillion in commercial property online. Through this web-based platform, FTI prepared a website (www.pfinorthbayportofolio.com) and an offering memorandum, and accessed RCM's proprietary email contact list of verified buyers with qualifications to purchase a portfolio of the type and magnitude of the Portfolio. As a result of the campaign: 10,259 qualified and verified investor contacts received notice of the bankruptcy sale; 3,284 investor contacts viewed the detailed email presenting the investment opportunity; and 245 investor contacts followed the links to the executive summary on the website that included the offering memorandum. The list of 245 contacts who clicked through to read the details of the deal included major real estate investment groups, all over the region as well as the nation, including global asset management firms in the $500B+ assets under management range.

14. During and after the email campaign, FTI continued to market the portfolio via personal contacts and outreach, leveraging the materials produced to continue outreach to known qualified buyers. In the week following the campaign launch, FTI sent the new marketing materials to more than 45 additional investor contacts with personal email and phone outreach, including local and national property investment/management groups and many of the largest national real estate private equity groups. Since the campaign launch up through August 2021, I and other FTI Senior Managing Directors logged approximately 30 hours of phone call conversations and in-person meetings pitching the portfolio to qualified potential investors.

15. The marketing campaign demonstrated results in stimulating potential buyer interest. As a result of activity during and after the email campaign, another 37 NDAs were signed. From the commencement of the marketing campaign through the bid deadline, the workspace was viewed 3,944 times with 235,740 document downloads. This represents an

1 extraordinary level of activity on a portfolio with a minimum overbid of $442.68 million.

16. FTI used its extensive industry contacts and followed industry best practices in its effort to achieve an active auction on behalf of the PFI investors. The stalking horse offer was the result of a highly competitive process among industry participants that had a high level of knowledge of North Bay Area real estate and the Portfolio. Many investment groups rejected the Portfolio as "non-institutional," meaning that the properties were of insufficient size and quality to meet their investment criteria. Many other investment groups spent significant time and effort to pursue the Portfolio only to conclude that the adverse conditions identified during due diligence such as 9 properties located in flood zones, encroachment issues on three properties, continuing effects of Covid-19 adversely effecting occupancy (particularly in the commercial properties), significant deferred maintenance and capital expenditures identified in the Property Condition Reports (and unknown to the Debtors prior to the reports), and accommodating the delayed closing due to title issues made the minimum overbid amount economically infeasible to achieve their desired returns. All of these issues almost certainly discouraged overbidding by other potential buyers given Hamilton Zanze's strong stalking horse offer price.

17. Hamilton Zanze has fulfilled (and in some cases exceeded) its obligations under the Asset Purchase Agreement and has increased its original contract price by $2.5 million despite the adverse conditions noted above.

18. In summary, during the marketing process, FTI logged more than 70 logged hours of direct telephone contact[4] reaching out directly to more than 80 potential buyers, executed 86 nondisclosure agreements with principal buyers, had approximately 300 distinct visitors to the VDR download more than 445,000 documents, received five offers on the total portfolio, and competitively bid the top 3 offerors against each other to establish the stalking horse offer.

19. If the stalking horse offer were underpriced, the Debtors would have had an active auction. Instead, the Hamilton Zanze offer is demonstrably the highest and best value to the Creditors.

---

[4] The logged hours are based on timesheet entries. Actual hours spent interacting with potential buyers exceeds recorded timesheet entries.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 14, 2021, at Sandy, Utah.

*Gregory Gotthardt*
Gregory Gotthardt