Tuesday, February 2, 2022

The Honorable Hannah L. Blumenstiel
United States Bankruptcy Court
Northern District of California, San Francisco Division
450 Golden Gate Avenue
San Francisco, CA 94102

Regarding: Professional Financial Investors, Inc., et al., Case No. 20-30604

Dear Judge Blumenstiel:

It seems sad to report that many questions about the PFI-PISF property valuations related to Case #20-30604, and conduct of the Chapter 11 process leading to the failed Stalking Horse auction, have still not been answered. A number of investors have expressed interest in documentation of what went wrong with this Ponzi scam, much of which can be attributed to poor oversight of the process since May 6, 2020. Many complaints persist about excessive fees scheduled to be sent to professionals, in spite of poor oversight throughout the process in addition to persistent communication and transparency problems.

It seems that little is being done to pay attention to the failures of, or change the Chapter 11 bankruptcy process for Ponzi scheme victims. The professionals attracted to these legal feeding frenzies are apparently immune to bearing any shame for poor performance.

Perhaps the most factual information is contained within the Declaration of David Alfaro - Head of the FTI Forensic Team. Docket #529 was uploaded with little fanfare on April 29, 2021. Emphasis during all-investor meetings under CRO Andrew Hinkelman (FTI) starting late Jan/Feb 2021 - end of May 2021 when the plan was approved, was on the development / management of a quickstep march of the investors to a plan approval at the end of May. Many all-investor sessions were spent on painful and repetitious explanations of the concepts of netting and clawbacks. David Alfaro's clear-headed information about the process was swept under the Chapter 11 rug. The extent of commingling, the oddly and consistently neat dollar values of intercompany transfers, and the consistency of distributions across the years to each investor should have been recognized as improper business practice since long before June, 2020. Even my accountant, whom I called as soon as the June, 2020 letters were sent to the investors from Eric Sternberger (Ragghianti), told me that extensive commingling had been discovered, and the investigation was forwarded to the SEC a month after Ken Casey's death.

***Facts about commingling were known early in June, 2020. We are still struggling today with how a one-pot approach due to commingling was universally ignored, in favor of a "divide and conquer strategy" facilitated by the professionals among the investors (most of whom participated in more than one type of investment). "Divide and conquer" prevented a facilitated acceptance of the one-pot plan that the investors were told very early on could be our future, and substituted an extremely costly process fraught with communication failures, lack of transparency, and misinformation-laden dockets.***

Even as the investors are expected to review and decipher fee applications, it is obvious that millions of dollars disappeared shortly after May 6, 2020, when case #20-30604 and related cases were first filed with the bankruptcy court. No documentation exists, nor has there ever been an explanation of the disappearance of many millions of dollars early on between May 6 - July 27, 2020. Even recently, the Dockets filed with the Court have stated that a long-running Ponzi scheme dating back to the 20th century was connected to a few PFI upper managers and acquaintances, and approximately $100M in real estate assets in over 70 properties evaporated by the summer of 2021. The only indictment that resulted from this colossal failure was that of Lewis Wallach.

At this late date in the process, and obvious from many questions and complaints still lingering, ignored, or suppressed about the Ch. 11 process, it would be beneficial to conduct a post-mortem for #20-30604 and related cases. Calling attention to the execution of the Ch. 11 process in Northern California will enable future investors to have a greater say in a process that strongly favors professional attorneys and accounting firms running roughshod over Ponzi victims.

As investor victims, our last remaining hopes are to try to persuade the SEC & US Trustees to assist with trimming more from the hyperinflated professional fees (not likely, given historical activity) many of whom were caught in dubious activities (LLC #39, #45 sales are well documented examples of inferior asset management).

A number of investors are in the process of identifying attorneys that are able to advise on additional civil actions against the PFI-PISF unindicted co-conspirators (Charlene Albanese, Cynthia Harrison-Wallach, Leslie Wallach, Manuel and Jarek Romero), each of whom appear to be still living high off the hog in homes made available with investor dollars.

In retrospect, it also appears that somewhere between November, 2020 - May, 2021, the preparation of a bulk liquidation process for the properties was conceived and finalized (perhaps by Michael VanderLey of Force 10, FTI, and SMRH representatives in meetings with Hamilton Zanze???). Absolutely no mention of Michael VanderLey's (Force 10) extensive involvement in the property valuation and Stalking Horse APA negotiation process was ever made to the investor community. Discovered by sheer coincidence, Mr. VanderLey's activities in the valuation of the properties and the negotiation of the Stalking Horse APA, as well as his strong ties to FTI employees, paint a picture that desperately needs explanation. From the fee applications, one can see that Michael VanderLey (Force 10), FTI, Sheppard Mullin, Hamilton Zanze and their counsel determined the property valuations for each property in the portfolio. Strangely, none of the >20 valuation / Stalking Horse APA negotiation meetings with Mr. VanderLey included any representation for the investors (no Independent Director Michael Goldberg, no attorneys from PSZJ, no LLC or DOT committee counsel).

**A Small Group of "Concerned Investors":**
A small group of "Concerned Investors" formed June 2021 in a chat room, which led to a number of zoom calls and intense analysis of the properties (albeit without factual data about the properties in the portfolio). Drawing heavily on outside real estate experts, we reached out to and spoke with each other and the experts in a number of June/July 2021 Zoom calls. This process eventually resulted in a letter to Judge Blumenstiel, Docket # 907, filed 2021-09-14, regarding the marketing of the properties.

In spite of repeated calls for factual data about the properties in the portfolio from a number of investors, there has never been any representation or explanation of the complete property portfolio valuations to investors beyond the Dockets filed in July, 2020 and early 2021 when the LLC properties filed for bankruptcy.

Concerned Investors scheduled 3 evening Zoom meetings in July, 2021 with Michael Goldberg (Independent Director, Akerman), including bit parts by Andrew Hinkelman & Greg Gotthardt (FTI), and Barrett Marum (SMRH), in an attempt to get major questions answered about the portfolio marketing process and the extraordinary number of very oddly recorded DOT transactions. No progress was made. The group had a subsequent Zoom meeting with UCC members in August, 2021, also with little/no result in improvement of the property marketing process or confused DOT information. As investors, we tried our best to break through the communication problems that have beset this Ponzi scam since May, 2020.

Concerned Investors were disappointed (as everyone else was) but in the end not entirely surprised at the failure of the Stalking Horse auction. Many investors in the larger PFI-PISF community believe that from the start, shortly after Ken Casey died, emphasis was placed on a bulk liquidation of the properties, with an extremely awkward combination of commercial office and multi-family properties. We took an expensive detour with the Chapter 11 process, hiring attorneys who led naïve investors in the divide and conquer strategy. ~$35-$40M later, we are exhaustedly hoping we can still exert some downward pressure on the overwhelming fees of the professionals. To this day, we are interested in reaching out to attorneys regarding civil activities against wrong-doers involved in this PFI-PISF Ponzi Scam.

**Connecting the Dots:**
In retrospect, some dots have been connected describing of the evolution of the historical activity of the PFI-PISF Scam, and the twisted development of the Chapter 11 process. Actions speak more loudly than words, and there are large gaps not met regarding appropriate oversight activity. Even though many investors in 2020 repeatedly voiced a desire to explore a continuing effort with a portion of the portfolio restructured as an ongoing business — the professionals and the committees never seemed to put any thought into a partial liquidation / partial restructuring effort for the benefit of these investors.

Even as the property markets in Marin/Sonoma were heating up Spring - Summer of 2021 (see August 31, 2021 article - comments on HZ multifamily activities in the pandemic market https://hamiltonzanze.com/urban-multifamily-starts-to-see-recovery/), the forced sale of the awkward bulk portfolio remained fixed, and a failed effort to maintain the value of the assets resulted in ~$100M in asset value vaporized between July 14, 2020 and the close of the sale. However, some properties were carved out of the portfolio well before the Ch. 11 plan was passed, two of which are still pending: LLC #39 and LLC #45 - and notably, no investors have been allowed to participate as beneficiaries of the giveaways associated with these 2 properties.

**Properties carved out for sale before the Hamilton Zanze portfolio of 60 properties was announced:**
The professionals facilitated carving out the sales of LLC #39 and LLC #45 well before the portfolio was tied up with a bow for Hamilton Zanze's mysterious partner, NCP JV LLC.  In August and September of 2021, issues with LLC #39 came to light (4th St. Business Center at 523 4th St. / Irwin St), which John Fiero (PSZJ) claimed in an all-investor meeting that due to "environmental problems" (proximity to a gas station, and a dry cleaning facility) the investors "were lucky" to get a $4.8M offer for the $7.4M property (case #21-30083). The debtors are sweeping this fire sale of LLC #39 under the Chapter 11 rug, and Eric Sternberger's client, the fraudulent Christopher Hart of Seagull Prime Real Estate Fund LLC (see documents attached), currently seems to be on track to acquire LLC #39, blissfully located in the middle of ~$50M of downtown San Rafael redevelopment projects. Like other properties Hart currently owns, it seems that LLC #39 could also be destined for flipping. Oddly, LLC #34 was sold (in spite of Fiero's "environmental issues") to Hamilton Zanze's partner NCP JV LLC.

Reviewing his attached bona fides, it seems bizarre that Mr. Hart of Seagull was chosen as the beneficiary of a multi-million dollar discount on LLC #39. Mr. Sternberger (Ragghianti) has denied any involvement in the sale (Docket # 868, 2021-08-27).  This leaves Sheppard Mullin attorneys as the deciding authority on the sale & greatly reduced price, reported by John Fiero of PSZJ in an all-investor meeting.

With the filing of Docket #1062 (2021-12-29) regarding the belated sale of LLC #45 (the American Building at 1099 D St. in San Rafael), it seems that greater value could have been maintained for the benefit of the investors. Instead, the debtors — even before the sale has closed — funded a remodeling & planning process and contributed ~$500,000 in additional funding due to "deferred maintenance" that no one has documented, for the benefit of the buyers of the property.

**The Wrap:**
Data is still being collected on some potential 3rd party co-conspirators of Ken Casey & Lewis Wallach, and documentation has not yet been shared for co-conspirators Charlene Albanese, Cynthia Harrison-Wallach, and other potential contributors to the scam (Manuel Romero, Jarek Romero, Leslie Wallach, Terry Carlson).

Many investors still wonder, even at this late date, why it took so long to dismiss Michael Hogan (former CRO) of Armanino, and why the professionals hired by Charlene Albanese (the felonious Ken Casey's lifetime partner) were allowed to remain in place for so long: Eric Sternberger (Ragghianti firm), Sheppard Mullin, Armanino.  Reflecting upon the cozy ties among the small world of the California bankruptcy-focused professionals, it's no longer a mystery that so many Ponzi victims were beaten into submission by the process.  And beaten we were.  A self-appointed "hall monitor" for the facebook platform, who, as a former attorney should have known better, routinely heaped verbal abuse on many participants in the platform. This has been well documented, as were Q&A sessions in all-investor meetings that were limited to long lines of investors limited to 1 question, 1 minute, tacked on at the ends of meetings, which virtually eliminated questions / answers of substance.  Email questions of substance sent to questionspfi@gmail.com were frequently ignored.

It seems that there is plenty of room for improvement in the management of Ponzi scams in the future.

Respectfully submitted,

Betsy Alberty
Former Investor, PFI/PISF
Attachments (additional original documents & color images available upon request)



Downtown San Rafael Redevelopment Project
https://www.cityofsanrafael.org/third-street-rehabilitation-05-30-2019/



Birds-eye view of San Rafael properties LLCs #34, #39 with "environmental problems"

MARY ANN SMITH
Deputy Commissioner
SEAN M. ROONEY
Assistant Chief Counsel
KIRK WALLACE (State Bar No. 129953)
Senior Counsel
One Sansome Street, Suite 600
San Francisco, CA 94104
Telephone: (415) 972-8546
Facsimile (415) 972-8550

Attorneys for Complainant

BEFORE THE DEPARTMENT OF BUSINESS OVERSIGHT

OF THE STATE OF CALIFORNIA

| | | |
|---|---|---|
| In the Matter of: | ) | CRMLA LICENSE NO.: 415-0042 |
| | ) | |
| THE COMMISSIONER OF BUSINESS | ) | |
| OVERSIGHT, | ) | ORDER REVOKING MORTGAGE LENDERS |
| | ) | LICENSE |
| Complainant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FIRST CALIFORNIA MORTGAGE | ) | |
| COMPANY, | ) | |
| | ) | |
| Respondent. | ) | |

1.      On May 18, 2018, the Commissioner of Business Oversight (Commissioner) brought an action pursuant to Financial Code section 50327 to revoke the residential mortgage lender license issued to Respondent First California Mortgage Company (First Cal), which has also done business under the names First Cal, Dealworks, and First Cal Mortgage Services Across America.

2.      First Cal is a residential mortgage lender licensed by the Commissioner pursuant to the California Residential Mortgage Lending Act (CRMLA) (Fin. Code, § 50000 et seq.), (CRMLA License No. 415-0042). First Cal had its principal place of business located at 1400 North McDowell Boulevard, Suite 300, Petaluma, California, 94954, but no longer has any business operations located at that address.

Case: 20-30604     Doc# 1111     Filed: 02/07/22     Entered: 02/07/22 11:49:27     Page 5 of
27

State of California - Department of Business Oversight

3.     The Commissioner brought the action to revoke First Cal's residential mortgage lender license pursuant to Financial Code section 50327 due to: (1) repeated failures by First Cal to remedy violations of Financial Code section 50202 and California Code of Regulations, title 10, section 1950.314.1 with regard to the improper commingling of trust account funds noted during repeated examinations and in violation of a prior order by the Department of Business Oversight (Department); and (2) failure to notify the Department that it had ceased doing business and was no longer located at any of its registered business addresses, it also failed to maintain working phone numbers or provide current address and contact information to the Department as required by Financial Code section 50124.

4.     On May 18, 2018, First Cal was served by the Department through certified and regular mail at its registered business address of 1400 North McDowell Boulevard, Suite 300, Petaluma, California, 94954, with copies of the following documents: (1) Accusation in Support of Order to Revoke Mortgage Lenders License; (2) Notice of Intention to Issue Order Revoking Mortgage Lenders License; (3) Statement to Respondent; and, (4) Notice of Defense (collectively, Administrative Action).  No request for hearing or other opposition to the Administrative Action was received by the Commissioner in the time specified by law.

5.     The above-described violations constitute grounds under Financial Code section 50327 to revoke the residential mortgage lenders license of Fist Cal in California.

The Commissioner hereby finds that, by reason of the foregoing, it is in the public interest to revoke the residential mortgage lending license of First California Mortgage Company.

THEREFORE, GOOD CAUSE APPEARING, IT IS ORDERED that the residential mortgage lenders license of First California Mortgage Company be revoked. This order is effective immediately.

Dated: June 11, 2018

JAN LYNN OWEN
Commissioner of Business Oversight

By_____
 MARY ANN SMITH
Deputy Commissioner
Enforcement Division

2
ORDER REVOKING MORTGAGE LENDERS LICENSE

**ORDER SUMMARY – Case Number: C-19-2759**

| | |
|---|---|
| Names: | First California Mortgage Company, Christopher K Hart |
| Order Number: | C-19-2759-20-CO01 |
| Effective Date: | 7/28/2020 |
| License Number: Or NMLS Identifier [U/L] | 24055 |
| License Effect: | Surrendered |
| Not Apply Until: | 7/28/2025 |
| Not Eligible Until: | |
| Prohibition/Ban Until: | 7/28/2025 |

| | | | | |
|---|---|---|---|---|
| Investigation Costs | $ 835 | | Paid ☒ Y ☐ N | Date 7/28/20 |
| Fine | $ 9,000 | Due | Paid ☐ Y ☒ N | Date |
| Assessment | $6,450.71 | Due | Paid ☐ Y ☒ N | Date |
| Interest | $1,354.65 | Due | Paid ☒ Y ☐ N | Date 7/28/20 |
| Late Filing Fee | $5,000 | Due | Paid ☐ Y ☒ N | Date |
| Cost of Prosecution | $ | Due | Paid ☐ Y ☐ N | Date |
| | No. of Victims: | | | |

Comments: Respondents are making installment payments of the fine/assessment/late fee according to the schedule in the Consent Order. Investigation fee and interest paid in full, $1,810.35 of the late penalty paid. Fine of $9,000 is non-stayed portion; total fine is $15,750.

---

**STATE OF WASHINGTON
DEPARTMENT OF FINANCIAL INSTITUTIONS
DIVISION OF CONSUMER SERVICES**

| | |
|---|---|
| IN THE MATTER OF DETERMINING: Whether there has been a violation of the Consumer Loan Act of Washington by: FIRST CALIFORNIA MORTGAGE COMPANY, NMLS #24055, and CHRISTOPHER K HART, President, CEO, NMLS #28542, Respondents | No.: C-19-2759-20-CO01 CONSENT ORDER |

COMES NOW the Director of the Department of Financial Institutions (Director), through his designee Lucinda Fazio, Division of Consumer Services Director, and First California Mortgage Company (Respondent FCMC), and Christopher K. Hart (Respondent Hart), and finding that the issues raised in the above-captioned matter may be economically and efficiently settled, agree to the entry of this Consent Order. This Consent Order is entered pursuant to chapter 31.04 of the Revised Code of Washington (RCW), and RCW 34.05.060 of the Administrative Procedure Act, based on the following:

**AGREEMENT AND ORDER**

The Department of Financial Institutions, Division of Consumer Services (Department) and Respondents have agreed upon a basis for resolution of the matters alleged in Statement of Charges No. C-19-2759-19-SC01 (Statement of Charges), entered December 12, 2019, (copy attached hereto). Pursuant to chapter 31.04 RCW, the Consumer Loan Act (Act), and RCW 34.05.060 of the Administrative Procedure Act, Respondents hereby agree to the Department's entry of this Consent Order and further agree that the issues raised in the above-captioned matter may be economically and efficiently settled by entry of this Consent Order. The parties intend this Consent Order to fully

resolve the Statement of Charges. Respondents are agreeing to not contest the Statement of Charges in consideration of the terms of this Consent Order.

Based upon the foregoing:

**A. Jurisdiction.** It is AGREED that the Department has jurisdiction over the subject matter of the activities discussed herein.

**B. Waiver of Hearing.** It is AGREED that Respondents have been informed of the right to a hearing before an administrative law judge, and hereby waive their right to a hearing and any and all administrative and judicial review of the issues raised in this matter, or of the resolution reached herein. Accordingly, Respondents, by their signatures and the signatures of their representatives below, withdraw their appeal to the Office of Administrative Hearings.

**C. Consumer Loan Company License Surrender.** It is AGREED that Respondent FCMC's Washington consumer loan company license is surrendered.

**D. Limitation on Participation in Industry.** It is AGREED that, for a period of five (5) years from the date of entry of this Consent Order, Respondent Hart shall refrain from obtaining an industry position that directly oversees, influences, or makes decisions for the regulatory or licensing affairs in any company which does business in Washington and is licensed under either the Mortgage Broker Practices Act or the Act.

**E. Application for License.** It is AGREED that, for a period of five (5) years from the date of entry of this Consent Order, Respondents shall not apply to the Department for any license under any name. It is further AGREED that, should Respondents apply to the Department for any license under any name at any time later than five (5) years from the date of entry of this Consent Order, such applying Respondents shall be required to meet any and all application requirements in effect at that time.

**F. Annual Assessment Payment and Interest.** It is AGREED that Respondents shall pay to the Department $6,450.71 for Respondent FCMC's Annual Assessment Report (AAR) filed with the Department for calendar year 2017. It is further AGREED that Respondents shall pay to the Department interest in the amount of $1,354.65 due to the late filing of the AAR.

**G. Late Filing Fee.** It is AGREED that Respondents shall pay to the Department a late filing fee of $5,000 based on the late filing of Respondent FCMC's AAR for calendar year 2017.

**H. Fine.** It is AGREED that Respondents shall pay a fine to the Department in the amount of $15,750. It is further AGREED that the Department will stay $6,750 of the fine for a period of five (5) years from the date of entry of this Consent Order, at which point the stayed portion of the fine shall be withdrawn, unless the stay is lifted pursuant to Paragraph I prior to the end of the five-year period.

**I. Lifting the Stay and Imposing the Fine.** It is AGREED that:

    i.   If the Department determines that Respondents have not complied with the terms of this Consent Order to a degree sufficient to warrant imposition of the full amount of the fine, and the Department accordingly seeks to lift the stay and impose the full amount of the fine set forth in Paragraph H above, the Department will first notify Respondents in writing of its determination.

    ii.  The Department's notification will include:

        a.  A description of the alleged noncompliance;

        b.  A statement that because of the noncompliance, the Department seeks to lift the stay and impose the full amount of the fine;

        c.  The opportunity for Respondents to contest the Department's determination of noncompliance in an administrative hearing before an Administrative Law Judge (ALJ) of the Office of Administrative Hearings (OAH); and

        d.  A copy of this Consent Order. The notification and hearing process provided in this Consent Order applies only to this Consent Order. It is solely provided in the event Respondents choose to contest the Department's determination of noncompliance.

iii. Respondents will be afforded twenty (20) business days from the date of receipt of the Department's notification to submit a written request to the Department for an administrative hearing to be held before an ALJ from the OAH.

iv. The scope and issues of the hearing are limited solely to whether or not Respondents are in violation of the terms of this Consent Order to a degree sufficient to warrant imposition of the full amount of the fine.

v. At the conclusion of the hearing, the ALJ will issue an initial decision. Either party may file a Petition for Review with the Director of the Department.

**J. Investigation Costs.** It is AGREED that Respondents shall pay to the Department its investigation costs of $835.

**K. Payment of AAR Fee, Interest, Late Fee, Fine, and Investigation Fee.** It is AGREED that Respondents shall pay the total amount due of $22,640.36 in the form of installment payments to the Department according to the following schedule:

i. $4,000 shall be paid upon delivery of this Consent Order, properly dated and signed;

ii. $2,000 shall be paid on or before the last day of each month, beginning August 1, 2020, until December 31, 2020; and

iii. $8,460.36 shall be paid on or before January 31, 2021.

Respondents shall make each payment to the Department in the form of a cashier's check made payable to the "Washington State Treasurer." Respondents may, at any time prior to January 31, 2021, pay the entire remaining balance of the sum owed to the Department.

**L. Authority to Execute Order.** It is AGREED that the undersigned have represented and warranted that they have the full power and right to execute this Consent Order on behalf of the parties represented.

**M. Non-Compliance with Order.** It is AGREED that Respondents understand that failure to abide by the terms and conditions of this Consent Order may result in further legal action by the

Director. In the event of such legal action, Respondents may be responsible to reimburse the Director for the cost incurred in pursuing such action, including but not limited to, attorney fees.

**N. Voluntarily Entered.** It is AGREED that Respondents have voluntarily entered into this Consent Order, which is effective when signed by the Director's designee.

**O. Completely Read, Understood, and Agreed.** It is AGREED that Respondents have read this Consent Order in its entirety and fully understand and agree to all of the same.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

**RESPONDENTS:**
First California Mortgage Company
By:

/s/ _____      7/17/20 _____
Christopher K. Hart                     Date
President & CEO

/s/ _____      7/17/20 _____
Christopher K. Hart                     Date
Individually

Approved for Entry:

/s/ _____      7/20/20 _____
Douglas G. Murken, # 87929          Date
Attorney at Law
Seifer, Murken, Despina, James & Teichman, ALC
Attorneys for Respondents

―――――――――――――――――――――――――――――
DO NOT WRITE BELOW THIS LINE

THIS ORDER ENTERED THIS 28th DAY OF July, 2020.

/s/ _____
Lucinda Fazio, Director
Division of Consumer Services
Department of Financial Institutions

Presented by:

/s/ _____
BRETT CARNAHAN
Financial Legal Examiner

Approved by:

/s/ _____
STEVEN C. SHERMAN
Enforcement Chief

CONSENT ORDER
C-19-2759-20-CO01
FIRST CALIFORNIA MORTGAGE COMPANY
CHRISTOPHER K. HART

---

**STATE OF WASHINGTON**
**DEPARTMENT OF FINANCIAL INSTITUTIONS**
**DIVISION OF CONSUMER SERVICES**

| | |
|---|---|
| IN THE MATTER OF DETERMINING Whether there has been a violation of the Consumer Loan Act of Washington by: | No. C-19-2759-19-SC01 |
| FIRST CALIFORNIA MORTGAGE COMPANY, NMLS #24055, and CHRISTOPHER K. HART, President, CEO, NMLS #28542,<br><br>Respondents | STATEMENT OF CHARGES and NOTICE OF INTENT TO ENTER AN ORDER TO REVOKE LICENSE, PROHIBIT FROM INDUSTRY, REQUIRE AFFIRMATIVE ACTION, COLLECT ANNUAL ASSESSMENT FEES, ASSESS LATE PENALTIES, IMPOSE FINE, COLLECT INVESTIGATION COSTS, and RECOVER COSTS AND EXPENSES |

**INTRODUCTION**

Pursuant to RCW 31.04.093 and RCW 31.04.165, the Director of the Department of Financial Institutions of the State of Washington (Director) is responsible for the administration of chapter 31.04 RCW, the Consumer Loan Act (Act). After having conducted an investigation pursuant to RCW 31.04.145, and based upon the facts available as of the date of this Statement of Charges, the Director, through his designee, Division of Consumer Services Acting Director Richard St. Onge, institutes this proceeding and finds as follows:

**I. FACTUAL ALLEGATIONS**

**1.1 Respondents.**

**A. First California Mortgage Company (Respondent FCMC)** was licensed by the Department of Financial Institutions of the State of Washington (Department) to conduct business as a consumer loan company on or about December 19, 2008, and continued to be licensed until its license expired on March 1, 2018. Respondent FCMC reportedly ceased Washington operations around the time of its license surrender request.

//

//

B. **Christopher K. Hart (Respondent Hart)** is a mortgage loan originator and has been President and CEO of FCMC since February 2016 until the apparent Respondent FCMC closure. Respondent Hart has never been licensed with the Department.

1.2 **Annual Reports.** Each licensee is required to submit to the Department an annual assessment report (AAR) and consolidated annual report (CAR), as well as pay an annual assessment fee on or before the first day of March each year, concerning the business and operations conducted during the previous calendar year if the licensee had a license for any time during the preceding calendar year. Respondent FCMC maintained its Washington license throughout 2017, but it did not submit either its AAR or CAR for that year, nor did it pay its annual assessment fee for business conducted in Washington in 2017 by the statutory deadline of March 1, 2018. Additionally, Respondent FCMC was required to submit reports for 2018 within 30 days of closure and pay an assessment for 2018 as well. As of the date of this statement of charges, Respondent FCMC has not submitted any of these reports or payments to the Department.

1.3 **Incomplete License Surrender.** Every licensee is required to submit its surrender closure forms within five business days of the date of that the licensee files its surrender request in the NMLS. Respondent FCMC submitted a license surrender request in the NMLS on January 12, 2018. As of the date of this statement of charges, Respondent FCMC has not submitted required surrender documentation to the Department.

1.4 **Notification of Canceled Surety Bond.** Every licensee is required to notify the Department of a cancellation of the licensee's surety bond within ten days of receipt of notification of the cancellation. Respondent FCMC's surety notified the Department on or about March 6, 2018, of the pending cancellation of Respondent FCMC's surety bond. As of the date of this statement of charges, Respondent FCMC has not reported the bond cancellation to the Department, either directly or through the NMLS.

1.5 **Maintain Surety Bond.** Every licensee is required to maintain a continuous surety bond, or permitted substitute, while holding an active license. As stated in paragraph 1.4, Respondent FCMC's surety notified the Department on March 6, 2018, of the bond's cancellation, with an effective cancellation date on or about April 20, 2018 (45 days after notice was received by the Department). Since that date, Respondent FCMC has not maintained either a surety bond or a permitted substitute while its license surrender status remained pending.

1.6 **On-Going Investigation.** The Department's investigation into the alleged violations of the Act by Respondents continues to date.

## II. GROUNDS FOR ENTRY OF ORDER

2.1 **Failure to File Annual Reports.** Based on the Factual Allegations set forth in Section I above, Respondents are in apparent violation of RCW 31.04.155, WAC 208-620-430(1), WAC 208-620-460(1), and WAC 208-620-499(2) for failing to file Respondent FCMC's CAR and AAR or before March 1, 2018 for calendar year 2017, and for failing to file Respondent FCMC's CAR and AAR within thirty days of closure for calendar year 2018.

2.2 **Failure to Pay Annual Assessment Fees.** Based on the Factual Allegations set forth in Section I above, Respondents are in apparent violation of RCW 31.04.085, WAC 208-620-430(1), WAC 208-620-460(1), and WAC 208-620-499(2) for failing to pay the annual assessment fees for 2017 and 2018 by the statutory deadlines set forth in paragraph 2.1.

2.3 **Failure to File Reports to the Department.** Based on the Factual Allegations set forth in Section I above, Respondents are in apparent violation of RCW 31.04.155, WAC 208-620-499, and WAC 208-620-490(3)(d)[1] for failing to file the required closure form and worksheet with the

[1] At the time of Respondent FCMC's surety bond cancellation, the applicable section of the WAC was 208-620-490(2)(e), which required updating Respondent FCMC's *NMLS record* upon notification of cancellation. Such requirement was amended effective September 1, 2018, and now requires notification directly to the Department of the bond cancellation.

Department following request for surrender of Respondent FCMC's license and for failing to notify the Department, either through NMLS or directly, of Respondent FCMC's surety bond cancellation within the required ten day time frame.

2.4     **Failure to Maintain a Surety Bond.** Based on the Factual Allegations set forth in Section I above, Respondents are in apparent violation of RCW 31.04.045(4) for failing to maintain Respondent FCMC's surety bond while Respondent FCMC's license surrender was still pending.

## III. AUTHORITY TO IMPOSE SANCTIONS

3.1     **Authority to Revoke License.** Pursuant to RCW 31.04.093(3)(a) and (b), the Director may revoke a license for a licensee's failure to either pay any fee due to the state of Washington or maintain the required surety bond, or the licensee, either knowingly or without exercise of due care, violates any provision of the Act or any rule adopted under the Act.

3.2     **Authority to Prohibit from the Industry.** Pursuant to RCW 31.04.093(6)(e), the Director may issue an order prohibiting from participation in the affairs of any licensee, any officer, principal, employee, mortgage loan originator, or any other person subject to the Act for a violation of RCW 31.04.155.

3.3     **Authority to Require Affirmative Action.** Pursuant to RCW 31.04.093(5)(b), the Director may issue an order directing the licensee, its employee or loan originator, or other person subject to the Act to take such affirmative action as is necessary to comply with the Act.

3.4     **Authority to Collect Annual Assessment Fees.** Pursuant to RCW 31.04.085 and WAC 208-620-430, every licensee shall pay to the Director, on or before the first day of each March or within thirty days of ceasing Washington operations, an annual assessment for the previous calendar year if the licensee has a license for any time during the preceding calendar year. Pursuant to RCW 43.17.240, interest at the rate of one percent per month, or fraction thereof, shall accrue on debts owed to the state, starting on the date the debts become past due.

3.5     **Authority to Collect Late Penalties.** Pursuant to RCW 31.04.155 and WAC 208-620-430(2), a licensee that fails to file a report that is required to be filed under the Act within the time frame imposed by the Act is subject to a penalty of $50 for each item for each day of delay, with a maximum late penalty of $5,000 per reporting year.

3.6     **Authority to Impose Fine.** Pursuant to RCW 31.04.093(4), the Director may impose fines of up to one hundred dollars per day, per violation, upon the licensee, its employee or loan originator, or any other person subject to the Act for any violation of the Act or failure to comply with any order or subpoena issued by the Director under the Act.

3.7     **Authority to Charge Investigation Fee.** Pursuant to RCW 31.04.145(3) and WAC 208-620-590, WAC 208-620-610(7), every licensee examined or investigated by the Director or the Director's designee shall pay for the cost of the examination or investigation, calculated at the rate of $69.01 per staff hour devoted to the examination or investigation, and shall pay travel costs if the licensee maintains its records outside the state.

3.8     **Authority to Recover Costs and Expenses.** Pursuant to RCW 31.04.205(2), the Director may recover the state's costs and expenses for prosecuting violations of the Act.

//

//

//

//

//

//

//

//

//

### IV. NOTICE OF INTENT TO ENTER ORDER

Respondents' violations of the provisions of chapter 31.04 RCW and chapter 208-620 WAC, as set forth in the above Factual Allegations, Grounds for Entry of Order, and Authority to Impose Sanctions, constitute a basis for the entry of an Order under RCW 31.04.093, RCW 31.04.165, RCW 34.04.202, and RCW 31.04.205. Therefore, it is the Director's intent to ORDER that:

4.1 Respondent First California Mortgage Company's license to conduct the business of a consumer loan company be revoked.

4.2 Respondents First California Mortgage Company and Christopher K. Hart be prohibited from participation in the conduct of the affairs of any consumer loan company subject to licensure by the Director, in any manner, for a period of five years.

4.3 Respondents First California Mortgage Company and Christopher K. Hart provide to the Department a completed AAR and CAR, including all required supporting documentation, for both calendar years 2017 and 2018 (the year in which Respondent First California Mortgage Company ceased Washington operations).

4.4 Respondents First California Mortgage Company and Christopher K. Hart pay an annual assessment fee for both calendar years 2017 and 2018, as calculated in accordance with the instructions for the AAR for each of those years, plus all accrued interest.

4.5 Respondents First California Mortgage Company and Christopher K. Hart jointly and severally pay a $5,000 late penalty for failing to file a CAR and AAR for the 2017 calendar year.

4.6 Respondents First California Mortgage Company and Christopher K. Hart jointly and severally pay a $5,000 late penalty for failing to file a 2018 closing CAR and AAR within 30 days of ceasing Washington operations.

4.7 Respondents First California Mortgage Company and Christopher K. Hart jointly and severally pay a fine. As of the date of this Statement of Charges, the fine totals $15,750.

4.8 Respondents First California Mortgage Company and Christopher K. Hart jointly and severally pay an investigation fee. As of the date of this Statement of Charges, the investigation fee totals $835.

4.9 Respondents First California Mortgage Company and Christopher K. Hart jointly and severally pay the Department's costs and expenses for prosecuting violations of the

Act in an amount to be determined at hearing or by declaration with supporting documentation in event of default by Respondents.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

## V. AUTHORITY AND PROCEDURE

This Statement of Charges and Notice of Intent to Enter an Order to Revoke License, Prohibit from Industry, Require Affirmative Action, Collect Annual Assessment Fees, Assess Late Penalties, Impose Fine, Collect Investigation Costs, and Recover Costs and Expenses (Statement of Charges) is entered pursuant to the provisions of RCW 31.04.093, RCW 31.04.165, RCW 31.04.202, and RCW 31.04.205, and is subject to the provisions of chapter 34.05 RCW (The Administrative Procedure Act). Respondents may make a written request for a hearing as set forth in the NOTICE OF OPPORTUNITY FOR ADJUDICATIVE HEARING AND TO DEFEND accompanying this Statement of Charges.

Dated this 12th day of December, 2019.

/s/
RICHARD ST. ONGE
Acting Director
Division of Consumer Services
Department of Financial Institutions

Presented by:

/s/
BRETT CARNAHAN
Financial Legal Examiner

Approved by:

/s/
STEVEN C. SHERMAN
Enforcement Chief

# Rescap Liquidating Trust v. First Cal. Mortg. Co.

Decided Jan 31, 2019

Case No. 18-cv-03283-WHO

01-31-2019

RESCAP LIQUIDATING TRUST, Plaintiff, v. FIRST CALIFORNIA MORTGAGE COMPANY, et al., Defendants.

William H. Orrick United States District Judge

## ORDER GRANTING MOTION TO DISMISS COUNTERCLAIMS AND STRIKE AFFIRMATIVE DEFENSES IN PART AND DENYING IN PART

Re: Dkt. No. 45

Plaintiff Rescap Liquidating Trust ("Rescap") moves to strike defendants' counterclaims and several affirmative defenses because they are premised on an interpretation of a settlement agreement release provision that I have already rejected in a previous order. Even if I draw all reasonable inferences favor of defendants, my interpretation of the provision does not change— the release provision is unambiguous. As a result, I dismiss the first three counterclaims for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing with prejudice and strike the affirmative defenses that are based on defendants' contrary interpretation of the release. Defendants' derivative fourth counterclaim for reformation of the settlement agreement is dismissed with leave to amend because it fails to adequately plead

demand futility and to plausibly allege how defendants were defrauded into signing the settlement agreement.

Rescap also moves to strike all allegations regarding confidential settlement communications because they are subject to a mediation order by the Hon. Susan Richard Nelson of the District of Minnesota. Rescap's motion is granted. Defendants must seek authorization from Judge Nelson before they use said confidential settlement communications in their defense. [2]

## BACKGROUND

The Order Denying Motion to Partially Dismiss the Complaint ("MTD Order") [Dkt. No. 41] discusses the background of this lawsuit in detail. What follows is the abridged version.

### I. The Minnesota Litigation

Rescap is suing defendant First California Mortgage Company ("FCMC") for the alleged fraudulent transfer of funds from FCMC so that it could avoid paying Rescap pursuant to an already executed settlement agreement. Complaint [Dkt. No. 1]¶. It also sues individual defendants Christopher Kaznin Hart, Dennis Hart, Elizabeth Hart-Armstrong, and David Armstrong (collectively the "Individual Defendants") who allegedly own, manage, and control FCMC. Id. It further asserts that defendants Hart Family Foundation, Seagull Services LLC, First California Lending Solutions, D.M.H. Family Limited Partnership, and Tivoli Asset Management (collectively the "Affiliate

Rescap Liquidating Trust v. First Cal. Mortg. Co.    Case No. 18-cv-03283-WHO (N.D. Cal. Jan. 31, 2019)

Defendants") are affiliates of FCMC and are owned and controlled by the Individual Defendants. Id.

Rescap is the successor-in-interest to the now bankrupt Residential Funding Company, LLC ("RFC"), which had purchased over 300 mortgage loans from FCMC and sold them into residential mortgage-backed securitization trusts or to whole loan purchasers. Id. at ¶¶ 1, 9, 23-25. The various loans eventually failed and RFC filed for bankruptcy in 2012. Id. at ¶ 26. In 2013, RFC brought suit against FCMC in *Residential Funding Company, LLC v. First California Mortgage Company*, No. 13-CV-3453 (D. Minn.) (the "Minnesota Litigation") for breach of contract and indemnification because FCMC breached Rescap's Client Contract and Client Guide, which set out stringent contractual representations and warranties made by FCMC to protect RFC. Id. at ¶¶ 2, 24, 28. The Minnesota Litigation ended when Rescap, RFC, and FCMC executed a Settlement and Release Agreement (the "Settlement Agreement"), requiring FCMC to pay Rescap under a defined payment schedule. Id. at ¶¶ 2, 29.

FCMC ultimately defaulted on the required payments. In accordance with the Settlement Agreement, Rescap received a Confession of Judgment in its favor for $6,497,500 and statutory post-judgment interest, which it filed in Sonoma County Superior Court. Id. at ¶¶ 3, 31-32. The state court entered judgment. In August 2017, the parties entered into the Amendment to the Settlement and Release Agreement, requiring that FCMC to make a single lump-sum payment of $6,697,074. Id. at ¶¶ 5, 34. FCMC failed to make the payment. Id. at ¶ 7.

Rescap alleges that while the Minnesota Litigation was pending and the Settlement Agreement was being negotiated, the Individual Defendants began transferring FCMC's assets to themselves and the Affiliate Defendants in order to prevent FCMC from having to pay its creditors. Id. at ¶¶ 3, 6, 42-

44. On or around March 7, 2017, FCMC's counsel told Rescap that it had no assets left to pay the amended judgment. Id. at ¶ 47.

### II. Rescap's Complaint and Motion to Dismiss

Rescap filed the instant action in June 2018. [Dkt. No. 1]. Shortly after, defendants moved to partially dismiss the Complaint, arguing that Rescap could not seek funds transferred prior to the date of the Settlement Agreement because of the agreement's release provision, among other things. [Dkt. No. 20]. I denied defendants' motion in its entirety. MTD Order. As it relates to the current motion, I found that the settlement agreement only released defendants from suits based on any violation of the Client Contract and Client Guide and that it did not extend to the alleged fraudulent transfer scheme at the heart of Rescap's complaint. MTD Order at 6-9. I held that the alleged fraudulent transfer scheme is unrelated to any violations of the Client Contract and Client Guide. Id.

### III. The Current Motion to Dismiss Counterclaims and Strike Affirmative Defenses

On July 19, 2018, FCMC filed its answer. [Dkt. No. 18]. On November 15, 2018, the remaining defendants filed their answer stating thirty-three affirmative defenses. Answer at 12-19 [Dkt. No. 42]. Defendants other than FCMC and Tivoli Asset Management next filed counterclaims against Rescap for (1) declaratory relief, (2) breach of contract, (3) breach of implied covenant of good faith and fair dealing, and (4) reformation of the Settlement Agreement. Counterclaims [Dkt. No. 43].

Rescap now moves to dismiss the counterclaims, arguing that the first three are predicated on a meritless interpretation of the Settlement Agreement's release that I have already ruled against. Motion to Dismiss Counterclaims ("Mot."). [Dkt. No. 45]. It also argues that

Case: 20-30604    Doc# 1111    Filed: 02/07/22    Entered: 02/07/22 11:49:27    Page 15 of 27

defendants fail to state a claim, that some of the counterclaims are duplicative of the affirmative defenses, and "4 that the fourth counterclaim for declaratory relief is not a proper derivative claim. *Id.* Additionally, it also requests that I strike the affirmative defenses that are based on defendants' interpretation of the Settlement Agreement and that I also strike certain allegations from the Counterclaims and Answers that constitute protected confidential settlement communications. *Id.*

## LEGAL STANDARD

### I. MOTION TO DISMISS

In moving to dismiss counterclaims, "[t]he standards that apply to the complaint apply to the counterclaims as well." *Heartland Payment Sys., Inc. v. Mercury Payment Sys., LLC*, No. 14-cv-0437-CW, 2016 WL 304764, at *2 (N.D. Cal. Jan. 26, 2016) Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss if a claim fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the claimant must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a claim must be supported by facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

Under Federal Rule of Civil Procedure 9(b), a party must "state with particularity the circumstances constituting fraud or mistake," including "the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted). However,

"Rule 9(b) requires only that the circumstances of fraud be stated with particularity; other facts may be pleaded generally, or in accordance with Rule 8." *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 992 (9th Cir. 2011).

In deciding a motion to dismiss for failure to state a claim, the court accepts all of the factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). But the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

### II. MOTION TO STRIKE

Federal Rule of Civil Procedure 12(f) authorizes a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The function of a motion to strike "is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983). Motions to strike are generally disfavored and "should not be granted unless the matter to be stricken clearly could have no possible bearing on the subject of the litigation." *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004). In addition, courts often require some showing of prejudice by the moving party before granting a motion to strike. *Hernandez v. Dutch Goose, Inc.*, No. C 13-03537 LB, 2013 WL 5781476, at *5 (N.D. Cal. Oct. 25, 2013).

"If the court is in doubt as to whether the challenged matter may raise an issue of fact or law, the motion to strike should be denied, leaving an assessment of the sufficiency of the allegations for adjudication on the merits." *Carolina Cas. Ins. Co. v. Oahu Air Conditioning Serv., Inc.*, 994 F. Supp. 2d 1082, 1090-91 (E.D. Cal. 2014). In

---

resolving a motion to strike, I view the pleadings in a light most favorable to the nonmoving party. *Platte Anchor Bolt*, 352 F. Supp. 2d at 1057.

## DISCUSSION

### I. THE SCOPE OF RELEASE PROVISION IN THE SETTLEMENT AGREEMENT AND THE FIRST THREE COUNTERCLAIMS

Rescap moves to dismiss the first three counterclaims for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing because I have already found defendants' interpretation of the release provision to be meritless. Mot. 10-13. It argues that because the released claims relate only to any alleged, or as yet unalleged, violations of the Client Contract or Client Guide, the release does not extend to FCMC's payment obligations under the Settlement Agreement. *Id.*

In opposition, defendants argue that because my previous ruling on the scope of the release "4 was in the context of their motion to dismiss and required me to draw all reasonable inferences in Rescap's favor, the scope of the release has not been determined for the purposes of this motion. Opposition at 4-6 [Dkt. No. 51]. Defendants suggest that because the inferences are to be construed in their favor on this motion, I am compelled to interpret the Settlement Agreement differently. *Id.* They contend that at the time the parties entered into the Settlement Agreement, the $12 million in pre-settlement transfers from FCMC were subject to avoidance as fraudulent transfers. Therefore, Rescap should have amended its complaint in the Minnesota Litigation or brought a new action seeking to avoid those transfers at that time if it wanted to preserve its claims. *Id.* at 8-9. Defendants argue that the pre-settlement transfers must be covered under the Settlement Agreement's release provision.

Defendants are wrong. Under both California and Minnesota law[3], interpretation of an unambiguous contract is a matter of law. *Gen. Cas. Co. of Am. v.*

*Azteca Films, Inc.*, 278 F.2d 161, 168 (9th Cir. 1960) ("Under California law where a written agreement attempts to cover all relationships of the contracting parties, interpretation [is a] a matter of law"); *Roldan v. Messerli & Kramer, P.A.*, No. CIV. 11-2035 DWF/FLB, 2015 WL 5039137, at *3 (D. Minn. Aug. 26, 2015) ("Further, the construction and interpretation of an unambiguous contract is a matter of law, and [w]hen the language is clear and unambiguous, [courts] enforce the agreement of the parties as expressed in the language of the contract.") (internal citation and quotation marks omitted). The terms of the Settlement Agreement are clear. The factual allegations contained in the counterclaims and answers do not create any ambiguity that would warrant a different interpretation than I have already provided.

> [3] In my prior order I noted that although by its own terms the Settlement Agreement was to be interpreted under Minnesota law, both parties argued that Minnesota and California law did not meaningfully differ with respect to interpretation of the release and cited only California authority. The parties now cite Minnesota law and I do as well.

The Settlement Agreement states in relevant part that it was intended to "resolve the Litigation [and to] reach a full and fair compromise resolution of all claims *concerning the Subject Loans*." Settlement Agreement § 1 (emphasis added). The release clause provides that:

> The RFC parties . . . hereby forever release, remise, acquit, stand satisfied and

> "7

forever discharge [FCMC] and, each solely in their capacity as such, its present and former parents, subsidiaries, affiliates, employees, officers, directors, agents, representatives, predecessors, heirs, successors, attorneys, insurers and assigns . . . from any and all manner of claims, actions, causes of action, charges, suits, rights, debts, dues, sums of money, accounts, reckonings, bonds, bills, damages, judgments, executions, obligations, attorney's fees, costs, expenses, liabilities, and demands of any kind or nature whatsoever, at law or in equity, which it may have had, ever had, claims to have had, now has or which its Affiliates, employees, officers, directors, agents, representatives, heirs, successors , attorneys, insurers and assigns hereafter can, *shall or may have solely relating to the Subject Loans* (the "Released Claims"); provided, however, that the Released Claims shall not include the obligations and agreements undertaken by Defendant in this Agreement.

Settlement Agreement § 4 (emphasis added). As I hold before, "claims related to Subject Loans" refers to claims related to FCMC's alleged violations of the Client Contract and Client Guide when it sold loans to RFC. MTD Order at 6-9. As such, only claims related to violations of the Client Contract and Client Guide have been released under the Settlement Agreement.

This finding is fatal to three of defendants' counterclaims. Defendants' first counterclaim seeks a declaration that "to the extent Rescap's claims for relief under their Complaint herein are based on alleged transfers of assets made by [FCMC] before the parties entered into the September 23, 2016 Settlement Agreement, those claims fall within the scope of the 'Released Claims' contained in the Settlement Agreement and are, therefore, barred by the release of claims in the Settlement Agreement." Counterclaims at 4-

6. As stated above, the Settlement Agreement is unambiguous and Rescap's claims for relief based on allegedly fraudulent transfers are not implicated by the release contained in Settlement Agreement. Accordingly, I grant Rescap's motion to dismiss defendants' first counterclaim with prejudice.

Defendants' second and third counterclaims fail as well. The second counterclaim for breach of contract is premised on defendants' allegation that Rescap breached the Settlement Agreement's "release of claims and implied covenant not to sue contained therein by seeking to avoid and/or otherwise to recover claimed damages for alleged payments of funds and/or assets by [FCMC] to Counterclaimants made prior to the . . . Settlement Agreement and the release of claims expressly benefiting the Hart Counterclaimants contained therein." *Id.* at 6-7. Similarly, the third counterclaim for breach of implied covenant of good faith and fair dealing is based on the alleged deprivation of the benefits of the Settlement Agreement and release caused by Rescap "₂ when it initiated this lawsuit to recover claimed damages for the allegedly fraudulent transfers. *Id.* at 7-8. Rescap did not breach the Settlement Agreement or the implied covenant of good faith and fair dealing when it filed this suit because the allegedly fraudulent transfers were not implicated in the Agreement's release.

While it is true that I must construe the facts in a light most favorable to the defendants, I cannot construe a contract in a way that would lead to an absurd result; it would be irrational for Rescap to enter into an agreement and simultaneously release any claims for frustration of that agreement. *LTL Commercial, LLC v. Hanover HRP LTL Assocs., LLC*, No. B262176, 2016 WL 4547659, at *12 (Cal. Ct. App. Sept. 1, 2016) ("we must construe contracts to avoid absurd results") (internal citation omitted); *Employers Mut. Liab. Ins. Co. of Wis. v. Eagles Lodge of Hallock, Minn.*, 165 N.W.2d 554, 556 (Minn. 1969) (same). I grant Rescap's motion to dismiss the first three

counterclaims. Amendment would be futile as there are no additional factual allegations that might affect my interpretation of the unambiguous Settlement Agreement. **II. THE FOURTH COUNTERCLAIM FOR REFORMATION OF THE SETTLEMENT AGREEMENT**

Rescap moves to dismiss the fourth counterclaim for reformation of the Settlement Agreement, arguing that the defendants Christopher Hart, Dennis Hart, and Elizabeth Armstrong Hart (the "Derivative Counterclaimants") have not shown demand futility. Mot. 17-20. It argues that this is an improper derivative claim because the Derivative Counterclaimants have failed to plead with particularity that they made attempts to secure FCMC board action or the factual basis upon which they believe a demand would have been futile. *Id.* Rescap also asserts that the Derivative Counterclaimants cannot plausibly plead that they were defrauded into signing the Agreement.*Id.*

Derivative Counterclaimants allege that demand would be futile because FCMC "is no longer in business, has no employees and does not have sufficient financial or other means to bring and prosecute this claim in its own name." Counterclaims at ¶ 25. Rescap responds that this allegation lacks the requisite particularity and is contradicted by FCMC's appearance in this suit, FCMC's representation by separate counsel, and FCMC's filing of its Answer and discovery "₉ responses. Mot. at 18. Further, as FCMC is "owned, managed, and controlled by members of the Hart family, including Defendants Dennis Hart, Christopher Hart, Elizabeth Hart, and David Armstrong[,]" Rescap contends that the Derivative Counterclaimants could simply have directed FCMC to bring the reformation counterclaim. *Id.* (quoting Defendants' Answer at ¶ 7 (Dkt. No. 42]. In opposition, Derivative Counterclaimants counter that accepting their allegations as true, they have sufficiently pleaded demand futility and that Rescap is actually trying to challenge whether FCMC is insolvent. Oppo. at 21-23.

Under Federal Rule of Civil Procedure 23.1, a shareholder who seeks to bring a derivative suit must either first demand action from the board, or "plead with particularity the reasons why such demand would have been futile." *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014) (internal citation omitted). "[T]he substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief." *Id.* I agree with the parties that in this case California law controls the demand futility analysis. California law follows Delaware law on demand futility. *Oakland Raiders v. Nat'l Football League*, 93 Cal. App. 4th 572, 586 n.5 (2001). Demand is excused as futile where particularized facts are alleged showing reasonable doubt that: "(1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984); see also *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 990 (9th Cir. 1999), overruled on other grounds.

As an initial matter, I am skeptical that corporate insolvency is an adequate ground upon which to plead demand futility. Absent any cited authority to support Derivative Counterclaimants' theory of futility, it is not clear to me that they have standing to seek reformation of the Settlement Agreement. Further, as Rescap points out, FCMC is represented by counsel, has appeared in this case, and has filed an answer and discovery responses. Although I am required to construe the facts in a light most favorable to the Derivative Counterclaimants, FCMC's participation in this case is properly subject to judicial notice and I "need not ... accept as true allegations that contradict matters properly subject to judicial notice[.]" *Gonzalez v. Planned Parenthood of Los Angeles*, 759 F.3d 1112, 1115 (9th Cir. 2014). ₁₀ Rescap's motion to dismiss the "₁₀ fourth counterclaim is granted.

Derivative Counterclaimants are given leave to amend their fourth counterclaim; they are encouraged to cite relevant authority that supports a finding of demand futility where the cooperation is insolvent. I caution them that, absent persuasive authority, I am not convinced that their theory of futility has merit, and if it does, why it would apply given the judicially noticed facts of FCMC's ongoing involvement in this litigation. As the issue of Derivative Counterclaimants standing has not been resolved, I do not reach the merits of Rescap's motion to dismiss the fourth counterclaim. I will note that the pleading that they were defrauded into signing the Agreement does not appear plausible. III. DEFENDANTS' ALLEGATIONS CONCERNING CONFIDENTIAL SETTLEMENT COMMUNICATIONS

As part of the Minnesota Litigation, the parties were ordered to mediate their claims by the court. *In re RFC and ResCap Liquidating Trust Litigation*, No. 13-CV-3451 (D. Minn. May 11, 2016), Dkt. No. 1347. Judge Nelson later issued Pretrial Order No. 16, Protocol for Confidentiality of Mediation and Settlement (the "Mediation Order"), which states in relevant part:

> Confidential Settlement Communications shall be strictly confidential and shall not be admissible for any purpose in any judicial or administrative proceedings, nor used for any purpose other than in connection with the mediation, and no person or party participating in the mediation, including counsel for any mediation party, shall disclose a Confidential Settlement Communication to any non-party to the mediation, or to any court, unless authorized by this Court.

*Id.*, ECF No. 1668 at ¶ 2. It applies to "all mediations or other settlement discussions that have already occurred or will occur in connection with these consolidated proceedings [.]" *Id.* at ¶ 3.

Rescap argues that Judge Nelson has not authorized disclosure of any confidential settlement communications. Accordingly, it moves to strike FCMC's answer [Dkt. No. 18] at 6:2-5, 6:12-16, and 7:3-7 and the remaining defendants' answer [Dkt. No. 42] at 6:19-25 (paragraph 35) and 14:18-21 (all remaining text in paragraph 12 following "Settlement and Release "11 Agreement") for failure to comply with the Mediation Order.[2]

> [2] As all five of the counterclaims have already been dismissed, Rescap's motion to strike the portions which allegedly violate the Mediation Order is moot.

In opposition, defendants make three futile arguments. The first is that the Mediation Order and Settlement Agreement's confidentiality provision, when read together, permit disclosure. Regarding any future settlement agreement, the Mediation Order states in relevant part:

> This Order does not prohibit any party from disclosing that a case has been settled. However, that disclosure is limited to the statement that "the case is settled." The terms of any settlement reached by the parties as a result of the mediation will be strictly confidential until the parties enter into a final settlement agreement and then the confidentiality of the settlement will be treated in accordance with the provisions of the final settlement agreement concerning confidentiality. Those provisions should be clear and detailed and incorporate any instances in which disclosure might be necessary (e.g. securities filings and the like).

Mediation Order at ¶ 3. The Settlement Agreement's confidentiality provision states in relevant part:

> (a) Each Party agrees that this Agreement as well as all documents, communications, drafts and other materials of any kind relating to the negotiation of this Agreement by the Parties that Defendant, on the one hand, and any of the RFC Parties, on the other hand, have provided or shall provide exchange or disclose to the other, shall be "Confidential Information" for purposes of this Agreement.
>
> (b) No party, and no person within the control of a Party (together with the Parties, "Covered Persons"), shall disclose any Confidential Information, except that disclosure of such information shall be permitted in the following limited circumstances: (i) in an action by any Party to enforce this Agreement to the extent reasonably required for the purposes of enforcement; (ii) in response to a court order, subpoena or other demand made in accordance with applicable law; . . . (xi) to enforce rights under this Agreement.

Settlement Agreement at § 7(a)-(b).

Read together, these clauses do not allow for disclosure of confidential settlement communications. Rather, disclosure of the terms of the settlement is allowed in limited instances as defined by the Settlement Agreement. To the extent that defendants suggest that the language of the Settlement Agreement conflicts with Judge Nelson's Mediation Order, the Mediation Order controls.[12]

Defendants' second argument fares no better. They contend that Minnesota Local Rule 16.5(d) permits disclosure. It states in relevant part that: "A confidential dispute resolution communication must not be disclosed outside the alternative dispute resolution process by anyone without the consent of the party that made the confidential dispute resolution communication." D. Minn. LR

16.5(d). Again, the terms of the Mediation Order supersede defendant's argument: "For the avoidance of doubt, to the extent that any part of this Order shall conflict with Local Rule 16.5(d), the terms and provisions of this Order shall govern." Mediation Order at ¶ 4. There can be no question that this issue was expressly contemplated by Judge Nelson's order. I am baffled that defendants would make this argument.

Defendants' third argument is that Rescap may not put defendants' confidential settlement communications at issue in its complaint and then bar defendants from countering its allegations by invoking the "shield" of mediation privilege. Mot. 10-13. Defendants point to some of the following allegations in the complaint in support of their argument: "This action arises out of a scheme by the individual Defendants to induce Plaintiff to enter into a settlement agreement" that left "FCMC an empty shell unable to satisfy its settlement obligations " and that "[u]nbeknownst to Plaintiff, while the [Minnesota Action] was pending and even while negotiating the Settlement Agreement, the individual Defendants began transferring FCMC's assets to themselves and entities they controlled [.]" Mot. at 12 (citing Complaint at 2). These allegations do not relate to the content of any communications made between the parties. Instead, they describe alleged actions by defendants and that there was a time period during which there were negotiations over the Settlement Agreement. Rescap has not used any confidential settlement communications as a sword.

Judge Nelson rejected a similar argument in another case involving Rescap and a different mediation order. *In re RFC & Rescap Liquidating Trust Action*, 2018 WL 4863597 (D. Minn. Oct. 8, 2018). In ruling on a motion in limine where Rescap sought to exclude information regarding confidential mediation communications from being introduced at trial in contravention of a similar mediation order, Judge Nelson held that: "This is not a classic 'sword and shield' case . . .

where one party sought to introduce into evidence confidential materials from a mediation session while *15 at the same time barring any discovery into those same materials. . . Here, not only did a court block access to confidential materials, but RevCap is not attempting to introduce confidential mediation materials into evidence." *Id.* at *8. In this case, Rescap has not revealed any confidential settlement communications in its pleadings and the *sword/shield* doctrine is similarly inapplicable.

Should defendants seek to use confidential settlement communications in their defense, there exists a simple solution: comply with the terms of the Mediation Order and seek authorization from Judge Nelson. Defendants are cautioned that if they seek to amend their fourth counterclaim, their amendments must be consistent with this order and the Mediation Order. IV. **THE AFFIRMATIVE DEFENSES**

Rescap moves to strike affirmative defenses that are based, at least in part, on defendants' twice rejected interpretation of the Settlement Agreement's release provision, including FCMC's Estoppel (FCMC's Answer at 5:11-14); Assumption of Risk (*id.* at 7:16-19); Unclean Hands (*id.* at 8:18-22); Waiver and Release by Conduct (*id.* at 9:8-11), and Prior Release of Claims by Contract (*id.* at 10:4-6) affirmative defenses. It also seeks to strike the remaining defendants affirmative defenses for Waiver and Release (Defendants' Answer at 13:6-11); Unclean Hands (*id.* at 14:13-23); Release (*id.* at 16-22-26); Breach of Contract (*id.* at 17:1-5); and Fraud (*id.* at 17:6-11). Mot. at 22-23. In opposition, defendants contend that their interpretation of the Settlement Agreement compels me to deny the motion.[3] Oppo. at 23-24.

[3] Defendants also argue that the motion to strike is untimely under Federal Rule of Civil Procedure 12(f)(2). Oppo. at 23-24. However, many courts have held that "a party has the right to challenge the legal sufficiency of a defense at any time and therefore a court can consider the merits of

an untimely motion to strike." *United States v. Wang,* 404 F. Supp. 2d 1155, 1157 (N.D. Cal. 2005) (internal quotation marks omitted) Defendants also argue that I may not apply my previous interpretation to adjudicate their "yet unpleaded counterclaims and defenses," without providing them "an opportunity to at least submit a written memorandum in opposition to such motion[.]" *Id.* at 6 (quoting *Wang v. Belt,* 642 F.2d 359, 362 (9th Cir. 1981)). They are wrong again. They have submitted multiple briefings concerning their interpretation of the Settlement Agreement insofar as the affirmative defenses rest on their rejected interpretation, the motion to strike is ripe. -

I have already rejected defendants' interpretation as a matter of law. I grant Rescap's motion to strike FCMC's second affirmative defense for estoppel, seventh affirmative defense for assumption of risk, tenth affirmative defense for unclean hands, eleventh affirmative defense for *14 waiver and release by conduct, and twelfth affirmative defense for prior release of claims by contract insofar as each of these defenses rely on an interpretation of the Settlement Agreement that is contrary to this order or my previous order interpreting the Settlement Agreement. With respect to the remaining defendants' affirmative defenses. I strike their seventh affirmative defense for waiver and release, twelfth affirmative defense for unclean hands, and twenty fifth affirmative defense for fraud in the same manner as above. The twenty third affirmative defense for release and the twenty fourth affirmative defense for breach of contract are also struck in their entirety because they are wholly contravened by my interpretation of the Settlement Agreement.

Rescap also asks me to strike the affirmative defenses for estoppel, merger, res judicata, lack of consideration, failure of consideration, lack of mutual assent, mistake, rescission, reformation, and frustration of purpose. Its motion to strike

these affirmative defenses is denied as premature. Unlike the scope of the Settlement Agreement, I do not consider these affirmative defenses to be fully briefed by the parties and I leave an assessment of the sufficiency of the allegations for adjudication on the merits. *Carolina Cas. Ins. Co.,* 994 F. Supp. 2d at 1090-91.

## CONCLUSION

The first, second, and third counterclaims are dismissed with prejudice. The fourth counterclaim is dismissed with leave to amend within ten days of the date below.

I strike FCMC's answer [Dkt. No. 18] at 6:2-5, 6:12-16, and 7:3-7 and the remaining defendants' answer [Dkt. No. 42] at 6:19-25 (paragraph 35) and 14:18-23 (all remaining text in paragraph 12 following "Settlement and Release Agreement"). These portions of both answers violate Judge Nelson's Mediation Order. Should defendants wish to use confidential settlement communications in this litigation, they must obtain an order from Judge Nelson allowing them to do so.

I also strike FCMC's second affirmative defense for estoppel, seventh affirmative defense for assumption of risk, tenth affirmative defense for unclean hands, eleventh affirmative defense for waiver and release by conduct, and twelfth affirmative defense for prior release of claims by

contract insofar as each of these defenses rely on an interpretation of the Settlement Agreement that is contrary to this order or my previous order interpreting the Settlement Agreement. The *15 remaining defendants' seventh affirmative defense for waiver and release, twelfth affirmative defense for unclean hands, and twenty fifth affirmative defense for fraud are struck in the same manner. The remaining defendants' twenty third affirmative defense for release and the twenty fourth affirmative defense for breach of contract are struck in their entirety.

**IT IS SO ORDERED.** Dated: January 31, 2019

/s/

_____

William H. Orrick

United States District Judge

casetext



**Secretary of State
Statement of Information**
(Limited Liability Company)

**LLC-12**

20-B39751

# FILED

In the office of the Secretary of State
of the State of California

MAR 25, 2020

**This Space For Office Use Only**

**IMPORTANT — Read instructions before completing this form.**

**Filing Fee – $20.00**

**Copy Fees –** First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

**1. Limited Liability Company Name** (Enter the exact name of the LLC. If you registered in California using an alternate name, see instructions.)

SEAGULL PRIME REAL ESTATE FUND, LLC

| **2. 12-Digit Secretary of State File Number** | **3. State, Foreign Country or Place of Organization** (only if formed outside of California) |
|---|---|
| 202007310059 | CALIFORNIA |

**4. Business Addresses**

| | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| a. Street Address of Principal Office - Do not list a P.O. Box<br>899 Northgate Drive, Suite 310 | San Rafael | CA | 94903 |
| b. Mailing Address of LLC, if different than item 4a<br>899 Northgate Drive, Suite 310 | San Rafael | CA | 94903 |
| c. Street Address of California Office, if Item 4a is not in California - Do not list a P.O. Box<br>899 Northgate Drive, Suite 310 | San Rafael | CA | 94903 |

**5. Manager(s) or Member(s)**

If no managers have been appointed or elected, provide the name and address of each member. At least one name and address must be listed. If the manager/member is an individual, complete Items 5a and 5c (leave Item 5b blank). If the manager/member is an entity, complete Items 5b and 5c (leave Item 5a blank). Note: The LLC cannot serve as its own manager or member. If the LLC has additional managers/members, enter the name(s) and addresses on Form LLC-12A (see instructions).

| a. First Name, if an individual - Do not complete Item 5b | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Chris | | Hart | |

b. Entity Name - Do not complete Item 5a

| c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 899 Northgate Drive, Suite 310 | San Rafael | CA | 94903 |

**6. Service of Process** (Must provide either Individual OR Corporation.)

**INDIVIDUAL** – Complete Items 6a and 6b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Eric | | Sternberger | |

| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 1101 Fifth Avenue, Suite 100 | San Rafael | CA | 94901 |

**CORPORATION** – Complete Item 6c only. Only include the name of the registered agent Corporation.

c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b

**7. Type of Business**

a. Describe the type of business or services of the Limited Liability Company

Real Property Investment

**8. Chief Executive Officer, if elected or appointed**

| a. First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| b. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

**9. The Information contained herein, including any attachments, is true and correct.**

| 03/25/2020 | Eric Sternberger | Attorney | |
|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | Title | Signature |

**Return Address (Optional)** (For communication from the Secretary of State related to this document, or if purchasing a copy of the filed document enter the name of a person or company and the mailing address. This information will become public when filed. SEE INSTRUCTIONS BEFORE COMPLETING.)

Name:

Company:

Address:

City/State/Zip:

Case: 20-30604    Doc# 1111    Filed: 02/07/22    Entered: 02/07/22 11:49:27    Page 20 of 27

September 12, 2021

The Honorable Hannah L. Blumenstiel
US Bankruptcy Court
Northern District of California
450 Golden Gate Ave.
Mail Box 36099
San Francisco, CA 94102



Regarding: Professional Financial Investors, Inc., et al., Case No. 20-30604

Dear Judge Blumenstiel,

As a software CEO, entrepreneur, real estate investor with a commercial and residential portfolio, and a top PFI investor, I want to help maximize what investors get, especially for those who lost their primary income or life savings. Most things went quite well except for the step of selling assets to the only bidder, instead of marketing using 2021 strategic tactics. FTI's approach resulted in a stalking bid sale and has failed to even reach auction in a very robust real estate market. The outreach was a preventable failure: no auction, no more money.

We were led to believe over the course of meetings that there would be: 1. No fire sale. 2. No liquidation, 3. Extensive Marketing, 4. Auction, 5. Transparency to owners (us), 6. Accountability, 7. No Shortcuts/Favoritism. 8. Fairness and Answers.

1. Several weeks ago, a team of 10 investors, had multiple hour long discussions with Michael Goldberg (Akerman) and his team to point out that hands-on proactive marketing to the top RE buyers in the country is a must, especially due to their adopted strategy of bundling and bulk selling combined commercial /residential portfolio. He wholeheartedly agreed with my overall assessment & proposal and passed it on to Greg Gotthardt at FTI, who led the Stalking Horse effort. My proposal was precisely to prevent what happened - i.e. no auction, no bidders and just mostly non bidders in the data room.

2. After it was declared that there would be no auction, FTI claimed that "10,000 emails were blasted" and that 87 potential bidders were in the data room. This was our entire point over several days/hours that email blasts, websites etc. do not work in 2021, especially for a $500M sale!. This appears to be the equivalent of email automation to investors such as Blackrock, Blackstone, Vanguard, State Street, and expecting a call back. We expected a personal 1 on 1 outreach report instead.

3. One of the numerous independent and local Real Estate experts we consulted was kind enough to forward a sample list of 40 targets who would be capable of writing a check or bidding $500M or more. We forwarded this list to FTI, but it was not followed up with a detailed activity report back to us. We asked and continue to ask for a report on which of the top 40 were contacted, when, how, with who and what was the outcome and why they declined to bid. Not a big ask, is it?. We have been unable to hold a discussion with FTI so we could clarify the questions designed to improve our outcome.

4. As an active contributor and participant in Facebook PFI, dozens of other investors continually expressed concern about the lack of transparency, and the inability to get non-confidential, factual information about the properties such as appraisals, net operating incomes, after repair value and such. This has impacted our ability to know if we could have truly improved the outcome as owners.

Our UCC counsel, Debra Grassgreen of PSZJ, stated anything can go wrong with the current bidder. So, we are requesting renewed effort via a backup plan to help maximize the sale. As investors with a keen interest in a positive outcome, we'd like to see documentation of a personal and proactive outreach to the top contenders (sample list attached) and avoid starting all over.

In summary, we would like to understand. Were our properties liquidated expeditiously? Or were our properties marketed effectively to bring the investors the highest return possible? Did we get the process we deserved here? and request the following:

1) Confirm a backup plan with personal verifiable outreach plan

2) That consideration be given to reducing cost and fees

3) FTI detailed outreach report and performance review of the sale process made available to all PFI Investors

Thank you,

Respectfully,

Anand Ayyar,

anand94949@gmail.com, PFI Investor, 4153281606

**Attachment:** List of 40 Real Estate Investment Targets

CC:

Debra Grassgreen, PSZJ

John Fiero, PSZJ

Michael Goldberg, Akerman

CC: Of all the co-signers to this letter

Kevin Shambrook, kevin.shambrook@gmail.com

Chris and Elizabeth Meloney cemeloney@gmail.com

Miriam Phillips, miriphil9@gmail.com

Leslie Harari, leslieharari@yahoo.com

Betsy Alberty, albertybetsy@gmail.com

Ian Hutagalung, ihutagalung@yahoo.com

Moses Kravitz, mosesk@mosesk.com

**SAMPLE LIST OF TOP RE BUYERS**

1. AEW Capital Mgt
2. AIG Global Real Estate
3. Aimco
4. Apollo
5. Arc70
6. Bain Capital
7. Balfour Beatty
8. Beacon
9. Blackrock
10. Blackstone Group
11. Brookfield Asset Management
12. Carlyle
13. CBRE Global
14. Cerberus
15. CIM Group
16. Colony
17. DRA Advisors
18. Fairfield
19. Fortress Investment
20. FPA Family
21. Goldman
22. Greystar Real Estate
23. HighBrook Investments
24. Hines
25. KSL
26. Lincoln
27. Lone Star Funds
28. MCR
29. MGPA
30. Morgan Stanley
31. Nuveen
32. Oaktree
33. Oaktree Capital
34. Shorenstein
35. Starwood Capital
36. State Street
35. Tishman Speyer
36. TPG
37. Vanguard
40. Veritas
41. WestBrook

**2021-12-02 The Role of Michael VanderLey (Force 10 Partners) in the PFI-PISF Portfolio Sale**

**Docket #971, 11-04-2021**, activities involving Michael VanderLey of Force 10 partners were quite involved during the negotiations of the portfolio sale to Hamilton Zanze – to the extent that investors might want to know what Michael VanderLey and Force 10 get out of the PFI-PISF portfolio sale.

**Docket #697, filed 6-24-2021**, early meeting activities regarding property valuation and term sheet with Michael VanderLey (Force 10), with Hinkelman, et al. – meetings took place as early as March 29, 2021. None of these meetings seem to have been attended by Michael Goldberg (Akerman, Independent Director), or attorneys with PSZJ (Grassgreen, Fiero), or LLC/DOT counsel. Did investors not have any representation during these meetings?

VanderLey, Hinkelman and Gotthardt were all colleagues at FTI.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
**Greg Gotthardt is** a Senior Managing Director at FTI Consulting and is based in Los Angeles. Mr. Gotthardt is a member of the FTI's Real Estate Solutions practice.

Dates Employed: Sep 2016 – Present
Employment Duration: 5 yrs 4 mos
Location: Greater Los Angeles Area
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
**Michael VanderLey, Partner, Head of Real Estate Practice, Force Ten Partners LLC**
Dates Employed: 2017 – Present
Employment Duration: 4 yrs
Location: San Francisco Bay Area

**Force 10:** advisory firm specializing in corp restructuring, challenged businesses, litigation & other special situations. Work with clients and their legal counsel to create advantage and financial return.
- Corporate Restructuring | Business Turnaround & Crisis Management
- Investment Banking | Investment Advisory & Asset Management | Fiduciary Services
- Expert Testimony | Forensic Accounting | Forensic IT

**FTI Consulting: Senior Managing Director**
Dates Employed: 2009 – 2017
Employment Duration: 8 yrs
Member of the Real Estate Solutions Group. Led the Real Estate Capital Markets practice within FTI Capital Advisors, LLC. Represented debtors, secured creditors, creditors' committees and equity interests in connection with in-court and out-of-court restructurings, capital raises and asset sale transactions.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
**Andrew Hinkelman**
**Sr Managing Director at FTI Consulting and Financial Services Consultant**
San Francisco, California, United States
Dates Employed: Sep 2002 – Present
Employment Duration: 19 yrs 4 mos

Location: San Francisco Bay Area

Andrew Hinkelman is a senior managing director in FTI's Corporate Finance practice and is based in San Francisco. Mr. Hinkelman's work encompasses corporate finance, performance improvement, mergers and acquisition advisory, private capital financing, operational strategy and business plan development.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**The connection between Michael VanderLey (Force 10), Andrew Hinkelman (FTI), Greg Gotthardt (FTI) and Kurt Houtkooper (HZ)**

- Some may remember that in Docket #880, filed 9-02-2021, Kurt Houtkooper of HZ claimed that Michael VanderLey's role was minimal:
  *"Hamilton Zanze was alerted to the Debtors' efforts to market and sell the Property described in the Motion through Michael VanderLey at Force 10 Partners, who had previously been a Senior Managing Director at FTI and had worked with Andrew Hinkelman."*
- Fewer will recall that Michael VanderLey was a candidate for the PFI-PISF CRO position, who interviewed September/October of 2020.
- In 2021, a large number of meetings were conducted which included Michael VanderLey from Force 10 partners, the debtors, and the firms hired by Charlene Albanese. Oddly, none of the meetings included counsel for the investors (Goldberg, Grassgreen or Fiero, or any committee members).
- So, what did Michael VanderLey, Hink's former colleague at FTI, get out of participation in this portfolio sale of 60 properties to Hamilton Zanze? Who pays? How much?

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**Meetings attended by VanderLey (Force 10):**

3/29/2021 Andrew Hinkelman (FTI) Participate in call with G. Gotthardt and S. Daar (both FTI), M. VanderLey (Force 10), K. Houtkooper, D. Nelson (both Hamilton Zanze), D. Messing, J. Snover (both Graham Realty) regarding indicative term sheet.

4/20/2021 Andrew Hinkelman (FTI) Participate on call with G. Gotthardt (FTI), M. VanderLey (Force 10), K. Houtkooper (Hamilton Zanze) regarding real estate valuation.

5/13/2021 Andrew Hinkelman (FTI) Attend meeting regarding stalking horse asset purchase agreement status with G. Gotthardt, S. Daar (both FTI), M. VanderLey (Force 10), K. Houtkooper (HZ), D. Messing (GSR).

5-27-2021 (VanderLey meetings with Hink and Gotthardt)

6-2-2021 VanderLey meeting with Gotthardt to discuss APA 6-2-2021 follow-up call with Gotthardt on APA

6-3-2021 VanderLey call with Hinkelman, Gotthardt, Houtkooper (HZ) about APA terms (as with other meetings, Hinkelman & Gotthardt each billed the investors for this meeting)

6-7-2021 call re: draft APA with VanderLey (Force 10), Hinkelman, Marum (Sheppard Mullin), and D. Riley (Allen Matkins)

6-8-2021 VanderLey & Gotthardt meeting to discuss stalking horse APA revisions

6-9-2021 Meeting re: due diligence and SH offer APA business terms attended by Hinkelman (FTI), Gotthardt (FTI), VanderLey (Force 10), Houtkooper (HZ), M. Leake (SMRH), R. Bello (SMRH)

6-10-2021 Call about APA - page turn review with Hinkelman (FTI), Gotthardt (FTI), M. Leake & R. Bellow (both SMRH), M. VanderLey (Force 10), D. Messing (GSR), A Burney (Allen Markins)

6-13-2021 Discussion on latest changes to APA Gotthardt (FTI) & VanderLey (Force 10)

6-14-2021 Negotiating final points of APA Hinkelman (FTI), D. Messing (GSR), Gotthardt (FTI), Houtkooper (HZ), VanderLey (Force 10)

6-15-2021 Continue final points negotiation Hinkelman (FTI), D. Messing (GSR), Houtenkooper (HZ), VanderLey (Force 10)

6-16-2021 Hinkelman (FTI), D. Messing (GSR), Houtkooper (HZ), VanderLey (Force 10) negot. final points of APA

6-16-2021 Gotthardt (FTI) & VanderLey (Force 10) discussion of business points on SH APA

8-20-2021 Hinkelman (FTI) Participate on call with T. Williams, A. Cabeal, K. Houtkooper (all HZ), B. Marum, O. Katz, R. Bello (all Sheppard), G. Gotthardt (FTI), A. Burney, D. Riley (both Allen Matkins), J. Ahmed, R. McCollister (both DKP), M. VanderLey (Force 10), A. Van Noord (Kirkland) regarding portfolio amendments to asset purchase agreement.

8-22-2021 Hinkelman (FTI) Participate in portfolio amendment call with T. Williams, A. Cabeal, K. Houtkooper (all Hamilton Zanze), M. Leake, O. Katz, B. Marum (all Sheppard), M. VanderLey (Force 10), A. Burney (Allen Matkins), D. Messing (GSR) and G. Gotthardt (FTI).

9-6-2021 Hinkelman (FTI) Participate on call with G. Gotthardt (FTI), O. Katz, M. Leake, R. Bello (all Sheppard), A. Cabeal, K. Houtkooper (both HZ), M. VanderLey (Force 10) and D. Messing (GSR) to discuss latest revisions to the 3rd amendment to Purch Agreement

6-14-2021 Gotthardt (FTI) call with VanderLey (Force 10) to discuss potential solutions for 1222 Irwin & 481 Ignacio properties

8-2-2021 Hinkelman (FTI), G. Gotthardt, S. Daar, M. Kaptain (all FTI), K. Houtkooper, A. Cabeal (both HZ), D. Messing (GSR) and M. VanderLey (Force 10) to touch base on status of due diligence process, TIC negotiations, employee interviews.

8-2-2021 Gotthardt (FTI), Participate in team discussion with S. Daar, A. Hinkelman, M. Kaptain (all FTI), K. Houtkooper, A. Cabeal (both HZ), M. VanderLey (Force 10), D. Messing (GSR) to discuss status of due diligence process, tenant interviews, and timelines.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuse may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; May 2020. All rights reserved.

POSTAGE REQUIRED

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

# UNITED STATES
# POSTAL SERVICE®

# PRIORITY®
# MAIL

PAPER POUCH

...cted delivery date specified for domestic use.

...domestic shipments include up to $50 of insurance (restrictions apply).*

...s Tracking® included for domestic and many international destinations.

...ed international insurance.**

...n used internationally, a customs declaration form is required.

...e does not cover certain items. For details regarding claims exclusions see the
... Mail Manual at http://pe.usps.com.

...ional Mail Manual at http://pe.usps.com for availability and limitations of coverage.

AT RATE ENVELOPE

■ ANY WEIGHT

...ACKED ■ INSURED

EP14F May 2020
OD: 12 1/2 x 9 1/2

P000001000014

---

U.S. POSTAGE
$8.95
PM 2-DAY
98362 0004
... of mailing
02/03/22
SSS
06      25
11487373

0004

PRIORITY MAIL 2-DAY®

EXPECTED DELIVERY DAY: 02/07/22

SHIP
TO:   Judge Hannah Blumenstiel
      450 GOLDEN GATE AVE
      San Francisco CA 94102-3661

USPS TRACKING® NUMBER

9505 5066 3666 2034 4248 95

RECEIVED
FEB 07 2022
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP