March 26, 2022



Judge Hannah Blumenstiel
United States Bankruptcy Court Northern District of California
450 Golden Gate Avenue
Mailbox 36099
San Francisco, CA 94102

In reference to:
Professional Investors, Inc. Case #20-30604 (HLB)
(Jointly Administered with Case #20-30579)

Dear Judge Blumenthal:

I am the Chair of the UCC, or should I say, former chair, as we are officially no longer engaged as a UCC. Moreover, I'm the person, with the support of many others, who started this whole idea of pulling ourselves together and working together toward a healthy outcome and I have facilitated the process intimately for close to two years.

First, I want you to know I've listened to and watched your actions at each step along the way and have admired your ability to stick with the facts and conduct yourself with dignity and grace. Moreover, I've deeply appreciated your willingness to let us do our thing, no matter how unusual it may have been. Your willingness and support have enabled us to get close to the best outcome we could have under difficult circumstances.

That said, I have watched what has happened of late with consternation and wanted to write to you personally.

I know that you have received over 140 personal letters from members of the investor community and a singular letter signed by over 500 investors imploring you to consider reducing the fees, with two primary arguments:

1. They didn't do such a good job (especially FTI); and
2. This just isn't fair to have us pay so please reduce the fees.

Some of these folks have accused the professionals of onerous behavior, deplorable fees, etc. and have claimed, "we're now twice victimized, once from Ken Casey and the second time by the professionals."

I want you to know that I understand many of the people and their feelings. They were not intimately a part of the decision-making process and therefore felt powerless to influence it. Moreover, some felt that those of us in positions of responsibility did not do the right thing. For example, some believe we should never have hired people at such high rates, and never accepted the stalking horse strategy.

While I can appreciate their feelings, I don't share the view. After all, I was part of the larger team that made those choices, and we did the best with what we knew.

However, I do join them in solidarity on the two key points. First, like them, I have significant questions about the conduct of FTI, and second, I find all the fees extraordinarily high in a victim case like ours. My primary issue isn't with the professionals themselves. It's with the system that has no way of course correcting and distinguishing between a huge multi-billion-dollar business and a small case like ours where the victims suffer so greatly. I will explain these points more fully.


## FTI

In my estimation, while FTI did a good job on the forensics and the claims process, they also did a number of things that I find problematic.

1. They told us they were the best. Our lawyers told us. And we believed. They estimated their fees would be $2-4 million for the forensics. While we thought that was a very high price, we chose to go with them as we felt that in the long run, excellent professionals would resolve our case in a more effective and efficient manner. Their estimate was woefully short. For professionals with decades of experience and tremendous expertise, their estimates should have been close to accurate. Or they should have stuck with the estimate and charged us no more than the high end of their estimate.
2. They told us that there would also be some fees for dealing with the claims (they did not say how much but it sure sounded like it wouldn't be another $2-4 million). The fact that they did not say the amount implied it was an amount that would likely tolerable. So, they sat behind a shield of silence, leading us to believe one thing. We were horrified when the actual bill came in for the claim process.
3. They went well beyond the original estimate without letting us know until after the fact. When we pointed it out, they said, "oops" and then reduced their fee by something like $400k. They admitted to the error, but they didn't admit that their attitude toward us created the error. Errors happen for a reason. In this case, I think it was their fundamental relationship to us that caused the error—meaning, they were acting like our pockets were deep and they had free reign to what they always do with big firms.
4. When we were faced with the prospect of us paying around $10million for the forensics and claims management, we said, "whoa, this is unconscionable." We said, please bring it down significantly." They said they would bring it down a bit but all of the work was required and so you, the investors, should pay us for our work. And if you don't like it, you can go elsewhere.
5. At this point, we were in a terrible bind. Pay them and then start from there with a new firm, which would lead us to have to find someone with less expertise and pay for the huge process of shifting forensics mid-stream. This was too risky for obvious reasons.

The second option was to not pay them, but that would violate our contract with them, which is not who we are as a people. The third option was to stick with them, and then hope at this point we could argue why they handled their part in ways that, while it was in the letter of the law, it violated ethical and respectful business practices.

6. They offered us a blended rate, which made sense at the time. Frankly, I wish we had not done it that way for it gives them the ability to obfuscate who does what at what rate. Even though one could argue that the blended rate strategy is a good one, what didn't make sense to me is how it was possible that we had to pay so many high-level consultants so much to do what was mostly clerical work. I'm happy to pay top dollar for high end strategic work, but what made this case complex was not the dazzling complexity of the process, it was the ton of moving money around. This does not require high end folks to discover. It was obvious. We just needed a lot of clerical people to go through the mountains of checks and data. We don't need $500/hr people to do that work. When this issue was raised with them recently, they said they were not charging for the clerical. But then, how do you justify thousands of hours of high end consultants on a case like this? It doesn't make sense. I believe the strategy is borne out of their desire to pad their pocketbooks with little regard to the people who pay their bills. They did the work but could have done it much differently and saved us a whole lot of money.

7. Andrew Hinkleman and his team came on board later in the case and convinced us they were the best at what they do. Some of the lawyers knew them and vouched for them. We hired them and they proceeded to do good work. They promised to cut costs and increase occupancy of the rental properties. Instead, on top of the $175,000 per month for Andrew Hinkleman and Greg Goddard, they added another $225,000 for additional FTI staff. They also paid over $1mill for someone to head up the staff when they could have found someone great to do it for one fourth that amount. Why did we need to pay a top dollar person to head up a staff of 50? It was not essential. Hink was the top guy. He could have had a decent leader to do the job with his oversight. And he could have found this person outside the firm. I know many people who are good leaders who could have done the job. I recognize it required a deft touch, but the bill was unconscionable.

8. They set up an auction strategy with a stalking horse. They represented this would yield the best outcome. When the final auction came to pass, no one showed up. All of the wrangling happened behind closed doors. And so, the stalking horse won. Unfortunately for us, the outcome was woefully lower than we had all expected. To their credit, they didn't promise the auction would work, but they did say they thought it was the best strategy, that it would work and pointed to the high volume of people engaged in looking at us. They also pointed out how high-powered people who want such important real estate tend to get caught up with their egos in auctions like this which pushes up the price and that was the plan. Well, they were wrong and it didn't work. Marin County has very valuable property. Many investors, including those with real estate expertise, still believe that FTI should have gotten a much higher price for the real estate. I have no idea if it is true, and we'll never know.

So here we have the following situation: We did in fact hire them. The forensics side did a good job but communicated poorly until we insisted otherwise. In my view, the very fact that they went over budget without discussing it with the UCC tells me that their primary interest was to do a good job and get paid handsomely, but without any recognition of who we were as investors, namely victims of a Ponzi, that could not easily oversee their work, nor could we easily challenge the efficacy of their work. That was Michael Goldberg's job. And while Michael did a great job in my view in helping us wend our way through a difficult and complex situation, he was not good at overseeing their work carefully. He was in Florida, and he was responsible for many cases, including the Miami condominium collapse. He did the best he could but could not oversee the work of FTI sufficiently. So, we trusted his loose oversight and FTI's integrity.

But we also set up committee responsible for overseeing the money. This committee did the best they could, but they were not watching every detail (nor should they) and weren't charged with managing the cost of the work nor the budget itself. These people have day jobs and did the best they could with what they had.

My biggest issue is that FTI did not demonstrate any capacity to think strategically as it related to our needs. They did not seek, nor find, any avenues to reduce the cost significantly. They offered at one point a rough justice approach where they would analyze the movement of money for a few years and then make some assumptions, but this was unwise, for the basis of our strategy was to do things in a way that reduced the likelihood people in our community would distrust the professionals or each other so much so that they would seek lawyers and start suing. We felt, and still do, that the best strategy was to be impeccable in the process. So "rough justice" was not an option even though I recognize it could have saved us money in the short run. It the long run, it was too risky.

Beyond a rough justice idea, they offered no solutions. FTI has tons of experience with people who have decades of expertise. They just said sorry it cost so much, sorry the auction didn't turn out, sorry we didn't communicate so well at first. They never said, sorry, we didn't estimate well. They stood firm on the veracity of their strategy and acted quite defensively along the way.  To their credit, they did acknowledge that the outcome was unfortunate. In the end, their fees were shockingly higher than what they estimated, and they failed at getting a great outcome, and now we are told by them that we must pay the bill.

As a customer of their services, I am deeply disappointed, as are so many investors. And if you asked the members of the committees and the investors as a whole, virtually all would heartily agree.

But, in the end, all we are is a set of Ponzi victims who had no option but to hire the best and hope for the best. In their opposition to Baddley's motion, they make the argument that they are charging fair market rates for complex chapter 11 restructurings. Well, we are a complex chapter 11 restructuring, but we are a small one. And we are actually not a complex restructure. We are a complex Ponzi scheme. The restructure is pretty simple and rather easy,

especially given how we as an investor body worked with each other and collaborated with the debtor. FTI typically works with big restructures, and they are comparing these complex big ones to ours. What is the standard rate for complex, difficult cases where the dominant number of victims are suffering because of their loss? What is the standard rate for us? Whatever rate that is, that is the rate to compare to.

**All the Fees**

As to the fees, even though we negotiated them, and therefore one could argue they were fair because of this, I don't believe they are fair. But that is just one person's opinion. It is really up to you, the judge, to decide what is fair and reasonable. If you compare rates of other cases, you might find these close. I don't know. I've seen the argument on both sides and it's out of my expertise to discern what is right and just from a legal standpoint. But is it fair and reasonable when every single law firm we interview all were high and all were willing to come down just a bit to acknowledge our plight, but no more?

I think all the fees are high and don't want you to think that just because we negotiated them, we think they are fair. None of us thought they were. They were just the best we could do. We had no reasonable option, and we had no expertise in bankruptcy professional fees. In our delicate case, going with anyone but the best and most collaborative would have been unwise. They were terrific in this case and worked together to get the best outcome for us. Legally, the fees may or may not pass the test of reasonableness given the Bankruptcy Code, but, in my view, they don't pass the test of what is societally reasonable in our case.

I cannot say the same good things about FTI. I believe they did a good job on the forensics and the claims. I think they did a poor job in estimating. As a result, we were stuck with their fee structure while paying two to three times more than their highest estimate. And we suffered from their initial poor communication. They have revealed themselves to be a typical consulting firm that acts more on behalf of themselves and cares more about earning their money and getting their profits than about the people they are serving.

And I happen to be intimately aware of the ways large consulting firms operate. I am an organizational consultant, one of the thought leaders in the field of organization development, have written seven books in my profession, one of which was exploring the nature of the consulting industry and how it could be far better. And I have had many clients who are big consulting firms and know their practices. FTI acted consistent with the prevailing practices of most top firms who make a ton of money. When they apply those tactics with large firms, the firms pay the bills. Those firms can afford to. When they apply them to a situation like ours, we get hurt in the process, with no recourse but to say, "something just doesn't sit well." In this situation, our pocketbooks got drained even more.

That's what almost all the letters are saying, and I agree.

That said, there are some great outcomes of this case. First, we settled this with only two lawsuits, both of which were settled out of court. That's a huge win and I attribute this to the good work of all the investors, the good work of the lawyers and Michael Goldberg. Second, we did it in record time. This is not in dispute and a wholehearted "thank you" to all of them and all of us is deserved. What is not deserved is the huge bill.

You have been a beacon of light for us at each step along the way. I trust you will do what is right, taking into account all the variables presented and your important experience. Thank you kindly for reading this and being willing to hear us in court directly.

Respectfully,

Dr. Keith Merron

# fedEx ®

**This envelope is only for FedEx Express® shipments.**

You can help us get your package safely to its destination by packing your items securely. Need help? Go to **fedex.com** for packing tips.

Check your FedEx Express shipping document, the current FedEx Service Guide or the conditions of carriage for complete terms, conditions and limits of liability.

© 2020 FedEx 155475/155476 REV 11/20



Please recycle. See how we're connecting the world in responsible and resourceful ways at **sustainability.fedex.com**.

ORIGIN ID:SRFA    (415) 342-1331
KEITH HERRIN
110 GLEN PARK AVE

SAN RAFAEL, CA 94901
UNITED STATES US

SHIP DATE: 26MAR22
ACTWGT:0.15 LB
CAD: 69826F9/SSF02300

BILL CREDIT CARD

TO ATTN: JUDGE HANNAH BLUMENSTIEL
US BANKRUPTCY COURT, N. DIST OF CA
450 GOLDEN GATE AVE
MAILBOX 36099
SAN FRAN CA 94102

TRK# 2713 1550 0985
0201

XW APCA

MON – 28 MAR 10:30A
PRIORITY OVERNIGHT

94102
CA-US SFO

FedEx
Express