John D. Fiero (CA Bar No. 136557)
PACHULSKI STANG ZIEHL & JONES LLP
One Sansome Street, 34th Floor, Suite 3430
San Francisco, CA 94104
Telephone: (415) 263-7000
Facsimile: (415) 263-7010
E-mail: jfiero@pszjlaw.com

Attorneys for Michael Goldberg,
Trustee of the PFI Trust

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>PROFESSIONAL FINANCIAL INVESTORS, INC., *et al.*,<br><br>Debtor. | Case No. 20-30604<br>(Jointly Administered)<br><br>Chapter 11 |
| Michael Goldberg, Trustee of the PFI Trust,<br><br>Plaintiff,<br><br>v.<br><br>Leslie Michelle Wallach,<br><br>Defendant. | Adv. Proc. No. 24-_____<br><br>**COMPLAINT FOR DAMAGES FOR BREACH OF FIDUCIARY DUTY, AND TO EQUITABLY SUBORDINATE CLAIM PURSUANT TO 11 U.S.C. § 510(C)(1)** |

Michael Goldberg, the duly-appointed Trustee ("***Trustee***" or "***Plaintiff***") of the PFI Trust (the "***Trust***") arising from the above-captioned chapter 11 case of Professional Financial Investors, Inc. and Professional Investors Security Fund ("***PISF***") and their affiliated debtors (collectively, "***PFI***" or the "***Debtor***"), as and for his complaint ("***Complaint***") against the above-captioned defendant, Leslie Michelle Wallach ("***Wallach***" or "***Defendant***"), by its undersigned counsel, alleges as follows upon information and belief:

## I.

## **INTRODUCTION**

1. By this action, the Trustee – standing in the shoes of PFI and its defrauded investors by virtue of the *Modified Second Amended Joint Plan of Professional Financial*

1 *Investors, Inc. and its Affiliated Debtors Proposed by the Debtors and Official Committee of*
2 *Unsecured Creditors and Supported by the Ad Hoc LLC Members Committee and the Ad Hoc*
3 *DOT noteholders Committee Dated (May 20, 2021)* (the "**Plan**") – seeks to recover amounts lost by PFI and its investors in a long-running Ponzi scheme, along with other amounts legally due and owing as a result of the Defendant's neglect and malfeasance. Additionally, Plaintiff seeks to hold Defendant accountable for her malfeasance and neglect in failing for years to check the dangerous impulses of Ken Casey, her own brother Lewis Wallach (incarcerated in federal prison), and Manuel Romero (the now-disgraced CFO who reported to her), as more particularly described below.

2. PFI and PISF were two branches of the Professional Financial Investors enterprise that employed Defendant in Novato, California. The companies were founded as real estate investment and management firms specializing in multi-unit residential and commercial properties in Northern California. Specifically, on or about November 1, 1983, Kenneth Casey founded PISF and served as its sole shareholder, officer, and director from that date until his death on May 6, 2020. On or about August 15, 1990, Mr. Casey also founded PFI and served as its sole officer, director and shareholder until 1998, when he relinquished his corporate positions. In 1990, PFI hired Defendant Lewis Wallach as a bookkeeper who later took over as president of PFI in 1998. Mr. Wallach continued to serve as president of PFI until June 2020, when the extent of the fraud outlined below was made clear and he was asked to resign. Defendant left PFI at or about the same time.

3. For several decades, PFI offered investors what appeared to be safe, steady returns backed by Marin and Sonoma County real estate. When Casey died suddenly in May 2020, however, it quickly became apparent that their investment business, Professional Financial Investors (PFI), was actually a long-running Ponzi scheme that cost investors hundreds of millions of dollars.

4. There was nothing particularly clever or original about Casey and Wallach's Ponzi scheme. It would have been obvious to anyone with access to PFI's financials (such as Defendant). They were raising hundreds of millions of dollars from mostly local mom and pop

investors, by promising returns that income from the properties couldn't cover. To make the promised interest payments and fund their lavish lifestyles, Casey and Wallach were depositing money from new investors into company accounts and then using those funds to pay previous investors and for their personal benefit.

5. The Ponzi scheme was so obvious that within a month of Casey's death, the scheme was publicly exposed, the SEC had opened an investigation, and PFI had suspended monthly payments to existing investors. The above-captioned bankruptcy case ensued.

## II.
## JURISDICTION AND VENUE

6. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b).

7. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), and (O).

8. This adversary proceeding is brought pursuant to 11 U.S.C. §§ 502, 510 and Rules 3007(b) and 7001 of the Federal Rules of Bankruptcy Procedure.

9. Venue lies in the United States Bankruptcy Court, Northern District of California, San Francisco Division, pursuant to 28 U.S.C. § 1409(a).

## III.
## GENERAL FACTUAL ALLEGATIONS

10. One person who had a clear view of PFI's financial condition far earlier than 2020 was Defendant Leslie Wallach. As an executive with a significant accounting background who began working at PFI in 2002 and who for many years held the title of Director of Finance before becoming PFI's Chief Administrative Officer for the remainder of her tenure, Defendant's responsibilities included but were not limited to working with the very investors who became victims of the Ponzi scheme. Defendant's paid compensation in her final full year of employment (2019) exceeded $200,000. Plaintiff is informed and believes, and on that basis alleges, that in the PFI administrative hierarchy, company CFO Manuel Romero reported to Defendant.

11. PFI and PISF orchestrated the purchase of no less than 70 properties over the years. These properties were owned by LLCs (with PFI as the managing member), by limited partnerships (with PFI as the general partner), or by PFI itself (with investors as tenants in common). For each real estate purchase, PFI set up a separate bank account where investor funds raised for that particular real estate investment should have been segregated from other investments and from PFI and PISF's corporate funds.

12. PFI and PISF also each maintained a general corporate account for company money. And each company maintained at least one clearing account: PFI maintained one clearing account, titled "PFI Clearing," and PISF maintained two clearing accounts, titled "PISF Clearing" and "PISF Transfer." The clearing accounts were the primary vehicle used to defraud investors and keep the PFI Ponzi scheme running. Plaintiff is informed and believes, and thereon alleges, that Defendant Wallach had full, regular and continuous visibility into such accounts due to her high position in the company and access to the online banking and internal accounting systems.

13. Clearing accounts are pass-through accounts that are designed to temporarily hold funds before they are transferred to a more permanent location. They should carry a balance only when funds need to be transferred somewhere else and return to a zero balance once those funds are cleared out, which should typically happen on a daily basis. Clearing accounts are often used by businesses to simplify routine banking transactions. In the case of an investment company like PFI, clearing accounts were used to receive investor wires or checks, which were then supposed to be re-routed to the appropriate investment account.

14. PFI sometimes cleared new investor money out of its clearing accounts as expected. If an investor wired a $100,000 investment into a PFI clearing account, PFI (and Defendant) might then transfer the exact same amount into the appropriate investment account. But on many occasions, when new investor funds were deposited into a clearing account, PFI (and Defendant) would let them sit in the clearing account indefinitely, commingling those funds with other new investor funds, and eventually using that money for an illicit purpose. Such funds might end up funding payments to existing investors (which were sometimes made by issuing a wire or check directly to investors and sometimes through a payroll processing company that PFI

and Defendant oddly used to distribute funds back out), or the funds might be used to cover shortages in a variety of other accounts, including shortages in other clearing accounts or in PFI's general accounts. Or they might be used to fund transfers to Casey's and Wallach's personal bank accounts.

15. Although PFI's assets were real estate and thus notoriously illiquid for short term purposes, PFI maintained a liberal withdrawal policy that allowed investors to seek a return of some or all of their invested funds on little notice and for little reason. Defendant was fully aware of this policy and was regularly involved in returning investor funds upon request. Plaintiff is informed and believes, and based thereon alleges, that Defendant knew or should have known that the only way a business with PFI's financial model could create the illusion of flexible liquidity for investors was by allowing improper commingling, and ignoring ordinary protections that would have ensured that new investor funds were deposited as the investor intended and that prevented those same funds from being paid out to old investors.

16. As PFI's Director of Finance and later as PFI's Chief Administrative Officer and Manuel Romero's superior, Defendant was on notice that PFI's handling of its bank accounts was far less than perfect. Indeed, she received and sent dozens of emails regarding the overdraft situations PFI often found itself in because it was operated as a Ponzi scheme and not as a legitimate business. She also knew about the (highly improper) movement of money between properties and accounts that happened with regularity. As a result of her knowledge, the emails, and her daily interaction with Ken Casey, her brother Lewis Wallach, and Manuel Romero, Plaintiff is informed and believes, and based thereon alleges, that Defendant knew or should have known that PFI was not a legitimate business and was, instead, a vicious Ponzi scheme.

17. It was common practice at PFI for Ken Casey and her brother Lewis to divert PFI assets to their own purposes. Just two examples include her brother Lewis' multi-million investment in Texas real estate using money taken from the company and Ken Casey's regular use of PFI staff and personnel to improve real estate he owned personally. Plaintiff is informed and believes, and based thereon alleges, that Defendant was aware of such activities but never sought to further investigate or stop them.

18. As a trained and experienced accountant, Defendant knew that multi-family and commercial real estate projects commonly maintained reserve funds to account for wear, weathering, age, and replacement of physical assets. However, PFI's properties did not maintain such reserves because to have done so would have limited the Ponzi scheme's ability to perpetuate itself. Plaintiff is informed and believes, and based thereon alleges, that Defendant knew PFI's properties did not maintain appropriate reserves, or reserves at all in many instances.

19. Another highly unusual practice at PFI was its acceptance and retention of large amounts of cash representing what were supposed to be investor funds. Defendant knew that PFI maintained a safe for the purpose of accepting and storing cash. Indeed, she knew about the safe and on occasion helped in the counting of cash placed therein.

20. As Director of Finance and later as Chief Administrative Officer, Manuel Romero reported to Defendant. Plaintiff is informed and believes, and based thereon alleges, that Defendant was fully aware of PFI's regular overdrafts and improper moving of monies between accounts as manipulated by Romero and her brother. However, Defendant never made any effort to stop or correct these practices.

21. Defendant has filed two proofs of claim in the above-captioned bankruptcy case, claim numbers INV-50 and INV-54, which are clearly duplicates as each such claim assets a total net claim of $583,675.42 and a total restitution claim of $612,859.19 (the "***Claims***").

## IV.

## **FIRST CLAIM FOR RELIEF – BREACH OF FIDUCIARY DUTY**

22. Plaintiff realleges and incorporates the allegations set forth in paragraphs 1 through 20 above, as if fully set forth herein.

23. As a long-time high level executive officer of PFI, Defendant owed a fiduciary duty of care to PFI.

24. Defendant was grossly negligent and breached her fiduciary duty of care by failing to act upon her knowledge of the above-described facts or make any effort to stop the Ponzi scheme at any time.

25. Had Defendant acted as a responsible and prudent corporate executive, she would have taken steps to correct the faulty practices described above. She did not – ever.

26. As a direct and proximate result of Defendant's actions and inactions, PFI ended up with properties it could not fund and investors it could not repay. As a direct consequence of the foregoing predicament, PFI was damaged in an amount no less than $100 million.

## V.

## SECOND CLAIM FOR RELIEF – FOR EQUITABLE SUBORDINATION OF PROOFS OF CLAIM

27. Plaintiff realleges and incorporates the allegations set forth in paragraphs 1 through 26 above, as if fully set forth herein.

28. The conduct of the Defendant, as alleged above, constitutes inequitable conduct.

29. By reason of the Defendant's conduct, the Debtor's general unsecured creditors were harmed.

30. Allowing the Defendant to receive payment on the Claims prior to the Debtor's general unsecured creditors would be unfair and inequitable.

31. Equitable subordination of the Claims is consistent with the Bankruptcy Code.

32. This Court has the requisite equitable power pursuant to Section 510(c)(1) of the Bankruptcy Code. Because of the facts and circumstances described in the preceding paragraphs of this Complaint, the Claims should be equitably subordinated to all of the claims of the Debtors' general unsecured creditors.

## VI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests relief as follows:

1. For a judgment against Defendant in an amount to be proven at trial, but not less than $100,000.00.

2. For a judgment equitably subordinating the Claims so that nothing is paid to Defendant from the bankruptcy estate until all other allowed general unsecured claims have been paid in full.

3. For costs of suit.

4. For such other and further relief as is just and proper.

Dated: September 9, 2024　　　　　　　PACHULSKI STANG ZIEHL & JONES LLP

By　*/s/ John D. Fiero*
　　John D. Fiero

　　*Attorneys for Michael Goldberg,*
　　*Trustee of the PFI Trust*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA